# Exhibit A

PURCHASE AND SALE AGREEMENT

between

OGDEN REALTY CO.

as Seller

and

THE HOBOKEN BROWNSTONE COMPANY*
*A Registered Trade Name of WEST BANK REALTY INC.

as Buyer



DEP EXHIBIT  D
DG-16
6/23/15 PaCM

Draft 2/19/2013

DG00359

## Table of Contents

| | Page |
|---|---|
| ARTICLE 1 Sale of Property; Purchase Price | 1 |
| ARTICLE 2 Due Diligence | 2 |
| ARTICLE 3 Title | 3 |
| ARTICLE 4 Representations | 5 |
| ARTICLE 5 Certain Particular Matters | 7 |
| ARTICLE 6 Closing; Closing Adjustments | 7 |
| ARTICLE 7 Casualty; Condemnation | 11 |
| ARTICLE 8 Remedies on Default | 11 |
| ARTICLE 9 Escrow Agent | 12 |
| ARTICLE 10 Certain Definitions | 13 |
| ARTICLE 11 Miscellaneous Provisions | 14 |

i

DG00360

## PURCHASE AND SALE AGREEMENT

THIS AGREEMENT, dated this __12__ day of April, 2013, between OGDEN REALTY CO. (also known as Ogden Realty Company), a New Jersey general partnership (the "Seller"), and THE HOBOKEN BROWNSTONE COMPANY, a Registered Trade Name of WEST BANK REALTY INC. a New Jersey Corporation (the "Buyer").

### Preliminary Statement

A.      The Seller owns certain property located in Jersey City, New Jersey.

B.      The Seller desires to sell such property to the Buyer, and the Buyer desires to purchase such property from the Seller.

C.      All capitalized terms used in this Agreement and not otherwise defined shall have the respective meanings ascribed to such terms in Article 10 of this Agreement.

NOW, THEREFORE, for ten dollars and other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), the Seller and the Buyer hereby agree as follows:

### ARTICLE 1
### Sale of Property; Purchase Price

Section 1.1.      Sale and Purchase.  On the terms and conditions provided in this Agreement, the Seller shall sell, convey and assign the Property to the Buyer, and the Buyer shall purchase the Property from the Seller.

Section 1.2.      Property.  As used in this Agreement, the term "Property" means the land, together with any and all buildings and improvements thereon, located in Jersey City, Hudson County, New Jersey that comprises the following street addresses and lots and blocks as shown on the tax map of Jersey City:

> 311 Seventeenth Street (Block 366, Lot A.1)
> 289 Coles Street (Block 366, Lot A.2)
> 258-282 Sixteenth Street (Block 329, Lot B.1)
> 296 Coles Street (Block 329, Lot 22)
> 298 Coles Street (Block 329, Lots 23 and 24)
> 305 Coles Street (Block 367, Lot A.2)

The Property is more particularly described on Exhibit A to this Agreement.

Section 1.3.      Purchase Price.  The total purchase price for the Property is Twenty-Two Million Dollars ($22,000,000) (the "Purchase Price").

Section 1.4.      Payment of Purchase Price.  The Purchase Price shall be paid by the Buyer as follows:

(a)      On the date on which this Agreement is executed and delivered, the sum of Ten Thousand Dollars ($10,000) shall be deposited with the Escrow Agent, by wire transfer of immediately available funds or by check (subject to collection);

Draft 2/19/2013

DG00361

(b)      On or before the last day of the Due Diligence Period, the sum of Two Million One-Hundred Ninety-Thousand Dollars ($2,190,000) shall be deposited with the Escrow Agent by wire transfer of immediately available funds or by certified check or by attorney's trust check.

(c)      At the closing, the balance of the Purchase Price, Nineteen Million Eight Hundred Thousand Dollars ($19,800,000), subject to the closing adjustments hereinafter provided, shall be paid to the Seller by wire transfer of immediately available funds, or by certified check or by bank check or (to the extent of not more than $100,000) by attorney's trust check.

Section 1.5.    Appurtenant Rights.  The sale and purchase of the Property for the Purchase Price as contemplated by this Agreement includes all right, title and interest of the Seller (if any) in and to (a) any and all privileges, tenements, hereditaments, rights of way, easements and appurtenances of the Property; (b) any and all streets, ways, strips or gores of land adjoining the Property; (c) any and all fixtures attached to the Property (d) any and all governmental approvals and permits relating to the Property; and (e) any and all rights, warranties, and guarantees relating to the Property.

ARTICLE 2
Due Diligence

Section 2.1.    Due Diligence Termination.  (a)  A due diligence period is hereby established for the Buyer's investigation, at its sole cost and expense, of any and all matters relating to the Property (including the physical and environmental condition of the Property, the availability and adequacy of utilities servicing the Property, the feasibility of the Buyer's proposed use of the Property, any title issues related to the property, and governmental approvals), which due diligence period shall begin on the Effective Date and shall end at 5:00 p.m. on April 22 , 2013 (the "Due Diligence Period").

(b)      The Buyer may terminate this Agreement by written notice sent to the Seller before the end of the Due Diligence Period, without any obligation to specify which aspect of its investigation was unsatisfactory and without any right on the Seller's part to challenge such election to terminate.  Upon such termination, (i) the Buyer shall be entitled to the return of the Deposit, and (ii) except as otherwise expressly provided in this Agreement with respect to the Surviving Provisions, this Agreement and all the rights and obligations of the respective parties hereunder shall be null and void. Upon such a termination prior to the end of the Due Diligence Period, the Escrow Agent shall promptly remit the Deposit to the Buyer.  If this Agreement is so terminated prior to the end of the Due Diligence Period, the Seller shall take no action of any type or kind to prevent or otherwise block the remittance by the Escrow Agent of the Deposit to the Buyer, and the Seller shall take no action of any type or kind against the Escrow Agent for so remitting the Deposit.

(c)      If the Buyer does not send to the Seller such written notice of termination within the Due Diligence Period, the Buyer shall be deemed to have waived its right of termination under this Section, and this Agreement shall continue in full force and effect, provided that the Buyer has remitted to the Escrow Agent on or before the last day of the Due Diligence Period the portion of the Deposit identified in clause (b) of Section 1.4.  If the Buyer has not remitted to the Escrow Agent by the last day of the Due Diligence Period such portion of the Deposit, the Buyer shall be deemed to have terminated this Agreement within the Due Diligence Period, with the same effect as though the Buyer had affirmatively given notice of termination as provided in subsection (b) of this Section.

Section 2.2.    Inspections.  At all times prior to the end of the Due Diligence Period, the Buyer shall be entitled to access to the Property, for the purpose of conducting one or more inspections of the Property by the Buyer and one or more qualified professionals or consultants, all at the sole expense of the Buyer.  Such inspections shall be conducted on reasonable advance notice to the Seller, during regular business hours, in a good and workmanlike manner, in compliance with all applicable laws.  If any damage or any borings or any other disturbance at the Property is caused by the Buyer's inspection, the Buyer shall if requested by the Seller repair such damage or restore the Property to the condition in which it existed prior to such borings or other disturbance.

DG00362

Section 2.3.    Insurance. Prior to entering on the Property to conduct any intrusive testing, the Buyer shall furnish to the Seller a certificate of insurance evidencing that the Buyer maintains in effect comprehensive general liability insurance from an insurance company authorized to do business in New Jersey. Such certificate of insurance shall name the Seller as an additional insured and shall evidence such insurance in an amount not less than $2,000,000.

Section 2.4.    Indemnification. The Buyer shall indemnify and hold harmless the Seller against and from any and all liability, loss, cost, or expense (including, without limitation, reasonable attorneys' fees) incurred by the Seller arising out of the conduct of inspections of the Property by the Buyer, its agents or its independent contractors. This indemnity shall exclude any liability, loss, cost or expense incurred by the Seller by virtue of the mere discovery by the Buyer (or its agents or independent contractors) of any existing contamination at the Property. This Section shall survive a termination of this Agreement.

Section 2.5.    Reports and Other Materials. Not later than seven days after the execution and delivery of this Agreement by the Seller, the Seller shall deliver to the Buyer complete copies of all of the following, to the extent that such items are in the possession of the Seller or within the reasonable control of the Seller:

(a)    all reports relating to the environmental condition of the Property;

(b)    all governmental approvals and permits relating to the Property;

(c)    all title insurance policies and/or the most recently conducted title reports as to the Property; and

(d)    all surveys of the Property.

### ARTICLE 3
### Title

Section 3.1.    Title. (a) Title to the Property shall be marketable and insurable at regular rates by a title insurance company licensed to do business in New Jersey selected by the Buyer, free of Title Objections.

(b)    As used in this Agreement, the term "Title Objection" means any encumbrance or exception that renders title to the Property unmarketable or that materially affects the value of the Property or the use of the Property as a residential development, except that Permitted Exceptions shall not constitute a Title Objection.

(c)    As used herein, the term "Permitted Exceptions" means the exceptions identified on Exhibit B attached hereto and as also set forth in Section 3.6 herein.

(d)    Within three (3) business days after the Effective Date, the Buyer shall order a commitment for title insurance with respect to the Property from a title insurance company licensed to do business in the State of New Jersey. Not later than the end of the Due Diligence Period the Buyer shall give to the Seller written notice of any encumbrance or exception that the Buyer considers to be a Title Objection. If (whether before or after the expiration of the Due Diligence Period) any update received by the Buyer from the title company of such title commitment discloses an encumbrance or exception not theretofore disclosed that the Buyer considers to be a Title Objection, the Buyer shall give to the Seller within five (5) business days after the Buyer (or its counsel) receives such update written notice of such encumbrance or exception.

Section 3.2.    Remedying of Title Objections. (a) The Seller shall have no obligation to bring any action or proceeding or otherwise incur any expense or liability (contingent or otherwise) to

3

DG00363

remedy any Title Objection.  If the Seller elects not to remedy one or more Title Objections the Seller shall promptly notify the Buyer thereof, and the Buyer may elect either (i) to accept such title as the Seller is able to convey on the closing date, without any reduction of the Purchase Price or any other credit or allowance on account thereof or any other claim against the Seller; or (ii) to terminate this Agreement. Upon such termination, (x) the Buyer shall be entitled to the return of the Deposit, and (y) except as otherwise expressly provided in this Agreement with respect to the Surviving Provisions, this Agreement and all the rights and obligations of the respective parties hereunder shall be null and void, and (z) (if such termination occurs after the expiration of the Due Diligence Period the Seller shall reimburse the Buyer for reasonable title search and survey costs actually incurred by the Buyer, upon presentation of invoices therefor.  Such election shall be made by the Buyer within ten days after written notice shall have been given by the Seller to the Buyer to the effect that the Seller does not elect to remedy the Title Objection(s), and the remedies of the Buyer shall be limited to such election.  Notwithstanding the foregoing provisions of this subsection, the Seller at its own expense shall (a) in all events be obligated to obtain a discharge, at or before the closing, of any encumbrance created by the Seller in violation of Section 3.4, of any mortgage or security interest granted by the Seller prior to the Effective Date, of any judgment lien against the Seller entered prior to the closing date, and any construction lien or claim thereof filed against the Seller prior the closing date; and (bb) use its best efforts to remedy any other Title Objection, if the same can be remedied for less than $50,000.

(b)     Although it is not obligated to do so (except as provided in the immediately preceding sentence), the Seller shall have the right to remedy any Title Objection.  For the purpose of remedying Title Objections, the Seller shall have the right to one or more adjournments of the closing date for an aggregate period not exceeding (30) days, provided that the Seller gives written notice to the Buyer, within ten days after the Buyer shall have given written notice to the Seller of such Title Objection(s), to the effect that the Seller will promptly and in good faith attempt to remedy such Title Objection(s).  If the Seller fails to remedy one or more Title Objections prior to the adjourned closing date, the provisions of subsection (a) of this Section shall be applicable, and the Seller shall be deemed to have elected not to remedy the Title Objection(s).

Section 3.3.     [Intentionally Omitted].

Section 3.4.     Covenant not to Encumber.  From and after the Effective Date until the closing or the termination of this Agreement, the Seller shall not grant any mortgage, lease or other encumbrance on title to the Property, without the prior written consent of the Buyer, which consent shall not be unreasonably withheld.

Section 3.5.     Mortgage Discharge.  If at closing there is any mortgage lien on the Property that the Seller is obligated to pay and discharge, the Seller may use the proceeds of the Purchase Price to satisfy the same, provided that (a) the Seller delivers to the Buyer at closing an instrument in recordable form sufficient to satisfy such lien of record, together with the recording fee for such instrument, or (b) if the lienholder is a banking or other financial institution, the Seller delivers to the Buyer at closing a current payoff letter from the holder of such lien and good funds in the amount necessary to satisfy such lien are at closing remitted to the lienholder, or to the title insurance company for remittance by it to the lienholder, and the title insurance company insures over such lien in the Buyer's title insurance policy.

Section 3.6.     Survey.  If the Buyer elects to obtain a survey of the Property by a licensed surveyor, and if such survey shows any encroachment (except as set forth in Sections 3.4 or this Section 3.6), setback violation, boundary-line discrepancy or any other condition that materially adversely affects the marketability of title or the value or use of the Property, the same shall be deemed and treated in the same manner as a Title Objection under the foregoing provisions of this Article (including the requirement that any objection be communicated to the Seller not later than the end of the Due Diligence Period).  However, the following matters shown on the survey made by Dresdnor Robin (Donald E. Walby, P.L.S.) dated October 4, 2005 and revised through November 3, 2006, shall not constitute survey objections: As to Lots B.01, 22, 23 and 24 in Block 329: an existing platform extending into the bed of Jersey Avenue; As to Lot A.02 in Block 367: mislocated fencing, a guard house extending into the bed of

4

17th Street, storage containers and a paved parking area over the northerly property line, utility poles with light and transformer and overhead wires over the westerly and northerly portion of the premises and the Approximate Location State Claim Line over the southerly, westerly and easterly portions of the Premises; and As to Lots A.01 and A.02 in Block 366:  Overhead wires and utility pole with transformer over the southerly corner of the premises and the Approximate Location of State Claim Line over the westerly portion of the premises (the foregoing being called collectively the "Existing Survey Facts").  In addition thereto, subsequent to the aforesaid survey Texas Eastern Transmission, LP, a limited partnership of the State of Delaware, pursuant to an order of the United States District Court for the District of New Jersey dated June 28, 2012, in Civil Action Number 12-3412 entitled ", Texas Eastern Transmission, LP, a limited partnership of the State of Delaware v. 1.73 Acres of Land, More or Less, in the City of Jersey City, Hudson County, New Jersey, et. al" exercised eminent domain powers to condemn a permanent easement and a temporary easement on, over and under Block 367, Lot A.2. and such action and the aforesaid easements shall not constitute a survey objection. Further, any attorney's fees associated with such proceeding shall likewise not constitute a title objection.

Section 3.7.    Seller's Cooperation.  The Seller shall execute and deliver to the Buyer and its title insurance company such instruments and documents as may reasonably be required to cause the standard exceptions to be deleted from the title insurance policy to be issued by such title company to the Buyer with respect to the Property.

ARTICLE 4
Representations

Section 4.1.    Limitation on Liability.  (a) The Buyer acknowledges and agrees that the Buyer is purchasing the Property in its "AS IS" condition, without any representation or warranty on the part of the Seller, except for any representations and warranties that are expressly set forth in this Agreement.

(b)    Without limiting the generality of the foregoing, and except as otherwise expressly set forth in this Agreement, the Buyer acknowledges that neither the Seller nor any Person acting or purporting to act for the Seller has made or now makes any representations or warranties and that the Seller is unwilling to make any representations and has held out no inducements to the Buyer. Without limiting the generality of the foregoing, and except as otherwise expressly set forth in this Agreement, the Seller has not made any representations or warranties, express or implied, as to (i) the current or future real estate tax liability, assessment or valuation of the Property; (ii) the potential qualification of the Property for any benefits conferred by federal, state or municipal laws, whether for subsidies, special real estate tax treatment, insurance, mortgages or any other benefits, whether similar or dissimilar to those enumerated; (iii) the compliance of the Property, in its current or any future state, with applicable zoning ordinances and the ability to obtain a variance in respect to the Property's non-compliance, if any, with said zoning ordinances; (iv) the availability of the financing for the purchase, alteration, rehabilitation or operation of the Property from any source, including but not limited to state, city or federal government or any institutional lender; (v) the future use of the Property; (vi) the present and future condition and operating state of any machinery or equipment on the Property, if any, and the present or future structural and physical condition of the Property or its suitability for rehabilitation or renovation; (vii) the ownership or state of title of any personal property on the Property, if any; (viii) the presence or absence of any rules or notices of violations of law issued by any governmental authority; or (ix) any other matter or thing affecting or relating to the Property including, without limitation, environmental matters of any and all kinds.  Seller is not liable or bound in any manner by any verbal or written statements, representations, real estate brokers' "set-ups", or information pertaining to the Property or the operation, layout, expenses, condition, income, leases or rents furnished by any real estate broker, salesman, agent, employee, or other person, unless the same are expressly set forth in this Agreement.

(c)    Seller makes no representation or warranty, express or implied, with

5

DG00365

respect to: (i) the existence or presence on, at, under or about the Property of any environmental hazards, conditions, defects or hazardous materials, including but not limited to, any flammables, explosives, radioactive materials, asbestos, asbestos containing material, PCB's, hazardous waste, petroleum product derivative, compound or mixture, and (without limitation) those substances defined as "hazardous substances" or "hazardous wastes" (collectively referred to as "Hazardous Substances") under any environmental laws; (ii) the Property's compliance with the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 and Superfund Amendments and Reauthorization Act of 1986 ("CERCLA"), the Hazardous Materials Transportation Act, the Resource Conservation and Recovery Act, the Water Pollution Control Act, the Clean Air Act, the New Jersey Spill Compensation and Control Act (the "Spill Act"), the Industrial Site Recovery Act (except as expressly set forth herein), the Brownfield and Contaminated Site Remediation Act, the Water Pollution Control Act, Air Pollution Control Act, Solid Waste Management Act, and all regulations under all such Acts, or under any other federal, state or local law, ordinance or regulation applicable to the existence, removal, generation, transportation, discharge, process, storage or treatment of Hazardous Substances. The Buyer has not relied upon and will not rely upon, either directly or indirectly, any statement, representation or warranty of Seller or any agent, employee or representative of Seller, except for those that are expressly set forth in this Agreement. The Buyer represents that it is a knowledgeable Buyer of real estate and that (apart from the representations and warranties of the Seller that are expressly set forth in this Agreement) the Buyer is relying solely on its own expertise and that of Buyer's contractors. The Buyer represents that the Buyer has conducted or will conduct such environmental investigations of the Property as the Buyer considers appropriate, and the Buyer shall rely upon same, and, upon closing, the Buyer shall assume the risk that adverse matters, including, but not limited to, adverse physical and environmental conditions, may not have been revealed by Buyer's environmental investigation of the Property. Buyer acknowledges and agrees that upon closing, subject to the representations and warranties that are expressly set forth in this Agreement, the Buyer is purchasing the Property "AS IS, WHERE IS, WITH ALL FAULTS", and Buyer further acknowledges and agrees that there are no oral agreements, warranties or representations, collateral to or affecting the Property that are not set forth in this Agreement. The terms and condition of this paragraph shall expressly survive the closing and not merge therein. Seller is not liable or bound in any manner by any verbal or written statements, representations, or information pertaining to the Property furnished by any real estate broker, agent, employee, servant or other Person, unless the same are expressly set forth or referred to herein.

Section 4.2.    Representations and Warranties. The Seller represents and warrants (x) that the transaction contemplated by this Agreement has been duly authorized by all necessary action on the part of the Seller, and (y) that no legal proceeding is pending with respect to the Property except for the condemnation proceedings set forth in Section 3.6 and Exhibit B. Furthermore, the Seller represents, to the best of the Seller's knowledge and belief, as follows:

(a)     The Seller is a general partnership duly formed, validly existing and in good standing under the laws of New Jersey.

(b)     No consent, authorization or approval by any governmental authority or any other Person is required in connection with the execution, delivery or performance by the Seller of this Agreement.

(c)     The transaction contemplated by this Agreement is not subject to ISRA.

(d)     The Seller is the sole owner of the Property, beneficially and of record (except as set forth in Section 3.6 and Exhibit B).

(e)     Neither the Seller nor any affiliate of the Seller owns any property adjacent to the Property.

(f)     There are no tenants or other occupants of the Property (except as otherwise set forth in Section 3.6 herein and Exhibit B).

6

DG00366

(g)     The Seller has not received written notice from any governmental authority that the Property or the use thereof does not comply with any law or regulation.

(h)     No bankruptcy or reorganization proceeding with respect to the Seller is pending or presently contemplated by the Seller.

(i)     The current operations, if any (other than those being undertaken by Texas Eastern Transmission, LP), at the Property fall within one or more of the following NAICS numbers, that is to say, 48411, 484121, 484122, 49311; and the use of the Property since 1983 has fallen within those numbers (or equivalent SIC Code numbers).

Section 4.3.    Timing.  The Seller represents that the representations contained in this Article are, to the best of Seller's knowledge and belief, true on and as of the Effective Date and will be true on and as of the date of closing (with the same effect as though made on and as of the date of closing), in each case to the best of the Seller's knowledge and belief (except that such limitation as to "knowledge and belief" shall not apply to the Unqualified Warranties).  If any such representation is untrue on the date scheduled for closing, then the Buyer may terminate this Agreement on written notice to the Seller, whereupon (i) the Buyer shall be entitled to the return of the Deposit, and (ii) except as otherwise expressly provided herein with respect to the Surviving Provisions, this Agreement and all the rights and obligations of the respective parties hereunder shall be null and void.  The representations of the Seller contained in this Agreement shall not survive the closing, except that the Unqualified Warranties shall survive the closing.  With respect to the phrase "knowledge of the Seller", the knowledge of each of each general partner of the Seller and of Francis J. Walsh, III, Raymond R. Wisniewski and Paul K. Hennessy shall be imputed to the Seller.

## ARTICLE 5
### Certain Particular Matters

Section 5.1.    Certain Environmental Matters.  The Buyer specifically acknowledges and agrees that it hereby waives, releases and discharges any claim it has, might have had or may have against the Seller with respect to the environmental condition of the Property.  From and after the closing, the Buyer shall, to the extent permitted by law, defend and indemnify the Seller against claims for contribution and/or indemnification in the event any claim is asserted against the Buyer by third parties for pre-existing environmental conditions.  The provisions of this Section shall survive the closing.

## ARTICLE 6
### Closing; Closing Adjustments

Section 6.1.    Closing.  The closing of title shall occur on June 28, 2013, time of the essence.  The closing shall occur at the offices of counsel for the Buyer, Norris, McLaughlin & Marcus, P.A., at 721 Route 202/206, Bridgewater, New Jersey, or (if requested by the Buyer) at the office of counsel for the Buyer's mortgage lender, or at such other place in New Jersey as the Seller and the Buyer may mutually agree.  At the closing, the Seller shall deliver possession of the Property to the Buyer, free of all tenants or other occupants (other than as set forth in Section 3.6 herein and Exhibit B).  If any litigation is commenced by a third Person with respect to the Property that makes title unmarketable (except the currently pending action commenced by Texas Eastern Transmission, LP), the Buyer may (without impairing any of the rights of the Buyer under this Agreement) postpone the closing date until such litigation is resolved and is no longer subject to appeal.

Section 6.2.    Items to be Delivered by Seller at Closing.  At the closing, the Seller shall deliver to the Buyer each of the following:

(a)     the customary New Jersey form of bargain and sale deed with covenant against grantor's acts, duly executed by the Seller, in recordable form.  Such deed may contain the metes

7

and bounds description prepared by the Buyer's licensed surveyor reflecting its survey, provided that such survey is certified to the Seller;

(b)     a closing statement showing the applicable closing adjustments, duly executed by the Seller;

(c)     a duly executed affidavit of title (in substantially the form attached hereto as Exhibit C);

(d)     an affidavit to the effect that the Seller is not a foreign person under the Foreign Investment Real Property Tax Act;

(e)     consents, resolutions or other written evidence satisfactory to the Buyer as to the proper authorization by the Seller of the transaction contemplated by this Agreement and as to the incumbency of the general partner of the Seller signing the deed and other closing documents on behalf of the Seller (together with like documents of any entity that is a general partner of the Seller); and a certified photocopy of the executed partnership agreement of the Seller together with all amendments (which may be redacted to omit financial and economic data);

(f)     keys, combinations and access-codes in the possession of the Seller relating to locks at the Property;

(g)     a bill of sale, without any warranty, as to the personal property described in Section 1.6, duly executed by the Seller (it being agreed that the portion of the Purchase Price allocated thereto is zero);

(h)     a certificate of the Seller stating that the representations of the Seller contained in this Agreement are true on and as of the closing date, with the same effect as though made on and as of the closing date;

(i)     an IRS 1099 Reporting Form, duly executed by the Seller;

(j)     if applicable, an affidavit of consideration, and a seller's residency certification/exemption certificate, in the forms prescribed by the State of New Jersey, duly executed by the Seller; and

(k)     such other certificates and instruments as the Buyer or its title insur company may reasonably request; and

(l)     an assignment in form satisfactory to both Seller and Buyer of Seller's interest in and to that certain condemnation proceeding set forth in Section 3.6 and Exhibit B., including all proceeds thereto, as well any and all rights, benefits and obligations under that certain fee agreement between Seller and the law firm of Bathgate, Wegener and Wolf, P.C., representing Seller is such condemnation proceeding.

Section 6.3.     Items to be Delivered by Buyer at Closing.  At the closing, the Buyer shall deliver to the Seller each of the following:

(a)     the balance of the Purchase Price required to be paid at closing pursuant to Section 1.4(b) hereof, subject to closing adjustments as hereinafter provided; and

(b)     a closing statement showing the applicable closing adjustments, duly executed by the Buyer.

8

DG00368

Section 6.4.   Closing Adjustments.  (a) At the closing, the following adjustments shall be made as of the closing date (with the closing date being a day of income and expense to the Seller):

(i)     real estate taxes, on the basis of the calendar year for which assessed; and

(ii)     if the same constitute a lien on the Property, water and sewer charges; (if there is a water meter at the Property, the Seller shall attempt to obtain a reading thereof not later than 15 days prior to the closing date, and the unfixed water charge and the unfixed sewer charge, if any, based thereon for the intervening time shall be apportioned on the basis of such last reading).

(b)     Any water or sewer charges that are not a lien on the Property, and all other utility charges (including gas, electricity and telephone), that are owing on the closing date shall be paid by the Seller directly to the utility company.

(c)     If, at the closing, the Property is subject to an assessment (whether confirmed or unconfirmed) for municipal improvements that have been commenced prior to the closing date, then the Seller shall pay at closing the full amount of such assessment (irrespective of whether or not the assessment is payable in installments that extend beyond the closing date).  In the case of such an assessment that is unconfirmed, the Seller shall pay at closing a reasonable estimate of such assessment; when the amount of the assessment is confirmed, the Seller shall pay any deficiency to the Buyer (if the estimate proves to have been insufficient) or the Buyer shall return any excess to the Seller (if the estimate proves to have been excessive).

(d)     The amount of the New Jersey realty transfer fee payable in connection with the conveyance of the Property shall be deducted from the amount of the proceeds of the Purchase Price to be paid to the Seller and shall be paid by the Buyer directly to the County Clerk for the account of the Seller.  If applicable, the Buyer shall pay to the County Clerk the so-called commercial mansion tax (if any) required to be paid by the Buyer upon the recordation of the deed pursuant to N.J.S.A. 46:15-7.2.

(e)     If on the closing date the final real estate tax bill for the calendar year in which the closing occurs is not available, the real estate tax adjustment shall be based upon the preliminary tax bill (if available) or upon the tax bill for the prior calendar year.  In such case, a final tax adjustment shall be made within 30 days after the final tax bill is issued, and the Seller or the Buyer (as the case may be) shall make an appropriate payment to the other based upon such readjustment.

(f)     If after the closing any error is discovered in the parties' adjustments at closing, the same shall be corrected as soon after discovery as possible.

(g)     This Section shall survive the closing.

Section 6.5.   N.J. Tax Clearance.   (a) The Buyer may, pursuant to N.J.S.A. 54:50-38 and N.J.S.A. 54:32B-22, give notice to the Division of Taxation (the "Division") of the State of New Jersey (the "State") of the sale contemplated by this Agreement (which notice may be accompanied by a copy of this Agreement).  The Seller shall provide to the Buyer such information as is required by the Division's form of such notice, promptly upon request by the Buyer.  Buyer's attorney shall submit the required form to the State of NJ, Department of Treasury, Division of Taxation, within 5 business days upon receipt of the required information from Seller.  When the Buyer files the same with the Division, the Buyer shall provide a copy thereof to the Seller simultaneously.  If, as provided in such statutes, the Division notifies the Buyer that a possible claim for State taxes exists and such notice from the Division includes the amount of the State's claim, the Buyer shall be entitled at closing to remit a portion of the Purchase Price equal to such amount to the Tax Escrow Agent instead of to the Seller; and the Seller shall not be entitled to refuse to close title under this Agreement by reason thereof.  The Tax Escrow Agent shall hold such

9

amount in escrow; and the Tax Escrow Agent shall release the same from escrow only on the terms and conditions hereinafter provided in this Section.

(b)     If after the closing the Division directs that such amount (or any portion thereof) be remitted to the Division, then the Tax Escrow Agent shall remit such amount (or such portion thereof) to the Division, promptly after the Tax Escrow Agent is given (by the Buyer, the Seller or otherwise) a copy of such notice from the Division directing the same. If the Division gives written authorization for such escrowed amount of the Purchase Price (or any portion thereof) to be released to the Seller, the Tax Escrow Agent shall remit such amount (or such portion thereof) to the Seller, promptly after the Tax Escrow Agent is given (by the Buyer, the Seller or otherwise) a copy of such written authorization from the Division. Otherwise, the Tax Escrow Agent shall not release such escrowed amount (or any portion thereof) from escrow, except (a) as the Seller and the Buyer jointly may direct in writing (provided that the same does not violate any obligation of the Tax Escrow Agent to the Division), or (b) as a court of competent jurisdiction may direct. The Tax Escrow Agent shall not remit any amount to the Division or to the Seller pursuant to this Section until five (5) business days have elapsed after the Tax Escrow Agent shall have given to the Seller (if the Buyer shall have provided such notice to the Tax Escrow Agent) or to the Buyer (if the Seller shall have provided such notice to the Tax Escrow Agent) or to both the Seller and the Buyer (if neither of them shall have provided such notice to the Tax Escrow Agent) a copy of the notice from the Division directing or authorizing the remittance of the escrowed amount to the Division or to the Seller.

(c)     As regards the Tax Escrow Agent and the Buyer, the Seller waives any right to object to the remittance by the Tax Escrow Agent to the Division of the amount directed by the Division to be remitted; and the Tax Escrow Agent shall perform its obligation under this Section to make the remittance to the Division, notwithstanding any objection by the Seller thereto. (The Seller acknowledges that the Seller retains the remedy of applying to the Division for a refund, if the Seller believes that the amount directed by the Division to be remitted is incorrectly calculated or that such direction of the Division is otherwise improper.) Furthermore, the Tax Escrow Agent and the Seller acknowledge that the provisions of this Section protect the Buyer against liability for the Seller's tax liability as provided in N.J.S.A. 54:50-38 and N.J.S.A. 54:32B-22 and may not be waived or amended without the consent of the Buyer.

(d)     Notwithstanding anything to the contrary contained in this Section, the Tax Escrow Agent may at any time deposit with the Superior Court of New Jersey the amount escrowed under this Section and give notice thereof to the Seller, the Buyer and the Division, whereupon the Tax Escrow Agent shall be relieved and discharged of all further liability and obligations to the Seller and the Buyer and the Division under this Section with respect thereto.

(e)     The Seller acknowledges that the Tax Escrow Agent is counsel for the Buyer. The Seller, having conferred with counsel, hereby waives any right to object to any conflict of interest on the part of the Tax Escrow Agent existing by reason of such fact and consents to the continued representation of the Buyer by the Tax Escrow Agent in connection with the transaction contemplated by this Agreement, including any litigation relating to this Agreement.

(f)     The Seller acknowledges that the Tax Escrow Agent is acting solely as a stakeholder under this Section. The Tax Escrow Agent shall have no duties other than those duties that are expressly set forth in this Section. The Seller shall indemnify and hold harmless the Tax Escrow Agent against and from any and all liabilities and expenses (including reasonable attorneys' fees) incurred by or asserted against the Tax Escrow Agent as a result of any acts or omissions of the Tax Escrow Agent (in its capacity as Tax Escrow Agent) in connection with the escrow established under this Section, except for any such actions or omissions as are taken by the Tax Escrow Agent in bad faith, in willful disregard of this Agreement or involving gross negligence. The Tax Escrow Agent may (but shall not be obligated to) obtain satisfaction of such indemnification obligation by applying thereto any of the amount escrowed hereunder that is authorized by the Division to be released to the Seller.

DG00370

(g)     The Seller hereby represents and warrants to the Buyer that the Seller's Federal Tax Identification Number is as set forth beneath its signature line below.

(h)     The provisions of this Section shall survive the closing.

## ARTICLE 7
### Casualty; Condemnation

Section 7.1.     <u>Notice.</u>  Prior to the closing, if the Property or any portion thereof is damaged or destroyed by fire or other casualty, or if any eminent domain proceeding beyond that set forth in Section 3.6 and Exhibit B herein is commenced or threatened against the Property or any portion thereof, the Seller shall give prompt written notice thereof to the Buyer.

Section 7.2.     <u>Consequences.</u>  (a)  If any condemnation proceeding beyond that set forth in Section 3.6 and Exhibit B herein is commenced against the Property or any significant portion thereof prior to the closing, or if all or any significant portion of the Property is damaged by fire or other casualty prior to the closing, either the Seller or the Buyer may terminate this Agreement on written notice to the other within 20 days after the terminating party learns of such condemnation or casualty.  Upon such termination, (i) the Buyer shall be entitled to the return of the Deposit, and (ii) except as otherwise expressly provided in this Agreement with respect to the Surviving Provisions, this Agreement and all rights and obligations of the respective parties hereunder shall be null and void.

(b)     If this Agreement is not so terminated, the Seller and the Buyer shall proceed to closing (subject to the other terms and conditions of this Agreement), without diminution of the Purchase Price; and the Seller shall at closing (i) assign to the Buyer all of the Seller's right, title and interest in and to insurance proceeds in respect of such damage or destruction or the condemnation award relating to such taking except for the payment/award of the Temporary Easement, which shall be pro-rated between Buyer and Seller based upon each's percentage of ownership during the term of the Temporary Easement, and (ii) provide to the Buyer a closing credit the amount of insurance proceeds or condemnation award that the Seller shall have received in respect thereof prior to the closing plus (with respect to such insurance proceeds) the amount of the deductible applicable thereto.

(c)     Notwithstanding subsection (a) of this Section, if the Seller gives a notice of termination as provided therein, the Buyer may nullify such notice of termination by notifying the Seller in writing of such nullification within five days after the Buyer receives such notice of termination.  In such case, the parties shall proceed as provided in subsection (b) of this Section.

## ARTICLE 8
### Remedies on Default

Section 8.1.     <u>Remedies of Seller on Default by Buyer.</u>  If the Buyer fails to pay the Purchase Price as required by this Agreement, the Seller may terminate this Agreement on 15 days' prior written notice to the Buyer (unless such default is cured within such 15 days), whereupon (a) the Seller shall be entitled to the Deposit, as liquidated damages and not as a penalty, and (b) except as otherwise expressly provided herein with respect to the Surviving Provisions, this Agreement and all the rights and obligations of the respective parties hereunder shall be null and void.  Such retention by the Seller of the Deposit as liquidated damages shall be the sole remedy of the Seller for such default on the part of the Buyer, except that nothing in this sentence shall restrict the right of the Seller to pursue remedies against the Buyer with respect to the Surviving Provisions.

Section 8.2.     <u>Remedies of Buyer on Default by Seller.</u>  If the Seller materially defaults in the performance of any of the covenants and agreements contained in this Agreement that are required to be performed by the Seller at or before the Closing, or if a default on the part of the Seller occurs by reason of a breach of any of the representations and warranties of the Seller contained in this Agreement, then the Buyer may either (at the option of the Buyer):

11

(a)      terminate this Agreement on 15 days' prior written notice to the Seller (unless such default is cured within such 15 days), whereupon (i) the Buyer shall be entitled to the return of the Deposit, and (ii) if the Seller deliberately and in bad faith breaches in any material respect any covenant, representation or warranty contained in this Agreement, the Buyer shall be entitled to recover from the Seller the expenses actually incurred by the Buyer in connection with the transaction contemplated by this Agreement, including reasonable title examination charges, survey costs, attorneys' fees, costs of inspections and financing costs, and (iii) except as otherwise expressly provided in this Agreement with respect to the Surviving Provisions, this Agreement and all the rights and obligations of the respective parties under this Agreement shall be null and void; or

(b)      obtain a decree for specific performance; provided, however, that if the Buyer is unable to realize upon an action for specific performance because the Seller has conveyed the Property to a third Person, the Buyer may recover from the Seller the Buyer's actual damages.

## ARTICLE 9
## Escrow Agent

Section 9.1.      Escrow Agent. (a) The Deposit shall be held in escrow by the Escrow Agent in accordance with the terms hereinafter provided.  The acceptance by the Escrow Agent of the Deposit shall constitute the agreement of the Escrow Agent to the terms of this Section.

(b)      The Deposit shall be held by the Escrow Agent in a segregated interest-bearing account at Bank of America, N.A. or at another commercial bank designated by the Escrow Agent and approved by the Seller and the Buyer.  The portion of the Deposit consisting of accrued interest shall be paid to the Buyer or to the Seller (as applicable) with the remaining portion of the Deposit as provided in this Agreement.

(c)      At the closing, the Escrow Agent shall remit the Deposit to the Seller.

(d)      The Escrow Agent is authorized to remit the Deposit to either party, if:

(i)      the Escrow Agent shall have received from such party a written demand for the Deposit, together with a sworn statement by a general partner or officer or manager or member of such party (or of a constituent entity of such party) stating that such party is entitled to be paid the Deposit hereunder and stating the reason therefor (the "Demand Notice"); and

(ii)      the Escrow Agent shall have sent the Demand Notice to the other party; and

(iii)      the Escrow Agent shall not have received an Objection Notice from the other party within 15 days after the Escrow Agent shall have sent the Demand Notice to such other party.

The other party may, upon its receipt of a Demand Notice, deliver to the Escrow Agent a written notice objecting to the remittance of the Deposit to the party demanding the same, together with a sworn statement by a general partner or officer or manager or member of such party (or of a constituent entity of such party) as to why the party making the demand is not entitled to the Deposit (an "Objection Notice"). If the Escrow Agent receives an Objection Notice within 15 days after sending a Demand Notice to the non-demanding party, the Escrow Agent shall not remit the Deposit to either party unless directed to do so in writing by (i) the order of a court of competent jurisdiction, or (ii) both parties.  (Nothing in this paragraph (d) shall apply to the required return of the Deposit to the Buyer pursuant to Section 2.1 of this Agreement upon a termination of this Agreement by the Buyer by the end of the Due Diligence Period; in such case, the Escrow Agent is obligated to return the Deposit to the Buyer immediately).

12

(e)     If either party delivers a Demand Notice or an Objection Notice frivolously or in bad faith, such party shall be liable for all attorneys' fees reasonably incurred by the other party in collecting the Deposit, plus interest on the Deposit at the rate of 10% per annum from the delivery of such Notice until collection.

(f)     Notwithstanding anything herein to the contrary, the Escrow Agent may at any time (either before or after a Demand Notice or an Objection Notice or both shall have been sent), deposit the Deposit with the Superior Court of New Jersey and give notice to the Seller and Buyer thereof, whereupon the Escrow Agent shall be relieved and discharged of all further liability and obligations hereunder with respect thereto.

(g)     The Buyer acknowledges that the Escrow Agent is counsel for the Seller. The Buyer, having conferred with counsel, hereby waives any right to object to any conflict of interest on the part of the Escrow Agent existing by reason of such fact and consents to the continued representation of the Seller by the Escrow Agent in connection with the transaction contemplated by this Agreement, including any litigation relating to this Agreement.

(h)     The Seller and Buyer acknowledge and agree that the Escrow Agent is acting solely as a stakeholder, at their request. The Seller and the Buyer shall jointly and severally indemnify and hold harmless the Escrow Agent against and from any and all liabilities and expenses (including reasonable attorneys' fees) incurred by or asserted against the Escrow Agent as a result of any actions or omissions on the part of the Escrow Agent (in its capacity as Escrow Agent) in connection with this Agreement, except for such actions or omissions as constitute negligence or willful misconduct on the part of the Escrow Agent or breach by the Escrow Agent of the express terms of this Agreement.

(i)     The provisions of this Article shall survive the closing or termination of this Agreement.

## ARTICLE 10
## Certain Definitions

Section 10.1.   Definitions and Index of Definitions.  (a) As used in this Agreement, the following terms have the following meanings respectively:

"DEP" means the New Jersey Department of Environmental Protection.

"Deposit" means the amount that shall have been deposited with the Escrow Agent pursuant to Section 1.4, together with all interest that accrues thereon while in escrow.

"Effective Date" means the date on which this Agreement is executed and delivered by the Buyer and the Seller.

"Escrow Agent" means Morgan Melhuish Abrutyn.

"including" means "including (without limiting the generality of the foregoing)".

"ISRA" means the Industrial Site Recovery Act (N.J.S.A. 13:1K-6 et seq.), the regulations promulgated thereunder, and any amendments to such legislation or regulations from time to time.

"Person" means an individual, partnership, limited partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

"Surviving Provisions" means the provisions of this Agreement that are expressly

DG00373

provided herein to survive (as applicable) a termination of this Agreement or a closing under this Agreement.

"Tax Escrow Agent" means Norris McLaughlin & Marcus, P.A., a New Jersey professional corporation.

"Unqualified Warranties" means the representation and warranty of the Seller set forth in the first sentence of Section 4.2, as to the due authorization by the Seller of the transaction contemplated by this Agreement and as to the absence of any legal proceeding pending with respect of the Property.

As used in this Agreement, the following terms have the meanings ascribed to them in the respective Sections indicated below:

"Due Diligence Period" – Section 2.1.

"Existing Survey Facts" – Section 3.6.

"Permitted Exception" – Section 3.1.

"Property" – Section 1.2.

"Purchase Price" – Section 1.3.

"Title Objection" – Section 3.1.

### ARTICLE 11
### Miscellaneous Provisions

Section 11.1.   Section 1031 Exchange.  Notwithstanding anything contained herein to the contrary, each party agrees (if requested by the other party) to take at closing any actions that are reasonably necessary to help the other party to effect a like-kind exchange of the Property pursuant to Section 1031 of the Internal Revenue Code (as amended), including (a) executing a consent to the assignment of this Agreement by the requesting party to a qualified intermediary, and (b) (in the case of the Buyer, where the Seller is the requesting party) paying to the qualified intermediary the cash at closing for the Property or (in the case of the Seller, where the Buyer is the requesting party) receiving from the qualified intermediary the cash at closing for the Property; provided, however, that in no event shall the non-requesting party be required to take title to any other real property or to incur any additional expense or liability in order to effectuate the like-kind exchange.

Section 11.2.   Entire Agreement; Merger Clause.  This Agreement constitutes the entire agreement and understanding of the parties hereto with respect to the subject matter hereof, and it supersedes all prior and contemporaneous representations, agreements and understandings with respect thereto, whether written or oral.

Section 11.3.   Assignment.  This Agreement, and any or all of the rights of the Buyer hereunder, shall be assignable by the Buyer with the written consent of the Seller, which consent shall not be unreasonably withheld, delayed or conditioned.  No such assignment shall relieve the Buyer of any of its obligations under this Agreement.

Section 11.4.   Brokerage.  (a) Each of the Seller and the Buyer represents and warrants to the other that it has not dealt with any broker, finder or similar agent in connection with the transaction contemplated by this Agreement, and that it has not taken any action which would result in any broker's, finder's or other fee or commission being due or payable to any other Person in connection with the transaction contemplated hereby.

14

DG00374

(b)      The Seller shall indemnify and hold harmless the Buyer against any claim asserted against the Buyer by either or both of such brokers, or by any other broker or finder based on any acts of the Seller, for a broker's, finder's or other similar fee, commission or compensation in connection with the transaction contemplated by this Agreement (as well as reasonable attorneys' fees incurred by the Buyer relating to any such claim).

(c)      The Buyer shall indemnify and hold harmless the Seller against any claim asserted against the Seller by any broker or finder (other than the brokers named in subsection (a) of this Section), based on any acts of the Buyer, for a broker's, finder's or other similar fee, commission or compensation in connection with the transaction contemplated by this Agreement (as well as reasonable attorneys' fees incurred by the Seller relating to any such claim).

(d)      Notwithstanding the foregoing, Buyer agrees to be responsible for and shall hold harmless and defend Seller from and against any and all claims for commission that C.B. Richard Ellis, Inc., L.J. Melody & Company and/or NAI James E. Hanson, Inc., or any of their brokers may assert or be entitled to as a result of the transaction contemplated by this Agreement.

(e)      The agreements contained in this Section shall survive the closing or any termination of this Agreement.

Section 11.5.    Expenses. (a)  The Seller shall pay the costs and expenses (i) expressly required by this Agreement to be paid by it and (ii) of its legal counsel.

(b)      The Buyer shall pay the costs and expenses (i) expressly required by this Agreement to be paid by it, and (ii) of its legal counsel and (as applicable) engineers, architects and other consultants, and (iii) of the title report and title insurance (if any) obtained by the Buyer with respect to the Property, and (iv) of the survey (if any) obtained by the Buyer with respect to the Property.

Section 11.6.    Attorneys' Fees. Notwithstanding anything to the contrary contained in this Agreement, if any litigation ensues between the Buyer and the Seller in connection with this Agreement, the reasonable attorneys' fees of the prevailing party shall be paid by the other party.  The agreement contained in this Section shall survive the closing or any termination of this Agreement.

Section 11.7.    Notices. All notices and other communications under this Agreement shall be in writing, and shall be deemed to be sufficiently given (a) when delivered personally, or (b) one business day after having been sent by Federal Express or other recognized overnight courier for which receipt is given, or (c) two days after having been mailed by certified mail return receipt requested, or (d) except with regard to a TIME OF ESSENCE notice, when transmitted by e-mail and appropriate confirmation thereof is received, in each case, to a party at its address set forth below:

Seller:

Ogden Realty Co.
c/o National Retail Systems, Inc.
611 Route 46W
Hasbrouck Heights, NJ 07604
Attention: Paul K. Hennessy
Email: paul.hennessy@nrsonline.com

- with a simultaneous copy to -

Morgan Melhuish Abrutyn
651 West Mount Pleasant Avenue – Suite 200
Livingston, New Jersey 07039
Attention: Robert J. Machi, Esq.
Email: _____

DG00375

Buyer:

The Hoboken Brownstone Company
161 – 14th Street
Hoboken, New Jersey 07030
Attention: Mr. George T. Vallone
Email: GVallone@HBrownstone.com

- with a simultaneous copy to -

Norris, McLaughlin & Marcus, P.A.
721 Route 202/206
P. O. Box 5933
Bridgewater, New Jersey 08807-5933
Attention: Kevin T. O'Brien, Esq.
Email: ktobrien@nmmlaw.com

Escrow Agent:

Morgan Melhuish Abrutyn
651 West Mount Pleasant Avenue – Suite 200
Livingston, New Jersey 07039
Attention: Robert J. Machi, Esq.
Telecopy No.: 973-994-3375

or to such other address as such party may designate to the other parties in writing.  Notwithstanding the foregoing, a confirmed telecopy so transmitted to such counsel for the Seller or the Buyer (as applicable) shall suffice as notice to the Seller or the Buyer (as applicable).  Counsel for a party may give written notice on behalf of such party.

Section 11.8.   Due Authorization.  The person executing this Agreement below on behalf of each party represents and warrants that this Agreement has been duly authorized by such party.

Section 11.9.   Further Assurances.  From time to time at either party's request (whether before, at or after the closing), the other party shall execute, acknowledge and deliver such other and further documents, and shall take such further action, as the requesting party may reasonably request to better effectuate the provisions of this Agreement, provided that the same can be done without material cost or liability to such other party.

Section 11.10.   WAIVER OF JURY TRIAL.  THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE PROPERTY OR ANY DOCUMENT EXECUTED IN CONNECTION HEREWITH OR RELATED HERETO, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF EITHER PARTY.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES TO ENTER INTO THIS TRANSACTION.  THE AGREEMENT CONTAINED IN THIS SECTION SHALL SURVIVE THE CLOSING OR A TERMINATION OF THIS AGREEMENT.

Section 11.11.   Business Days.  If the last day provided for in this Agreement for the Seller or the Buyer to take a particular action is a Saturday, Sunday or legal holiday, such last day shall be extended until the next day that is not a Saturday, Sunday or legal holiday.

16

DG00376

Section 11.12. <u>Miscellaneous.</u> (a) No provision of this Agreement may be changed or waived orally or by any course of dealing, but only by an instrument in writing signed by the party to be charged with such change or waiver.

(b)     This Agreement shall be construed and enforced in accordance with the internal laws of the State of New Jersey, without giving effect to the principles of conflicts of law.

(c)     This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same Agreement.

(d)     The captions in this Agreement are inserted for convenience of reference only and in no way define, describe or limit the scope or intent of this Agreement or any of the provisions hereof.

(e)     No provision of this Agreement shall be construed by any court or other judicial authority against any party hereto by reason of such party's being deemed to have drafted or structured such provision.

(f)     No failure or delay on the part of either party in exercising any right or remedy in respect of this Agreement shall operate as a waiver thereof; nor shall any single or partial exercise thereof preclude any other or further exercise of the same or any other right or remedy on the same or any future occasion.

Section 11.13. <u>Form W-9.</u> Upon the request of the Escrow Agent, each of the Seller and the Buyer shall execute and deliver to the Escrow Agent a duly completed IRS Form W-9 in connection with the Deposit.

IN WITNESS WHEREOF, this Agreement has been executed by the Seller and the Buyer as of the day and year first above written.

<u>SELLER</u>: OGDEN REALTY CO.

By: _____
Name: PAUL E HENRETT
Title:     CA

Federal Tax Identification Number of Seller:

_____

<u>BUYER</u>:THE HOBOKEN BROWNSTONE COMPANY, a Registered Trade Name of WEST BANK REALTY INC.

By: _____
Name - Title: George Vallone - President

ESCROW AGENT:
The Escrow Agent hereby agrees to the provisions of Article 9 of this Agreement.
MORGAN MELHUISH ABRUTYN

By: _____
Robert J. Machi
Partner

17

DG00377

**EXHIBIT A**

<u>Property Description</u>

DG00378

*CHICAGO TITLE INSURANCE COMPANY*

*AT-1525262*

Alliance Title
Agency
19 West
Main Street,
P.O. Box 840
Freehold,
New Jersey
07728 732-
462-1000
Fax 732-409-
7749

Beginning at the point of intersection formed by the northerly line of 17th Street (60' row) and the westerly line of Coles Street (60' row) and running; thence

1. Along the northerly line of 17th Street North 83 degrees 43 minutes 58 seconds West a distance of 400.00 feet to a point in the easterly line of Monmouth Street; (60' row) thence
2. Running along the easterly line of Monmouth Street North 06 degrees 21 minutes 02 seconds East a distance of 46.00 feet to a point; thence
3. Continuing along the easterly line of Monmouth Street in a northeasterly direction along a curve to the right having a radius of 664.00 feet a distance of 140.91 feet to a point; thence
4. South 25 degrees 17 minutes 19 seconds East a distance of 26.56 feet to a point; thence
5. Continuing along the easterly line of Monmouth Street in a northeasterly direction along a curve to the right having a radius of 630.00 feet an arc distance of 103.96 feet to a point in the former centerline of 18th Street; thence
6. Running along the former centerline of 18th Street, South 83 degrees 43 minutes 58 seconds East, a distance of 257.56 feet to a point in the westerly line of Coles Street; thence
7. Running along the westerly line of Coles Street South 06 degrees 21 minutes 02 seconds West, a distance of 230.00 feet to the point and place of Beginning.

The above description was drawn in accordance with a survey made by Dresdner Robin (Donald E. Walby, P.L.S.) dated October 4, 2005 and revised through February 6, 2007.

Being also known as Lot(s) A.2 Block 367, as shown on the Tax Map of the City of Jersey City, County of Hudson, State of New Jersey. (Said Lot and Block shown for informational purposes only.)

CHICAGO TITLE INSURANCE COMPANY

AT-1525262

SCHEDULE A
NUMBER 4

DESCRIPTION

All that certain Lot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the City of Jersey City, County of Hudson, State of New Jersey, and being more particularly described as follows:

Beginning at the point of intersection formed by the northerly line of 16th Street (60' row) and the westerly line of Jersey Avenue (80' row) and running; thence

1. Along the northerly line of 16th Street North 83 degrees 43 minutes 58 seconds West a distance of 300.00 feet to a point; thence

2. North 06 degrees 21 minutes 02 seconds East a distance of 125.00 feet to a point; thence .

3. North 83 degrees 43 minutes 58 seconds West a distance of 100.00 feet to a point in the easterly line of Coles Street; (60' row) thence

4. Running along the easterly line of Coles Street North 06 degrees 21 minutes 02 seconds East a distance of 75.00 feet to a point in the southerly line of 17th Street (60' row); thence .

5. Running along the southerly line of 17th Street South 83 degrees 43 minutes 58 seconds East a distance of 400.00 feet to a point in the westerly line of Jersey Avenue; thence

6. Running along the westerly line of Jersey Avenue South 06 degrees 21 minutes 02 seconds West a distance of 200.00 feet to the point and place of beginning.

The above description was drawn in accordance with a survey made Dresdner; Robin (Donald E. Walby, P.L.S.) dated October 4, 2005 and revised through January 29, 2007.

Being also known as Lot(s) B.1, 22, 23 and 24 Block 329 as shown on the Tax Map of the City of Jersey City, County of Hudson, State of New Jersey. (Said Lot and Block shown for informational purposes only.)

*CHICAGO TITLE INSURANCE COMPANY*

*AT-1525262*

All that certain Lot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the City of Jersey City, County of Hudson, State of New Jersey, and being more particularly described as follows:

Beginning at the point of intersection formed by the Northerly line of 16th Street (60' row) and the Westerly line of Coles Street (60' row) and running; thence

*Alliance Title Agency 19 West Main Street, P.O. Box 840 Freehold, New Jersey 07728 732-462-1000 Fax 732-409-7749*

1. Along the northerly line of 16th Street North 83 degrees 43 minutes 58 seconds West a distance of 400.00 feet to a point in the easterly line of Monmouth Street; (60' row) thence

2. Running along the easterly line of Monmouth Street North 06 degrees 21 minutes 02 seconds East a distance of 200.00 feet to a point in the southerly line of 17th Street; thence

3. Running along the southerly line of 17th Street South 83 degrees 43 minutes 58 seconds East a distance of 400.00 feet to a point in the westerly line of Coles Street; thence

4. Running along the westerly line of Coles Street South 06 degrees 21 minutes 02 seconds West a distance of 200.00 feet to the northerly line of 16th Street being the point and place of Beginning.

The above description was drawn in accordance with a survey made by Dresdner Robin (Donald E. Walby, P.L.S.) dated October 4, 2005 and revised through January 29, 2007.

Being also known as Lot(s) A.1 and A.2 Block 366 as shown on the Tax Map of the City of Jersey City, County of Hudson, State of New Jersey. (Said Lot and Block shown for informational purposes only.)

DG00381

EXHIBIT B

Certain Permitted Exceptions

1.  Subject to Restrictions set forth in Deed Book 2964 at page 46 (affects Block 367, Lot A.02).

2.  Easement as set forth in Deed Book 3939 page 180 (Block 329, Lots 17, 18, 19, 20 and 21).

3.  Subject to Temporary Easement set forth in Deed Book 7687 at page 1 (affects Block 376, Lot A.02).

4.  Right, title and interest of the State of New Jersey in and to so much of the land described in Schedule A hereof as is now or was formerly affected by the ebb and flow of the tide.  (Block 366, Lot A.01).

5.  Right, title and interest of the State of New Jersey in and to so much of the land described in Schedule A hereof as is now or was formerly affected by the ebb and flow of the tide.  (Block 367, Lot A.02).

6.  Right, title and interest of the State of New Jersey, in fee, in and to so much of the premises in question as is now or was formerly affected by the ebb and flow of the tide (Block 330, Lot C).

7.  Temporary Construction Easement set forth is Deed Book 5831 at page 1.

8.  Subject to Restrictions set forth in Deed Book 2964 at page 46.

9.  Right, title and interest of Texas Eastern Transmission, LP in and to so much of the land described in a certain Order of Taking dated June 28, 2012, issued by the United States District Court for the District of New Jersey, Civil Action Number 12-3412 entitled Texas Eastern Transmission, LP, a limited partnership of the State of Delaware v. 1.73 Acres of Land, More or Less, in the City of Jersey City, Hudson County, New Jersey, et. al" and any attorney's fees associated by such proceeding.

10. The Existing Survey Facts (as such term is defined in Section 3.6 of this Agreement).

{00712664}

DG00382

EXHIBIT C

Form of Seller's Affidavit of Title

# AFFIDAVIT OF TITLE

STATE OF NEW JERSEY
COUNTY OF _____          SS.:

Donna Walsh and Patricia Wisniewski say under oath:

1.      **Partners.**  Each of us is a partner of Ogden Realty Co., A New Jersey Partnership. The partnership will be called the "partnership" and sometimes simply "it" or "its". The partnership has offices located at 2820 16th Street, North Bergen, New Jersey.  The partnership is also known as Ogden Realty Company.

Each of us is fully familiar with the business of the partnership, a citizen of the United States and at least 18 years old.

2.      **Representations.**   These statements are true to the best of our knowledge, information and belief.

3.      **Partnership Authority.**  The partnership is the only owner of the property located at 311 Seventeenth Street (Block 366, Lot A.1);  289 Coles Street (Block 366, Lot A.2); 258-82 Sixteenth Street  (Block 329, Lot B.1);  296 Coles Street (Block 329, Lot 22);  298 Coles Street (Block 329, Lot(s) 23 (Lot 24));  305 Coles Street (Block 367, Lot A.2);  272 Seventeenth Street (Block 330, Lot A.PL);  288 Seventeenth Street  (Block 330, Lot B.1); 287 Eighteenth Street  (Block 330, Lot B.2);  831 Jersey Avenue  (Block 330, Lot 6);  829 Jersey Avenue (Block 330, Lot  7);  and 827 Jersey Avenue (Block 330, Lot 8).  All such Property is located in Jersey City, New Jersey.

This property is to be sold by the partnership to Coles Street Development Associates LLC (the "Buyer").

This action, and the making of this affidavit of title, have been duly authorized by the partnership.   The partnership agreement of the partnership is the partnership agreement dated May ____, 2000 between the Donna Walsh and Patricia Wisniewski, a copy of which is attached hereto.  It is in full force and effect and has not been modified. It supersedes and replaces the partnership agreement of the partnership dated February 2, 1977 among Francis Walsh, Sr., Frances Walsh, Francis Walsh, Jr. and Norbert Walsh. Francis Walsh, Sr. and Francis Walsh are deceased, and their interests in the partnership passed to Francis Walsh, Jr., Norbert Walsh, and Patricia (Walsh) Wisniewski.  The interest of Norbert Walsh was extinguished pursuant to two orders entered by the Superior Court of New Jersey, Hudson County, in proceedings captioned Wisniewski v.

{00712664}

DG00383

Walsh and Walsh v. Walsh (consolidated under docket number C-13-96):  the Order Implementing Court's Rulings Regarding Phase I Issues filed March 2, 2000, and the Corrected Amended and Second Amended Final Judgment Entered As Of February 14, 2002 filed April 25, 2000.  Frank Walsh, Jr. transferred his interest in the partnership to Donna Walsh, his wife.  Accordingly, Patricia Wisniewski and Donna Walsh comprise all the partners in the partnership.  The partnership is legally authorized to transact business in New Jersey, it is not restrained from doing business nor has any legal action been taken for that purpose.  It has never changed its name or used any other name, except for Ogden Realty Company.  Except as described above in this paragraph, there have been no changes to the partnership, and there has been no withdrawal, bankruptcy, death, insolvency, or incompetency of any partner.  The partnership has not been dissolved.  The partnership is an existing partnership.

4.     Ownership and Possession.  It has owned this property since October 29, 1987.  No one has questioned its right to possession or ownership.  The partnership has sole possession of this property.  There are no tenants or other occupants of this property.  Except for its agreement with the Buyer (if this is a sale) it has not signed any contracts to sell this property that remain in effect.  It has not given anyone else any rights concerning the purchase or lease of this property.  It has never owned any property which is next to this property.

5.     Improvements.  No additions, alterations or improvements are now in progress or have been made to this property since four (4) months past.  It has always obtained all necessary permits and certificates of occupancy.   All charges for municipal improvements such as sewers, sidewalks, curbs or similar improvements benefiting this property have been paid in full.  No building, addition, extension or alteration on this property has been made or worked on within the past four months.  The partnership is not aware that anyone has filed or intends to file a mechanic's lien or building contract relating to this property.  No one has notified it that money is due and owing for construction or repair work on this property.

6.     Liens or Encumbrances.  Except as set forth in Schedule B-Section II of the title insurance commitment issued by _____ under File No. _____, it has not allowed any interests (legal rights) to be created which affect its ownership or use of this property.  No other persons have legal rights in this property, except the rights of utility companies to use this property along the road or for the purpose of servicing this property, the possible right, title and interest of the State of New Jersey, in fee, in and to so much of the premises in question as is now, or was formerly affected by the ebb and flow of the tide.  The partnership does not have any pending lawsuits or judgments against it or other legal obligations which may be enforced against this property.  It does not owe any disability, unemployment, social security, municipal or alcoholic beverage tax payments.  No bankruptcy or insolvency proceedings have been named by or against it, nor has it ever been declared bankrupt.  No one has any security interest in any personal property or fixtures on this property.

All liens (legal claims, such as judgments) listed on the attached judgment or lien search as not against the partnership, but against others with similar names. Without limiting the generality of the immediately preceding sentence, the judgment against Ogden Realty Corp. bearing judgment number J-026194-1988 is not against the partnership, but rather is against another entity with a similar name.

7.    Reliance.  The partnership makes this affidavit in order to induce the Buyer to accept its deed and to induce its title insurance company to insure the same. It is aware that the Buyer and such title insurance company will rely on the statements made in this affidavit and on its truthfulness.

_____
DONNA WALSH,
GENERAL PARTNER

_____
PATRICIA WISNIEWSKI,
GENERAL PARTNER

Signed and sworn to before me on
this _____ day of _____, 20__

_____
ROBERT J. MACHI, ESQ.
ATTORNEY AT LAW, STATE OF NJ

{00712664}

DG00385