# Exhibit E

Memorandum

To: Bruce Menin

From: George Vallone and Daniel Gans

Date: June 29, 2013

Subject: Walsh/Ogden

We are disappointed that we were unable to close yesterday by the 5 o'clock deadline. We were brokenhearted when you told us that there was a perceived issue with our integrity and honesty, these are qualities of utmost importance to us. We had felt that we were aggressively pursuing a relationship with all the team members at CH by always making ourselves available and suggesting the value of meetings and discussions to clarify situations that inevitably arise.

After having some time to reflect on what happened yesterday, we decided to recap the issues that were causing you trouble and present our view of them with the desire for you to be comfortable with us and want to move forward.

1. **The Broker Commission:** The first briefing memo we sent you on March 14, 2013 spelled out all the monies that would be needed in addition to the $22 million land cost in order to get the property fully entitled and "ready to build". On the line just under the land cost is the words "RE Commission (est) $440,000". The word "est" was a holdover from earlier Briefing Memos we had sent other investors when the commission was 3% (i.e. $660,000) but we thought we would be able to negotiate it lower, which we did before the March 14 version went to you at 2%.

   During our discussion yesterday morning, you pointed out correctly that in Section 11.4 Brokerage – of the Purchase and Sale Agreement in subsection (a) it states that neither buyer nor seller has dealt with any other broker. Here's the background on that. In the original contract we executed with Ogden in June 2007 nearly the same language appears except at the end of 11.4 (a) it names the same two broker's companies we have been dealing with all along. Further down in that same section, In Section 11.4 (c) of the June 2007 contract, it states that *"buyer and seller represents to each other that they have not dealt with any other broker other than the brokers mentioned in subsection (a) above."*

   Our contract carries remnants of the June 2007 contract. Given the passage of time since the first contract, the seller's decided they no longer owed these brokers their 3% commission. We agreed to pay the commission to them but subsequently renegotiated it down to 2%. We agreed with the seller to negotiate the commission and document it in a side agreement and not include it in the contract. In fact, in our contract in 11.4 (a) it states that no broker was involved *however* in 11.4 (a) our contract still carries the original 2007 language which states that *"buyer and seller has dealt with no other broker other than the brokers mentioned in subsection (a) above".*

   Finally as Dan mentioned yesterday we invited Eric to the NAI Hanson private box at Yankee Stadium so he could meet the brokers and we could all get to know each other. How can he claim he didn't know? If he did, why didn't he tell you? These guys have listings on properties in the immediate vicinity of the Walsh/Ogden property and we felt that by keeping our relationship close we would have first access to those listings after the closing. As it turned out Eric was stuck in a closing and never made the ballgame.

1



We really don't feel anything was withheld or that we were not transparent on this issue though if we had all spent more time reviewing the paperwork we had given you either with Eric, your attorneys or you these missed communications would not have happened.

2. **Spectra Energy Condemnation Settlement**: On several occasions prior to signing the contract in April of this year, we talked about the Spectra Energy pipeline going past our property at Van Leer. We showed Chaim pictures of the structures that were to be built between our property and the Walsh Ogden site. We also showed him aerial photos and drawings which indicated the pipeline route. The earliest writing regarding the Walsh Ogden deal and the pipeline and how condemnation and temporary work space easement payments would be shared appeared in the Purchase and Sale Agreement (PSA) in Section 7.2 (b). Someone at Crescent Heights must have read that before you put the $2.2M deposit down on April 28th.

We got a call from Spectra on June 5, 2013 asking for our assistance negotiating an additional easement area they needed from the Walsh/Ogden property. We asked them to send us some documentation which they did. On June 6, 2013 we sent a briefing memo to Eric with the three documents Spectra had sent us the day before as attachments.

The first attachment was the offer letter from Spectra to Walsh/Ogden attempting to settle their lawsuit by raising the amount of money they were willing to pay for the temporary and permanent easements from $2,110,000-$3 million. It also spelled out how they propose to break down the amount between the temporary easement and the permanent easement. If there was no settlement, once the lawsuit over the value of the condemnation was settled (in one or two years), assuming the $2,110,000 initial offer was upheld by the courts, in accordance with Section 7.2 (b) of the PSA, our share would have been $1,112,305.

The second attachment on the email to Eric was an itemization of the breakdown of the temporary and permanent easement payments for the $3 million condemnation settlement Spectra was offering.

The third attachment on the email to Eric was a diagram to show the additional 3300 ft.$^2$ they wanted to purchase from Walsh/Ogden in order to allow the pipe to go straight through the Walsh Ogden property they mistakenly had thought they had purchased from New Jersey Transit.

Six days later, on June 11, Eric emailed us back in response to our Spectra Memo to him with the question, "Does this mean we get an extension?" We replied to Eric's question by saying, "No this does not get us the extension, just the hope of some extra cash at the closing. George is reaching out to Paul again to see if they are interested in pursuing the settlement."

We heard nothing further on the subject.

On June 13, the settlement meeting was held with Spectra. At the end of the meeting we were so happy with the results. We had substantially increased the Spectra Settlement Offer amount. Under the original offer, we would have received (assuming the courts had upheld the $2,110,000 initial offer) $1,112,305 after a year or two of litigation between Spectra and Walsh Ogden was done.

As a result of the June 13 meeting, Spectra increase their offer to $3.5 million and our share increased to $1,934,256. This was an increase of over $900,000. We agreed to split the legal fee 50-50 ($141,863 each) resulting in a net credit off of the purchase price of $1,792,394. **Most importantly, we were going to get it at the closing Friday.**

2

Ackman00007

We appreciate the response you gave us yesterday after we recapped the above (in somewhat less detail) that you "might have done better". In retrospect we wish we had called you to personally attend the settlement meeting. Nothing would've made us happier than to be working side-by-side with you so you would have fully understood all the aspects of this transaction.

3. **Title Insurance Problem:** We are fairly certain that the reason the surveyor picked up the fact that approximately 3300 ft.$^2$ along the northwestern edge of the property were not owned by Walsh Ogden is because Spectra thought initially that New Jersey Transit owned it and filed maps showing that demarcation. Those maps were picked up by the tax assessor and then by your surveyor which led the title company to believe that it was not Walsh Ogden property. The title company did not know until my conference call with them late Friday afternoon when Spectra Energy was so convinced that this was a mistake and that the property was in fact owned by Walsh Ogden that they paid an additional $1.4 million to Walsh Ogden to gain access to this narrow strip of land so that they did not have to bend the pipe and go around it.

Notwithstanding any of that, we tried to convince you yesterday that even if we lost that 3300 ft.$^2$ piece it would cost just $255,000 of the $1.79 million credit off the purchase price we had gotten from the Spectra settlement and just 15 units of density on a 1000 unit project.

4. **VanLeer Environmental:** We have explained to Chaim in great detail, since we first signed the agreement on Vanleer, the evolution of the environmental remediation plan. When the original site plan zoning approval was granted with underground parking, the approved environmental cleanup plan was essentially a large "dig and dump" operation. After we decided to eliminate underground parking, the LSRP proposed treating the soil in-situ and leaving most of it on-site. He told us this would significantly reduce the cost of the remediation which was originally estimated to be over $10 million. When we first appeared in front of the DEP with members of your team to present this proposed change it seemed as though they had accepted the approach that had been recommended to us by the LSRP. Several weeks later however the DEP called for a follow-up meeting wherein they expressed reservations about the approach that began to call its efficacy into question. Before that second meeting, the LSRP introduced us to a recently approved remedial solution called "soil compliance averaging" that would not require treating the soil but was just as cost effective as the treatability method with a predicted cost result that had a higher confidence level. We were very interested. At our second meeting with the DEP we planned to introduce this soil averaging approach and we mentioned this to both Daisy and Doug before that second meeting by email.

At that second meeting with the DEP it became apparent that DEP staff was having issues with the in-situ soil treatment approach we had submitted at the first meeting, it was a perfect entrée to introduce the new soil averaging technique we were considering. We learned at that meeting that Doug also felt that this solution was much better and would give CH more comfort. Again we have always been transparent and open with your staff and consultants in what was going on with this. This will be the remediation protocol to be submitted to DEP in about three weeks. From what was said at the meeting we believe it will be accepted. We of course will follow up with a meeting at DEP after the submission to make sure.

We now recognize that we should have been communicating directly with you on these issues and highlighting them to you until we were sure that you understood them. In our defense, we did almost on a weekly basis request meetings or conference calls to discuss all of the issues that we were briefing CH on because we felt they were important to get to a closing.

It is an absolute shame that this all came down to yesterday and we ran out of time to meet the 5 o'clock deadline. Nevertheless, there is still a slim chance we may be able to close on Monday.

3

This is what we think must be done.

First and foremost as you stated Friday morning, you must be convinced that we are honest and good partners.

Second you must be comfortable that the project is worth purchasing, even if we are unable to get the title insurance company to ensure over this 3300 ft.² strip of land by Monday morning (and we ultimately lose 15 units of density if the planning department doesn't allow us to use the easement in our calculations).

Third we should call Ray (one of the two partners) on Sunday and tell him we are ready to close Monday without any title issue.

After you left the office today, I called Ray and pleaded with him to let us close on Monday. I told him we were waiting for word from the title company and I would really like to be able to call him over the weekend with news that there are no issues left to prevent us from closing on Monday. Ray gave me his cell phone number and said I could call him over the weekend if we were in fact ready to close on Monday. He represented that he would speak to Francis and "see what he could do".

Additionally, late this evening Paul called me and said that Francis had called him to say that Francis understood that we had not closed and that we were seeking an extension to Monday. Francis instructed Paul to contact the other buyer and try to get a feel for how much more they would pay and how real they were. Paul then advised me that if we were going to be allowed to close on Monday we would probably have to put up some more money.

Finally, we called the broker's (who felt very badly over today's result) to ask them if they could think of any way to help us. They said they would speak to Mr. Hansen (the founder of NAI Hansen) who, at over 75 years old, has a great deal of experience and connections. They called me back shortly thereafter and said that Mr. Hansen happens to know Jim Dugan (Francis's father-in-law who represented the other buyer) and that, if you still wanted to close on Monday and we are unable to put the deal back together Monday morning, he would call Jim Dugan to see if he could get him to agree to allow us to close on Monday.

Minutes ago, (it's 2 PM Saturday afternoon) one of the brokers we spoke to yesterday called me to say he just learned that Mr. Hansen doesn't just know Dugan, he is a partner with Jim Dugan on a very large deal! This should give us more hope.

Bruce, we apologize for not communicating with you more.  We want you to know it is very important to us to be known as honest, upfront, transparent, and willing to deliver bad news when it occurs.  Our reputation is what we cherish most.  We have been trying to respect all the members of the CH team and felt that our messages and desire to meet to go over issues was being relayed to you.  We were under the false perception that the CH team liked us and respected our input though we were frustrated that we often got very little feedback on issues we presented and conference calls and meetings were not set up.  We now know that if we aren't getting responses on issues that we feel are important that we should contact you directly.

We need to hear from you this weekend that CH is ready to move forward with us and the Walsh/Ogden purchase on Monday or, that you don't want to close and you release us from our assignment of the contract. That way, if we can close with another investor we'll return your deposit. This is certainly not our preferred outcome.  It would be an absolute shame if we lost this 1100 unit project we have been working on for 6 years now that we are in one of the strongest markets in the country.

We hope you enjoy the rest of your weekend!

4

Ackman00009