# Exhibit F

# In The Matter Of:

*Texas Eastern v.*
*0.77 a Acres*



*Daniel Gans*
*February 12, 2015*

*Rizman Rappaport Dillon & Rose*
*66 W. Mt. Pleasant Ave.*
*Livingston, N.J. 07039*
*(973) 992-7650*
*reporters@rizmanrappaport.com*

Min-U-Script® with Word Index

## Page 1

```
 1              UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW JERSEY
 2            CIVIL ACTION NO. 14-167 (SRC)(CLW)

 3

 4    TEXAS EASTERN TRANSMISSION,
      LP, a Limited Partnership
 5    of the State of Delaware,

 6
            Plaintiff             DEPOSITION UPON
 7                                ORAL EXAMINATION
                                       OF
 8       v.                       DANIEL GANS

 9    0.77 a ACRES OF LAND, MORE
      OR LESS, IN THE CITY OF
10    JERSEY CITY, HUDSON COUNTY,
      NEW JERSEY, COLES JERSEY
11    DEVELOPMENT, CO., LLC,
      OGDEN REALTY, CO., JANE AND
12    JOHN DOES 1 through 50
      (fictitious name defendants)
13    and ABC BUSINESS ENTITIES,
      1 through 50, (fictitious
14    name defendants),

15
            Defendants
16

17

18    --------------------------

19            T R A N S C R I P T of the

20    stenographic notes of SUSAN GIOFFRE, a Notary

21    Public and Certified Court Reporter of the State

22    of New Jersey, License No. XI001220, taken at the

23    offices of DeCOTIIS, FITZPATRICK & COLE, LLP,

24    500 Frank W. Burr Boulevard, Teaneck, New Jersey,

25    on Thursday, February 12, 2015.
```

## Page 2

```
 1   A P P E A R A N C E S :

 2

 3   DeCOTIIS, FITZPATRICK & COLE, LLP
     Glenpointe Centre West
 4   500 Frank W. Burr Boulevard
     Teaneck, New Jersey 07666
 5   (201) 928-1100
     mash@decotiislaw.com
 6   BY:  MICHAEL J. ASH, ESQ.
     Counsel for Plaintiff
 7

 8
     BATHGATE, WEGENER, WOLF, PC
 9   One Airport Road
     Lakewood, New Jersey
10   (732) 363-0666
     BY:  PETER H. WEGENER, ESQ.
11   Counsel for Ogden Realty

12

13   BUCHANAN, INGERSOLL & ROONEY, PC
     1290 Avenue of the Americas - 30th Floor
14   New York, New York 10104-3001
     (212) 440-4435
15   BY:   CHRISTOPHER DALTON, ESQ.
     christopher.dalton@bipc.com
16   Counsel for Witness, Daniel Gans

17

18

19

20

21

22

23

24

25
```

## Page 3

```
 1                 I N D E X

 2

 3   WITNESS NAME                          PAGE NO.

 4

 5   DANIEL GANS

 6
        DIRECT EXAMINATION BY MR. ASH         6
 7
        CROSS-EXAMINATION BY MR. WEGENER     154
 8

 9

10

11

12             REQUESTS

13
     PAGE 27              LINE 18
14
     PAGE 69              LINE 24
15
     PAGE 73              LINE 13
16
     PAGE 85              LINE 12
17
     PAGE 109             LINE 7
18
     PAGE 122             LINE 10
19
     PAGE 122             LINE 18
```

## Page 4

```
 1                 E X H I B I T S

 2

 3   EXHIBIT NO.    DESCRIPTION          PAGE NO.

 4

 5   DG-1           Subpoena                 8

 6
     DG-2           Letter, 6/5/13          43
 7

 8   DG-3           Letter, 10/24/13        62

 9
     DG-4           Closing Report          98
10

11   DG-5           Release                109

12
     DG-6           Agreement between Client
13                  and Architect          118

14
     DG-7           Quote                  119
15

16   DG-8           Letter to Tax Assessor 123

17
     DG-9           City of Jersey City
18                  General Development
                    Application            124
19

20   DG-10          Series of E-Mails      125

21

22   DG-11-A        Dresdner Robin Survey, 132
                    Side 1
23

24   DG-11-B        Dresdner Robin Survey, 132
                    Side 2
25
```

Page 5

```
 1
 2                E X H I B I T S
 3   EXHIBIT NO.    DESCRIPTION        PAGE NO.
 4
 5   DG-12-A        C.H. Acquisitions Survey,
 6                  Side 1                134
 7   DG-12-B        C.H. Acquisitions Survey,
 8                  Side 2                134
 9   DG-12-C        Note 13               135
10
11   DG-13-A        Dresdner Robin Survey
12                  (Side 1)              136
13   DG-13-B        Survey/Lot 7          137
14
15   DG-13-C        Notes of Survey       138
16   DG-14-A        Dresdner Robin Survey,
17                  10/17/13              138
18   DG-14-B        Area near Block 6005,
19                  Lot 7                 138
20   DG-14-C        Notes on Survey       140
21
22   DG-15-A        Vicinity Survey       146
23   DG-15-B        Sheet 5 of 18         146
24
25
```

Page 6

```
 1  D A N I E L    G A N S,
 2     305 Coles Street, Jersey City, New
 3     Jersey, called as a witness, having
 4     been first duly sworn according to
 5     law, testifies as follows:
 6
 7     DIRECT EXAMINATION BY MR. ASH:
 8
 9  Q.  Good morning.
10  A.  Good morning.
11  Q.  My name is Michael Ash. I'm an
12    attorney. I represent Texas Eastern
13    Transmission, LP in this matter.
14      You've been sworn.
15      Have you been deposed before?
16  A.  Yes, I have.
17  Q.  About how many times, to the best of
18    your recollection?
19  A.  Five times, maybe.
20  Q.  Well, since you've been deposed about
21    five times I think you have a general
22    understanding of the ground rules.
23      You've been sworn in today, so do you
24    understand that your testimony today is under
25    oath and will have the same weight and effect as
```

Dans - Direct                                        Page 7

```
 1    it would if you were testifying in a court of law
 2    in front of a judge and a jury?
 3  A.  Yes, I do.
 4  Q.  I'll ask question, and if you could
 5    wait until I ask the complete question before you
 6    begin to respond, we'll have a nice clean
 7    transcript of this proceeding.
 8      If there's an objection to my
 9    question, Mr. Dalton is here representing you;
10    please allow him to object, express the reason
11    for the objection, and then based on our
12    discussion you'll be directed to respond or not.
13      All your responses today need to be
14    audible, so a "Yes" or "No" is appropriate, a
15    shake of the head is not, so the court reporter
16    can understand your response.
17      Have you taken any medications or
18    substances this morning that would impair your
19    ability to comprehend or respond to my questions?
20  A.  No, I have not.
21  Q.  If there's a question of mine you
22    don't understand, please express that and I will
23    rephrase so that you do.
24      If you want a break just let me know,
25    I'm happy to accommodate anyone here.
```

Dans - Direct                                        Page 8

```
 1      There are a lot of documents laid out
 2    here. I don't think we're going to go too, too
 3    long. I don't want to go all day. I know you're
 4    busy, I'm busy. All right?
 5      Let's get right into it. Let's mark
 6    our first document. Let's mark this DG-1.
 7      (Subpoena is received and marked as
 8    Exhibit DG-1 for Identification.)
 9      (Witness reviewing notes.)
10  Q.  Okay. Mr. Gans, I've handed you a
11    document we've marked DG-1. It's titled
12    "Subpoena to Testify at Deposition in a Civil
13    Action."
14      Have you seen this document before?
15  A.  Yes.
16  Q.  And this subpoena directed you to
17    appear for a deposition back in November of 2014
18    which has been rescheduled for today.
19      Is that correct?
20  A.  That's correct.
21  Q.  And the subpoena directed you to bring
22    certain documents which are identified in the
23    document request in Exhibit A to the subpoena.
24      Have you reviewed those requests?
25  A.  Yes.
```

| Dans - Direct | Page 9 |
|---|---|

1  Q. We had an opportunity in December, I
2  believe December 16, 2014, to inspect documents
3  in your office at 305 Coles Street in Jersey
4  City.
5      Were those documents responsive to the
6  request in the subpoena?
7  A. Yes, they were.
8  Q. Are you aware of any other documents
9  that would not have been available at the
10  inspection of your records on December 16, 2014
11  that would otherwise be responsive to the
12  subpoena?
13  A. No, I am not.
14  Q. You said you've been deposed about
15  five times.
16      What were the previous occasions in
17  which your deposition was taken?
18      Let's start with the most recent.
19  A. The most recent was a case on a
20  project where the architect ended up suing the
21  developer.
22  Q. Where was that project?
23  A. Maxwell Place in Hoboken.
24  Q. And were you a fact witness or an
25  expert witness?

| Dans - Direct | Page 10 |
|---|---|

1  A. I was a fact witness.
2  Q. And what entity or -- were you
3  affiliated with an entity or were you
4  individually a party in that case?
5  A. I was affiliated with an entity.
6  Q. What entity was that?
7  A. Hoboken Find, LLC.
8  Q. And was that the developer of the
9  Maxwell House project?
10  A. That was the developer of the Maxwell
11  project.
12  Q. And prior to your deposition in the
13  Maxwell Place litigation, what was the litigation
14  in which you were deposed?
15  A. I think an insurance case on one of
16  our projects.
17  Q. And what projects?
18  A. I don't recall exactly.
19  Q. Do you remember what year?
20  A. Sometime in the '90s.
21  Q. What year was the Maxwell Place
22  litigation?
23  A. 2003, 2004.
24  Q. Did that litigation go to trial or did
25  it settle?

| Dans - Direct | Page 11 |
|---|---|

1  A. That went to trial.
2  Q. Did you testify as a witness at trial?
3  A. Yes, I did.
4  Q. When was that?
5  A. The best of my recollection, 2005,
6  2006 maybe.
7  Q. What was the outcome of that
8  litigation?
9  A. The complaint had gone to the wrong
10  court. There was a result, but ultimately for
11  some reason it had gone to the wrong court, and
12  after that there was a settlement.
13  Q. Did you speak with anyone --
14  A. Going back to another litigation
15  court.
16  Q. Did you speak with anyone prior to
17  your deposition today?
18  A. Yes.
19  Q. With whom did you speak?
20  A. I spoke to my attorney, Chris Dalton.
21  Q. Anyone else?
22  A. No.
23  Q. Did you review any documents to
24  prepare for your deposition today?
25  A. Not any specific documents, no.

| Dans - Direct | Page 12 |
|---|---|

1  Q. Did you review any documents to
2  prepare for the deposition today?
3  A. No.
4  Q. Did you write any of the court filings
5  in this litigation, Texas Eastern vs .077 Acres
6  of Land of New Jersey and Coles Jersey
7  Development?
8  A. I have not.
9  Q. You did, however, provide a
10  certification in this litigation.
11      Is that correct?
12  A. I believe so, yes.
13  Q. What's your date of birth?
14  A. 6/8/54.
15  Q. And what's your current address?
16  A. 67 Jefferson Street, Hoboken, New
17  Jersey 07030.
18  Q. You attended Gettysburg University?
19  A. Gettysburg College.
20  Q. College.
21  A. College.
22  Q. What year did you graduate?
23  A. 1977.
24  Q. And what degree did you earn there?
25  A. English literature.

Texas Eastern V.
0.77 a Acres

Dans - Direct                                    Page 13

1  Q.  Do you have any graduate level
2  education?
3  A.  I went to Pratt in Brooklyn for two
4  years.
5  Q.  Did you earn a degree at Pratt?
6  A.  I did not.
7  Q.  What did you study at Pratt?
8  A.  Interior environmental design.
9  Q.  Do you have any professional or other
10  certifications aside from a college degree or a
11  degree from an educational entity.
12  A.  No.
13  Q.  Do you have any professional licenses?
14  A.  No.
15  Q.  Where are you currently employed?
16  A.  Hoboken Brownstone Company.
17  Q.  And what is your occupation there?
18  A.  I'm a developer.
19  Q.  How long have you been with the
20  Hoboken Brownstone Company?
21  A.  Well, Hoboken Brownstone Company is a
22  d/b/a of West Bank Realty.
23     To the best of my recollection, we
24  started West Bank Realty in 1976, so I've been
25  there since then.

Dans - Direct                                    Page 14

1  Q.  When you say "we" who are you
2  referring to?
3  A.  My partner, George Vallone,
4  V-a-l-l-o-n-e.
5  Q.  Have you been a developer for the
6  Hoboken Brownstone Company since its inception in
7  1986?
8  A.  Yes, I have.
9  Q.  And where did you work prior to that?
10  A.  I had another company, a number of
11  other companies as we built out projects.
12     My partner and I started the business
13  in 1980.  We had one company in 1980 and the
14  following year we had another company for another
15  project.  I think in 1983 we started West Bank
16  Construction, '83 or '84, and West Bank Realty
17  came shortly after that.
18  Q.  So is it fair to say that you've been
19  a real estate developer since around 1980?
20  A.  Yes.
21  Q.  Is it also fair to say that you've
22  been a real estate developer either partnering or
23  working with George Vallone since 1980?
24  A.  Yes.
25  Q.  And what are your responsibilities for

Dans - Direct                                    Page 15

1     Hoboken Brownstone as a real estate developer?
2  A.  Locating properties that are
3  interesting to develop in our market,
4  conceptualizing the program for that property,
5  working on bringing investors for the property.
6     Over the years my responsibilities
7  have changed, so I'll speak a little bit more to
8  what it is today.
9     Working on -- once a property is
10  acquired, working on the approvals necessary for
11  development, which include site plan approvals,
12  environmental approvals, amongst others, creating
13  pro formas to attract investment again for the
14  development of the sites.
15  Q.  As part of your responsibilities or
16  day-to-day activities as a developer, do you
17  review titled documents?
18  A.  Rarely.
19  Q.  Do you review surveys of properties?
20  A.  Yes.
21  Q.  Do you review zoning of properties?
22  A.  Yes.
23  Q.  Do you review concept plans?
24  A.  Yes.
25  Q.  Do you review development

Dans - Direct                                    Page 16

1     applications?
2  A.  Yes.
3  Q.  Do you frequently participate in real
4  estate transactions?
5     MR. DALTON: Objection.  Can you
6  quantify "frequently"?
7  Q.  As part of your responsibilities or
8  activities as a real estate developer acquiring
9  and selling real estate?
10  A.  Yes.
11  Q.  Are you a member of an entity called
12  Hoboken Brownstone Company?
13  A.  Yes.
14  Q.  Are you a member of an entity called
15  West Bank Realty?
16  A.  Yes.
17  Q.  Are you currently a member of an
18  entity called Brownstone Project Management, LLC?
19  A.  Yes.
20  Q.  Are you currently a member of an
21  entity called 110 Hoboken Urban Renewal, LLC?
22  A.  I believe we've closed that company.
23  I'm not 100 percent sure.
24  Q.  So it would be more accurate to say
25  you were formerly a member of an entity called

| Dans - Direct | Page 17 |
|---|---|

1  110 Hoboken Urban Renewal, LLC?
2  A.  That's correct.
3  Q.  Are you a member of an entity called
4  Jersey Development Co., LLC?
5  A.  Yes.
6  Q.  Are you also a member of an entity
7  called Coles Street Park Development, Co., LLC?
8  A.  Yes.
9  Q.  When did you become a member of Coles
10  Jersey Development, Co., LLC?
11  A.  To the best of my recollection,
12  September 2013.
13  Q.  Are there other entities that you are
14  currently a member of?
15  A.  Yes.
16  Q.  What are those entities, to the best
17  of your recollection?
18  A.  39 New York Avenue and Van Leer Place,
19  LLC.  There are others, but I can't recall right
20  now.  I have to get a list.  There are a few
21  others.
22  Q.  Do you understand that the present
23  litigation, the litigation in which you're being
24  deposed today involves the condemnation of a
25  permanent easement of .770 acres of land on a

| Dans - Direct | Page 18 |
|---|---|

1  portion of Lot 7, Block 6005 Jersey City by Texas
2  Eastern Transmission, LP?
3  A.  Yes.
4  Q.  Do you understand the acquisition of a
5  permanent easement is this litigation as part of
6  a larger project by Texas Eastern and Spectra
7  Energy?
8  A.  Yes.
9  Q.  If I refer to the pipeline project
10  developed by Spectra Energy and Texas Eastern
11  collectively as the "Texas Eastern Project,"
12  you'll understand what I mean, right?
13  A.  Yes, I will.
14  Q.  What do you know about the Texas
15  Eastern Pipeline Project?
16  A.  Had a lot of opposition by the local
17  entities; Hoboken and Jersey City.  The project
18  moved forward despite all of that.
19      We were contacted as owners at the
20  time of the entity called 110 Hoboken Avenue
21  which we also referred to as the Van Leer
22  Project.
23      At that time we were told that our
24  property was desired to be used for a staging
25  area and it would be used for a staging area

| Dans - Direct | Page 19 |
|---|---|

1  through -- when that -- when we found out that
2  that was the desire of Texas Eastern, to use our
3  property, we contacted attorneys, an attorney, to
4  find out how best to deal with this issue and
5  decided subsequently to talk to the people at
6  Texas Eastern and negotiate a settlement with
7  them for use of our property.
8  Q.  Now, that property that you described
9  as the Van Leer property, that was owned by
10  110 Hoboken Urban Renewal, LLC at the time?
11  A.  Yes, it was.
12  Q.  And that property is designated
13  Block 6005, Lot 2 on the tax map of Jersey City?
14  A.  I believe so.  I'd have to look.
15  Q.  The street address would be 110
16  Hoboken Avenue in Jersey City?
17  A.  No.  The street address was 127 or 137
18  -- 127-137 Hoboken Avenue.
19  Q.  And that's in Jersey City?
20  A.  In Jersey City.
21  Q.  What attorneys did you contact at that
22  time?
23  A.  Ingersoll Buchanan.
24  Q.  Who specifically?
25  A.  Stanley Yorsz.

| Dans - Direct | Page 20 |
|---|---|

1  Q.  Do you remember the month and year
2  that you were contacted by Texas Eastern?
3  A.  I don't know offhand.
4  Q.  Do you recall who you interacted with
5  on behalf of Texas Eastern?
6  A.  I think the first person I dealt with
7  was somebody by the name of Derrick.  I can't
8  remember the last name.
9      And ultimately, I dealt with another
10  gentleman by the name of Bill Simmons.
11  Q.  Do you recall speaking with Tom
12  Bartolozzi?
13  A.  I do not.
14  Q.  Do you recall speaking with Frank
15  Gessner?
16  A.  I don't remember the name.
17  Q.  You do recall speaking with Bill
18  Simmons?
19  A.  Yes.
20  Q.  And you understood him to be an agent
21  for Texas Eastern?
22  A.  Yes.
23  Q.  And ultimately, you negotiated a
24  settlement for the use of the Van Leer site for a
25  temporary staging area?

Texas Eastern v.
0.77 a Acres

| Dans - Direct | Page 21 |
|---|---|

1  A.  Yes.
2  Q.  You were also aware that Texas Eastern
3    acquired permanent and temporary easements on the
4    property known as Block 6005, Lot 13 formerly
5    owned by Ogden Realty Company?
6  A.  Yes.
7  Q.  When did you first become aware that
8    there was a pending condemnation action for
9    temporary and permanent easements on Block 6005,
10   Lot 13?
11 A.  Right around the same time that I was
12   made aware that Texas Eastern wanted to use the
13   110 Hoboken Avenue property.
14 Q.  Do you remember when that was?
15 A.  I don't remember exactly, but within a
16   few years it would have been.
17 Q.  Hoboken Brownstone entered into a
18   purchase and sale agreement with Ogden Realty
19   Company to purchase Block 005, Lot 13, correct?
20 A.  Yes.
21 Q.  Do you recall when that was?
22 A.  March of 2013.
23 Q.  When you entered into -- strike that.
24      When Hoboken Brownstone entered into a
25   purchase and sale agreement to purchase Block

| Dans - Direct | Page 22 |
|---|---|

1    005, Lot 13 in March 2013, at that time were you
2    aware there was a pending condemnation action
3    to acquire permanent and temporary easements on
4    Lot 13?
5  A.  Yes.
6  Q.  The purchase and sale agreement
7    between Hoboken Brownstone and Ogden Realty and
8    included additional properties as well, right?
9  A.  Yes.
10 Q.  To the best of your recollection, are
11   those properties also Block 6003, Lots 2, 3 and
12   4; Block 6004, Lots 1 and 2, Block 6005, Lot 13
13   and a portion of Lot 7?
14 A.  Yes, that's my recollection.
15 Q.  How did the purchase and sale
16   agreement between Hoboken Brownstone and Ogden
17   Realty for what I will call collectively the
18   Ogden Tracts (T-r-a-c-t-s), when did the
19   negotiations begin for the purchase of the Ogden
20   Tracts?
21 A.  Our relationship with Ogden went back
22   to -- I should say the first time we entered into
23   a contract with Ogden was in 2007 and we also
24   entered into a contract with Ogden again in 2010,
25   and the we entered, again, as I mentioned in

| Dans - Direct | Page 23 |
|---|---|

1    2013.
2  Q.  The purchase and sale agreement
3    entered into between Hoboken Brownstone and Ogden
4    Realty in 2007, was that terminated?
5  A.  Yes.
6  Q.  What was the reason for that
7    termination?
8  A.  Litigation by the former purchaser.
9  Q.  Who was that former purchaser?
10 A.  Lance Lucarelli.
11 Q.  What was the outcome of that
12   litigation?
13 A.  Ogden won the litigation.
14 Q.  Do you recall the purchase price in
15   2007?
16 A.  It was a formula price and included an
17   additional portion of another block.
18 Q.  What was the formula based on;
19   density?
20 A.  Density, number of units that we would
21   achieve.  I think, to the best of my
22   recollection, the price, the starting price or
23   the base price, was 38, $40 million.
24 Q.  That contract was subject to
25   approvals?

| Dans - Direct | Page 24 |
|---|---|

1  A.  That contract was subject to
2    approvals.
3  Q.  Do you recall the minimum density in
4    that contract?
5  A.  I do not.
6  Q.  What was the additional portion of an
7    additional lot that was included in that
8    contract?
9  A.  A block to the north of Block 6003 on
10   Jersey Avenue, just to the north, between Jersey
11   avenue and Coles.
12 Q.  Is that now the site for the Cast Iron
13   Lofts?
14 A.  Yes.  To clarify, it was the Cast Iron
15   Lofts II.  Cast Iron I, I believe, had already
16   been sold.
17 Q.  When was the 2007 purchase and sale
18   terminated?
19 A.  It's hard for me to remember exactly
20   the dates.  I think in the fall of 2013, early
21   fall of 2007, I'm sorry, I'm so sorry, 2007.
22      I'm getting my years mixed up.
23 Q.  The second purchase and sale agreement
24   that was entered into between Hoboken Brownstone
25   and Ogden Realty was in 2010?

Rizman Rappaport Dillon & Rose - (973) 992-7650
Let Our Fingers Do Your Talking

Texas Eastern v.
0.77 a Acres

| Dans - Direct | Page 25 |
|---|---|

1  A.  Yes.
2  Q.  And what was the purchase price?
3  A.  To the best of my recollection, I
4  believe it was 26 million, 28 million.
5  Q.  Did the purchase price in 2010 also
6  include the Cast Iron Lofts space too?
7  A.  I believe it did.
8  Q.  And it also included the Ogden Tracts?
9  A.  Yes.
10  Q.  Was the purchase price in 2010 subject
11  to approval?
12  A.  No.
13  Q.  How was the $26 million purchase price
14  in 2010 negotiated; was it also a formula?
15  A.  No.
16  Q.  When was the 2010 purchase and sale
17  agreement terminated?
18  A.  Best of my recollection, maybe 90 days
19  after it was signed.
20  Q.  Why was the 2010 purchase and sale
21  agreement terminated?
22  A.  The equity that we thought would be in
23  place to purchase it was not.
24  Q.  Did that purchase and sale agreement
25  include a financing contingency?

| Dans - Direct | Page 26 |
|---|---|

1  A.  No.
2  Q.  The 2013 purchase and sale was entered
3  into you said in March 2013?
4  A.  To the best of my recollection, it was
5  March.
6  Q.  The purchase price for the Ogden
7  Tracts was $22 million?
8  A.  That's correct.
9  Q.  How did you arrive at that purchase
10  price in 2013?
11  A.  That was the price that Ogden told us
12  that it would be sold for, that they would sell
13  it for.
14  Q.  Was there a formula to arrive at the
15  $22 million purchase price?
16  A.  No.
17  Q.  So the purchase price in 2013 of
18  $22 million is not based on per unit value,
19  residential unit?
20  A.  The contract?
21  Q.  The negotiation of the purchase price?
22  A.  It was not based on a per unit.
23  Q.  Was it based upon a per acre value?
24  A.  I can't -- I don't know what it was
25  based on.  As I mentioned, it was given -- it was

| Dans - Direct | Page 27 |
|---|---|

1  a price that was told to us.
2  Q.  Was the $22 million purchase price in
3  the agreement subject to approvals or
4  development?
5  A.  No.
6  Q.  Was there some allocation of the
7  entire purchase price of $22 million per tract or
8  per block and lot?
9  A.  No.
10  Q.  There was a written agreement -- there
11  was a written contract between Hoboken and Ogden
12  Realty as of March 2013?
13  A.  Yes.
14  Q.  Do you know if you have retained a
15  copy of that contract?
16  A.  My company, yes.
17  Q.  In my review of your files I didn't
18  find a copy of that contract, so if you still
19  have a copy I would like to be provided with a
20  copy, please.
21        MR. DALTON: Was that not in our
22  production from Coles Jersey?
23        MR. ASH: No.
24        MR. DALTON: I thought it was.
25  Q.  Were there any contingencies in the

| Dans - Direct | Page 28 |
|---|---|

1  purchase and sale agreement in 2013 between Ogden
2  and Hoboken Brownstone?
3  A.  Define your thought of
4  "contingencies."
5  Q.  What's your thought of a contingency?
6  A.  Subject to approvals would be a
7  contingency, financial contingencies.
8  Q.  So these would be obligations on
9  behalf of the party that would need to be
10  satisfied prior to the closing?
11  A.  Correct.
12  Q.  So were there any obligations on
13  behalf of the buyer that needed to be satisfied
14  prior to the closing?
15  A.  No.
16  Q.  Are there any obligations on behalf of
17  the seller that needed to be satisfied prior to
18  the closing?
19  A.  No.
20  Q.  Was there a firm closing date in the
21  purchase and sale agreement?
22  A.  Yes, there was.
23  Q.  What was that date?
24  A.  To the best of my recollection,
25  June 28, 2013.

| Dans - Direct | Page 29 |
|---|---|

1  Q.  Was there some penalty or another
2  provision if there was no closing by June 28,
3  2013?
4  A.  If you called the penalty forfeiture
5  of deposit, I'm recalling right now, when we
6  talked about contingencies, and in the contract
7  there were what we would call "normal
8  contingencies" that the seller had to provide,
9  such as clear title and there may have been other
10  language in there that it needed to be -- it
11  needed to be acknowledged or understood better
12  that the seller had to provide -- you know, to
13  prove the legal ownership and that the title was
14  clear to be able to be sold.
15  Q.  What was the deposit made by Hoboken
16  Brownstone as the purchaser?
17  A.  To my recollection, just north of a
18  million dollars.
19  Q.  And if there was no closing by
20  June 28, 2013, that deposit of over a million
21  dollars would have been forfeited?
22  A.  Subject to the seller giving clear
23  title.
24  Q.  When Hoboken Brownstone entered into
25  the purchase and sale agreement, Hoboken

| Dans - Direct | Page 30 |
|---|---|

1  Brownstone, as an entity, consists of you and
2  your partner, George Vallone?
3  A.  Yes.
4  Q.  And were you both aware of the
5  permanent and temporary easements acquired by
6  Texas Eastern acquired on Lot 13 as of
7  March 2013?
8  A.  I was aware of the easement, permanent
9  easement and the temporary easement.
10  Q.  Your purchase of the Ogden Tracts in
11  the March 2013 purchase and sale agreement, was
12  that specifically subject to a permanent and
13  temporary easements acquired by Texas Eastern on
14  Lot 13?
15  A.  Yes.
16  Q.  Was there some adjustment of the
17  purchase price of $22 million for the overall
18  Ogden Tracts due to the existence of the Texas
19  Eastern permanent and temporary easements on
20  Lot 13?
21  A.  I'm going to correct the question
22  again and say there was, but it was an easement
23  at that time.
24  Q.  What did you understand the easement
25  to be at that time?

| Dans - Direct | Page 31 |
|---|---|

1  A.  An easement running from west to east
2  along 18th Street was the permanent easement in
3  about 50 feet from the property line, and a
4  temporary easement that covered that entire
5  block.
6  Q.  Had you reviewed a copy of that
7  easement as part of your due diligence leading up
8  to signing the purchase and sale agreement in
9  2013?
10  A.  I was aware of it.  I don't recall
11  reviewing any specific document at that time.
12  Q.  Do you recall discussing the Texas
13  Eastern permanent and temporary easements on Lot
14  13 with your partner, George Vallone, in 2013?
15  A.  Yes.
16  Q.  What did you discuss with Mr. Vallone?
17  A.  The existence of the easement and I
18  discussed it with Mr. Vallone and with my
19  architects at the time.
20  Q.  What was the nature of that
21  discussion?
22  A.  To understand the implications of that
23  easement on the development.
24  Q.  What were the implications of that
25  easement on the development as you discussed it

| Dans - Direct | Page 32 |
|---|---|

1  with Mr. Vallone and the architects in 2013?
2  A.  If it inhibited the -- it inhibited
3  what could be built on the site.
4  Q.  What was your understanding of how the
5  easements inhibited what could be built on
6  Lot 13?
7  A.  The easement prohibited the
8  construction of the wing of the building, an
9  11-story wing of the building as it appeared on
10  the zoning map, and portion of the seven-story
11  building that was on the -- that was also on the
12  zoning map.
13  Q.  Having an understanding that a
14  permanent and temporary easement inhibited
15  development of a portion of Lot 13, did you then
16  approach Ogden Realty for some adjustment of the
17  purchase price of $22 million for the Ogden
18  Tracts?
19  A.  Yes.  I pause only because there was a
20  mutual understanding between Ogden and us of this
21  existence, and I can't remember who brought up
22  the discussion first, but we discussed it.
23  Q.  Who discussed it?
24  A.  The discussions were primarily between
25  my partner, George Vallone, and Paul Hennessy.

Texas Eastern v.
0.77 a Acres

| Dans - Direct | Page 33 |
|---|---|

1   Q.  And do you recall what was discussed
2   between George Vallone and George Hennessy?
3   A.  Yes.
4   Q.  What was that discussion?
5   A.  That the fair thing to do would be
6   that the temporary easement, upon the time of
7   ownership, would be split and that the permanent
8   easement value would be given to us.
9   Q.  Given to the buyer?
10   A.  To the buyer.
11   Q.  Who is Paul Hennessy?
12   A.  Paul is the CFO, I believe, of Ogden.
13   I don't know of Ogden -- of the company that
14   Ogden was helping to put together the deal for
15   Ogden.
16   Q.  When did the discussion between
17   Mr. Vallone and Mr. Hennessy as to the impact of
18   the Texas Eastern easement on the purchase price
19   of the Ogden Tracts take place?
20   A.  Maybe a week before we signed the
21   contract for purchase.
22   Q.  Were the terms of a fair arrangement
23   discussed between Mr. Vallone and Mr. Hennessy or
24   an allocation of the temporary easement proceeds
25   and the buyer receiving an allocation for the

| Dans - Direct | Page 34 |
|---|---|

1   permanent easement compensation memorialized in
2   the March 2013 purchase and sale agreement?
3   A.  Yes.
4   Q.  So there was a specific provision in
5   the agreement between Ogden Realty and Hoboken
6   Brownstone allocating proceeds from a combination
7   of the permanent and temporary easements?
8   A.  Yes.
9   Q.  Was the term in the purchase and sale
10   agreement consistent with what you've outlined
11   today, to the best of your recollection?
12   A.  To the best of my recollection, it is.
13   Q.  Was there some discussion -- strike
14   that.
15   As the buyer, did you understand that
16   the litigation over the value of the permanent
17   and temporary easements were the just
18   compensation to the property owner for the
19   acquisitions of the permanent and temporary
20   easements by Texas Eastern was pending as of
21   March 2013?
22   A.  Yes.
23   Q.  Was there a discussion between Ogden
24   Realty, as seller, and Hoboken Brownstone, as
25   buyer, as to an acceptable amount of just

| Dans - Direct | Page 35 |
|---|---|

1   compensation for the permanent and temporary
2   easements provided by Texas Eastern during the
3   executory period of the contract?
4   A.  "Executory" meaning while it was in
5   effect?
6   Q.  Yes.
7   A.  Yes.
8   Q.  What was that discussion?
9   A.  I don't recall exactly the time that I
10   was made aware by Texas Eastern that there were
11   issues that they had with Ogden that included an
12   additional piece of property on lot 6005.
13   Texas Eastern made us aware of that
14   when they heard that we had -- I believe when
15   they had heard we had got into a contract with
16   Ogden.
17   Q.  The additional property you're
18   referring to, is that the portion of Lot 7 on
19   Block 6005?
20   A.  Yes.
21   Q.  Ultimately, the contract between
22   Hoboken Brownstone and Ogden Realty was
23   terminated.
24   Is that right?
25   A.  Yes.

| Dans - Direct | Page 36 |
|---|---|

1   Q.  When was that terminated?
2   A.  To the best of my recollection, the
3   date was June 28, 2013.
4   Q.  Why was it terminated?
5   A.  We were unable to meet the deadline
6   for the closing.
7   Q.  When you say "we" who are you
8   referring to?
9   A.  The first Hoboken Brownstone and we
10   had -- we had brought in a financial partner,
11   development partner, to finance the acquisition
12   and ultimately, they did not.
13   Q.  Who was that financing partner?
14   A.  Crescent Heights.
15   Q.  During the contract period you became
16   aware that the Ogden Tracts may include a portion
17   of Lot 7, Block 6005?
18   A.  It was always my understanding that
19   that was included in the Ogden Tracts.
20   Q.  When did you first become aware that
21   Texas Eastern was interested in acquiring
22   inquiring an additional permanent easement on
23   Block 6005, a portion of Lot 7?
24   A.  Sometime in late April, early May of
25   2013.

Dans - Direct                                    Page 37

1  Q.  What information or documents did you
2   review as to whether or not Ogden Realty actually
3   owned a portion of Lot 7, Block 6005?
4  A.  Could you repeat the question, please?
5      (Question read back.)
6  A.  I was shown a document by Bill
7   Simmons.
8  Q.  Do you recall what the document was?
9  A.  Bill met me in a diner close to my
10  office and showed me a diagram of that piece of
11  property.
12 Q.  That was the Malibu Diner?
13 A.  The Malibu Diner, yes.
14 Q.  Did anyone else attend that meeting at
15  the Malibu Diner?
16 A.  No.
17 Q.  Do you recall Tom Bartolozzi attending
18  that meeting at the Malibu Diner?
19 A.  I don't really recall exactly if it
20  was one or two people or if Bill brought anybody
21  with him.
22     We may have met a number of times to
23  discuss it and certainly he wasn't alone every
24  time.
25 Q.  Do you recall Bill Simmons being

---

Dans - Direct                                    Page 39

1  Q.  Were you aware of that settlement
2   offer made by Texas Eastern to Ogden Realty in
3   June of 2013 that included a permanent easement
4   on the additional Lot 7 portion?
5  A.  Yes, that was shown to me that day.
6  Q.  That was shown to you at the Malibu
7   Diner?
8  A.  At the Malibu Diner.
9  Q.  Do you recall that meeting taking
10  place on June 4, 2013?
11 A.  I wouldn't recall the date, but that
12  sounds in the right timeframe.
13 Q.  Do you recall the amount of that
14  offer?
15 A.  It was a settlement offer and it came
16  out with a number on the bottom that was a total
17  settlement for the entire -- all the issues that
18  surrounded the Ogden Tracts.
19     I don't specifically recall exactly
20  the amount for that Lot 7.
21 Q.  Regardless of the specific amount for
22  Lot 7, do you recall if the settlement offer
23  included easement rights as to a portion of
24  Lot 7?
25 A.  Yes.

---

Dans - Direct                                    Page 38

1   joined by another representative of Texas Eastern
2   who had a moustache and a Texas accent and
3   perhaps a large hat?
4  A.  I don't.
5  Q.  Who told you that an easement on the
6   portion of Lot 7 could not be condemned because
7   it was not within the area authorized in the FERC
8   permit and to amend the FERC permit would be too
9   costly and time consuming?
10 A.  Bill Simmons.
11 Q.  You recall he specifically told you
12  that?
13 A.  I don't.  As I said, I don't recall if
14  there was other people at the meeting.
15     I knew Bill and he was the one who set
16  it up and somebody at that meeting told me.
17 Q.  Someone at the meeting at the Malibu
18  Diner --
19 A.  At the Malibu Diner.
20 Q.  -- told you specifically --
21 A.  Specifically.
22 Q.  -- that the easement on the portion of
23  Lot 7 that Texas Eastern wanted could not be
24  condemned?
25 A.  That's correct.

---

Dans - Direct                                    Page 40

1  Q.  You have that specific recollection
2   that a settlement was conditioned on the grant of
3   permanent easement rights for a portion of Lot 7?
4  A.  I was aware that Texas Eastern had
5   made an offer to Ogden of that nature, yes.
6  Q.  Was the purpose of the meeting at the
7   Malibu Diner on June 4, 2013 or thereabouts to
8   make that same offer to you as the future buyer?
9      (Cell phone interruption.)
10     MR. ASH: Let's go off the record.
11     (Off record.)
12     (Question read back.)
13 A.  Not specifically as the future buyer.
14  It was brought to my knowledge that Texas Eastern
15  needed or desired a settlement prior to the time
16  when the entity -- our contract would be
17  finalized and the purpose was that they felt
18  perhaps there was an opportunity for us to
19  persuade Ogden that perhaps it would be best to
20  work with Texas Eastern to achieve the greatest
21  value.
22 Q.  Do you recall discussing Hoboken
23  Brownstone's future development plans of Lot 13
24  with representatives of Texas Eastern when you
25  met at the Malibu Diner?

---

**Dans - Direct** — Page 41

1 A.  That was not part of the conversation.
2 Q.  Do you recall telling a representative
3  of Texas Eastern that most of lot 13 would be
4  developed as a green area?
5 A.  I have trouble with the lots, what
6  portion of Block 6005 was Lot 13, so without
7  seeing a survey or looking at a diagram, I can't
8  tell.
9     MR. ASH: I'm not going to mark this
10  just yet for, but the record directing the
11  witness' attention to a survey prepared by
12  Dresdner Robin for Coles Jersey Development
13  Co., LLC dated October 17, 2013.
14 Q.  Reviewing this survey, do you see
15  Block 6005, Lot 13?
16 A.  Yes.
17 Q.  And does that refresh your
18  recollection as to the location of Lot 13 as
19  we've been discussing it?
20 A.  Yes.
21 Q.  And do you recall that is the property
22  on which Texas Eastern acquired a permanent and
23  temporary easement?
24 A.  Yes.
25 Q.  Do you recall during your meeting with

**Dans - Direct** — Page 42

1  Texas Eastern representatives in the Malibu Diner
2  on or about June 4, 2013 that you indicated the
3  development on Lot 13 would be mostly for a green
4  area?
5 A.  I may have said a portion of that
6  block would be developed for a green area as per
7  the redevelopment ordinance.
8 Q.  Do you recall telling representatives
9  of Texas Eastern at the Malibu Diner on or about
10  June 4, 2013 that easement restrictions on Lot 13
11  would not impact density of development because
12  of variance from the city to be obtained to build
13  up higher and keep the same unit density?
14 A.  I may have said that that was a
15  desire. I never take variances or anything of
16  that nature for granted. That was certainly a
17  hope.
18 Q.  My question is not whether or not a
19  variance would be applied for or granted, but
20  whether or not you, specifically, told
21  representatives of Texas Eastern that the
22  easement restrictions on Lot 13 were not your
23  concern because variance relief would be
24  available?
25 A.  I don't recall the exact conversation,

**Dans - Direct** — Page 43

1  but as I said, that was our hope.
2 Q.  Did you say that on June 4, 2013?
3 A.  I may have. I don't recall exactly
4  the conversations.
5 Q.  Do you recall that topic being part of
6  the conversation with Texas Eastern at the Malibu
7  Diner?
8 A.  It may have, yeah.
9     MR. ASH: Let's have this marked DG-2,
10  please.
11     (Letter, 6/5/13, is received and
12  marked as Exhibit DG-2 for Identification.)
13 Q.  Mr. Gans, if you'll take a minute and
14  just review the document, the first page of what
15  we've marked DG-2.
16     (Witness reviewing exhibit.)
17 A.  I don't remember one of these pages
18  right here, the fifth page DG 00244. I don't
19  remember that page. I may have had it. I don't
20  recall it. All the other documents I recall.
21 Q.  Okay. DG-2 we have numbers.
22     At the bottom right, the first page is
23  DG 00246. Do you see that?
24 A.  Yes.
25 Q.  And do you understand that is a

**Dans - Direct** — Page 44

1  reference to documents produced from your
2  office --
3 A.  Right.
4 Q.  -- from December 16, 2014?
5 A.  Yup, yes.
6 Q.  Do you recall receiving this letter,
7  which is Page 1, of DG-2 dated June 5, 2013 to
8  your attention from Mr. Franklin S. Gessner
9  Right-of-Way Project Manager for Texas Eastern?
10 A.  Yes, yes.
11 Q.  And do you see that this letter refers
12  to a meeting of June 4, 2013?
13 A.  Yes.
14 Q.  Does this refresh your recollection as
15  to whether or not you met with Texas Eastern
16  representatives on June 4, 2013 at the Malibu
17  Diner?
18 A.  Yes, it does.
19 Q.  Do you recall if Mr. Gessner was in
20  attendance at that meeting on June 4, 2013?
21 A.  Yes, I do.
22 Q.  Do you agree that this letter of
23  June 5, 2013 is an offer to Hoboken Realty (sic)
24  as the buyer of Lot 13 to settle the pending
25  condemnation action for the easements acquired on

Dans - Direct                                    Page 45

1   Lot 13?
2   A.   It's to Hoboken Brownstone.  It's to
3   propose a settlement and I believe it was fully
4   understood that, you know, we had no ability to
5   ourselves to get into an agreement to accomplish
6   what was desired.
7   Q.   The first sentence of the letter is
8   directed to you and your associates as future
9   owners of the property, correct?
10  A.   Correct.
11  Q.   And you indicated that a closing was
12  scheduled for June 28, 2013?
13  A.   That's correct.
14  Q.   So would you agree the intention of
15  this offer letter to you as the future owner of
16  that property in a matter of weeks was to settle
17  the pending condemnation action?
18  A.   As I said, it was understood that we
19  did not have the ability to, as future owners, to
20  make any agreement on the property and that all
21  we were there to do was to be facilitators.
22  Q.   At of June 5, 2013, you had an
23  interest as the buyer of the property and the
24  result of the condemnation litigation, right?
25  A.   Yes.

Dans - Direct                                    Page 46

1   Q.   That was specifically addressed in the
2   purchase and sale agreement which was in effect
3   as of June 5, 2013?
4   A.   Yes, that's correct.
5   Q.   So any settlement of the condemnation
6   action would have required your consent as well
7   as Ogden Realty's consent as of June 5, 2013?
8   A.   I don't believe that's true.
9   Q.   Why don't you believe that's true?
10  A.   I think Ogden had the right to settle
11  the litigation without our consent.
12  Q.   Why?
13  A.   They were the property owners.  We
14  were -- we would get our share of that
15  settlement, but Ogden retained the right to make
16  the settlement.
17  Q.   If we look at the first page of DG-2,
18  the letter of June 5th, the second paragraph, the
19  third sentence begins "Our offer of 3 million..."
20       Do you see that?
21  A.   Yes.
22  Q.   It reads, "Our offer of $3 million was
23  based on using the March 18, 2013 drawing and the
24  breakdown of our offers is as follows: $838,468
25  for the permanent easement and $1,496,692 for the

Dans - Direct                                    Page 47

1   temporary work space which was calculated at
2   $83,149.55 per month for 18 months and is
3   contingent on the future owners granting the
4   additional easement depicted on drawing Plat
5   HUD -- 98.3."
6        Do you see that statement?
7   A.   Yes.
8   Q.   Do you recall that drawing, HUD-98.3,
9   as of March 18, 2013 being enclosed with the
10  letter?
11  A.   Yes.
12  Q.   And do you identify that enclosure to
13  the letter of June 5, 2013 as being marked
14  DG 00248 which is included in DG-2?
15  A.   Yes.
16  Q.   Did you respond to this offer letter?
17  A.   Yes.
18  Q.   What was your response?
19  A.   Our response was that as contingent
20  future owners we didn't have any ability to enter
21  into any agreements, though we would speak to
22  Ogden regarding what had been laid out to us --
23  to me.
24  Q.   To whom did you direct that response?
25  A.   Mr. Gessner and Mr. Simmons.

Dans - Direct                                    Page 48

1   Q.   Was it by letter, was your response by
2   e-mail, or was it by phone?
3   A.   I don't recall.
4   Q.   Did you discuss this offer letter of
5   June 5, 2013 with anyone?
6   A.   Yes.
7   Q.   With whom?
8   A.   Firstly, Mr. Vallone, and then with
9   Paul Hennessy.
10  Q.   What did you discuss with Mr. Vallone
11  with regard to this June 5, 2013 offer letter?
12  A.   We discussed its existence and our
13  belief that a settlement was a better outcome.
14  Q.   Better outcome than continuing --
15  A.   Then continuing litigation, and that
16  there would be a greater value from a settlement.
17  Q.   Did you and Mr. Vallone have an
18  opinion as to the fairness of this offer?
19  A.   We thought there might be an
20  opportunity here to increase the offer that had
21  been put on the table and thought that that
22  seemed fair.
23  Q.   Did you discuss this offer with
24  Mr. Vallone before you discussed the offer with
25  Mr. Hennessy?

| Dans - Direct | Page 49 |
|---|---|

1 A.  Yes.
2 Q.  What did you then discuss with
3  Mr. Hennessy about this June 5, 2013 offer?
4 A.  Its existence and that we felt that a
5  negotiated settlement would ultimately bring all
6  parties more money than continued litigation.
7 Q.  What was Mr. Hennessy's response?
8 A.  Mr. Hennessy was open to discussing
9  it.
10 Q.  Did you discuss the substance of the
11  offer from Mr. Hennessy?
12 A.  Yes.
13 Q.  Did you discuss the amount of money
14  offered?
15 A.  Yes.
16 Q.  What was the discussion as to the
17  amount of money offered?
18 A.  That it was an offer and possibly
19  going in and settling this; maybe there would be
20  -- maybe we could push it up higher.
21 Q.  Was there a discussion as to a
22  specific amount for a counteroffer to
23  Mr. Hennessy?
24 A.  I don't recall.
25 Q.  How about Mr. Vallone?

| Dans - Direct | Page 50 |
|---|---|

1 A.  I don't think so.
2 Q.  Did you discuss with Mr. Hennessy the
3  express contingency that the offer is based on
4  additional permanent easement rights as to Lot 7?
5 A.  Yes.
6 Q.  What was that discussion?
7 A.  That due to Texas Eastern's desire to
8  have that property and that that was needed, an
9  agreement needed to be made very quickly if that
10  was going to remain on the table because the work
11  had progressed to that point or either a
12  diversion had to be made or the easement had to
13  be in place, and that it appeared to us and we
14  were told by and shown by Mr. Gessner and
15  Mr. Simmons that if is this -- if the easement
16  wasn't granted it would be a substantial increase
17  in the cost of the work associated with the buy
18  and therefore, this opportunity was an
19  opportunity that was existed at that point on
20  June 4th or 5th and would be gone.
21   And we thought because of that there
22  was an opportunity to sit down and negotiate a
23  settlement.
24 Q.  Did you discuss the June 5th offer
25  with anyone else besides Mr. Vallone and

| Dans - Direct | Page 51 |
|---|---|

1  Mr. Hennessy?
2 A.  We made Crescent Heights aware of the
3  offer.
4 Q.  With whom did you discuss the offer on
5  behalf of Crescent Heights?
6 A.  I discussed that with Eric Hopkins at
7  Crescent Heights.
8 Q.  Was Crescent Heights your partner or
9  Hoboken Brownstone's partner as a purchaser or
10  were they an assignee of the contract?
11 A.  They were an assignee of the contract.
12 Q.  And was Crescent Heights -- strike
13  that?
14   What was your discussion of the
15  settlement offer with Crescent Heights?
16 A.  It was thought that this was an
17  opportunity worth pursuing and that we felt --
18  and because of this the amount of cash needed at
19  the closing would be less than was required on
20  the contract.
21 Q.  Was Crescent Heights, in response to
22  the June 5, 2013 offer, willing to grant
23  additional easement rights on the portion of
24  Lot 7 as part of a settlement with Texas Eastern?
25 A.  I'm not sure they fully focused on it

| Dans - Direct | Page 52 |
|---|---|

1  at Crescent Heights at that moment.
2   Through our correspondence we -- we,
3  Mr. Vallone and myself, believed that Crescent
4  Heights was on board with the concept.
5 Q.  Was there any discussion between you
6  and Mr. Vallone or a representative of Crescent
7  Heights as to any adverse impact on the
8  development potential of the Ogden Tracts due to
9  the additional permanent easements rights to be
10  granted on Lot 7?
11 A.  Yes.
12 Q.  What was that discussion?
13 A.  Our feeling was that the size of the
14  property wasn't that great and the hope that
15  amendments to the redevelopment ordinance would
16  allow for additional height that there may be no
17  effect of this.
18 Q.  Your discussion with Crescent Heights
19  was that there may be no adverse impact to the
20  development potential of the Ogden Tracts as a
21  result of the additional permanent easement on a
22  portion of Lot 7?
23 A.  I said that specifically to
24  Mr. Vallone. I do believe we made it aware to
25  Crescent Heights. I'm not sure that Crescent

---

Dans - Direct                                    Page 53

1    Heights focussed on it.
2  Q.  Let's turn Page DG 00247. It's the
3    second page of DG-2.
4       Did you prepare this?
5  A.  No.
6  Q.  Do you know who prepared this?
7  A.  Spectra Energy.
8  Q.  Was this included as part of the
9    June 5, 2013 letter?
10 A.  Yes.
11 Q.  And if I go to the next page,
12   DG 00248, this was also included with the June 5,
13   2013 letter?
14 A.  Yes, it was.
15 Q.  If we go to Page DG 00244, you're not
16   sure where the page came from?
17 A.  No.
18 Q.  Do you recognize this page as coming
19   from your files?
20 A.  It seems to be, but I'm not sure if it
21   has anything to do with these documents.
22 Q.  You don't recall preparing this
23   Document 244?
24 A.  This is the type of information that
25   we do collect. As I mentioned, we had this new

---

Dans - Direct                                    Page 54

1    property, the Coles Street property, under
2    contract a number of times, and it appears to be
3    a summation of our costs up to that day, but I --
4    again, I don't know if it had anything to do or
5    if this just slipped into these pages because I
6    don't believe it was part of this package.
7  Q.  While you are not specifically
8    familiar with Document 244, is it fair to say
9    that reviewing this document today, to the best
10   of your recollection, your costs of $412,300.37
11   for the purchase of the Ogden Tracts is reflected
12   in this document?
13 A.  Yes.
14 Q.  Let's turn to the last page of DG-2,
15   please. This document has a Bates stamp number
16 • DG 02445.
17      Have you seen this document before?
18 A.  Yes.
19 Q.  Did you prepare this document?
20 A.  No.
21 Q.  Do you know who prepared this
22   document?
23 A.  Spectra Energy.
24 Q.  Do you see some handwritten notations?
25 A.  Yes.

---

Dans - Direct                                    Page 55

1  Q.  Do you know whose notations those are?
2  A.  To the best of my recollection,
3    Mr. Gessner or Mr. Simmons made those on the
4    document at some point.
5  Q.  Where it says "$2,002,205" and it says
6    "To: (110)," do you know what that refers to?
7  A.  That's the number that Spectra felt we
8    should get from Ogden, which was really
9    meaningless to us.
10 Q.  So you understand 110 to mean Hoboken
11   Brownstone as the purchaser of the Ogden Tracts?
12 A.  I do.
13 Q.  And when it says below that "Previous
14   Owner", is it your understanding that it refers
15   to Ogden Realty?
16 A.  Yes.
17 Q.  Do you recall attending a meeting on
18   June 13 at the office of Texas Eastern in Jersey
19   City?
20 A.  Yes.
21 Q.  Who attended that meeting?
22 A.  Mr. Vallone, myself, Paul Hennessy,
23   Peter Wegener, and I don't recall the names of
24   the attorneys or the representatives from Texas
25   Eastern that were there.

---

Dans - Direct                                    Page 56

1       It may have been Mr. Gessner.
2    I don't recall.
3  Q.  Do you recall if a sign-in sheet was
4    circulated?
5  A.  Yes.
6  Q.  Was there a sign-in sheet circulated?
7  A.  I believe there was, yes.
8  Q.  Did you retain a copy of that sign-in
9    sheet?
10 A.  I don't recall.
11 Q.  Do you recall who circulated that
12   sign-in sheet?
13 A.  I don't recall.
14 Q.  In addition to the individuals that
15   attended the meeting that you specifically
16   recall, you recall generally that there were
17   representatives of Texas Eastern present?
18 A.  Yes.
19 Q.  Was Bill Simmons there?
20 A.  No.
21 Q.  Do you know if Mr. Gessner was there
22   on behalf of Texas Eastern?
23 A.  I don't recall.
24 Q.  Do you recall if counsel on behalf of
25   Texas Eastern was present?

---

Dans - Direct                                                          Page 57

1  A.  Yes.
2  Q.  Were they with my firm?
3  A.  Yes.
4  Q.  Do you recall if it was Jeff Smith?
5  A.  I don't recall the name.
6  Q.  Do you recall if John Bauer attended
7  on behalf of Texas Eastern?
8  A.  The name is familiar.
9  Q.  Do you recall anyone else attended the
10  meeting?
11  A.  There may have been another person
12  from Texas Eastern.
13  Q.  Who suggested having the meeting?
14  A.  Myself and Mr. Vallone.
15  Q.  Why did you attend the meeting?
16  A.  To assist as an intermediary and,
17  obviously, an interested party in the settlement.
18  Q.  You were an intermediary between?
19  A.  Ogden and Texas Eastern.
20  Q.  Did you understand Mr. Wegener to be
21  representing Ogden Realty in the scope of the
22  condemnation litigation that was pending at the
23  time?
24  A.  Yes.
25  Q.  What was discussed at that meeting on

Dans - Direct                                                          Page 58

1  June 13, 2013?
2  A.  A settlement offer which included the
3  lot that we were told Texas Eastern did not have
4  a -- the opportunity to condemn.
5  Q.  A specific discussion of the
6  settlement meeting was to settle the pending
7  condemnation on Lot 13 as well as a grant of
8  additional permanent easement rights to Texas
9  Eastern on a portion of Lot 7?
10     THE WITNESS: Could you read that
11  again?
12     (Question read back.)
13  A.  Yes.
14  Q.  What was the discussion that took
15  place that day?
16  A.  A discussion about values.
17  Q.  At that point Texas Eastern had made a
18  $3 million settlement offer, correct?
19  A.  Correct.
20  Q.  And that also included additional
21  permanent easement rights on Lot 7?
22  A.  Yes, correct.
23  Q.  Was a counteroffer on behalf Ogden
24  Realty made at the June 13, 2013 meeting?
25  A.  Yes.

Dans - Direct                                                          Page 59

1  Q.  Do you recall the amount of the
2  counteroffer by Ogden Realty?
3  A.  I don't recall where we started.
4  Q.  Do you recall if the counteroffer by
5  Ogden Realty was a sum of money to settle the
6  pending condemnation for permanent and temporary
7  easements on Lot 13 as well as compensation for
8  additional permanent easement on Lot 7?
9  A.  Yes.
10  Q.  Do you recall a settlement being
11  reached at the June 13, 2013 meeting as to the
12  pending condemnation of permanent and temporary
13  easements on Lot 13 that included additional
14  permanent easement rights on Lot 7?
15  A.  Yes.
16  Q.  Do you recall the amount of that
17  settlement?
18  A.  I don't recall the exact amount.  I
19  have a hunch in my mind.
20  Q.  If I told you the amount was
21  three-and-a-half million dollars, would that
22  refresh your recollection as the settlement
23  amount?
24  A.  Yes, it would, that was the amount.
25  Q.  Was there some negotiation back and

Dans - Direct                                                          Page 60

1  forth before the amount of three-and-a-half
2  million dollars was agreed to by all parties?
3  A.  Yes.
4  Q.  How long did that conversation take
5  place or how long did that negotiation take
6  place?
7  A.  Two or three hours.
8  Q.  Were there a number of offers and
9  counteroffers in the midst of that two-hour or so
10  negotiation session?
11  A.  Yes.
12  Q.  Who accepted the offer of
13  three-and-a-half million dollars for the
14  condemnation of the permanent and temporary
15  easements on Lot 13 and the additional permanent
16  easement rights on Lot 7 on behalf of Ogden?
17  A.  Paul Hennessy.
18  Q.  Were you or George Vallone consulted
19  by Mr. Hennessy in accepting that offer prior to
20  his acceptance to Texas Eastern?
21  A.  Yeah.
22  Q.  Was that in a separate discussion away
23  from Texas Eastern and their counsel?
24  A.  Yes.
25  Q.  What was discussed amongst you and

Texas Eastern V.
0.77 a Acres

| Dans - Direct | Page 61 |
|---|---|

1   Mr. Hennessy as to the three-and-a-half million
2   dollar offer?
3   A.   How the funds would be shared.
4   Q.   What were the arrangements of how the
5   three-and-a-half million dollar settlement amount
6   would be allocated?
7   A.   There were a number of formulas that
8   we came up with, but it virtually came out to
9   about a 50-50 deal.
10   Q.   So to the best of your recollection,
11   during the break-out session, if you will, of the
12   overall settlement meeting, you discussed a 50-50
13   allocation of three-and-a-half million dollars
14   with Mr. Hennessy?
15   A.   Yes.
16   Q.   And do you specifically recall that
17   settlement amount being conditioned on a grant of
18   permanent easement rights as to a portion of
19   Lot 7?
20   A.   Yes.
21   Q.   Was the allocation of the settlement
22   amount ever reduced to writing between the
23   parties?
24   A.   At that meeting or --
25   Q.   After that meeting.

| Dans - Direct | Page 62 |
|---|---|

1   A.   I wasn't made aware of that.
2       MR. ASH: Let's mark this DG-3,
3   please.
4       (Letter, 10/24/13, is received and
5   marked as Exhibit DG-3 for Identification.)
6   Q.   Take a look at Page 2 of what we've
7   marked DG-3.
8       (Witness reviewing exhibit.)
9   Q.   Have you reviewed Page 2 of DG-3?
10   A.   Yes.
11   Q.   Do you recall e-mail correspondence
12   between George Vallone and Paul Hennessy with
13   regard to the settlement offer condemnation by
14   Texas Eastern?
15   A.   Yes.
16   Q.   Do you see on Page 2 there's an
17   excerpt from an e-mail from George Vallone to
18   Paul Hennessy?
19   A.   Yes.
20   Q.   Do you recall receiving this e-mail or
21   being copied on this e-mail?
22   A.   Yes.
23   Q.   When it refers to "Ray and Francis,"
24   do you know who that refers to?
25   A.   Yes.

| Dans - Direct | Page 63 |
|---|---|

1   Q.   Who is Ray?
2   A.   Ray is my brother-in-law and Francis
3   is the son -- Ray is the son-in-law and Francis
4   is the son of Frank Walsh.
5   Q.   Who is Frank Walsh?
6   A.   Frank Walsh was the -- a principal of
7   Ogden, the father of Francis, and at that time I
8   guess head of NRT Trucking which is the main
9   company of Ogden.
10   Q.   Do you know Rays' full name?
11       That's not Ray Walsh, is it?
12   A.   No, I can't recall right now.
13   Q.   How about Francis?
14   A.   Francis is a Walsh.
15   Q.   Francis is a Walsh.
16       Do you recall receiving this e-mail?
17   A.   Yes.
18   Q.   Did you collaborate with Mr. Vallone
19   in drafting this e-mail?
20   A.   Yes.
21   Q.   You see in Paragraph 2, No. 2, it says
22   "If Ray and Francis agree with us to sell the
23   Spectra the extra easement area so they don't
24   have to bend the pipe, Spectra is proposing to
25   pay us $225,060 for the price of this additional

| Dans - Direct | Page 64 |
|---|---|

1   permanent easement plus pay an additional
2   $664,840 as a settlement offer."
3       Who worked out the different amounts
4   of the settlement components in this e-mail?
5   A.   Texas Eastern and Spectra.
6   Q.   In the next sentence it says -- I'm
7   sorry, were you finished?
8   A.   Yeah, Spectra was the one who had the
9   numbers, the dollar values, had proposed the
10   dollar values.
11   Q.   Spectra, out of the overall settlement
12   offer, allocated different amounts based on the
13   various easement locations and easement
14   interests?
15   A.   That's correct.
16   Q.   And it was your understanding that the
17   additional permanent easement area was the Lot 7
18   portion of the Ogden Tracts?
19   A.   Yes.
20   Q.   The $225,060, was that based on the
21   allocation of the Lot 7 additional permanent
22   easement from the $3 million settlement offer?
23   A.   I don't recall that exactly.  I would
24   have to look at the numbers again.
25   Q.   The next sentence in that Paragraph 2

Dans - Direct                                    Page 65

1   in the e-mail reads, "Since it would be an
2   additional permanent easement area, we would get
3   the $225,060."
4       Do you see that?
5   A.  Yes.
6   Q.  This is you and Mr. Vallone proposing
7   to receive compensation for the permanent
8   easement area on Lot 7 that wasn't part of the
9   initial condemnation?
10  A.  Yes.
11  Q.  What was your reasoning for that
12  allocation?
13  A.  Well, the reason was the same reason
14  that -- why we believed a settlement, an overall
15  settlement would be better to get into at this
16  time and the offers would be better from Texas
17  Eastern at this time to the overall settlement.
18      It wasn't just the one number, it was
19  the entirety of it that we were focused on.
20  Q.  At the bottom of the page, Page 2 of
21  DG-3, that begins "June 24, 2013..."
22  A.  Yup.
23  Q.  Do you see an allocation of a
24  settlement amount of $3,500,000?
25  A.  Yes.

Dans - Direct                                    Page 66

1   Q.  Is this allocation consistent with the
2   settlement allocation between Texas Eastern and
3   Ogden Realty of which you agreed to on behalf of
4   Crescent Heights?
5   A.  Yes.
6   Q.  Where it says "Allocation for
7   additional permanent taking, $255,000," is that
8   referring to the same allocation in the e-mail
9   from George Vallone that there's an additional
10  permanent easement allocation to be paid to the
11  buyer?
12  A.  Yes.
13  Q.  So of the agreed to settlement amount,
14  the allocation for the additional permanent
15  easement rights on the portion of Lot 7,
16  Block 6005 was $255,000?
17  A.  We looked at it as an entirety and the
18  value was -- the dollars, as they were written
19  down here, weren't important to us.
20      Rather what was important to us was
21  the overall settlement.
22      And that's how we looked at it, that
23  it was broken up like this by whoever decided
24  these were the values wasn't really as important
25  as the total settlement, and it -- certainly

Dans - Direct                                    Page 67

1   included into the allocation was the value that
2   Spectra put on a settlement.
3   Q.  Based on the e-mail from Mr. Vallone
4   there was an allocation made by Mr. Vallone as to
5   the overall settlement value, correct?
6   A.  These numbers didn't come from
7   Mr. Vallone.  These were the numbers that were
8   derived at the meeting.  These were not values
9   that we just divided this up.  This is the way it
10  was being proposed to us.
11  Q.  But there's a proposal in the e-mail
12  from Mr. Vallone where he says "Since it would be
13  an additional permanent easement area, we would
14  get the $225,060."
15      Do you see that?
16  A.  That's correct.
17  Q.  So there's an allocation based on the
18  different easements and Mr. Vallone proposing to
19  get the benefit of certain compensation for
20  certain allocated easement amounts, right?
21  A.  Yes, but it goes on, as it says, that
22  there's other parts of this that made it even
23  more viable to want to pursue this.  It wasn't
24  just getting the two and a quarter.
25  Q.  Who is Sharon Christenbury or

Dans - Direct                                    Page 68

1   Chrisberry?
2   A.  Sharon was an attorney for Crescent
3   Heights.
4   Q.  What is CH Acquisitions II, LLC?
5   A.  That was the name Crescent Heights was
6   using to acquire the property.
7   Q.  That's a legal entity?
8   A.  I believe it is.
9   Q.  Hoboken Brownstone Company signed the
10  purchase and sale agreement with Ogden Realty to
11  an entity, right?
12  A.  Yes.
13  Q.  Is that the entity --
14  A.  Yes.
15  Q.  -- that the agreement was assigned to?
16  A.  I believe so, yes.
17  Q.  What was the relationship between CH
18  Acquisitions II, LLC and Hoboken Brownstone as of
19  June 2013?
20  A.  I don't recall exactly our
21  relationship.  We were under contract with
22  Crescent Heights, so I don't recall exactly if it
23  was the same entity, it may have been, to
24  purchase the 110 property.
25      Now, there was an agreement regarding

Dans - Direct                                      Page 69

1    that property with Crescent Heights, but I'm not
2    -- I don't really recall exactly what our
3    relationship was with CH II, if there was no --
4        I better leave it like that. I really
5    don't recall exactly what our relationship was at
6    that time. They certainly were under contract
7    with us to purchase 110.
8    Q.  Was Hoboken Brownstone Company still
9    under contract to purchase the Ogden Tracts with
10   Crescent Heights as of June 2013?
11   A.  We had assigned our rights under the
12   contract to Crescent Heights.
13   Q.  When did that assignment take place?
14   A.  Within ten days or less of the signing
15   of the contract.
16   Q.  Within ten days of signing the
17   contract between Ogden Realty Company and Hoboken
18   Brownstone?
19   A.  Correct.
20   Q.  Was there additional consideration for
21   that assignment between Hoboken Brownstone and
22   Crescent Heights?
23   A.  No.
24   Q.  Do you have a copy of the assignment
25   of the purchase and sale agreement from Hoboken

Dans - Direct                                      Page 70

1    Brownstone to Crescent Heights?
2    A.  I'm sure we did. I don't recall if we
3    still have that document. I don't know where to
4    find it quickly, but it may have come up.
5    Q.  To the extent that you maintain a copy
6    of that assignment in your records, I would like
7    a copy of that as well.
8    A.  Okay.
9    Q.  What's Jersey City North, LLC?
10   A.  I don't recall.
11   Q.  Are you personally or have you ever
12   been a member of the entity known as Jersey City
13   North, LLC?
14   A.  Not to my recollection.
15   Q.  Is Hoboken Brownstone Company an agent
16   for Crescent Heights from the time the purchase
17   and sale agreement with Ogden was assigned to
18   Crescent Heights until the agreement was
19   terminated on June 28, 2013?
20   A.  Yes, we were working on their behalf.
21   Q.  Was Hoboken Brownstone working on
22   behalf of Crescent Heights through some legal
23   documents whether, a Power of Attorney, an
24   express delegation of authority in the assignment
25   or some other document?

Dans - Direct                                      Page 71

1    A.  No.
2    Q.  What was your understanding of your
3    authority as an agent on behalf of Crescent
4    Heights between signing the assignment of the
5    purchase and sale agreement from Ogden until
6    June 28, 2013?
7        THE WITNESS: I'm going to ask that
8    you repeat that, please.
9        (Question Read Back.)
10   A.  To make Crescent Heights as
11   comfortable as possible with the transaction.
12   Q.  Did you have authority to sign binding
13   documents on behalf of Crescent Heights during
14   the period between the assignment of the Ogden
15   purchase and sale agreement of June 28, 2013?
16   A.  We had no written authority.
17   Q.  While you had no written authority
18   it's your understanding you had authority,
19   nonetheless, to be an agent for Crescent Heights?
20   A.  Yes.
21   Q.  Who is William Ackman?
22   A.  He's a gentleman we've known for many
23   years. I first met him in 1984, '85 -- no, maybe
24   it was after that, '86 or '87.
25       He's the son of Larry Ackman, who we

Dans - Direct                                      Page 72

1    met first, who is the principal of a mortgage
2    broker company in Manhattan.
3        William Ackman ended up, after we had
4    met him going back to school, graduate school,
5    and ultimately started a hedge fund in Manhattan,
6    and that hedge fund invested in a development
7    with us in the late '90s, and Mr. Ackman now has
8    another hedge fund.
9    Q.  What was the project that Mr. Ackman
10   invested with you in early '90s?
11   A.  Maxwell House, the Maxwell House
12   factory in Hoboken.
13   Q.  What was Mr. William Ackman's role in
14   the Maxwell House project?
15   A.  He was an investor.
16   Q.  Was there any amendment to the
17   purchase and sale agreement between Ogden Realty
18   and Hoboken Brownstone as assigned to Crescent
19   Heights between March 2013 and June 28, 2013?
20   A.  Not to my recollection.
21   Q.  Was the settlement for the Texas
22   Eastern condemnation and the additional permanent
23   easement area on Lot 7 memorialized in a writing
24   as to an allocation between Ogden Realty, Hoboken
25   Brownstone, and Crescent Heights?

**Dans - Direct** — Page 73

```
 1  A.  Yes, I believe there was.
 2  Q.  Do you recall what that document
 3  consisted of?
 4  A.  No.
 5  Q.  Do you recall who drafted that
 6  document?
 7  A.  No.
 8  Q.  Do you recall signing that document?
 9  A.  I don't recall.
10  Q.  You do recall seeing a document,
11  however?
12  A.  Yes, I do.
13  Q.  Was that document created, negotiated,
14  finalized prior to June 28, 2013?
15  A.  I believe it was, yes.
16  Q.  Do you maintain a copy of that
17  agreement?
18  A.  If I haven't produced it, I don't
19  think I have a copy.
20  Q.  Well, I did not find a copy in your
21  files, nor was there one produced, so to the
22  extent that you have retained a copy, I ask for a
23  copy.
24  A.  Okay.
25  Q.  The purchase and sale agreement
```

**Dans - Direct** — Page 74

```
 1  between Ogden Realty and Hoboken Brownstone as
 2  assigned to Crescent Heights was terminated on
 3  June 28, 2013?
 4  A.  That's correct.
 5  Q.  Did you already testify today that it
 6  was because there was a lack of financing
 7  available to close on the property?
 8  A.  There was a dispute with Crescent
 9  Heights.  They felt that they -- the owner didn't
10  have clear title and that was the reason Crescent
11  Heights ultimately said was the reason that they
12  weren't closing.
13  Q.  Crescent Heights terminated the
14  agreement because the seller could not provide
15  clear title?
16  A.  Yes.
17  Q.  Was their deposit of over a million
18  dollars returned?
19  A.  No.
20  Q.  It was not?
21  A.  It was not.
22  Q.  It was forfeited under the agreement?
23  A.  On June 28th it was disputed.
24  Q.  What was the cloud on title that
25  Crescent Heights objected to as to Ogden's
```

**Dans - Direct** — Page 75

```
 1  ability to convey clear title?
 2  A.  Their objection was Lot 7 was unclear
 3  who the ownership was of that lot.
 4  Q.  What documents did Crescent
 5  review in forming an opinion that Ogden did not
 6  have clear title to Lot 7?
 7  A.  There were questions on surveys.
 8  Q.  Did you discuss the questionable title
 9  as to Lot 7 with either counsel or
10  representatives of Crescent Heights?
11  A.  Yes.
12  Q.  What did you discuss with the
13  representatives of Crescent Heights with regard
14  to the cloud on the title for Lot 7?
15  A.  We believed that there was not a cloud
16  on the title and the error was really something
17  that was that -- had not properly been picked up
18  by the surveyor.
19  Q.  It was your opinion at that time that
20  Ogden Realty had title to a portion of Lot 7?
21  A.  Yes.
22  Q.  And Crescent Heights disagreed with
23  your opinion as to the title of Lot 7?
24  A.  They felt there was still questions
25  regarding that.
```

**Dans - Direct** — Page 76

```
 1  Q.  Did you discuss the cloud on title of
 2  Lot 7 with representatives of Ogden Realty?
 3  A.  Yes.
 4  Q.  Did the representatives of Ogden
 5  Realty that you discussed the cloud on title of
 6  Lot 7, did those Ogden Realty representatives
 7  believe they held title to a portion of Lot 7?
 8  A.  Absolutely.
 9  Q.  What documents did they provide to in
10  support of their opinion that Ogden Realty had a
11  clear title to Lot 7?
12  A.  These are things that I don't
13  personally review, but my attorneys think there
14  was title runs on the property that show that
15  that was owned by Ogden.
16  Q.  Who were your attorneys at the time?
17  A.  My attorneys were Norris McLaughlin.
18  Q.  Who specifically?
19  A.  Kevin O'Brien.
20  Q.  So as of June 28, 2013, the contract
21  to purchase the Ogden Tracts were terminated?
22  A.  Correct.
23  Q.  Ultimately, the Ogden Tracts get
24  conveyed to a new entity called Jersey
25  Development Company, LLC?
```

Dans - Direct                                    Page 77

1  A.  Correct.
2  Q.  That closing takes place on July 3,
3  2013?
4  A.  Correct.
5  Q.  Could you describe what happened
6  between June 28, 2013 and July 3, 2013 between
7  the termination of the contract for the sale of
8  the Ogden Tracts to Crescent Heights as assigned
9  and the purchase of the Ogden Tracts by Coles
10 Jersey Company on June 3rd -- strike that --
11 July 3rd?
12     MR. DALTON: Off the record.
13     (Discussion off record.)
14 A.  After we found out -- I'll step back a
15 little bit to the beginning of the day on June --
16 we'll call it June 28th.
17     We went into the city to Crescent
18 Heights' office and had a chat from Bruce Menin,
19 and Bruce was one of the principals of Crescent
20 Heights.  We were expecting that the closing
21 could still occur.
22     And in the morning Bruce told us there
23 were a number of issues that he wasn't happy with
24 regarding some of our performance, including the
25 settlement, and that at that moment he wasn't

Dans - Direct                                    Page 78

1  prepared to close on the property, but he was
2  going to be speaking with his partners.
3     He asked us at that time about a
4  number of the issues that he wasn't happy about
5  and we explained them all to him and he brought
6  up Mr. Ackman's name, who he had gone to school
7  with, and who he had already talked to about us
8  before he entered into the agreement on the Van
9  Leer site, the 110 Hoboken Avenue property.
10    They had gone to graduate school at
11 Harvard together.
12    And he said he was going to give
13 Mr. Ackman a call and get a little more insight
14 into us.
15    He then said, "Guys, I'm going to be
16 speaking to my partners in a couple hours and
17 I'll give you a call then."
18    And we said, "We'll wait downstairs.
19 Give us a call.  When you're ready we'll come up
20 and talk to you."
21    And by the time he called us up it was
22 late in the afternoon and he said "Look, we're
23 not going to close" and, you know, "We think that
24 we have a position that the seller wasn't
25 offering us a clear title."

Dans - Direct                                    Page 79

1     And we were upset and heartbroken as
2  we left and we tried to convince him that this --
3  that the title issue was not an issue and it was
4  just a surveying issue, but that did little to
5  hold it off.
6     We called Ogden and told them and they
7  informed us that the deal was over and we still
8  had hope that possibly we could convince Crescent
9  Heights in a day or two that there was no title
10 problem and we could close on the property and
11 they said that the contract was terminated and
12 the only way we could close on the property was
13 if we came up with the cash quickly, if Crescent
14 Heights came up with it on Monday or Tuesday that
15 they could close, but they weren't going to share
16 the allocations of the Spectra/Texas Eastern
17 money with us.
18    On George's drive home Bill Ackman
19 called him up and said that he had just spoken to
20 Bruce Menin.  Bruce had never reached him even
21 though he had placed a call earlier in the day,
22 it was well after about four or five o'clock,
23 let's say, on a Friday afternoon that Bill
24 finally called Bruce Menin back and they chatted
25 and had a nice talk, and Bill said that he was

Dans - Direct                                    Page 80

1  going to see Bruce over the weekend and ask if we
2  would write a little memo to him to go over the
3  points that were bothering Bruce about our
4  performance, and we wrote that memo.
5     I believe Bruce and Bill met on a
6  Saturday.  They had a barbecue together, I think
7  at Bill's house in the Hamptons, and a phone call
8  was put together on Sunday between -- which I was
9  not on -- with Mr. Malone, with Bruce Menin and
10 with Sonny -- Sonny Kahn was Bruce Menin's
11 partner in Crescent Heights, he was in Florida --
12 and in that conversation George said the only way
13 we're going to close this right now is to forfeit
14 the 1.8 -- close to $1.8 million.
15    And Crescent Heights said that that's
16 not going to happen and they're going to fight it
17 out with these guys.  "They owe us our money
18 back."
19    And so we saw a battle brewing, and
20 that was on -- so that was sometime Sunday
21 morning.  Bill had asked George to give him a
22 call back after the conference call and George
23 did that and told Bill what had gone -- what had
24 happened and that Crescent Heights was out and
25 that they were going to commence litigation and

Dans - Direct                                                                    Page 81

1  this was all going to get tied up for a long
2  time, you know.
3      And we asked Bill if we could come in
4  and review the project with him. Bill had -- we
5  first made Bill aware of the project, I believe,
6  in 2007 when we first signed the contract, and
7  again in 2010, where we came very close to making
8  a deal with Bill and Ogden, and that fell apart
9  too at the last moment.
10     So Bill said -- told us yes, I think
11 he told us he was staying at his house and said
12 "Come into the city on Monday and I'll meet you
13 guys after I get home, come to my house."
14     And Bill's father, Larry, told us to
15 come into the city, have dinner with him on
16 Monday, and then we'd go over to Bill's after
17 that and go over the project.
18     We brought in the information we had
19 to Bill and sat in his home and went over it and
20 told him all the benefits of getting involved in
21 a piece of property like this.
22     And he -- and we were there with his
23 father and also his manager of his personal LLC.
24     This was going to be done, if we did
25 it, through his personal company, not through the

Dans - Direct                                                                    Page 82

1  hedge fund that he's involved in.
2      And he said "Look, guys, I'll think
3  about it." You know, "I'll give you a call in
4  the morning."
5      Mr. Vallone was traveling for a week's
6  vacation and he flew off and Bill called me at
7      8:30 in the morning and told me that he really
8  didn't feel that comfortable about the project,
9  about buying another piece of land and getting
10 involved in something like this at this point.
11     And I started my very best convincing
12 to try to tell him this is the best of the best,
13 and my promotor salesman is up in the air flying,
14 George Vallone.
15     And Bill, being a good friend and a
16 good partner and having been a good partner,
17 allowed me to go on. And the more I chatted, and
18 we were on phone five or ten minutes and he kept
19 politely saying back to me "I'm just not feeling
20 real estate right now" and "I don't know if it's
21 right", "I think I'm really going to take a pass
22 on this."
23     And then all of a sudden he says
24 "Look, I got another call coming through, just
25 hold on a second."

Dans - Direct                                                                    Page 83

1      Then a number of minutes go by, one,
2  two, three, four, five, and I'm sitting on the
3  phone hanging, you know, my stomach churning and
4  he gets back on the phone and says "That was my
5  father."
6      And Larry had been always against that
7  portion of Jersey City. And he came on and said
8  "Look, I think it's a good deal and I think we
9  should do it."
10     And so Bill told me all that and I
11 said "Great." He said, "Look, I'm not saying I'm
12 going to do it yet, but I'm going to make a few
13 phone calls. I'm going to call Doug Yearly from
14 Toll Brothers..." who he had dealt with at
15 Maxwell House site "...and a few other people and
16 I'll get back to you.
17     We talked back and forth. I talked
18 with Larry. Doug Yearly gave us a good
19 recommendation on the site and George finally
20 landed and got on the phone, chatted, I told him
21 to give Bill a call. He gave Bill a call, and at
22 that time by then Bill had been convinced and
23 said "Let's make a closing" and we jumped through
24 hoops and we got to the closing.
25     No contract, Ogden wanted no contract.

Dans - Direct                                                                    Page 84

1      We would have been happy to have one, create one,
2  but they say no contract; either you come and
3  show up with the cash and we'll do it, but we do
4  not want the contract. The contract is dead."
5      So I was given the authority to be the
6  signer for Bill Ackman at the closing.
7      I think that's it.
8  Q.  I have a few follow-ups to your answer
9  as you can imagine.
10     When you were referring to "we" that
11 is you and Vallone?
12 A.  Yes.
13 Q.  Ogden indicated to you that a deal
14 going forward there would be no allocation of the
15 condemnation settlement of three-and-a-half
16 million between Ogden and whoever the future
17 buyer would be?
18 A.  Yes.
19 Q.  Who communicated that on behalf of
20 Ogden?
21 A.  Paul Hennessy.
22 Q.  Is there writing to that effect or a
23 letter or an e-mail?
24 A.  I don't recall.
25 Q.  You accepted those terms as a buyer

---

**Dans - Direct**                                      Page 85

1   going forward, that there would be no allocation
2   of the three-and-a-half million dollar
3   settlement?
4       MR. DALTON: Objection.  I don't think
5   that -- just a clarification.
6       MR. ASH: That's fine.  I'll come back
7   to that.
8   Q.  You wrote a memo to Bill Ackman as to
9   the terms of the deal with Ogden and the
10  potential development of the site?
11  A.  Yes.
12  Q.  Do you have a copy of that memo in
13  your file?
14  A.  A copy of a memo that laid out the
15  development to Mr. Ackman?
16  Q.  Yes.
17  A.  I believe so, yes.
18  Q.  I haven't seen a copy of that memo and
19  it wasn't in the files, I reviewed so to the
20  extent you maintained a copy of that memo, I
21  would like a copy.
22      Did that memo identify the Texas
23  Eastern pipeline or the easements?
24  A.  No.
25  Q.  Did it identify as an issue an

---

**Dans - Direct**                                      Page 86

1   allocation of settlement proceeds of
2   three-and-a-half million dollars with the seller
3   Ogden?
4   A.  No.
5   Q.  The deposit of the purchase and sale
6   agreement between Ogden and Hoboken Brownstone
7   was $1.8 million?
8   A.  The deposit on the initial contract?
9   Q.  Yes, the March 2013 contract.
10  A.  To the best of my recollection.
11      I don't remember the exact amount.
12  Q.  I'm only asking as a clarification
13  because I think earlier today your testimony was
14  the deposit was north of one million and then in
15  your previous answer you indicated it was
16  $1,800,000.
17      Is that the amount, to the best of
18  your recollection?
19  A.  No, I'm sorry, you misunderstood.
20  When I said the 1.8 I was referring, I think,
21  before to the amount of the settlement, 1.8.
22      I don't remember -- you'd have to go
23  back to that question, but when I mentioned that
24  I think I was referring to that 1.81792, not the
25  deposit.

---

**Dans - Direct**                                      Page 87

1       I'd have to go back to the question.
2   Maybe I misunderstood it.
3   Q.  In your answer, your previous answer,
4   you indicated that there was a $1.8 million
5   amount.
6       Do you recall talking about
7   $1.8 million?
8   A.  That was the amount of -- that would
9   come off -- would have come off the purchase
10  price if we had closed on the original contract.
11  Q.  So if you closed on the original
12  contract of 22 million there would have been a
13  reduction of the purchase price by $1,792,393.94?
14  A.  That was our understanding, yes.
15  Q.  Was that memorialized in writing, that
16  allocated the settlement amount between Ogden
17  Realty and Crescent Heights?
18  A.  I don't recall exactly how that was
19  memorialized.  It was memorialized in documents
20  of this nature as you put in front of me,
21  certainly memorialized like that.
22      I don't know if there were any other
23  documents.
24  Q.  Bill Ackman's personal LLC, is that
25  Table LLC?

---

**Dans - Direct**                                      Page 88

1   A.  Yes, Table Management.
2       MR. ASH: Let's go off the record.
3   (Discussion off record.)
4   (Luncheon Recess Taken.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

---

Dans - Direct | Page 89

1   A F T E R N O O N    S E S S I O N
2
3     CONTINUED DIRECT EXAMINATION BY MR. ASH:
4
5 Q. Now, as of June 28, 2013 Crescent
6   Heights, who was the buyer of the Ogden Tracts
7   under assignment of the purchase and sale
8   agreement of Hoboken Brownstone, terminates the
9   agreement, correct?
10 A. Correct.
11 Q. So why are you now concerned with
12   finding a buyer for the Ogden Tracts?
13 A. I would like to own the property.
14 Q. You weren't going to own the property
15   if Crescent Heights bought it, right?
16 A. I believed that an agreement -- if
17   Crescent Heights had closed on the property that
18   they would have -- at some point in the future --
19   had us -- brought us into the partnership that
20   owned the property.
21 Q. Was that potential arrangement
22   discussed with Crescent Heights at some point?
23 A. Yes.
24 Q. You deposit money under the purchase
25   and sale agreement of a little bit more than a

---

Dans - Direct | Page 90

1   million dollars, was that Crescent Heights'	money
2   on deposit or was that Hoboken Brownstone's money
3   on deposit?
4 A. Crescent Heights, other than I think
5   $10,000.
6 Q. So what steps were taken between
7   June 28, 2013 and July 2013 for Coles Jersey
8   Development Company, LLC to purchase the Ogden
9   Tracts?
10 A. Again, a long explanation of how we
11   ended up there.
12     Once Bill agreed on that -- I believe
13   it was a Tuesday afternoon -- that he would close
14   on the property, his law firm, Sullivan Cromwell,
15   and Tony Colletta, and our attorney, Kevin
16   O'Brien -- Kevin shared the documents, shared
17   everything with Tony Colletta and Kevin acted on
18   behalf of Coles Jersey Development to purchase
19   the property.
20 Q. What were the terms that were
21   negotiated in lieu of a purchase and sale
22   agreement for Coles Jersey to buy the Ogden
23   Tracts from Ogden?
24 A. It was an all-cash purchase. There
25   were no terms.

---

Dans - Direct | Page 91

1 Q. So it was an all-cash purchase and the
2   amount was $22 million?
3 A. Yes.
4 Q. The purchase was not subject to
5   approvals for development?
6 A. No.
7 Q. The purchase was not based on a
8   density of development that could be achieved on
9   the property?
10 A. No.
11 Q. Had you presented a density of
12   development that could be achieved on the
13   property to Mr. Ackman prior to purchase by Coles
14   Jersey?
15 A. Yes.
16 Q. What was to be the allocation of the
17   settlement between Texas Eastern and Ogden with
18   Ogden and Coles Jersey?
19 A. There was nothing mentioned about it.
20 Q. There was nothing mentioned between
21   Ogden and Coles Jersey?
22 A. That's correct.
23 Q. Had you mentioned it to Ackman?
24 A. No, I don't believe I mentioned it to
25   Ackman, the purchase of the property.

---

Dans - Direct | Page 92

1 Q. The settlement of three-and-a-half
2   million dollars for the permanent and temporary
3   easements on Lot 13 and additional permanent
4   easement on Lot 7 was never discussed between you
5   and Ackman prior to purchase?
6 A. I don't recall if it was ever
7   mentioned during the -- well, Crescent Heights
8   still had the opportunity to purchase the
9   property if that had become an issue.
10     Crescent Heights had an issue, as I
11   mentioned, with some of our actions.
12 Q. One of the actions that Crescent
13   Heights had an issue with was the way you dealt
14   with the settlement?
15 A. Yes.
16 Q. Specifically what was their issue with
17   how you addressed the settlement?
18 A. They felt they hadn't been notified
19   enough about it. We felt very strongly
20   differently. We had many e-mails that said that
21   and we defended our actions.
22     And Bill -- before he even thought
23   about purchasing the property, he was friends
24   with, as I mentioned, Bruce Menin and tried to
25   tell Bruce, "Look, Danny and George are good

---

Min-U-Script®

Dans - Direct
Page 93

1  guys. They're not doing anything to be devious
2  or do anything wrong."
3      And I don't know if there were any --
4  I don't recall if any amounts were talked about
5  or anything, but there was a memo we had prepared
6  about our actions, the ones that Bruce felt it
7  didn't give him full confidence in us.
8  Q.  That was the memo you prepared for
9  Ackman's benefit?
10 A.  We prepared that for Ackman's benefit,
11  for the benefit of -- so that Ackman could, at
12  that moment, still hopefully convince Bruce to
13  close.
14 Q.  One of the issues addressed in the
15  memo to Ackman was the treatment of the Texas
16  Eastern settlement agreement?
17 A.  Yes, I can't remember the exact -- how
18  that was all put together in the memo, but that
19  was involved in that discussion, yes.
20 Q.  In addition to the memo prepared for
21  Ackman's benefit, that would have specifically
22  addressed the three-and-a-half million dollar
23  settlement with Texas Eastern and Ogden.
24      Did you also discuss that settlement?
25      MR. DALTON: Objection to form, but

Dans - Direct
Page 94

1  you can answer.
2  A.  No.
3  Q.  There was no discussion?
4  A.  There was no discussion.
5  Q.  Did Ackman have questions for you
6  based on the memo?
7  A.  No, it was all very quick.  Bill
8  wasn't focused on it other than trying to have a
9  nice barbecue with his friend, Bruce, and say
10  "These guys are nice guys."
11 Q.  Do you know if Ackman was aware that
12  the purchase price to Crescent Heights for the
13  Ogden Tracts of $22 million was then offset by
14  approximately $1.8 million for the allocation of
15  the Texas Eastern settlement?
16      MR. DALTON: I have an objection to
17  form, but you can answer.
18 A.  As I mentioned, there was a memo
19  prepared for Bill prior to his meeting with Bruce
20  Menin for a barbecue and that was all that Bill
21  could have been -- that Bill could have been
22  aware of.
23      He certainly didn't know about the
24  contract or anything of that nature.  It was just
25  that one memo to him regarding the relationship

Dans - Direct
Page 95

1  with Crescent Heights and a number of items that
2  Crescent Heights was unhappy about.
3  Q.  So at any point do you know if Ackman
4  was aware that the purchase price that Crescent
5  Heights would pay for the same property
6  ultimately purchased by Coles Jersey was a little
7  over $20 million, $20,200,000 to Crescent
8  Heights, but $22 million to Coles Jersey?
9  A.  I don't think he was aware of that.
10 Q.  You never explained that difference?
11 A.  I don't recall what was in that memo
12  because it was exactly what we had explained in a
13  the memo.  I think we had delivered that memo,
14  but that was really the extent of trying to
15  explain that.
16 Q.  On July 3, 2013 Coles Jersey purchased
17  the Ogden Tracts, right?
18 A.  Correct.
19 Q.  You attended that closing?
20 A.  Yes.
21 Q.  Where was the closing?
22 A.  At Ogden's law firm.  I don't remember
23  the attorney's name, but it was at their
24  attorney's office.
25 Q.  Do you remember where that office was

Dans - Direct
Page 96

1  located?
2  A.  I don't know.  I can't remember,
3  actually.
4  Q.  Was the office in Jersey City?
5  A.  No.
6  Q.  Was it in Hoboken?
7  A.  No.
8  Q.  Did you drive there?
9  A.  Yes.
10 Q.  Drove yourself?
11 A.  Yes.
12 Q.  Did anyone come with you?
13 A.  No.
14 Q.  Did anyone else attend the closing on
15  behalf of the buyer?
16 A.  Other than my attorney?
17 Q.  Including your attorney.
18 A.  Well, my attorney was there, the
19  attorney for --
20 Q.  Who was that attorney?
21 A.  Kevin O'Brien.
22 Q.  Did he meet you at the closing?
23 A.  Yes.
24 Q.  Mr. Vallone didn't attend the closing?
25 A.  No.

Texas Eastern v.
0.77 a Acres

**Dans - Direct**          Page 97

1   Q.   Who attended the closing on behalf of
2    the seller?
3   A.   Paul Hensen.
4   Q.   Anyone else?
5   A.   No.
6   Q.   Did they have an attorney -- did the
7    seller have an attorney at the closing?
8   A.   Yes.
9   Q.   Who was that?
10   A.   I don't remember the name.
11   Q.   Was the closing in the morning or in
12    the afternoon?
13   A.   Afternoon.
14   Q.   Was there pressure to get the closing
15    done before the holiday weekend?
16   A.   Yes, pressure by Ogden to get the
17    closing done.
18   Q.   Did you receive a draft of closing
19    documents before the closing?
20   A.   Some documents. I don't know if I had
21    all -- every document.
22   Q.   Do you recall reviewing the documents,
23    the draft closing documents, prior to attending
24    the closing?
25   A.   Yes.

**Dans - Direct**          Page 98

1     (Closing Report is received and marked
2    as Exhibit DG-4 for Identification.)
3   Q.   You could just flip through what we
4    marked DG-4.
5   A.   I would like to flip it.
6     (Witness reviewing exhibit.)
7   Q.   You've seen these documents before,
8    right?
9   A.   Yes.
10   Q.   These were produced through my review
11    of your files on CD that was marked DG 00358 to
12    the best of your recollection or if you know?
13   A.   Yes.
14   Q.   Have you reviewed these documents
15    since the closing?
16   A.   No.
17   Q.   If you look at the first two pages
18    there's an index of documents.
19     Do you know if there are any closing
20    documents that would have been prepared for the
21    closing or signed at the closing or in relation
22    to the closing that are not listed in the index
23    of documents?
24   A.   I do not.
25   Q.   You're not aware?

**Dans - Direct**          Page 99

1   A.   I'm not aware of anything that's not
2    included here.
3   Q.   You signed all closing documents on
4    behalf of the buyer Coles Jersey Development
5    Company, LLC?
6   A.   Yes, I did.
7   Q.   Those documents included the
8    settlement statement?
9   A.   Yes.
10   Q.   The buyers Affidavit of Consideration?
11   A.   Yes.
12   Q.   The assignment of licenses, permits,
13    contracts and other intangible property?
14   A.   Yes.
15   Q.   The bulk sale escrow agreement?
16   A.   Yes.
17   Q.   The release of condemnation proceeds?
18   A.   The release of condemnation proceeds?
19     This says "Condemnation Settlement."
20   Q.   Strike that.
21     You signed the release as the
22    condemnation settlement amount?
23   A.   Yes.
24   Q.   And you signed the assignment and
25    limited liability company agreement for Coles

**Dans - Direct**          Page 100

1    Jersey?
2   A.   Yes, I believe I did. I was wearing a
3    few hats that day.
4   Q.   What hats were you wearing that day?
5   A.   As to the lease's condemnation
6    settlement I was wearing -- it says "Hoboken
7    Brownstone," in many of the documents I signed on
8    behalf of Coles Jersey.
9   Q.   Were you a member of Coles Jersey
10    Development, LLC at the closing?
11   A.   No.
12   Q.   You formed the limited liability
13    company called Coles Jersey Development, LLC with
14    Mr. Vallone, right?
15   A.   We formed it? It was formed by an
16    attorney.
17   Q.   You and Mr. Vallone were not the
18    original members of the entity Coles Jersey
19    Development Company, LLC?
20   A.   No. It was a new company.
21   Q.   Please turn to one of the last
22    documents in DG-4, the assignment and limited
23    liability company agreement, Coles Jersey
24    Development Company, LLC.
25     Are you there?

Dans - Direct                                      Page 101

1  A.  Okay.
2  Q.  If you go to Paragraph 6, would you
3  read that, please?
4      (Witness reviewing exhibit.)
5  A.  "Sole member Table Jersey, LLC shall
6  be a sole member of the company.  Each of George
7  Vallone and Daniel Gans hereby represent and
8  warrant and cause the formation of the company
9  and that no other person or entity has any
10  ownership or beneficial interest of any kind,
11  economic or otherwise, in the company.  Each of
12  George Vallone and Daniel Gans hereby assigns all
13  of their right, title, and interest in their
14  company to the member."
15  Q.  So the company was formed on July 1,
16  2013?
17  A.  Yes.
18  Q.  And when it was formed you and
19  Mr. Vallone were members of that entity, right?
20      MR. DALTON: Objection to form.
21  Objection to form.
22  Where do we have that?
23      MR. ASH: I'm asking him the question.
24      MR. DALTON: Answer if you know.
25  A.  When we formed -- when this was --

Dans - Direct                                      Page 102

1      THE WITNESS: Please read the
2  question, again.
3      (Question read back as follows:
4      "QUESTION: And when it was formed you
5      and Mr. Vallone were members of that
6      entity, right?")
7  A.  From what I read now, it seems that
8  that's correct.  I didn't recall that.
9  Q.  What are you reading specifically that
10  refreshes your recollection?
11  A.  What you asked me to read out loud
12  just now to the court stenographer.
13  Q.  Paragraph 6 of the assignment and
14  limited liability company agreement of Coles
15  Jersey?
16  A.  Correct.
17  Q.  On July 2nd, in that agreement, you
18  then assign your membership status to Table
19  Jersey, LLC?
20  A.  Correct.
21  Q.  And in Paragraph 11 of the same
22  agreement you are designated as an authorized
23  person and an authorized signatory of Coles
24  Jersey Development Company, LLC.
25      Is that right?

Dans - Direct                                      Page 103

1  A.  That's correct.
2  Q.  And it is with that authority that you
3  signed all of the documents on behalf of the
4  buyer, Coles Jersey Development Company, LLC, at
5  a closing on July 3, 2013, correct?
6  A.  That's correct.
7  Q.  Did you review the closing documents
8  with Ackman or any other representative of Coles
9  Jersey Development, LLC?
10  A.  No.
11  Q.  As of July 3, 2013, were there any
12  other members of Coles Jersey Development
13  Company, LLC other than Table Jersey, LLC of
14  which the sole member was William Ackman?
15  A.  Not to my knowledge.
16  Q.  Do you know if Ackman approved the
17  closing documents before you signed them at
18  closing?
19  A.  I don't believe that he read the
20  documents prior to closing.
21  Q.  Did Ackman's entity, Table Jersey,
22  LLC, have separate counsel?
23  A.  Yes.
24      MR. DALTON: I'm sorry, separate from
25  whom?

Dans - Direct                                      Page 104

1      MR. ASH: Separate from Mr. O'Brien.
2  A.  Yes, they did.
3  Q.  That was a gentleman at Sullivan
4  Cromwell?
5  A.  Yes.
6  Q.  What was his name?
7  A.  Tony Colletta.
8  Q.  Did Mr. Colletta review the closing
9  documents on behalf of Table JERSEY, LLC prior to
10  closing?
11      MR. DALTON: Objection to form.
12  Q.  You can answer.
13  A.  I believe he or someone in his firm
14  reviewed the documents.
15  Q.  Were the documents reviewed by
16  Mr. Colletta or someone in his firm, did he
17  review all of the documents you signed at
18  closing?
19      MR. DALTON: Objection to form.
20      You can answer it.
21  A.  I do not know.
22  Q.  On Page 1 of the document, DG-4, under
23  the heading "Closing Report", the second
24  paragraph indicates that there was no purchase
25  and sale agreement.

Dans - Direct                                          Page 105

1       "However, a purchase and sale
2     agreement dated April 12, 2013 had previously
3     been entered into between Ogden and Hoboken
4     Brownstone Company (an affiliate of Coles
5     Jersey). Then Hoboken Brownstone Company
6     assigned such agreement to an unaffiliated entity
7     and the agreement was thereafter terminated by
8     Ogden as a result of an alleged breach by such
9     entity of its obligation to close title by the
10    date required."
11       Is the unaffiliated entity described
12    in that second paragraph on DG-4, is that
13    Crescent Heights?
14  A.  Yeah, the CH II you named the entity
15    that Crescent Heights was using, yes.
16  Q.  CH II Acquisitions?
17  A.  Correct.
18  Q.  Hoboken Brownstone Company is
19    described here as an affiliate of Coles Jersey.
20       Do you see that?
21  A.  Yes.
22  Q.  What does that mean?
23  A.  I don't know.
24  Q.  As of July 3, 2013 was Hoboken
25    Brownstone Company affiliated with Coles Jersey?

Dans - Direct                                          Page 106

1  A.  No.
2  Q.  As of the closing date, what was the
3    arrangement between Ogden Realty and Coles Jersey
4    Development Company, LLC with regard to the Texas
5    Eastern condemnation settlement?
6       THE WITNESS: Could you read the
7    question again, please?
8       (Question read back.)
9  A.  There was none.
10  Q.  There was no arrangement?
11  A.  There was no arrangement.
12  Q.  Let's turn to the assignment of
13    licenses, permits and contracts or other changes.
14       MR. WEGENER: Where is that, toward
15    the end?
16       THE WITNESS: It's right in the middle
17    of it.
18       MR. WEGENER: The assignment of
19    limited liability company and agreement.
20       Is that what you're talking about?
21       MR. ASH: No. Assignment of licenses
22    permits, and contracts and other intangible
23    property.
24  Q.  And you signed this document on behalf
25    of Coles Jersey Development Company, LLC?

Dans - Direct                                          Page 107

1  A.  Yes.
2  Q.  And "This assignment specifically
3    excludes any interest in the condemnation action
4    which is referred to as Civil Action No. 1234-12
5    in the city of Jersey, Hudson County or any
6    proceeds therefrom."
7       Do you see that?
8  A.  Yes.
9  Q.  So this purchase by Coles Jersey
10    Development was made with a specific release of
11    any proceeds of that settlement, correct?
12  A.  That's what it says.
13  Q.  And at the time you signed this, that
14    settlement of three-and-a-half million dollars
15    included all compensation for the permanent and
16    temporary easements on Lot 13 and the permanent
17    easement on Lot 7, correct?
18  A.  I don't know. I'm not sure what this
19    action really was.
20  Q.  You're not sure what that refers to?
21  A.  I'm not 100 percent sure of what this
22    -- that action refers to, but whatever it refers
23    to...
24  Q.  "Whatever it refers to."
25       Is that your entire answer?

Dans - Direct                                          Page 108

1  A.  At the time I signed it I didn't know
2    what -- I didn't do any research on Civil Action
3    No. 1234-12, what exactly that meant.
4       I did not -- I don't know if that
5    included what part of what settlements or what
6    exactly that action was.
7  Q.  Did you ask anyone?
8  A.  No.
9  Q.  Do you know who prepared this
10    document?
11  A.  I can only assume that it was prepared
12    by Ogden's attorneys.
13  Q.  Do you know if this was part of the
14    draft closing documents that you reviewed prior
15    to the closing?
16  A.  It may have been, but I did not
17    specifically review each document that may have
18    been there, but I don't recall reviewing it, but
19    there were a lot of documents, obviously.
20  Q.  Were you copied on any transmittals
21    between Ogden's attorney and Coles Jersey
22    Development Company's attorney that would have
23    attached draft closing documents?
24  A.  I very well might have been.
25  Q.  Do you specifically recall seeing any

Dans - Direct                                    Page 109

1   transmittal?
2   A.   I do not specifically recall that.
3   Q.   Do you recall if there were any
4   revisions made to proposed closing documents by
5   attorneys for Coles Jersey prior to the closing?
6   A.   I don't recall.
7   Q.   I didn't see any correspondence with
8   draft closing documents in your files, but to the
9   extent you have maintained those records, I ask
10  for the document.
11      MR. ASH: Let's mark this DG-5.
12      (Release is received and marked as
13  Exhibit DG-5 for Identification.)
14      (Witness reviewing exhibit.)
15  Q.   Have you read DG-5?
16  A.   Yes.
17  Q.   Have you seen this before?
18  A.   Yes.
19  Q.   What is this document?
20  A.   A release.
21  Q.   What does it release?
22  A.   It releases any and all such claims
23  and rights with respect to such condemnation
24  award for the Texas Eastern Transmission lot.
25  Q.   You signed this at closing?

Dans - Direct                                    Page 110

1   A.   Yes, I did.
2   Q.   Do you see at the bottom of the first
3   paragraph a reference to Texas Eastern
4   Transmission, LP versus 1.73 Acres of Land More
5   or Less, Docket No. 1234-12?
6   A.   Yes.
7   Q.   Does that refresh your recollection as
8   to the docket in the previous document we
9   reviewed?
10  A.   Yes. I don't know. I'm just asking
11  you right now if it's the same numbers without
12  looking and checking and all of that, but it
13  refreshes my memory.
14  Q.   And this release includes, but is not
15  limited to Block 6005, Lots 7 and 13.
16      Do you see that?
17  A.   Yes.
18  Q.   And when you signed this document, was
19  it your understanding that this was a release of
20  the three-and-a-half million dollar settlement
21  Texas Eastern paid to Ogden Realty for the
22  easements acquired, temporary and permanent, on
23  Lot 13 as well as the additional permanent
24  easement on a portion of Lot 7?
25  A.   Yes.

Dans - Direct                                    Page 111

1   Q.   And you signed this document at
2   closing as a representative of the buyer, Coles
3   Jersey Development Company, LLC, correct?
4       MR. DALTON: Objection.
5   A.   No. I signed it as the Hoboken
6   Brownstone Company because they were the ones who
7   had a previous contract that was null and void
8   and I signed as Hoboken Brownstone Company.
9   Q.   Who prepared this document?
10  A.   I believe this was prepared by Ogden's
11  attorneys.
12  Q.   And this document was signed as part
13  of the closing documents on July 3, 2013,
14  correct?
15  A.   Yes.
16  Q.   Was there some discussion about you
17  signing this release at the closing?
18  A.   No.
19  Q.   Did you ask any questions about this
20  document before signed it at the closing?
21  A.   No.
22  Q.   Did you review the document before you
23  signed it at closing?
24  A.   Yes.
25  Q.   Had you seen a draft of this document

Dans - Direct                                    Page 112

1   prior to closing?
2   A.   I don't recall. It was very quick
3   when I read something; it may have been the day
4   before, it may have been that day.
5   Q.   Are you aware if anyone else would
6   have reviewed this document as a draft prior to
7   closing?
8   A.   Only my attorney.
9   Q.   Did you sign any other documents at
10  the closing on behalf of the Hoboken Brownstone
11  Company?
12  A.   I don't recall.
13  Q.   Did you indicate at closing that you
14  were not signing this document on behalf of the
15  purchaser, Coles Jersey Development Company, LLC?
16  A.   No.
17  Q.   Do you believe the intention of this
18  release is to bind the purchaser of the property,
19  Coles Jersey Development Company, LLC?
20  A.   I can't -- I don't want to speculate
21  on what the intention was of the document.
22  Q.   But you signed it, right?
23  A.   Yes.
24  Q.   And what was your intention in signing
25  the document?

Min-U-Script®

Texas Eastern v.
0.77 a Acres

**Dans - Direct**                                      Page 113

1  A.  It was the release of the settlement
2  proceeds that we had negotiated under the prior
3  contract.
4  Q.  Under what prior contract?
5  A.  The contract to purchase the property
6  that we assigned to Crescent Heights.
7  Q.  So you believe this release has no
8  effect, no binding effect, on Coles Jersey
9  Development Company, LLC?
10 A.  It's signed by Hoboken Brownstone
11 Company.
12 Q.  Did you sign this document, this
13 release at closing, with the intention to release
14 any right to compensation on behalf of Coles
15 Jersey Development Company, LLC?
16 A.  I didn't give it much thought at that
17 moment. I believe that this was meant for the
18 Hoboken Brownstone Company to the prior contract
19 and that that released any obligation that Ogden
20 had to share anything of the proceeds of the
21 condemnation, and that was it.
22 Q.  Do you believe it was the intention of
23 the assignment of licenses, permits, contracts
24 and other intangible property for Coles Jersey
25 Development Company, LLC to release any claim for

**Dans - Direct**                                      Page 114

1  compensation for the easements acquired by Texas
2  Eastern?
3     MR. DALTON: Objection to form, but
4  you can answer.
5  A.  Again, I don't think I gave it any
6  thought at that moment; really what the specifics
7  of it was, of those releases, because in lots of
8  documents what the documents say is what they
9  say.
10 Q.  Did Coles Jersey Development Company,
11 LLC purchase the Ogden Tracts on July 3, 2013
12 subject to permanent easements for the benefit of
13 Texas Eastern on Lot 13 and Lot 7?
14    MR. DALTON: Objection to form.
15 A.  I'm not sure what Coles Jersey was
16 fully aware of at that point. I was only a
17 signor of documents. I can't speak for them.
18 Q.  When that conveyance took place from
19 Ogden to Coles Jersey and you were there, as the
20 express agent of the buyer was that conveyance
21 made subject to permanent easements benefitting
22 Texas Eastern on Block 6005, Lot 13 and a portion
23 of Lot 7?
24    MR. DALTON: Objection to form, asked
25 and answered. Calls for a legal conclusion

**Dans - Direct**                                      Page 115

1  to make. That's why we're in this lawsuit.
2  A.  I'm not sure what Coles Jersey was
3  aware of at that moment.
4  Q.  On July 18, 2013 you formed another
5  entity called Coles Street Park Development
6  Company, LLC, correct?
7  A.  Correct.
8  Q.  Who were the members of that entity?
9  A.  Mr. Vallone and myself.
10 Q.  What was the purpose of forming that
11 entity?
12 A.  To have an entity to become part of
13 Coles Jersey Development Co., LLC.
14 Q.  Coles Street Park Development Company,
15 LLC ultimately did become a member of Coles
16 Jersey Development Co., LLC, correct?
17 A.  Correct.
18 Q.  When did that take place?
19 A.  I think I answered and said maybe
20 early September, sometime in August of 2013.
21 Q.  So since that time you are now a
22 member of an entity that is a member of the owner
23 of the property?
24 A.  Yes.
25 Q.  What percentage ownership interest in

**Dans - Direct**                                      Page 116

1  the property do you have?
2  A.  Mr. Vallone and I have 20 percent.
3  Q.  Each or together?
4  A.  No, together.
5  Q.  And are you and Mr. Vallone even
6  partners in the 20 percent interest?
7  A.  Yes.
8  Q.  Who is Robert Van Haken?
9  A.  I believe he's the title -- I'm going
10 by memory, but I believe he was the title agent.
11 Q.  Title agent.
12    Do you recall any conversations you
13 had with Mr. Van Haken?
14    MR. DALTON: Can you put a timeframe
15 on it or just ever?
16 Q.  Since July of 2014?
17 A.  No.
18 Q.  Do you know who William Piccolli is?
19 A.  The name is familiar, but you have to
20 remind me.
21 Q.  How about John Farrell.
22    Do you know who John Farrell is?
23 A.  Again, you have to remind me.
24    Van Hanken I just met. He was the
25 appraiser.

Texas Eastern v.
0.77 a Acres

Dans - Direct                                    Page 117

1  Q.  A real estate appraiser?
2  A.  A real estate appraiser.  My mind is
3  slowly working.
4  Q.  Have you spoken with Mr. Van Hanken?
5  A.  I did.
6  Q.  Do you remember when?
7  A.  I don't -- I don't remember the dates.
8  Q.  What did you discuss with Mr. Van
9  Hanken?
10  A.  I don't know if I had any discussions
11  with him as much as sending him information
12  regarding the project.
13  Q.  Do you recall what information you may
14  have sent Mr. Van Hanken regarding the project?
15  A.  Information regarding the value of
16  properties and Lot 7, and I don't remember any
17  specific documents, but it was in regard to that.
18  Q.  Did he ask you for specific documents?
19  A.  I believe so.
20  Q.  Do you recall what documents he
21  requested of you?
22  A.  I don't recall exactly, but it was all
23  related to values and the size of the property
24  and that type of thing.
25  Q.  And you don't recall what specific

Dans - Direct                                    Page 118

1  documents you provided to him?
2  A.  No.  Diagrams of -- maybe descriptions
3  that I had.
4  Q.  How about Mr. Vallone; do you know if
5  Mr. Vallone had any conversations with Mr. Van
6  Hanken?
7  A.  I don't know.  I was certainly dealing
8  with this more than he was.
9  Q.  So you were the primary point of
10  contact to Mr. Van Hanken?
11  A.  Yes.
12  Q.  Hoboken Brownstone Company retained an
13  architect on behalf of Coles Jersey?
14  A.  No, no.  Coles Jersey retained its own
15  architect.
16      (Agreement between Client and
17  Architect is received and marked as Exhibit
18  DG-6 for Identification.)
19  Q.  DG-6 is an agreement between client
20  and architect.
21      Do you see that?
22  A.  Yes.
23  Q.  And it's dated September 10, 2013?
24  A.  Correct.
25  Q.  And it's between Hoboken Brownstone

Dans - Direct                                    Page 119

1  Company and Rafael Vinoly?
2      Is that how you say it?
3  A.  Yes, that's how you say it.  Yeah,
4  this is a proposal.
5  Q.  This is unsigned?
6  A.  Yes, unsigned.
7  Q.  What I've presented to you, was this
8  ultimately signed?
9  A.  No.
10  Q.  Was Rafael Vinoly actually retained
11  for the project?
12  A.  Yes.
13  Q.  And Rafael Vinoly was retained
14  directly by Coles Jersey?
15  A.  Yes.
16  Q.  How about Dresdner Robin, who retained
17  Dresdner Robin?
18  A.  I believe Coles Jersey, LLC.
19      MR. ASH: Let's mark this DG-7.
20      (Quote is received and marked as
21  Exhibit DG-7 for Identification.)
22  Q.  DG-7 is a quote from Dresdner Robin?
23  A.  Yes.
24  Q.  This is a quote to your attention at
25  Hoboken Brownstone Company, right?

Dans - Direct                                    Page 120

1  A.  Yes.
2  Q.  Did you, on behalf of Hoboken
3  Brownstone Company, hire Dresdner Robin to survey
4  the property or did Coles Jersey hire them?
5  A.  Coles Jersey.  You know, I see my name
6  again, Hoboken Brownstone Company.
7      Again, this was not signed.  Nine
8  times out of ten I would make sure that I would
9  never sign this other than for the entity that's
10  the owner of the property.
11  Q.  You're careful not to sign documents
12  on behalf of an entity you're not authorized to
13  sign documents on behalf of.
14      Is that what you're saying?
15  A.  The responsibility to pay these bills
16  was the owner of the property's responsibility,
17  not Hoboken Brownstone Company.
18      So I would ask -- I try to always ask
19  my contractors, who often make a mistake, on who
20  things are made out to, to correct those items.
21  Q.  Again, this document is not signed by
22  you?
23  A.  Correct.
24  Q.  Ultimately, it was signed by a member
25  of Coles Jersey?

Rizman Rappaport Dillon & Rose - (973) 992-7650
Let Our Fingers Do Your Talking

Dans - Direct | Page 121

1 A.  Yes, if it was signed by Coles Jersey,
2 I would have signed it.
3 Q.  You would have signed on behalf of
4 Coles Jersey?
5 A.  On behalf of Coles Jersey, not on
6 behalf of Hoboken Brownstone.
7 Q.  Coles Street Park Development Company,
8 LLC, are you and Mr. Vallone individually members
9 of that entity or is Hoboken Brownstone Company a
10 member of Coles Street Park Development Company,
11 LLC?
12 A.  I believe it's us as individuals.
13 Q.  Did Coles Jersey also hire Gilbane?
14 A.  Yes.
15 Q.  And that was not through Hoboken
16 Brownstone Company, that was also through Coles
17 Jersey?
18 A.  Correct.
19 Q.  CPL, Civil Engineering; Coles Jersey
20 hired them directly?
21 A.  Correct.
22 Q.  How about Otteau Valuation?
23 Who hired Otteau Valuation?
24 A.  I believe it was Coles Jersey?
25 Q.  Why was Otteau Valuation hired by

Dans - Direct | Page 122

1 Coles Jersey?
2 A.  To perform a property valuation on the
3 tidelands issue on an adjacent block to the one
4 that we're discussing.
5 Q.  Did Mr. Otteau prepare an appraisal of
6 that property?
7 A.  Yes.
8 Q.  Do you have a copy of that appraisal?
9 A.  Yes, I believe so.
10 Q.  I did not see a copy of that appraisal
11 in your file, but I did see a proposal for that
12 appraisal, so to the extent you have a copy of
13 that appraisal, I would ask for that.
14 Do you recall what the valuation
15 conclusion was of the Otteau appraisal?
16 A.  Not 100 percent sure.  I would be
17 throwing out a guess.
18 Q.  Mr. Dalton doesn't want you to guess
19 and I don't want you to guess, so just provide a
20 copy of that report to the extent you've
21 maintained a copy.
22 MR. ASH: Just send me copies of all
23 documents.
24 MR. DALTON: Sure.
25 Q.  Do you know if Coles of Jersey

Dans - Direct | Page 123

1 Development Company, LLC acquired a portion of
2 Lot 7 on Block 6005?
3 A.  Yes.
4 Q.  Do you know if Coles Jersey
5 Development Company, LLC has been paying real
6 estate taxes to Jersey City on a portion of
7 Lot 7, Block 6005?
8 A.  To the best of my knowledge, yes.
9 (Letter to Tax Assessor is received
10 and marked as Exhibit DG-8 for
11 Identification.
12 (Witness reviewing exhibit.)
13 Q.  Who is Janet Feeley?
14 A.  She's my office manager and
15 bookkeeper.
16 Q.  And have you seen this letter of
17 October 10, 2014?
18 A.  I don't know if I've seen it before,
19 but I see it now.
20 Q.  And do you see this is a letter to the
21 tax assessor to update their records because your
22 office moved to 305 Gold Street?
23 A.  Right.
24 Q.  And Blocks 6005, Lot 7 is not
25 indicated in this list, right?

Dans - Direct | Page 124

1 A.  Correct.
2 Q.  So do you know if the text assessment
3 records for Jersey City include a portion of
4 Lot 7 as being owned by Coles Jersey Development
5 Company, LLC?
6 A.  I don't know what Jersey City has in
7 their records.
8 (City of Jersey City General
9 Development Application is received and
10 marked as Exhibit DG-9 for Identification.)
11 Q.  Have you seen this document, DG-9?
12 A.  Yes.
13 Q.  Is the application filed on behalf of
14 Coles Jersey Development Company, LLC to the
15 Jersey City Planning Board?
16 A.  Yes.
17 Q.  And you have certified in this
18 application that you are an officer of the
19 corporate applicant and you are authorized to
20 sign the application for the corporation.
21 Is that right?
22 A.  Yes.
23 Q.  A development approval of subdivision
24 and site plan was granted to Coles Jersey by the
25 Jersey City Planning Board?

Dans - Direct                                    Page 125

1  A.  Yes.
2  Q.  And are those the resolution numbers
3  on the first page, 14-039, Subdivision 14-040
4  site plan.
5  A.  I believe so.
6  Q.  Do you know when the applications for
7  subdivision and site plan were approved?
8  A.  I don't recall our hearing date.  I do
9  remember that the approval was protected on
10  January 31, 2015 -- yeah, January 31, 2015, the
11  45-day appeal period ended, so 45 days prior to
12  that, you know, we were in front of the board for
13  the resolution and probably two or three weeks
14  before that we had our hearing date.
15      (Series of E-Mails is received and
16  marked as the DG-10 for Identification.)
17      MR. ASH:  Off the record.
18      (Discussion off record.)
19      (Recess.)
20
21      BY MR. ASH:
22  Q.  Okay, we just marked DG-10.
23      On the first page of DG-10 we have an
24  e-mail from you to William Ackman, Larry Ackman
25  -- that's his father, right?

Dans - Direct                                    Page 126

1  A.  Yes.
2  Q.  Who is Greg Liss?
3  A.  Greg is -- operates table management
4  development.
5  Q.  Who is Irwin Cohen?
6  A.  Irwin Cohen is a friend of Larry's.
7  Q.  This was dated September 25, 2013 with
8  certain attachments to the e-mail, right?
9  A.  Yes.
10  Q.  If you look at the -- it says in the
11  e-mail that there's a massing diagram.
12      Is that what is printed out and
13  attached here?
14  A.  Yes.
15  Q.  What is a massing diagram?
16  A.  It shows a conceptual plan of the bulk
17  of the bulk buildings and where they're going to
18  be located.
19  Q.  And there are one, two, three, four,
20  five different concepts of a massing plan
21  attached to this e-mail, right?
22  A.  These are all the same.  These are all
23  parts of the same massing diagrams but at
24  different levels of the building.
25  Q.  Different levels of the building, I

Dans - Direct                                    Page 127

1  see.
2  A.  I believe that's what we're looking
3  at, yes.
4  Q.  Page 1 is residential Level 1 and 2,
5  Page 2 is Levels 3, 4, 5 and 6, and then there
6  are the tower levels, a roof level, okay.
7      Now I follow it.
8      This massing plan prepared by Chester
9  Plusus Laskowski Partnership, LLC.
10      Do you know when this was prepared?
11  A.  I think this was prepared right around
12  that time that it was presented.
13  Q.  Around the date of the e-mail,
14  September 25, 2013?
15  A.  I would say that, yes.
16  Q.  This plan was attached to the e-mail,
17  correct?
18  A.  Correct.
19  Q.  The attachment file name is 9.213 Cole
20  Street Park Retail Option 67 PM.
21      Do you see that?
22  A.  Yes.
23  Q.  So these documents were created on or
24  September 25, 2013.
25      Is that fair?

Dans - Direct                                    Page 128

1  A.  That's fair.
2  Q.  If you look at the first page,
3  Residential Level 1 and 2, and if we look at the
4  area just east of Monmouth Street we have the
5  concept for the development of the Coles Jersey
6  property.
7      Is that what's depicted here?
8  A.  Yes, amongst other surrounding
9  properties.
10  Q.  Right.  You got -- you can see the
11  American Self Storage Building to the north
12  depicted, right?
13  A.  Yup.
14  Q.  You've got the Cast Iron Lofts to the
15  east, so we know where Lot 13 and Lot 7 of Block
16  6005 are depicted on this plan, right?
17  A.  Correct.
18  Q.  Now, there are no improvements
19  proposed for the Lot 7 portion of the Coles
20  Jersey property, right?
21  A.  That's correct.
22  Q.  Why is that?
23  A.  The knowledge that a Texas Eastern
24  pipe was under the ground there.
25  Q.  Was under the ground where?

Texas Eastern...
0.77 a Acres

Dans - Direct                                      Page 129

1  A.  In Lot 7.
2  Q.  That knowledge was available to you
3    and Coles Jersey as of September 25, 2013?
4  A.  Yes.
5  Q.  What was that knowledge based on?
6  A.  I saw the pipe go in the ground.
7  Q.  Well, there's no pipe depicted on this
8    plan, correct?
9  A.  Correct.
10 Q.  Is there pipe that actually encroaches
11   on the portion of Lot 7?
12 A.  Yes.
13 Q.  There were no improvements proposed
14   for Lot 7 because of the actual pipeline?
15 A.  Yes, that's correct.
16 Q.  How about on Lot 13, are there
17   improvements proposed for Lot 13 over the
18   pipeline?
19 A.  Lot 13 covers more than just where the
20   pipe is.
21 Q.  Do you see two dashed lines on
22   Lot 13?
23 A.  Yes.
24 Q.  What are those dashed lines?
25 A.  Those are the easement lines that

Dans - Direct                                      Page 130

1    Texas Eastern has.
2  Q.  Is that the permanent easement area?
3  A.  That's the permanent easement area.
4  Q.  On Lot 13?
5  A.  Correct.
6  Q.  The southern line has a turn in it.
7    Do you see that?
8  A.  Yes.
9  Q.  It turns southwest.
10   Is that also an easement line?
11 A.  Yes.
12 Q.  So was there a Texas Eastern permanent
13   easement on Lot 7 as of September 25, 2013?
14 A.  To the knowledge I had, I believe
15   there was.
16 Q.  When was that easement created, the
17   permanent easement on the portion of Lot 7?
18 A.  I don't know.
19 Q.  What documentation did Chester Pulsus
20   Laskowski Partnership have in their possession to
21   be able to plot the permanent easement lines on
22   Lot 13 and Lot 7 as of September 25, 2013?
23 A.  I had given them the location that had
24   been discussed with Texas Eastern.
25 Q.  Do you recall specifically what

Dans - Direct                                      Page 131

1    document showed the location of the easement?
2  A.  One of the earlier documents that you
3    brought out showed me were -- where Texas Eastern
4    wanted the easements.
5  Q.  Are you referring to an attachment to
6    DG-2?
7  A.  Yeah.
8  Q.  Specifically you are referring to
9    drawing number HUD-98.3 dated March 18, 2013 that
10   was provided to you on June 5, 2013 by Texas
11   Eastern?
12 A.  Correct.
13 Q.  And this drawing shows permanent
14   easement areas on a portion of Lot 7 and Lot 13?
15 A.  Correct.
16 Q.  This is the document you provided to
17   the civil engineer?
18 A.  Yes.
19 Q.  And what did you explain with regard
20   to the easement on Lot 7?
21 A.  That we could not build on it.
22 Q.  Because why?
23 A.  Because there was a pipe in the ground
24   there.
25 Q.  Was it because there was a pipe in the

Dans - Direct                                      Page 132

1    ground or because there was an easement?
2  A.  I knew the pipe was in the ground.  I
3    believed there was an easement.
4  Q.  And what was your belief or upon what
5    information did you believe there was an easement
6    on Lot 7 prior to September 25, 2013?
7  A.  Having written this that the pipe was
8    put in the ground.
9  Q.  To your knowledge, has Texas Eastern
10   even acquired an easement on a portion of Lot 7
11   prior to September 25, 2013?
12 A.  I had no knowledge of that.
13   MR. ASH:  I don't have copies of the
14   next documents, but we'll mark them in such a
15   way that I can make regular size copies
16   instead of the full size.
17   (Dresdner Robin Survey, Side 1, is
18   received and marked as Exhibit DG-11-A for
19   Identification.)
20   (Dresdner Robin Survey, Side 2, is
21   received and marked as Exhibit DG-11-B for
22   Identification.)
23 Q.  All right.  We've marked as 11-A a
24   survey prepared by Dresdner Robin and it's a
25   draft dated June 21, 2012 for CH Acquisitions.

Dans - Direct                                          Page 133

1    Do you see that?
2  A.  Yes.
3  Q.  And I'm going to mark 11-B the other
4  side of the survey with the portion of Lot 7, and
5  do you see a description in Lot 7 area which is
6  highlighted shaded in gray and it reads "Area of
7  questionable title possible owner New Jersey
8  Transit Corporation."
9    Do you see that?
10 A.  Yes.
11 Q.  Do you recall reviewing survey in
12 June 2012?
13 A.  Yes.
14 Q.  And did you have any questions for the
15 surveyor as to the area identified as being of
16 questionable title?
17 A.  I don't know if I had my concerns to
18 the surveyor or to the -- to Crescent Heights,
19 but I had questions about that, yes.
20 Q.  And that was as of June 2012?
21 A.  In June 2012.  I'm sorry, I'm sorry.
22   You know, this is -- I believe this
23 document is dated improperly.
24   And I can't believe that Crescent
25 Heights, at this time of the year in 2012 --

Dans - Direct                                          Page 134

1  I didn't have to ask them to do this during that
2  time for sure, so maybe I never saw -- I think
3  this is dated improperly.
4  Q.  Okay.  Is that consistent with your
5  recollection of the timeline negotiations between
6  Hoboken Brownstone, CH Acquisitions, they were in
7  2013?
8  A.  Yes.
9  Q.  There's another progress print that's
10 dated June 21, 2012 which is also, you think, a
11 typographical error in the date?
12 A.  Correct.
13 Q.  So then we move on to June 21, 2013,
14 another survey for C.H. Acquisitions.
15   MR. ASH: Let's mark this 12-A and
16 B, please.
17   (C.H. Acquisitions Survey, Side 1) is
18 received and marked as Exhibit DG-12-A for
19 Identification.)
20   (C.H. Acquisitions Survey, Side 2,
21 is received and marked as Exhibit DG-12-B for
22 Identification.)
23 Q.  So I'm going to mark 12-A near the
24 title, the key, if you will, of the survey.
25   This is a survey prepared for C. H.

Dans - Direct                                          Page 135

1  Acquisitions by Dresdner Robin of the Ogden
2  Tracts as of June 21, 2013.
3    The area of Lot 7, which I'm going to
4  mark DG 12-B says "Area of questionable title,
5  possible owner, New Jersey Transit Corporation."
6    Do you see that?
7  A.  Yes.
8  Q.  This is the title issue that prevented
9  C. H. Acquisitions from closing on the Ogden
10 properties?
11 A.  That's the reason they gave us.
12 Q.  There's a note 13 under the "Notes"
13 and it reads --
14   MR. ASH: Let's mark this 12-C.
15   (Note 13 is received and marked as
16 Exhibit DG-12-C for Identification.)
17 Q.  Note 13, which I've marked 12-C, reads
18 "The subject premises, Block 6005, Lot 13 is
19 subject to a Spectra Energy underground natural
20 gas transmission line.  Mapping of the location
21 is pending.  The proposed location of said gas
22 line is shown on drawings prepared by SGC
23 Engineering, LLC drawing number HUD 98.3 dated
24 March 18, 2013 and drawing LD-P-9085, dated
25 April 9, 2012.  Exception: No. 14 under

Dans - Direct                                          Page 136

1  investigation."
2    Do you know what "Exception 14" refers
3  to on the survey?
4  A.  No.
5  Q.  I don't see an exception 14 on this
6  survey.  Is there another document you may refer
7  to?
8  A.  I don't know.
9  Q.  Do you know what was still under
10 investigation as of June 21, 2013 by the
11 surveyor?
12 A.  The ownership of the property, of that
13 property.
14 Q.  Of the Lot 7 property?
15 A.  Yes.
16   MR. ASH: I'm going to mark this as
17 DG-13-A.  This is a survey, again, prepared
18 Dresdner Robin, this time it's called "Jersey
19 Development Company."  The date is October 9,
20 2013.
21   (Dresdner Robin Survey (Side 1) is
22 received and marked as Exhibit DG 13-A for
23 Identification.)
24 Q.  This is the survey that Dresdner Robin
25 prepared for Coles Jersey as a result of

Dans - Direct                                    Page 137

1   Coles Jersey hiring them to survey the
2   property?
3   A.  Correct.
4       MR. ASH: I'm going to mark DG-13-B
5   the portions of the survey near the Lot 7
6   portion which, again, is shaded in a light
7   gray and it reads, "Area of questionable
8   title, possible owner, New Jersey Transit
9   Corporation. See reference No. 4."
10      (Survey/Lot 7 is received and marked
11  as Exhibit DG-13-B for Identification.)
12  Q.  There's a reference No. 4 to the
13  Holland Park Block 329, LLC Topographic Boundary
14  Survey.
15      Do you have a copy of that survey?
16  A.  No.
17  Q.  Do you recall seeing a copy of that
18  survey?
19  A.  No.
20      MR. ASH: I'm going to mark DG-13-C
21  again, near the notes on the survey and note
22  13 reads "The subject premises, Block 6005,
23  Lot 13 is subject to a Spectra Energy
24  Underground Natural Gas Transmission line.
25  Mapping of the location is pending.  The

Dans - Direct                                    Page 138

1   proposed location of said gas line is shown
2   on drawings prepared by SGC Engineering, LLC
3   drawing No. HUD 98.3 dated March 18, 2013 and
4   drawing No. LD-P-9085 dated April 9, 2012."
5       (Notes of Survey are received and marked
6   as Exhibit DG-13-C for Identification.)
7
8   BY MR. ASH:
9   Q.  As of October 9, 2013 Lot 7 was still
10  an area of questionable title?
11  A.  Not to me.
12  Q.  To your surveyor it was, correct?
13  A.  I can't assume.  I guess so.
14      MR. ASH: I'm going to mark DG-14-A
15  it's a survey prepared by Dresdner Robin for
16  Coles Jersey Development Company, LLC as of
17  October 17, 2013.
18      I'm going to mark DG-14-B near the
19  area of Block 6005, part of Lot 7.
20      (Dresdner Robin Survey, 10/17/2013, is
21  received and marked as Exhibit DG-14-A for
22  Identification.)
23      (Area near Block 6005, Lot 7 is
24  received and marked as Exhibit DG-14-B for
25  Identification.)

Dans - Direct                                    Page 139

1   Q.  It no longer reads "Area of
2   Questionable Title" on Lot 7, correct?
3   A.  Correct.
4   Q.  What determination was made between
5   October 7, 2013 and October 17, 2013 with regard
6   to the status of title of the Block 6005 portion
7   of Lot 7 as depicted on this survey?
8   A.  I don't recall the documents that --
9   why the surveyor didn't think that property was
10  owned by Ogden originally.
11  Q.  Do you recall providing any documents
12  to the surveyor between October 7, 2013 and
13  October 17, 2013 that would have changed an
14  opinion as to the status of title of Block 6005
15  part of Lot 7?
16  A.  I don't recall if I had given her any
17  title information or not.
18  Q.  Do you know if any additional
19  information or documentation had been discovered
20  by Coles Jersey or any consultant of Coles Jersey
21  as of October 17, 2013 that would have answered a
22  question as to a cloud on title for a part
23  Lot 7 of Block 6005?
24  A.  No additional information from since
25  the closing.

Dans - Direct                                    Page 140

1   Q.  That you're aware of?
2   A.  That I'm aware of, yes.
3   Q.  And do you have a belief as to why the
4   surveyor changed the depiction of Lot 7 as of
5   October 17, 2013?
6   A.  It would be the title information.  I
7   was confident about it.
8   Q.  Was he provided with the title
9   information as of October 7, 2013 when he still
10  showed Lot 7 as an area of questionable title?
11  A.  I don't know.
12      MR. ASH: I'm going to mark DG-14-C
13  near the portion of the survey where the
14  notes are indicated.
15      (Notes on Survey is received and
16  marked as Exhibit DG-14-C for
17  Identification.)
18  Q.  And note 11 reads "Part of Lot 7 and
19  Lot 13 in Block 6005 is subject to an unrecorded
20  permanent easement granted to Texas Eastern
21  Transmission, LP which is shown on map entitled
22  "Permanent Easement Location Hudson County, New
23  Jersey, City of Jersey City, Tract HUD 98.3
24  prepared by SGC Engineering, LLC, dated
25  September 30, 2013, alignment sheet No. LDA 1077,

Dans - Direct
Page 141

1 drawing No. HUD 98.3."
2      What unrecorded easement is referred
3 to in note 11 of DG-14-C?
4 A.  The questioned property, the
5 questioned Lot 7.
6 Q.  It's your testimony that the portion
7 of Lot 7 owned by Coles Jersey was subject to an
8 easement for the benefit of Texas Eastern as of
9 October 17, 2013?
10 A.  I was -- I did not know.  I did not
11 know.  The surveyor put these marks on it.  I was
12 not -- I didn't do any research on that.
13 Q.  What information was provided to the
14 surveyor for him to conclude that there was an
15 unrecorded easement on the portion of Lot 7 and
16 Block 6005?
17 A.  He refers to SGC Engineering, and I
18 don't know who that is.
19 Q.  Well, he refers to an unrecorded
20 easement, right?
21      So there was no title record that
22 would have been recorded that he would have
23 access to to indicate the location of an
24 easement, so what information was he provided to
25 show an easement?

Dans - Direct
Page 142

1 A.  Possibly the drawings that we had in
2 Exhibit DG-2, in the back of that, I may have
3 shared that document with him.
4 Q.  That would be the drawing Tract 98.3
5 which was prepared by SGC engineers as of
6 March 18, 2013?
7 A.  Okay, yes.
8 Q.  And that was provided to the surveyor
9 with the information that that was a permanent
10 easement in favor of Texas Eastern?
11 A.  That was -- yes.
12 Q.  And that permanent easement is
13 depicted as of October 17, 2013 on the Dresdner
14 Robin survey as to both Lots 13 and a portion of
15 Lot 7?
16      MR. DALTON: Objection to form.
17      You can answer.
18 A.  Yes.
19 Q.  Now, up until the closing is it your
20 testimony that you had not discussed the
21 existence of a Texas Eastern pipeline or easement
22 with Mr. Ackman?
23 A.  That's correct.
24 Q.  We've since reviewed a number of
25 surveys prepared for Coles Jersey specifically as

Dans - Direct
Page 143

1 of October 7, 2013, and now DG-14, as of
2 October 17, 2013.
3      Did you review these surveys with
4 Mr. Ackman?
5 A.  No.
6 Q.  Did you indicate to Mr. Ackman or any
7 other representative of Coles Jersey that Texas
8 Eastern had permanent easements on Lot 13 and
9 Lot 7 as of October 17, 2013?
10 A.  Yes.
11 Q.  And what was that discussion with
12 regard to the existence of the Texas Eastern
13 easement on Lot 13 and Lot 7, Block 6005, Jersey
14 City as of October 17, 2013?
15 A.  That these pipes were in the ground
16 and these were depictions of the areas that we
17 could build in.
18      And based upon the knowledge we had,
19 that this is what we could build, where we could
20 build?
21 Q.  That you could not build in the shaded
22 areas on DG-14?
23 A.  That's correct.
24 Q.  And what was Mr. Ackman's response?
25 A.  Mr. Ackman is not involved in

Dans - Direct
Page 144

1 reviewing and looking over these documents.
2 Q.  But you did have a discussion with him
3 specifically?
4 A.  Not with him, specifically, no, not
5 with Bill Ackman.
6 Q.  With who specifically did you have a
7 discussion with?
8      Who was a representative of Coles
9 Jersey as to the existence of --
10 A.  Greg Liss and Larry Ackman.
11 Q.  Let me finish my question.
12 A.  Sorry.
13 Q.  Who was the representative of Coles
14 Jersey that you had a specific conversation with
15 with regard to the existence of permanent
16 easements for the benefit of Texas Eastern on
17 Lots 13 and a portion of 7 as they're shown on a
18 survey for Coles Jersey as of October 17, 2013?
19 A.  I don't recall the dates of when we
20 started discussing the easements specifically.
21 Q.  But you do recall having
22 conversations?
23 A.  Yes.
24 Q.  With Mr. Liss.  Is that right?
25 A.  Yes.

**Dans - Direct** — Page 145

1 Q. Anyone else?
2 A. And Larry Ackman.
3 Q. And Larry Ackman.
4    Was that one conversation with
5 Mr. Ackman and Mr. Liss together?
6 A. They were both aware of it at some
7 point. I made them aware of it at some point.
8    I don't remember when, but certainly
9 while we were creating the documents, the
10 drawings, we were aware that there was a pipe in
11 the ground.
12 Q. When you were creating drawings other
13 than this survey?
14 A. Yes.
15 Q. What drawings; concept plans?
16 A. Concept bulk studies as we looked at
17 earlier.
18 Q. Was there a concern by a
19 representative of Coles Jersey that there would
20 be a loss of residential units because of the
21 easements on Lot 13 and Lot 7?
22 A. Yes.
23 Q. What was the concern?
24 A. That we were losing square footage and
25 it was a concern.

**Dans - Direct** — Page 146

1 Q. Was there a discussion about being
2 able to accommodate density in other places where
3 square footage of the easements were lost?
4 A. There was discussions of the hopes of
5 that. Knowing the existing redevelopment plan,
6 there was no opportunity to regain that.
7    MR. ASH: Let's mark this 15, please.
8 I'm going to mark the first page DG-15-A and
9 mark Page 3 of the set 15-B.
10    (Vicinity Map is received and marked
11 as Exhibit DG-15-A for Identification.)
12    (Sheet 5 of 18 is received and
13 marked as Exhibit DG-15-B for
14 Identification.)
15    (Witness reviewing exhibits.)
16 Q. So with regard to DG-15-A, what is
17 this document?
18 A. The vicinity map for what we called
19 the Coles Street Redevelopment Project.
20 Q. This is sheet 2 of 18 as of July 22,
21 2014. Do you see that?
22 A. Yes.
23 Q. Was this part of the submission to the
24 Jersey City Planning Board for development
25 approvals?

**Dans - Direct** — Page 147

1 A. Yes, it was.
2 Q. If you look at the area of the Coles
3 Jersey property depicted, the portion of Lot 7,
4 do you see it says, "E-LRWY Company, second
5 class, part Lot 7," do you see that.
6    (Witness reviewing exhibit.)
7    (Witness getting glasses.)
8 A. I don't even know if I can read them
9 with these, my cheaters. All right. That's
10 better.
11    (Witness reviewing notes.)
12 A. I see that.
13 Q. You see that.
14    Do you know if that portion of Lot 7
15 is actually encumbered by an old freight line for
16 the benefit of Erie Lackawanna Railway?
17 A. It's encumbered by --
18 Q. And old freight rail line for Erie
19 Lackawanna Railway.
20 A. There are no lines in the road.
21 There's no tracks there.
22 Q. Do you know why this is indicated on
23 15-A?
24 A. No.
25 Q. Let's look at Page 3 that is marked

**Dans - Direct** — Page 148

1 15-B.
2    This is sheet 5 of 18 dated July 24,
3 2014. It's the preliminary and final site plan
4 for Coles Street Redevelopment.
5 A. Sheet 5 of 18.
6 Q. Right.
7 A. Yup.
8 Q. This was also submitted to the Jersey
9 City Planning Board as part of your site plan
10 application?
11 A. That's correct.
12 Q. Now, if you go to Lot 7 you include
13 that portion as owned by Coles Jersey, correct?
14 A. Correct.
15 Q. Your proposed improvements, do they
16 include squaring off the block of Monmouth Street
17 at the intersection of 18th Street?
18 A. Yes.
19 Q. And between the intersection of
20 Monmouth Street and 18th Street and the edge of
21 the property or the boundary of the property,
22 Lot 7, owned by Coles Jersey, who owned that
23 property?
24 A. I believe New Jersey Transit.
25 Q. And do you propose improving New

Dans - Direct
Page 149

1   Jersey Transit's property with a park or some
2   other improvement?
3   A.   The city requested the extension of
4   Monmouth Street and 18th Street and the creation
5   of sidewalks on that property.
6   Q.   If you look at the portion of Lot 7
7   along the western boundary with the New Jersey
8   Transit property you identified, we have a curb,
9   correct?
10  A.   Correct.
11  Q.   And it continues, the curb on the plan
12  continues along in a northeasterly direction.
13       Do you see that?
14  A.   Yes.
15  Q.   There are two parallel lines that
16  follow the same tangent, right?
17  A.   Yes.
18       MR. DALTON: Is that the long then
19  the short short long?
20       MR. ASH: Yes.
21       MR. DALTON: Okay, got it.
22  Q.   Is that a freight rail line depicted
23  on that plan?
24  A.   Don't know.
25  Q.   Do you know if New Jersey Transit has

Dans - Direct
Page 150

1   plans to extend the Hudson Bergen Light Rail
2   through this property?
3   A.   I know they currently do not.
4   Q.   Has it been talked about in some
5   conceptual phase by New Jersey Transit, to your
6   knowledge?
7   A.   I've been told by people at New Jersey
8   Transit not in their lifetime.
9   Q.   You're aware of all the freight rail
10  lines acquired by New Jersey Transit that would
11  potentially create the possibility of a light
12  rail extension on this property, correct?
13  A.   I'm aware that New Jersey Transit
14  bought this property to build the existing Hudson
15  Bergen Light Rail Line.
16  Q.   Do you know what New Jersey Transit
17  purchased the property for Hudson Bergen Light
18  Rail Line from the Erie Lackawanna Railway
19  Company?
20  A.   I'm not sure who they purchased it
21  from.
22  Q.   On this site plan marked 15-B, the
23  portion of Lot 7 is designated as Long Park.
24       Do you see that?
25  A.   Yes.

Dans - Direct
Page 151

1   Q.   And the easement area on Lot 13
2   includes a beach volleyball court and a portion
3   of the Coles Street Park.
4        Is that right?
5   A.   That's correct.
6   Q.   At any time was there any concept plan
7   that showed potential improvements aside from
8   green space for a lawn in the portion of Lot 7
9   owned by Coles Jersey?
10  A.   No.
11  Q.   Did the permanent easement for the
12  benefit of Texas Eastern on the portion of Lot 7
13  reduce the residential building potential of the
14  overall Coles Jersey project as depicted on 15-B?
15  A.   Absolutely.
16  Q.   And how many units were lost?
17  A.   That's an architect's question.  I
18  believe it was 21.
19  Q.   Did the permanent easement for the
20  benefit of Texas Eastern on a portion of Lot 7
21  reduce the economies of the plan development that
22  would result from a modified structure with a
23  reduced number of buildable units?
24  A.   Yes.
25  Q.   How so?

Dans - Direct
Page 152

1   A.   I believe so.
2   Q.   How so?
3   A.   Less square footage is less efficient
4   to build.
5   Q.   Is it true that there were no
6   improvements proposed for the portion of Lot 7 at
7   any time by Coles Jersey Development because
8   there were underground electrical lines that run
9   through Lot 7?
10  A.   There was always the knowledge that
11  the gas pipe was underground there too.
12  Q.   Are you aware of underground
13  electrical lines that run through Lot 7?
14  A.   I was made aware of that.
15  Q.   And was the property encumbered with
16  electrical lines prior to the installation of the
17  Spectra Texas Eastern natural gas pipeline?
18  A.   There were lines in the ground there
19  that --
20  Q.   The electrical lines predated the
21  Texas Eastern pipeline, correct?
22  A.   Correct.
23  Q.   And we're not just talking about
24  underground conduit lines, these are oil cooled
25  very significant capacity electrical lines, to

0.77 a Acres

**Dans - Direct**                                                Page 153

1   your knowledge?
2   A.  That's what I've been told.
3   Q.  These aren't the type of electrical
4   lines that can typically be rerouted or relocated
5   as part of a typical development at the cost of
6   the developer, correct?
7   A.  I never investigated it.
8   Q.  Isn't it true that there were no
9   improvements proposed for a portion of Lot 7 on
10  Block 6005 at any time by Coles Jersey because
11  it's an area of questionable title?
12  A.  No, that was not the reason.
13  Q.  Isn't it true that there's been no
14  improvement proposed at any time for a portion of
15  Lot 7 by Coles Jersey because there's a freight
16  rail line that runs through Lot 7?
17  A.  No, that was not a concern.
18  Q.  The area of 5,457 square feet as a
19  portion of Lot 7, was that included in the
20  overall density calculation for the overall yield
21  of the project in your site plan application?
22  A.  Yes.
23  Q.  The portion of Lot 7 that's depicted
24  as a lawn park, did that a allow the developer
25  applicant to receive a density bonus through the

**Dans - Direct**                                                Page 154

1   dedication of open space under the redevelopment
2   plan?
3   A.  No.
4   Q.  Why not?
5   A.  It wasn't required.  What gave the
6   developer a density bonus was the large park that
7   spans Lot 6004 and 6005 and 17th Street.
8       That allowed for a density bonus, one
9   of things that allowed for a density bonus.
10  Q.  Do you know if the beach volleyball
11  court is a permitted use within the Texas Eastern
12  permanent easement area?
13  A.  I was -- I'm not sure.
14  Q.  Have you or a representative of Coles
15  Jersey requested permission to build any
16  improvements in the easement area of Texas
17  Eastern?
18  A.  No.
19      MR. ASH: I have nothing further.
20      MR. WEGENER: Let me just ask a
21  question.
22
23
24
25

**Dans - Cross**                                                Page 155

1       CROSS-EXAMINATION BY MR. WEGENER:
2
3   Q.  Going back to DG-2, all right, the
4   sheet bearing Bates stamp 244, what is that,
5   again, that graph or analysis of numbers?
6   A.  I believe this was the investment that
7   Mr. Vallone or an entity that we were involved
8   with --
9   Q.  I'm sorry, who?
10  A.  Mr. Vallone and I had invested over
11  the many years that we have been involved with
12  this property.  It's just to show that we had
13  skin in the game.
14  Q.  That's the investment that Hoboken
15  Brownstone had put up so far?
16  A.  Hoboken Brownstone and another entity
17  that Mr. Vallone and I had.
18  Q.  Well, the contract was from Ogden
19  Realty to Hoboken Brownstone Company, right, the
20  contract?
21  A.  Right, but these funds probably date
22  back to 2007.
23  Q.  I'm sorry, what was the date of the
24  contract that we were --
25  A.  2013.

**Dans - Cross**                                                Page 156

1   Q.  2013.  The first contract in 2007 was
2   between, again, Ogden and who?
3   A.  I can't remember the entity that we
4   used at the time.
5   Q.  But it wasn't Hoboken Brownstone?
6   A.  It may have been.
7   Q.  And the contract that was assigned to
8   was it Crescent?
9   A.  Yes.
10  Q.  That contract was dated what?
11  A.  April 2013 to March 2013.
12  Q.  And the monies represented in DG-2
13  were part of those monies spent by Hoboken
14  Brownstone in pursuance of the contract, the 2013
15  contract?
16  A.  No.
17  Q.  When was the assignment from Hoboken
18  Brownstone to Crescent?
19  A.  Within ten days of signing the
20  contract in March 2013.
21  Q.  And once that contract was assigned to
22  Crescent, did you have any interest in the
23  property?
24      When I say "you", that's Hoboken
25  Brownstone; you were in your hat as Hoboken

Texas Eastern v.
0.77 a Acres

Dans - Cross | Page 157

1  Brownstone Company?
2  A.  I don't think we had a legal position
3  at that point.
4  Q.  You had no legal position?
5  A.  No legal position on it.
6  Q.  But you said you expected to own the
7  property if they closed on it.
8  Is that it?
9  A.  I expected at some point after the
10  closing that they would bring us, Hoboken
11  Brownstone, Mr. Vallone and myself or an entity
12  that we were involved in into the ownership.
13  Q.  And what was the basis for that
14  understanding?
15  A.  At the time we had a contract on the
16  Van Leer site; good faith.
17  Q.  In a prior course of dealing with the
18  Van Leer site that's how -- that's how the
19  property was developed?
20  A.  That's how they were brought in.  They
21  had a contract on the Van Leer site.  We showed
22  them the Ogden site and assigned the contract.
23  Q.  What was your interest in the Van Leer
24  site?
25  A.  A small percentage -- there were lots

Dans - Cross | Page 158

1  of fees involved with it.
2  Q.  Were you the developer?
3  Was Brownstone the developer of the
4  Van Leer site?
5  A.  We were going to assist -- Crescent
6  Heights was the majority owner and we would
7  assist them.
8  Q.  And did you have an agreement with
9  them a written agreement to assist them and
10  compensation?
11  A.  Yes, it was a pending contract.  It
12  was never executed, that contract.
13  We had a contract that they never
14  performed on.  They didn't perform on this one
15  and shortly after they didn't close on the Ogden
16  site, they opted out of the Van Leer site.
17  Q.  You're talking about Crescent?
18  A.  Crescent opted out of that site.
19  Q.  But Crescent did close on the Van Leer
20  site?
21  A.  No.
22  Q.  Did they close on any sites?
23  A.  Nope, not with me.
24  Q.  So the $412,000, did you ever get that
25  $412,000 back?

Dans - Cross | Page 159

1  A.  No.
2  Q.  When you discussed the transaction
3  with -- was it Coles Jersey or -- Bill, before
4  you had a deal you were discussing it with Bill,
5  right, Bill Ackman, right?
6  A.  Yes.
7  Q.  And did you discuss with him the fact
8  that you had already laid out close to half a
9  million dollars on the -- on this property to put
10  the deal together?
11  A.  Probably.
12  Q.  So he understood that you expected an
13  equity interest in the property?
14  A.  Yes, that we hoped for an equity
15  position.
16  Q.  Pardon?
17  A.  That we hoped for an equity position
18  in the property.
19  Q.  You understood that that was your
20  reasonable expectation for putting the deal
21  together and bringing it to him, right?
22  A.  Yes.
23  Q.  Did you ever give the assignment of
24  the contract to Ogden or anyone from Ogden, Paul
25  Hennessy or anyone represented by --

Dans - Cross | Page 160

1  A.  I don't know.
2  Q.  You don't know or no?
3  A.  I don't know.
4  Q.  You don't?
5  A.  I don't know.
6  Q.  So far as you know, he was -- did you
7  ever explain your relationship with Crescent to
8  Mr. Hennessy?
9  A.  Yes.
10  Q.  What did you tell him?
11  A.  That we had signed the contract, I'm
12  sure we told him that, the funds came from
13  Crescent, so we explained our relationship with
14  Crescent at the time and that they were going to
15  fund the project.  They were going to be the ones
16  funding the project.
17  Q.  They were going to fund the project
18  and you were going to develop it?
19  A.  Yes, Hoboken Brownstone along with
20  Crescent Heights.  Crescent Heights is a very
21  large developer and very capable.
22  Q.  Some kind of joint venture or
23  affiliated venture, right?
24  A.  Yes.
25  MR. WEGENER: Okay.  Nothing further.

Rizman Rappaport Dillon & Rose - (973) 992-7650
Let Our Fingers Do Your Talking

0.77 a Acres

Page 161

1    MR. ASH: Before we close the record,
2 I just wanted to say I made a request for
3 certain documents today.
4    I will write a letter to you and just
5 outline the requests, but to the extent I
6 have questions about those documents I just
7 reserve the right to reopen this deposition
8 and continue.
9    MR. DALTON: No objection.
10    MR. ASH: Okay.  We can close the
11 record.
12    (Deposition adjourned 4:30 p.m.)
13    (Exhibits retained by counsel.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 162

1                C E R T I F I C A T E
2
3
4
5    I CERTIFY that the foregoing is a true and
6 accurate transcript of the testimony as taken by
7 and before me stenographically at the time and
8 place aforementioned.
9
10
11    I FURTHER CERTIFY that I am neither attorney
12 for nor counsel to any of the parties; parties of
13 any of the attorneys in this action; and that I
14 am not financially interested in the outcome of
15 this case.
16
17    _____
18 SUSAN GIOFFRE, CCR
19 License No. XI001220
     Notary Public of the State of New Jersey
20
21
22
23
24
25

Page 163

1
2        W I T N E S S   C E R T I F I C A T E
3
4    I have read the foregoing transcript and
5 do hereby certify that it is a true and accurate
6
7 transcript of my testimony.
8
9
10
11
12    ---------------------------------
13              DANIEL GANS
14
15
16 Sworn and subscribed to before me
17 On the       day of        , 2015
18
19
20
21
22
23
24
25

1        C E R T I F I C A T E

2

3

4        I CERTIFY that the foregoing is a true and

5   accurate transcript of the testimony as taken by

6   and before me stenographically at the time and

7   place aforementioned.

8

9

10       I FURTHER CERTIFY that I am neither attorney

11  for nor counsel to any of the parties; parties of

12  any of the attorneys in this action; and that I

13  am not financially interested in the outcome of

14  this case.

15

16

17  SUSAN GIOFFRE, CCR
    License No. XI001220
18  Notary Public of the State of New Jersey

19

20

21

22

23

24

25