# Exhibit G

**In The Matter Of:**

*Texas Eastern v.*
*0.77 a Acres*



*Daniel Gans*
*Vol. 2*
*June 23, 2015*

*Rizman Rappaport Dillon & Rose*
*66 W. Mt. Pleasant Ave.*
*Livingston, N.J. 07039*
*(973) 992-7650*
*reporters@rizmanrappaport.com*

Min-U-Script® with Word Index

---

**Page 181**

```
 1              UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW JERSEY
 2             CIVIL ACTION NO. 14-67 (SRC) (CLW)
   -----------------------------
 3  TEXAS EASTERN TRANSMISSION,    :
    LP, a Limited Partnership      :
 4  of the State of Delaware,      :     VOLUME II
 5          Plaintiff,             :   CONTINUED
                                   :   DEPOSITION UPON
 6           v.                    :   ORAL EXAMINATION
                                   :        OF
 7  0.77 a ACRES OF LAND, MORE     :   DANIEL GANS
    OR LESS, IN THE CITY OF        :
 8  JERSEY CITY, HUDSON COUNTY,    :
    NEW JERSEY, COLES JERSEY       :
 9  DEVELOPMENT, CO., LLC, OGDEN   :
    REALTY, CO., JANE AND JOHN     :
10  DOES 1 through 50 (fictitious  :
    name defendants) and ABC       :
11  BUSINESS ENTITIES 1 through    :
    50,(fictitious name            :
12  defendants),                   :
13          Defendants.            :
   -----------------------------
14
15
16        T R A N S C R I P T of the stenographic
17  notes of RENEE RUSSO, CCR, CRCR, RPR, CRR, a
18  Certified Court Reporter and Notary Public of the
19  State of New Jersey, Certificate No. XI00143700
20  held at the offices of DECOTIIS, FITZPATRICK, &
21  COLE, 500 Frank W. Burr Boulevard, Teaneck, New
22  Jersey, on Tuesday, June 23, 2015, commencing
23  10:06 a.m.
24
25
```

---

**Page 182**

```
 1  A P P E A R A N C E S:
 2  DeCOTIIS, FITZPATRICK & COLE, LLP
    Glenpointe Centre West
 3  500 Frank W. Burr Boulevard
    Teaneck, New Jersey 07666
 4  BY:  MICHAEL J. ASH, ESQ.
    (201) 928-1100
 5  mash@decotiislaw.com
    Counsel for Plaintiff, Texas Eastern
 6  Transmission, LP
 7
    BUCHANAN, INGERSOLL & ROONEY, PC
 8  1290 Avenue of the Americas - 30th Floor
    New York, New York  10104-3001
 9  BY:  CHRISTOPHER DALTON, ESQ.
    (212) 440-4400
10  christopher.dalton@bipc.com
    Counsel for Witness, Daniel Gans
11
12
13
    ALSO PRESENT:
14
    Joseph DeCotiis, Jr.
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 183**

```
 1                   INDEX
 2                                         PAGE
 3  WITNESS:  DANIEL GANS
 4  CONTINUED DIRECT EXAMINATION BY MR. ASH   186
 5
 6
 7                  EXHIBITS
    NO.      DESCRIPTION                    PAGE
 8  DG-16  Purchase and Sale Agreement       188
           bates stamped DG00359-385,
 9         27 pages
10  DG-17  Letter dated 4/19/13 bates        203
           stamped DG00386-387, two pages
11
    DG-18  Spreadsheet, bates stamped        205
12         DG00388-389, two pages
13  DG-19  Memorandum From Gans and Vallone  217
           To Menin, dated 6/19/13, bates
14         stamped Ackman 00006-00009,
           four pages
15
    DG-20  Memorandum e-mail From Vallone    219
16         To Menin, dated 6/30/13, bates
           stamped Ackman 00013-14, two
17         pages
18  DG-21  E-mail From Gans To Vallone,      223
           cc Menin, dated 6/30/13,
19         bates stamped Ackman 00015-17,
           two pages
20
    DG-22  E-mail From Gans To Menin,        228
21         cc Vallone, dated 6/30/13,
           bates stamped Ackman 00018-20,
22         three pages
23  DG-23  Memorandum From Gans To Ackman    230
           dated 7/1/13, bates stamped
24         DG00390-397, eight pages
25
```

---

**Page 184**

```
 1              EXHIBITS Continued
 2  NO.      DESCRIPTION                    PAGE
 3  DG-24  E-mail From Gans To Menin,        234
           Goldman, dated 7/1/13 bates
 4         stamped Ackman 00021; E-mail
           From Vallone To Ackman dated
 5         7/1/13, bates stamped Ackman
           00022; E-mail From Ash To Gans,
 6         cc Simmons, dated 7/1/13 bates
           stamped Ackman 00023-24, four
 7         pages
 8  DG-25  Documents bates stamped           240
           Ackman 00034-35, two pages
 9
    DG-26  E-mail From Vallone To Colletta,  247
10         Ackman, cc Gans, dated 7/1/13,
           bates stamped Ackman 00037-38,
11         two pages
12  DG-27  E-mail dated 7/1/13 bates         250
           stamped Ackman 00041-43,
13         three pages
14  DG-28  E-mail From Ackman To Colletta,   253
           dated 7/1/13, bates stamped
15         Ackman 00044
16  DG-29  E-mail From Gans To Ackman        257
           dated 7/3/13, bates stamped
17         Ackman 00175
18
19
20
21
22
23
24
25
```

---

Texas Eastern v.
0.77 a Acres

| Gans, Daniel - direct - Ash | Page 185 |
| --- | --- |

1  D A N I E L  G A N S, 67 Jefferson Street,
2  Hoboken, New Jersey, 07030, having been first
3  duly sworn, was examined and testified as
4  follows:
5
6      CONTINUED DIRECT EXAMINATION BY MR. ASH:
7  Q.  Good morning, Mr. Gans.  Welcome
8  back.  As you're aware, my name is Michael Ash.
9  I'm an attorney at the firm DeCotiis, Fitzpatrick
10  and Cole.  As you are also aware, we represent
11  the plaintiff, Texas Eastern Transmission, LP.
12  I'm joined this morning by Joe DeCotiis, Jr.
13      This is a continuation of your
14  deposition in this matter that started on
15  February 12, 2015.  Is that your recollection?
16  A.  Yes.
17  Q.  Okay.  I'm just going to go over the
18  ground rules briefly, more for Mr. DeCotiis'
19  benefit than yours.  You've been deposed before,
20  right?
21  A.  Yes, I have.
22  Q.  You understand that even though we
23  are in the informal setting of a conference room
24  in my office, that the testimony you are giving
25  today is sworn and has the same effect as if you

| Gans, Daniel - direct - Ash | Page 186 |
| --- | --- |

1  were testifying before a judge and jury?
2  A.  Yes, I do.
3  Q.  All right.  You, if you can, please
4  answer audibly, so the court reporter can
5  memorialize your response.  Shaking of your head
6  or a gesture is not a sufficient response.
7      Have you taken any medications or
8  substances this morning that would impair your
9  ability to comprehend or respond to my questions?
10  A.  No, I have not.
11  Q.  Okay.  Thank you.  If you do not
12  understand a question, please say so and I will
13  try to rephrase the question.  If Mr. Dalton, who
14  is here to defend your deposition, objects to a
15  question, please wait to respond until we discuss
16  the basis of that objection, and you will be
17  directed to respond or not depending on our
18  colloquy.
19      If you need a break, just let me
20  know.  I don't think we'll be too long this
21  morning, and I think we've covered all of it?
22  A.  Thank you.  I understand.
23  Q.  Okay.  This deposition, as I've
24  indicated, is a continuation of your deposition
25  from February 12, 2015.  During that questioning

| Gans, Daniel - direct - Ash | Page 187 |
| --- | --- |

1  I had asked for certain documents you identified
2  in your responses that would have been responsive
3  to discovery requests, but had not yet been
4  produced.
5      I want to start out this morning by
6  looking at one of those documents, and let's mark
7  this.  We'll continue from February, March so
8  we'll start with DG-16.
9      (Exhibit DG-16 was received and
10  marked for identification by the court reporter.)
11  Q.  Okay.  You've been handed a document
12  that's bates stamped DG 359 through 385.  We've
13  marked it DG-16 this morning.  If you could just
14  take a look through that, and would you confirm
15  for me whether this is a complete copy of the
16  Purchase and Sale agreement between Ogden Realty
17  Company and the Hoboken Brownstone Company?
18  A.  Yes, I believe this is a full copy
19  of the Purchase and Sale agreement.
20  Q.  Okay.  On the cover of the agreement
21  there's a notation that the Hoboken Brownstone
22  Company is a registered trade name of West Bank
23  Realty, Inc.  Do you see that?
24  A.  Yes.
25  Q.  And that also tracks on the first

| Gans, Daniel - direct - Ash | Page 188 |
| --- | --- |

1  page of the agreement?
2  A.  Correct.
3  Q.  What is the entity, West Bank
4  Realty, Inc.?
5  A.  It's a realty company that my
6  partner, George Vallone, and I set up many years
7  ago.
8  Q.  You're a member of that entity?
9  A.  Yes, I am.
10  Q.  How is that entity set up?  It's a
11  corporation?
12  A.  Yes, it is.
13  Q.  So there are shares of that
14  corporation?
15  A.  Yes.
16  Q.  Who are the shareholders of that
17  corporation?
18  A.  George Vallone and Daniel Gans.
19  Q.  And how many shares do you have?
20  A.  It's a 50 percent partnership.
21  Q.  So the Hoboken Brownstone Company,
22  is that a separate legal entity or is it a trade
23  name?
24  A.  It's a trade name, dba.
25  Q.  So there is no legal entity, Hoboken

Rizman Rappaport Dillon & Rose - (973) 992-7650
Let Our Fingers Do Your Talking

| Gans, Daniel - direct - Ash | Page 189 |
|---|---|

1  Brownstone Company?
2  A.  That's correct, it's a dba.
3  Q.  And do you use Hoboken Brownstone
4  Company as the trade name for various entities
5  under your control?
6  A.  Yes.
7  Q.  How many entities would you say?
8  How many -- strike that.
9      How many different legal entities do
10  you control or own shares in that you have used
11  Hoboken Brownstone Company as a trade name?
12  A.  It would be a little bit of a guess
13  for me to answer.  I wouldn't be 100 percent
14  sure.
15  Q.  Well, qualifying your answer that it
16  is an estimate, would you be able to estimate?
17  A.  Yes.
18  Q.  How many entities, that are within
19  your control or in which you are a member or own
20  shares, would you estimate that you use Hoboken
21  Brownstone Company as a trade name?
22  A.  Two or three.
23  Q.  What entities are you referring to
24  when you're thinking of the two or three entities
25  that Hoboken Brownstone has been used as a

| Gans, Daniel - direct - Ash | Page 190 |
|---|---|

1  trading name or a doing business as name?
2  A.  Hoboken Project Management is the
3  one that comes up to mind, and I don't know,
4  there are other pieces of that, if we have
5  another account, so.
6  Q.  You're a member of an entity called
7  Coles Jersey Development Company, LLC, correct?
8  A.  Correct.
9  Q.  And have you ever used the Hoboken
10  Brownstone Company as a trade name for the legal
11  entity, Coles Jersey Development Company, LLC?
12  A.  Not to my knowledge, we never did
13  that, no.
14  Q.  The Purchase and Sale agreement, if
15  you look at the page, first page of the agreement
16  marked DG 361, the identification of property
17  within the Purchase and Sale agreement in Section
18  1.2, that does not include what is now known as
19  Block 6005, a portion of Lot 7, correct?
20  A.  Without looking exactly what these
21  include, I don't know from looking at this what
22  Block 6005 and the lots are, you know, what are
23  represented here, just from looking at this.
24  Q.  Do you recall the street address for
25  Block 6005?

| Gans, Daniel - direct - Ash | Page 191 |
|---|---|

1  A.  It's Block 367, 305 Coles Street.
2  Q.  That's the address for your current
3  office, correct?
4  A.  Right.
5  Q.  And the trailers you have are set up
6  on Block 6005?
7  A.  That's correct.
8  Q.  And the document identifies 305 Cole
9  Street, Block 367, you understand to be the
10  former tax designation for Block 6005?
11  A.  That's correct.
12  Q.  Do you have an understanding as to
13  what Lot 8.2 refers to?
14  A.  Not without referring to a diagram.
15  I would need to look at a diagram.
16  Q.  Okay.  If we go to Section 3.6 in
17  the agreement?
18  A.  I'm just going to grab some glasses,
19  make my life easier.  3.6.
20  Q.  Section 3.6, it says, "Survey"?
21  A.  Right.
22  Q.  Have you reviewed the entire
23  agreement?
24      MR. DALTON: Do you mean today or
25  previously?

| Gans, Daniel - direct - Ash | Page 192 |
|---|---|

1  Q.  Previously?
2  A.  No.
3  Q.  Are you familiar with or have you
4  ever reviewed Section 3.6 in this agreement?
5  A.  Not specifically, not in depth, no.
6  Q.  Okay.  If we look at the last
7  sentence on that page marked 364, it says:
8  "As to Lot A.02 in Block 367, mislocated fencing,
9  a guard house extending into the bed of 17th
10  Street, storage containers and a paved parking
11  area over the northerly property line, utility
12  poles with a light and transformer and overhead
13  wires over the westerly and northerly portion of
14  the premises and the approximate location State
15  claim line over the southerly westerly easterly
16  portions of the premises."
17      Do you know what the "approximate
18  location" of "State claim line" refers to as to
19  Block 367?
20  A.  No.
21  Q.  Do you know if that refers to a New
22  Jersey tidelands claim on Block 367?
23  A.  I don't believe it does.
24  Q.  What is the basis for your belief
25  that this paragraph does not refer to a New

Texas Eastern v.
0.77 a Acres

| Gans, Daniel - direct - Ash | Page 193 |
|---|---|

1   Jersey tideland claim on Block 367?
2   A.  There was a tideland claim on 6004.
3   Is that 367, 6004?  Can I go back to the front
4   here?
5   Q.  Yeah, please.
6   A.  Just to give myself some knowledge
7   again.  My only statement there is that Block 366
8   did have a tidelands claim on it and Block 367
9   did not.
10  Q.  Have you applied to the New Jersey
11  Tidelands Council for a license or a grant as to
12  any open tidelands claims on any of the
13  properties purchased from Ogden Realty Company?
14  A.  Yes.
15  Q.  What is the current status of the
16  application for a license or a grant?
17  A.  It's been granted.
18  Q.  You've received a grant and not a
19  license for open tidelands claims?
20  A.  I believe we received a grant.  I'm
21  not 100 percent knowledgeable about the
22  difference between a license and a grant.
23  Q.  Do you recall the compensation paid
24  for that grant?
25  A.  Approximately.

| Gans, Daniel - direct - Ash | Page 194 |
|---|---|

1   Q.  What was the approximate
2   compensation for the grant?
3   A.  $64,000.
4   Q.  And to the best of your recollection
5   that grant only includes property on Block 6004?
6   A.  That's correct.
7   Q.  How did -- strike that.
8       As part of your grant application
9   into New Jersey Tidelands Council, did you offer
10  the amount of $64,000 as compensation?
11  A.  It came through, that number came
12  through the process of applying for it.  I'm not
13  sure how we came up with that number exactly, how
14  they came up with that number.
15  Q.  Is the $64,000 compensation
16  supported by an appraisal?
17  A.  Yes, there was an appraisal done.
18  Q.  And that was an appraisal done at
19  your request or at Coles Jersey's request?
20  A.  It was for Coles Jersey request.
21  Q.  And that was prepared by Otteau
22  Valuation Company?
23  A.  That's correct.
24  Q.  Do you recall if the appraisal
25  prepared by Otteau Valuation Company included

| Gans, Daniel - direct - Ash | Page 195 |
|---|---|

1   portions of Block 6005?
2   A.  I do not recall that, no.
3   Q.  In the February 12th deposition I
4   had asked for a copy of that report and an
5   objection was made because it did not pertain to
6   Block 6005, and I just want to understand that
7   that was based on a review of the report?
8       MR. DALTON: The report addressed
9   Block 6004, not 6005, which is the piece of
10  property at issue right now.
11      MR. ASH: Okay.
12  Q.  Are you aware of NJDEP through
13  Tidelands Council had conducted or ordered their
14  own appraisal of the claimed area on Block 6004?
15  A.  I have no knowledge of that.
16  Q.  If we continue through Section 3.6
17  on the page marked DG 365, there's a specific
18  exception to the pending condemnation for
19  permanent and temporary easements by Texas
20  Eastern on Block 6005?
21      MR. DALTON: I'm going to make an
22  objection because it doesn't refer to it as 6005
23  in this document.
24      MR. ASH: Your objection is noted.
25  Q.  The document refers to Block 367,

| Gans, Daniel - direct - Ash | Page 196 |
|---|---|

1   Lot 8.2.  Do you see that?
2   A.  Yes.
3   Q.  So you were aware at the time that
4   you signed this Purchase and Sale agreement, that
5   you were acquiring the property subject to Texas
6   Eastern's condemnation of permanent and temporary
7   easements?
8       MR. DALTON: Objection to form.  I
9   don't believe that Mr. Gans signed this document.
10  Q.  The document was signed as Hoboken
11  Brownstone Company as the buyer?
12  A.  Correct.
13  Q.  And you're a 50 percent owner of
14  that company, correct?
15  A.  Correct.
16  Q.  And as a 50 percent owner of the
17  buyer in this Purchase and Sale agreement, were
18  you aware that Hoboken Brownstone would be
19  purchasing the property identified in the
20  Purchase and Sale agreement subject to Texas
21  Eastern's permanent and temporary easements?
22  A.  That's correct.
23  Q.  If we turn to page DG 368 at, this
24  is Section 6.2, Section L, the purchase of the
25  property identified in this Purchase and Sale

Gans, Daniel - direct - Ash                                    Page 197

1   agreement included certain items to be completed
2   at closing, one of which was an assignment of
3   seller's interest in and to that certain
4   condemnation proceeding identified in Section 3.6
5   and Exhibit B, "including all proceeds thereto as
6   well as any and all rights, benefits and
7   obligations under that certain fee agreement
8   between seller and the law firm of Bathgate,
9   Wegener and Wolf, representing seller in such
10  condemnation proceeding." Do you see that?
11  A. Yes.
12  Q. Was this a point negotiated between
13  Ogden Realty and Hoboken Brownstone?
14  A. Yes.
15  Q. So under the original Purchase and
16  Sale agreement, Ogden Realty was to assign all
17  interest in any condemnation proceeds to Hoboken
18  Brownstone?
19  A. That was not my understanding, no.
20  Q. Are you aware of a separate
21  agreement or an amendment to this agreement that
22  would change the terms of Section 6.2, L in
23  DG-16?
24  A. I don't recall if there was another
25  agreement that defined this a little bit more.

Gans, Daniel - direct - Ash                                    Page 198

1   Q. Are you aware of any conversations
2   or verbal agreements that may not have been
3   formerly memorialized in writing between Ogden
4   Realty Company and Hoboken Brownstone that dealt
5   with the assignment or allocation of condemnation
6   proceeds?
7   A. I do recall that there was some more
8   definition than what is written right here.
9   Q. More definition?
10  A. About the proceeds and who and how
11  the proceeds were allocated.
12  Q. And that "more definition" was
13  expressed in writing or was it communicated
14  verbally?
15  A. I thought it was somewhere in
16  writing, but I don't recall.
17  Q. Okay. To the extent that there was
18  an additional agreement that has not yet been
19  provided or identified, I would ask for a copy of
20  that.
21      MR. DALTON: If there is.
22      MR. ASH: If there is.
23      MR. DALTON: If such an agreement
24  exists.
25  A. My belief is if it hasn't come up in

Gans, Daniel - direct - Ash                                    Page 199

1   a request right now, you have all the agreements
2   that existed. Certainly the firm, Bathgate,
3   Wegener and Wolf, at one time had a concept in a
4   meeting talked about the disposition of the
5   proceeds that were a little, it sounded to me to
6   be a little bit different than what's written in
7   L. It says, "satisfactory," just seller and
8   buyer.
9       So maybe still there's a little open
10  in this, it seems open, and so that it was
11  defined later and you have those. I believe you
12  have those documents already that came from our
13  discussions with Mr. Wegener from --
14  Q. So it's your understanding that this
15  term in Section 6.2, Section L, was further
16  defined by additional documents between Ogden
17  Realty and Hoboken Brownstone?
18  A. Correct, yeah.
19  Q. Okay. Can we turn to page DG 371?
20  A. Seven.
21  Q. Under Article 7, the title's:
22  "Casualty, semicolon, Condemnation Section 7.1
23  Notice: Prior to the closing the property or any
24  portion thereof is damaged or destroyed by fire
25  or other casualty or if any eminent domain

Gans, Daniel - direct - Ash                                    Page 200

1   proceeding beyond that set forth in Section 3.6
2   and Exhibit B herein is commenced or threatened
3   against the property or any portion thereof, the
4   seller shall give prompt written notice thereof
5   to the buyer." Do you see that term?
6   A. Yes.
7   Q. Are you aware of any additional
8   eminent domain proceeding that was threatened
9   against the property during the executory period
10  of this contract?
11  A. Yes, I am aware that there was a
12  threatened, a possible threatened proceeding that
13  might occur.
14  Q. Are you referring specifically to
15  Texas Eastern's attempt to acquire an easement on
16  a portion of Lot 7 and Block 6005 --
17  A. Yes.
18  Q. -- in the spring of 2013?
19  A. Yes, I am.
20  Q. Did the seller, Ogden Realty
21  Company, provide Hoboken Realty, Hoboken
22  Brownstone Realty as the buyer with formal notice
23  of that threatened eminent domain as required in
24  Section 7.1?
25  A. I do not recall that.

---

**Gans, Daniel - direct - Ash**                                    **Page 201**

1  Q.  Having received some notice of that
2  threatened eminent domain proceeding, Hoboken
3  Brownstone Realty did not elect to terminate the
4  agreement as a remedy in Article 7?
5  A.  That is correct.
6  Q.  We turn to DG 382, which is Exhibit
7  B, certain permitted exceptions.  Item number
8  five identifies as a permitted exception:
9  "Right, title and interest of the State of New
10  Jersey in and to so much of the land described in
11  Schedule A hereof as is now or formerly effected
12  by the ebb and flow of the tide," referring to
13  Block 367, Lot 8.02.  Do you see that?
14  A.  I see that.
15  Q.  Are you aware of a separate
16  application to NJ Tidelands Council that would
17  specifically address what's formerly known as
18  Block 367?
19  A.  I am not aware of anything that's
20  been done with that.
21  Q.  And, again, at Item number 9, the
22  Texas Eastern condemnation for permanent and
23  temporary easements is identified as a permitted
24  exception?
25  A.  Yes, that's correct.

---

**Gans, Daniel - direct - Ash**                                    **Page 202**

1       MR. ASH:  Okay.  Let's mark this
2  DG-17, please?
3       (Exhibit DG-17 was received and
4  marked for identification by the court reporter.)
5  Q.  Mr. Gans, please take a minute and
6  review what we've marked DG-17, which is also
7  identified as bates stamp DG 386 and 387.  Are
8  you familiar with this document?
9  A.  Yes, I am.
10  Q.  And what is this document, DG-17?
11  A.  This is an assignment of our rights
12  under the contract to Crescent Heights.
13  Q.  When you say, "the contract," you're
14  referring to what we've marked DG-16?
15  A.  DG-16, correct.
16  Q.  Do you know who prepared this
17  document, DG-17?
18  A.  I'm not sure.
19  Q.  Okay.  The second paragraph reads:
20  "At or before the closing of title, assignee,"
21  who is identified as "CH Acquisitions 2, LLC,
22  will enter into a Development agreement with an
23  entity to be owned by George Vallone and Daniel
24  Gans identified as the VG entity, by which the VG
25  entity will be engaged by assignee to play a

---

**Gans, Daniel - direct - Ash**                                    **Page 203**

1  substantial role in assisting assignee with the
2  development of the project on the property."
3       This was a full assignment of Hoboken
4  Brownstone Realty's rights under the Purchase and
5  Sale agreement?
6  A.  Yes, it was.
7  Q.  The fourth paragraph refers to or
8  anticipates entering into an Assignment and
9  Assumption agreement between original buyer
10  defined as Hoboken Brownstone Company and
11  assignee, who is CH Acquisitions 2, LLC.  Do you
12  see that?
13  A.  Yes.
14  Q.  Was a separate Assignment and
15  Assumption agreement between Hoboken Brownstone
16  Company and CH Acquisitions 2, LLC ever
17  negotiated and executed?
18  A.  Was negotiated, I don't recall if it
19  was ever executed.
20  Q.  Did the terms of the Assignment and
21  Assumption agreement include a provision in which
22  West Bank Realty, Hoboken Brownstone Company or
23  some affiliated entity of West Bank Realty would
24  receive some equity portion of the ownership
25  entity of the property in the Purchase and Sale

---

**Gans, Daniel - direct - Ash**                                    **Page 204**

1  agreement?
2  A.  Yes, I believe it did.
3  Q.  Did the Assignment and Assumption
4  agreement specifically identify the Texas Eastern
5  easement condemnations?
6  A.  I don't recall.
7  Q.  Do you believe you have maintained a
8  copy of the unexecuted Assignment and Assumption
9  agreement?
10  A.  I don't recall if I have a copy of
11  it.
12       MR. ASH:  To the extent Mr. Gans or
13  Hoboken Brownstone Company has maintained a copy
14  of that draft Assignment and Assumption agreement
15  between Hoboken Brownstone Company and CH
16  Acquisitions 2 LLC, I would ask for a copy of
17  that.
18       MR. DALTON:  We'll check the files
19  again.  I do believe we produced everything, but
20  we'll check again.
21       MR. ASH:  Okay.  Thank you.
22       (Exhibit DG-18 was received and
23  marked for identification by the court reporter.)
24  Q.  Okay.  Can you take a minute, please
25  and review what we've marked DG-18?

---

Texas Eastern v.
0.77 a Acres

---

Gans, Daniel - direct - Ash                          Page 205

1       MR. ASH: And just for the record
2    it's identified as bates stamped DG 388 and 389.
3    Q.  Mr. Gans, are you familiar with
4    DG-18?
5    A.  Yes, I am.
6    Q.  DG-18 was produced by counsel in
7    response to my request for an agreement
8    memorializing terms of allocation of Texas
9    Eastern condemnation settlement between Ogden
10   Realty and Hoboken Brownstone Company, CH
11   Acquisitions.  Is that an accurate description of
12   this document?
13   A.  You say this was produced by the
14   attorneys?
15       MR. DALTON: By us.
16   Q.  It was produced to me in response to
17   my request for a copy of the agreement
18   memorializing terms of allocation of Texas
19   Eastern condemnation settlement between Ogden
20   Realty and Hoboken Brownstone, CH Acquisitions?
21   A.  That is correct.
22   Q.  So is it your understanding that
23   this two-page chart is the full extent of the
24   written agreement between Ogden Realty and
25   Hoboken Brownstone and CH Acquisitions as

---

Gans, Daniel - direct - Ash                          Page 206

1    purchaser for the condemnation settlement
2    proceeds?
3    A.  Yes.
4    Q.  Okay.  Who prepared DG-18?
5    A.  George created the spreadsheet.
6    Q.  Did you provide input or information
7    to George Vallone in creating DG-18?
8    A.  Yes, amongst others.
9    Q.  Who would be the "others," to your
10   recollection, that would have contributed
11   information or data to DG-18?
12   A.  This was created after our
13   settlement discussion, so the people that were
14   representing the different entities all had input
15   into this.
16   Q.  So this document, DG-18, was created
17   after a settlement meeting between Texas Eastern,
18   Ogden Realty and Hoboken Brownstone on or about
19   June 13th, 2013?
20   A.  I can't remember if this was right
21   before or after the settlement, I don't recall
22   that.
23   Q.  If we look at the first page of the
24   document in the middle of the page it says,
25   "Final settlement equals 3,500,000."  Do you see

---

Gans, Daniel - direct - Ash                          Page 207

1    that?
2    A.  Yes.
3    Q.  Is that the final negotiated
4    settlement after the negotiations at the June
5    13th, 2013 settlement meeting between Texas
6    Eastern, Ogden Realty and Hoboken Brownstone?
7    A.  Yes, it was.
8    Q.  Does that refresh your recollection
9    as to whether this document was created before or
10   after that meeting?
11   A.  This was created after that meeting.
12   Q.  Let's look at the top of page DG
13   388.  There's a separate chart that begins with
14   the column "address." Do you see that chart?
15   A.  Yes.
16   Q.  What is this chart?
17   A.  These are charts of properties that
18   were sold and the cost of those sales, the size
19   of the lots and the density.
20   Q.  Who prepared this chart at the top?
21   A.  Mr. Vallone and myself.
22   Q.  Did anyone contribute to the
23   research of these other transactions?
24   A.  I don't recall.
25   Q.  Were you working with an appraiser

---

Gans, Daniel - direct - Ash                          Page 208

1    at the time?
2    A.  Not in regard to this matter.
3    Q.  Do you recall consulting with an
4    appraiser named John Brody as part of the
5    settlement discussions between Texas Eastern and
6    Ogden Realty?
7    A.  I don't.
8    Q.  Do you recall any involvement by an
9    appraiser named John Brody during the settlement
10   negotiations between Ogden Realty and Texas
11   Eastern?
12   A.  I do not.
13   Q.  Was there another appraiser you may
14   have been working with, with regard to these
15   properties that you were purchasing from Ogden
16   Realty in the spring of 2013?
17   A.  I don't recall anyone else.
18   Q.  Okay.  There are certain conclusions
19   at the bottom of the first chart where you have
20   averages of sales price, lot size.  There's a
21   column, "PPU." Does that stand for price per
22   unit?
23   A.  Correct.
24   Q.  And then you have price per acre, is
25   that right?

---

Gans, Daniel - direct - Ash                                    Page 209

1   A.  Yes, it is.
2   Q.  And then an average density per
3   acre?
4   A.  Correct.
5   Q.  What were you analyzing in this
6   chart?
7   A.  We were making an effort to analyze
8   the cost and value of units on a piece of
9   property and how that related to density.
10  Q.  The conclusions in the chart on the
11  top of 300 -- I'm sorry, strike that.
12      $33,338 per unit and 4,576,792 per
13  acre became the basis for the valuation
14  calculations in the chart under the heading,
15  "permanent easement area valuation based on units
16  lost," correct?
17  A.  Correct.
18  Q.  How did you determine under
19  permanent easement area valuation based on units
20  lost that 57 units would be lost in the permanent
21  easement area?
22  A.  It was based upon the density per
23  acre.
24  Q.  So the chart on the top where it
25  says, "Average density of 137," the lost number

Gans, Daniel - direct - Ash                                    Page 210

1   of units of 57 is based on .417 acres of the
2   permanent easement area?
3   A.  I, just looking at the numbers, I'm
4   not 100 percent sure what the formulas are.
5   Q.  We could check that math, right?
6   A.  Yup, yup.
7   Q.  And it checks out?
8   A.  It does, okay.  I accept your --
9       MR. DALTON: I think we could agree
10  that .417 times the 4.576 million per acre works
11  out to 1.908.
12      MR. ASH: Okay.
13  Q.  And there's a separate calculation
14  for temporary work space under the permanent
15  easement valuation?
16  A.  Correct.
17  Q.  And there's a total valuation
18  concluded of $3,405,214, do you see that?
19  A.  Where are you looking?  I'm sorry.
20  Q.  At the bottom of that chart it says,
21  "bar valuation" equals "3,405,214"?
22  A.  Oh, okay.
23  Q.  What is the significance of that
24  amount?
25  A.  That amount was an estimation of the

Gans, Daniel - direct - Ash                                    Page 211

1   value of the Texas Eastern takings.
2   Q.  Did you go into the settlement
3   meeting with Texas Eastern with an idea or an
4   amount of compensation to settle the
5   condemnations that was consistent with your
6   calculations on DG-18 of roughly $3.4 million?
7   A.  Yes, we did.
8   Q.  So going into that meeting with a
9   demand, whether that was expressed to Texas
10  Eastern or not, of 3.4 million, you ended up
11  doing better at 3.5 million?
12  A.  We were only one of the people at
13  the table negotiating.
14  Q.  Prior --
15  A.  So I can't say what was acceptable
16  to everybody who was going into the meeting.
17  Q.  Was there a discussion between
18  Hoboken Brownstone and Ogden Realty as to what an
19  acceptable settlement would be prior to the June
20  13th, 2013 meeting with Texas Eastern?
21  A.  There were discussions.  To the best
22  of my knowledge, there was no resolutions prior
23  to the meeting.
24  Q.  Were you working with this valuation
25  calculation prior to the June 13th meeting?

Gans, Daniel - direct - Ash                                    Page 212

1   A.  Yes, we had prepared a document.
2   Q.  So the valuation of 3.4 million
3   approximate, that was the target, if you will,
4   for negotiations?
5   A.  That was Hoboken Brownstone, Mr.
6   Vallone and my valuation at the time and were
7   presenting that obviously to two parties sitting
8   at the table.
9   Q.  Was this document actually produced
10  and discussed at the June 13th, 2013 settlement
11  meeting?
12  A.  I don't recall.
13  Q.  Do you recall bringing this document
14  with you even if you didn't share it with Texas
15  Eastern?
16  A.  Yes, we would have had it with us.
17  Q.  And did you discuss this document,
18  DG-18, with or portions of the analysis with
19  Ogden Realty?
20  A.  Yes.
21  Q.  There's also an allocation for the
22  temporary easement duration between Ogden and
23  Hoboken Brownstone, correct?
24  A.  Say that again, please?
25  Q.  There's an allocation of the

Gans, Daniel - direct - Ash                                Page 213

1    duration of the temporary easement between Ogden
2    and Hoboken Brownstone?
3    A.   Yes.
4    Q.   And the allocation was 12 months of
5    a temporary easement to Ogden, six months to
6    Hoboken Brownstone?
7    A.   That is correct.
8    Q.   Who decided that allocation?
9    A.   It was based upon the closing date.
10   Q.   Okay.  If we go down to the bottom
11   half of the page under, "final settlement" equals
12   "$3,500,000," under "takings," do you see that
13   column, the first column?
14   A.   Yes.
15   Q.   The first row says, "corner," do you
16   see that?
17   A.   Yes.
18   Q.   What does "corner" refer to?
19   A.   A small piece of property from Block
20   367.
21   Q.   Is that specifically the .077 acre
22   portion of what's now known as Lot 7 on Block
23   6005?
24   A.   Yes, it is.
25   Q.   And if we go through the chart in

Gans, Daniel - direct - Ash                                Page 215

1    contingent upon permanent easement ri[
2    .077 acre portion of Lot 7, Block 6005 identified
3    on DG-18 as the "corner" piece?
4    A.   That is correct.
5    Q.   At the time you understood the
6    acquisition of permanent easement rights on the
7    .077 acre portion of Lot 7, Block 6005, in which
8    you identify as the corner piece on DG-18, as a
9    material term of the settlement between Texas
10   Eastern, Ogden Realty and Hoboken Brownstone?
11   A.   Yes.
12   Q.   The compensation for the .077 acre
13   portion of Lot 7, Block 6005 in which you've
14   identified as the corner piece on DG-18 was
15   allocated to Hoboken Brownstone Company amongst
16   the parties?
17   A.   That is correct.
18   Q.   The entire settlement of $3,500,000
19   allocated between Hoboken Brownstone and Ogden
20   Realty net of legal fees, proceeds to Hoboken
21   Brownstone totaled $1,792,394?
22   A.   That is correct.
23   Q.   The .077 acre portion of Lot 7 in
24   Block 6005 that you've identified as the corner
25   piece on DG-18, as being a material term of the

Gans, Daniel - direct - Ash                                Page 214

1    that row for corner, under "final offer" there's
2    an amount indicated, "$255,000," do you see that?
3    A.   Yes.
4    Q.   How was that amount determined?
5    A.   It was based on an offer that Texas
6    Eastern had made to Ogden.
7    Q.   Is that based on an allocation of
8    the entire settlement amount of 3,500,000 for the
9    permanent easement area?
10   A.   Please repeat that question.
11   Q.   Is the $255,000 amount for the
12   corner piece of .077 acres, is that an allocation
13   of the permanent easement compensation of the
14   total 3,500,000 settlement offer?
15   A.   Not really in my understanding of
16   the final offer.
17   Q.   So how was that $255,000 amount
18   determined based on the final offer?
19   A.   As I mentioned, 255 was the number
20   that Texas Eastern had allocated to this.
21   Certainly, the settlement offer had a lot to do
22   with that property.
23   Q.   You say, "The settlement offer had a
24   lot to do with that property."  Are you saying
25   that the entire $3,500,000 settlement was

Gans, Daniel - direct - Ash                                Page 216

1    settlement with Texas Eastern in order to acquire
2    permanent easement rights on that property, do
3    you understand that to be the same .077 acre
4    portion of Block 6005 that is the subject of the
5    instant condemnation?
6    A.   Yes, I do.
7         (Discussion off the record.)
8         (Recess is taken.)
9         MR. DALTON: Let's mark that 19,
10   please?
11        (Exhibit DG-19 was received and
12   marked for identification by the court reporter.)
13        (Discussion off the record.)
14        MR. ASH: Back on.  Okay.
15   Q.   DG-19, are you familiar with this
16   document?
17   A.   Yes, I am.
18   Q.   And what is this document?
19   A.   It's a document that we wrote to
20   Bruce Menin after he told us that he would not
21   close on the property?
22   Q.   And why did you prepare this
23   document?
24   A.   I prepared this document to try to
25   convince Bruce to, and Crescent Heights to

| Gans, Daniel - direct - Ash | Page 217 |
| --- | --- |

1   proceed with us and buy the project.
2   Q.   With whom did you share this
3   document?
4   A.   Bruce Menin.  I don't know if his
5   partner received it or not.
6   Q.   Did you share this memo with Bill
7   Ackman?
8   A.   Not to my recollection.
9   Q.   On Page 2 of this document DG-19
10   under the second section, "Spectra Energy
11   condemnation settlement," there's a reference
12   kind of halfway down the page to the additional
13   3,300 square foot, I'm going to add, portion of
14   the property.  Do you see 3,300 square feet?
15   A.   Yes, that's on it.
16   Q.   Does that refer to the .077 acre
17   portion of Lot 7 and Block 6005?
18   A.   Yes, it does.
19   Q.   And if we turn the page under number
20   three it says: "Notwithstanding any of that, we
21   tried to convince you yesterday that even if we
22   lost the 3,300 square foot piece, it would cost
23   just $255,000 of the $1.79 million credit off the
24   purchase price we had gotten from the Spectra
25   settlement and just 15 units of density on a

| Gans, Daniel - direct - Ash | Page 218 |
| --- | --- |

1   thousand unit project."  Do you see that?
2   A.   Yes, I do.
3   Q.   The $255,000 cost of the "3,300
4   square foot piece," you're referring to the
5   compensation for the corner piece in DG-18?
6   A.   That's correct.
7   Q.   And how did you determine that 15
8   units of density would be lost from the 3,300
9   square foot portion?
10   A.   The average units per acre
11   calculation.
12   Q.   In preparing this memo, it was your
13   understanding that the additional permanent
14   easement area on a portion of Lot 7, Block 6005
15   would result in a loss of 15 units?
16   A.   Yes.
17   (Exhibit DG-20 was received and
18   marked for identification by the court reporter.)
19   Q.   Mr. Gans, are you familiar with this
20   document, DG-20?
21   A.   I'm familiar with it.
22   Q.   And what is this document?
23   A.   It's a document written by my
24   partner, George Vallone, to Bruce Menin.
25   Q.   And did you also prepare this

| Gans, Daniel - direct - Ash | Page 219 |
| --- | --- |

1   document with George Vallone?
2   A.   I don't know.  I don't recall having
3   been part in preparing this specific document.  I
4   certainly spoke to Mr. Vallone, as he noted in
5   the document itself.
6   Q.   Do you recall reviewing this
7   document on or about June 30th, 2013?
8   A.   I'm sure I was copied on the e-mail
9   and reviewed it.
10   Q.   Why was this document prepared?
11   A.   To do what we could do to try to
12   continue to work with Crescent Heights and have
13   them close the property.
14   Q.   The subject of this memorandum is
15   "Walsh Ogden rescue effort progress since our
16   call this morning."  Do you recall June 30th,
17   2013 falling on a Sunday?
18   A.   I believe that is correct, yes.
19   Q.   Were you on a call with Mr. Menin
20   and Mr. Vallone on June 30th, 2013?
21   A.   I was not.
22   Q.   Are you aware if a call took place
23   that morning?
24   A.   Yes, I am.
25   Q.   Do you know who was on that call on

| Gans, Daniel - direct - Ash | Page 220 |
| --- | --- |

1   June 30th, 2013?
2   A.   Mr. Vallone, Bruce Menin and Sonny.
3   Q.   Who is Sonny?
4   A.   Sonny is Bruce's partner.  I believe
5   his last name is Sonny Kahn.
6   Q.   Do you know what was discussed on
7   the call June 30th, 2013?
8   A.   Only the items that are listed on
9   the -- listed by Mr. Vallone as to what was
10   discussed.
11   Q.   Based on a statement on Page 2, this
12   memo was prepared on or about 3:00 on June 30th
13   of 2013?
14   A.   Yes.
15   Q.   If we go back to the first page
16   under number two, the last sentence, it says:
17   "I am confident the Spectra person will be able
18   to educate the title company to the Walsh's
19   ownership of Lot 7.  I believe this because
20   Spectra executives were obviously convinced,
21   since they paid an additional 1.4 million to
22   settle their other dispute with Walsh and to gain
23   access to this strip of land."  Do you see that?
24   A.   Yes, I do.
25   Q.   So when it says, "I am confident,"

Gans, Daniel - direct - Ash                                                Page 221

1   that's Mr. Vallone speaking?
2   A.   That is correct.
3   Q.   Having read these two statements, is
4   that also your belief or would that have been
5   your belief as of June 30th, 2013?
6   A.   Yes.
7   Q.   And the "strip of land" referred to,
8   is it your understanding that that is the .077
9   acre portion of Lot 7, Block 6005?
10  A.   That is correct.
11  Q.   So it's your understanding that
12  gaining access to .077 acre portion of Lot 7,
13  Block 6005 in acquiring a permanent easement on
14  that portion of Lot 7 was a material term for
15  Spectra to settle all of the condemnations
16  against the Ogden Realty property?
17  A.   Yes.
18  Q.   Do you know if you shared this memo,
19  DG-20, with Bill Ackman?
20  A.   I don't recall this being shared
21  with Bill Ackman.
22  Q.   When you were deposed on February
23  12th, 2015, you had described the events of this
24  weekend and you noted that Bill Ackman was -- and
25  now I'm quoting at Page 80 of the transcript --

Gans, Daniel - direct - Ash                                                Page 222

1   "going to see Bruce over the weekend and ask if
2   we would write a little memo to him to go over
3   the points that were bothering Bruce about our
4   performance, and we wrote that memo." That's at
5   Page 80, Lines 1 through 4.
6       So did you prepare a memo at Mr.
7   Ackman's suggestion?
8   A.   At his suggestion we did, yes.
9   Q.   Is that the memo we've marked DG-19?
10  A.   Yes.
11  Q.   Does that also include DG-20?
12  A.   I believe DG-20 was written after
13  they had met.
14  Q.   Do you know if Bruce Menin and Bill
15  Ackman reviewed DG-19 when they met?
16  A.   I do not.
17  Q.   Did Ackman, did Bill Ackman ever
18  discuss the content of DG-19, DG-20 with you?
19  A.   No.
20      MR. ASH: DG-21, please.
21      (Exhibit DG-21 was received and
22  marked for identification by the court reporter.)
23  Q.   At the top of DG-21 this is an
24  e-mail from you to George Vallone, cc Bruce
25  Menin, sent Sunday, June 30, 2013 at 4:37 p.m.

Gans, Daniel - direct - Ash                                                Page 223

1   You wrote: "Hi, Bruce, we just heard back from
2   Ray. His position is that they would allow us to
3   close tomorrow if we walk away from our share of
4   the condemnation proceeds." Do you see that?
5   A.   Yes.
6   Q.   Who is "Ray"?
7   A.   Ray is one of the partners at the,
8   at Ogden.
9   Q.   What's his name?
10  A.   I can't recall his last name right
11  now, I'm drawing a blank, and Ray's the
12  brother-in-law.
13  Q.   The brother-in-law to whom?
14  A.   The Walsh family. He's married to
15  one of the -- was a daughter of Frank Walsh.
16  Q.   Do you know which daughter?
17  A.   No, I don't.
18  Q.   If you continue, "This comes out to
19  less than 1800 per unit. We argued strongly
20  against this and Ray said, talk to your partners
21  and see what they want to do." Did you talk to
22  your partners about walking away from the share
23  of condemnation proceeds?
24  A.   Yes.
25  Q.   With whom did you discuss releasing

Gans, Daniel - direct - Ash                                                Page 224

1   the condemnation proceeds of $1,792,000?
2   A.   I don't think I had the conversation
3   personally, no, I did not discuss that with them,
4   with Bruce or Sonny.
5   Q.   Who had that conversation?
6   A.   Mr. Vallone.
7   Q.   Do you know what was discussed?
8   A.   I believe that was discussed and the
9   compensation and walking away from the proceeds.
10  Q.   What was the outcome of that
11  discussion?
12  A.   The outcome of that discussion was,
13  it's been told to me by my partner, so it's his,
14  what I heard. He told me that this was not taken
15  well by Sonny, and I think he and Sonny had some
16  words and the deal fell apart.
17  Q.   Do you see at the bottom of this
18  e-mail there's a bates stamp, "Ackman 15," do you
19  see that?
20  A.   I do.
21  Q.   I'll represent to you that this
22  document was produced from Mr. Ackman's personal
23  file. Do you know how he would have received a
24  copy of this e-mail?
25  A.   We must have cc'd him, copied him on

Gans, Daniel - direct - Ash                              Page 225

1   the e-mail.
2  Q.  Do you know if you blind copied him
3   on e-mail over the period between June 28th and
4   July 1st, 2013?
5  A.  We may have, yes.
6  Q.  Do you specifically recall blind
7   copying Bill Ackman on e-mails between June 29th,
8   2013 and July 1st, 2013?
9  A.  I don't specifically recall that
10   exactly what we did, but we must have if he had
11   this in his files.
12  Q.  Was it at this point on June 30th,
13   2013 where the deal between Ogden to sell the
14   property and Hoboken Brownstone if it were to be
15   reinstated, a material term of that deal would
16   change and condemnation proceeds would be
17   released?
18  A.  That is correct.
19  Q.  So when do you recall hearing from
20   Ray on June 30th, 2013?
21  A.  George was the one who was talking
22   with Ray, so I don't know the time frames.
23  Q.  Do you know if it was a phone call
24   or an e-mail from Ray?
25  A.  To the best of my knowledge, it was

Gans, Daniel - direct - Ash                              Page 226

1   a phone call.
2  Q.  So when you say in this e-mail on
3   June 30th at 4:37 p.m., "We just heard back from
4   Ray," you're referring to yourself and Mr.
5   Vallone?
6  A.  That's correct.
7  Q.  And to the best of your
8   recollection, this e-mail that you sent would
9   have been contemporaneous with receiving that
10   phone call from Ray?
11  A.  Shortly thereafter, yes.
12  Q.  And that was the first time that the
13   issue of release in condemnation proceeds was
14   raised if he were to reinstate the purchase from
15   Ogden Realty?
16  A.  To the best of my knowledge, yes.
17  Q.  And you understood that walking away
18   from your share of the condemnation proceeds was
19   releasing any right to $1,792,394?
20  A.  That's correct.
21  Q.  And you also understood that
22   $255,000 of that $1,792,394 was compensation for
23   the .077 acre permanent easement on the portion
24   of Lot 7, Block 6005?
25  A.  I think I stated before that the

Gans, Daniel - direct - Ash                              Page 227

1   value of that property in the settlement
2   agreement was material, that was a material piece
3   of the settlement agreement.  So to the value was
4   a value that I believe Texas Eastern started
5   with.
6  Q.  Regardless of who allocated that
7   amount of $255,000, it was your understanding
8   that the release of the entire allocation of
9   $1,792,394 included compensation for the .077
10   acre permanent easement, additional permanent
11   easement on Lot 7, Block 6005?
12  A.  Yes, that's correct.
13       MR. ASH: Let's mark this DG-22,
14   please.
15       (Exhibit DG-22 was received and
16   marked for identification by the court reporter.)
17  Q.  DG-22 is an e-mail from you to Bruce
18   Menin copied George Vallone, Sunday, June 30th,
19   2013, at 6:23 p.m.  Do you see that?
20  A.  Yes.
21  Q.  You write: "Hi, Bruce, see e-mail
22   below from our attorney and the one below that
23   from the title company, sounds like positive
24   news.  We suggest having a conference call this
25   evening to discuss the condemnation proceeds

Gans, Daniel - direct - Ash                              Page 228

1   issue that Ogden put on the table, parenthesis,
2   that we forfeit for $1,792,394, end parenthesis,
3   so we are prepared to move forward tomorrow
4   morning."
5       Did you have a conference call on
6   the evening of June 30th, 2013?
7  A.  I don't recall that.
8  Q.  Do you recall blind copying Bill
9   Ackman on this e-mail?
10  A.  I don't recall that either.
11  Q.  You see the bates stamp number at
12   the bottom --
13  A.  Yes --
14  Q.  -- of the page?
15  A.  -- I do.
16  Q.  Do you know how Bill Ackman would
17   have received a copy of this e-mail?
18  A.  He must have been blind copied on
19   it.
20  Q.  Do you know if at some point after
21   June 30th, 2013 you would have provided
22   correspondence to Bill Ackman?
23  A.  Rephrase that question again.
24       MR. ASH: Can I have that back,
25   please?

Texas Eastern v.
0.77 a Acres

Gans, Daniel - direct - Ash                                    Page 229

1     (Record read back.)
2  A.  After June 30th, 2013, I would have
3  supplied Bill Ackman with documents.  I don't
4  know which one or what documents, but certainly I
5  would have supplied him with documents.
6  Q.  To the best of your recollection,
7  Bill Ackman would have come into possession of
8  this e-mail that we've marked DG-22 because you
9  blind copied him at the time?
10 A.  I don't recall exactly how he
11 received this, but it's certainly a possibility
12 that we blind copied him.
13 Q.  Is it your custom and practice to
14 blind copy certain individuals on e-mails from
15 time to time?
16 A.  From time to time.
17    MR. ASH:  DG-23, please.
18    (Exhibit DG-23 was received and
19 marked for identification by the court reporter.)
20 Q.  Are you familiar with this document,
21 DG-23?
22 A.  Yes, I am.
23 Q.  And how would you describe this
24 document?
25 A.  It's a briefing memo regarding the

Gans, Daniel - direct - Ash                                    Page 230

1  Coles Street properties.
2  Q.  Did you prepare this document?
3  A.  Yes, along with Mr. Vallone.
4  Q.  And why did you prepare this
5  document?
6  A.  To see if we could get them involved
7  in purchasing the property.
8  Q.  When you say, "them," that refers to
9  William Ackman and Larry Ackman?
10 A.  Yes.
11 Q.  Do you recall when you would have
12 transmitted this document to Larry Ackman and
13 William Ackman?
14 A.  I believe on the 1st, July 1st.
15 Q.  Did you e-mail the document, did you
16 hand it to them?
17 A.  I believe it would have been
18 e-mailed and maybe handed also.
19 Q.  This document was produced as DG 390
20 through 397 as a "Memorandum from Gans to Ackman
21 outlining terms of agreement with Ogden Realty
22 and development of property."  Is that an
23 accurate characterization of this document?
24 A.  Yes, it is.
25 Q.  Was there an additional memorandum

Gans, Daniel - direct - Ash                                    Page 231

1  or document that would have further discussed
2  terms of a deal between Ogden Realty and Hoboken
3  Brownstone?
4  A.  I don't believe so.
5  Q.  There's no mention in this document,
6  DG-23, about the Texas Eastern easements on the
7  property.  Is that right?
8  A.  That's correct.
9  Q.  There's no mention in DG-23 as to
10 the settlement of the Texas Eastern condemnation
11 of permanent and temporary easements on
12 properties.  Is that right?
13 A.  That's right.
14 Q.  Was that information not included as
15 part of the terms of the deal to be reinstated
16 between Ogden Realty and Hoboken Brownstone?
17 A.  Because the seller had indicated
18 that that was off the table if a new deal was
19 going to go forward.
20 Q.  Was it ever expressed by you from
21 Mr. Vallone to Larry Ackman or William Ackman,
22 Mr. Lyss or any other representative of the
23 Ackmans or their development entities that the
24 proceeds of the Texas Eastern condemnation
25 settlement that would have been available as a

Gans, Daniel - direct - Ash                                    Page 232

1  credit at closing to Crescent Heights was no
2  longer available in a deal going forward?
3  A.  Not to my recollection specifically
4  at this time that this was brought up.
5  Q.  If we turn to the page marked DG
6  396, we've got a, basically, a concept plan for
7  development, right?
8  A.  Correct.
9  Q.  Do you see -- I'm going to show you
10 my copy because it's in color.  Do you see the
11 green area that's marked "railroad easement
12 park"?
13 A.  Yes.
14 Q.  What does that refer to?
15 A.  That refers to New Jersey Transit
16 property that is funded and will become open
17 space.
18 Q.  And that's, is that contiguous with
19 the Conrail freight line identified on this
20 concept?
21 A.  Yes, and also the other green
22 portions.
23 Q.  So, to your understanding, that park
24 on the New Jersey Transit owned property is, is
25 that something that is coming to fruition?

Gans, Daniel - direct - Ash                                    Page 233

1  A.  Yes.
2      MR. ASH: Let's mark this DG-24,
3  please.
4      (Exhibit DG-24 was received and
5  marked for identification by the court reporter.)
6  Q.  DG-24, we have an e-mail from you to
7  Bruce Menin and Steve Goldman Monday, July 1st,
8  2013 at 9:10 a.m.  Who is Steve Goldman?
9  A.  Steve Goldman was Bruce Menin's
10  attorney.
11  Q.  Who is Daisy Torres?
12  A.  She worked for Crescent Heights.
13  Q.  As of Monday, July 1st, 2013, you're
14  still trying to convince Bruce Menin to come back
15  and close on the property?
16  A.  It appears from this that, yes, I'm
17  still working with them.  So my recollection of
18  dates is a little tough at the time.
19  Q.  Did you ever have a conversation
20  with Menin and Ackman together?
21  A.  No.
22  Q.  Do you know if Menin and Ackman ever
23  talked directly?
24  A.  I believe they did.
25  Q.  They met at Mr. Ackman's house for a

Gans, Daniel - direct - Ash                                    Page 234

1  barbecue?
2  A.  I believe that's correct, yes.
3  Q.  Did Mr. Menin or Mr. Ackman ever
4  relate back to you what was discussed at that
5  barbecue?
6  A.  Not to me, no.
7  Q.  To Mr. Vallone?
8  A.  I don't recall.
9  Q.  Do you know if they -- strike that.
10     Do you know if Menin and Ackman had
11  any additional conversations besides when they
12  met at Mr. Ackman's house for a barbecue on July
13  29th -- strike that, June 29th, 2013?
14  A.  I believe they had a conversation on
15  Friday evening when they didn't close.  I don't
16  remember the dates right now.
17  Q.  Did either Mr. Menin or Mr. Ackman
18  relate back to you what was discussed between Mr.
19  Menin and Mr. Ackman directly on June 28th, 2013?
20  A.  It was not related to me.
21  Q.  What wasn't related to you -- I'm
22  sorry, they never --
23  A.  The conversation between Bill Ackman
24  and Bruce Menin was not related.
25  Q.  They didn't report back?

Gans, Daniel - direct - Ash                                    Page 235

1  A.  They didn't, they didn't report back
2  to me about that.
3  Q.  Okay.  Now, back to DG-24, I see my
4  name there, right?
5  A.  Yes.
6  Q.  Do you recall you reached out to me
7  by phone on the morning of July 1st, 2013?
8  A.  I don't recall the conversation,
9  but.
10  Q.  There was specific information you
11  were looking for, right?
12  A.  Yes.
13  Q.  You wanted Texas Eastern's title
14  research with regard to the ownership of what we
15  had identified as parcel X, right?
16  A.  That's correct.
17  Q.  And you understand parcel X to be
18  the .077 acre portion of Lot 7, Block 6005?
19  A.  Yes, I do.
20  Q.  And we go to page Ackman 23, there's
21  an e-mail from me to you, cc Bill Simmons on July
22  1st, 2013, in which I attached a memo as to the
23  ownership of Lot 7, correct?
24  A.  That's correct.
25  Q.  You then forwarded that information

Gans, Daniel - direct - Ash                                    Page 236

1  to your title company, right?
2  A.  Yes.
3  Q.  They forward that information to
4  their underwriter, correct?
5  A.  Yes.
6  Q.  And then at some point the title
7  company reaches a conclusion consistent with the
8  analysis in the memo I provided to you as to the
9  ownership of Lot 7, right?
10  A.  That's correct.
11  Q.  Was there any additional research
12  that was conducted by either your attorneys, any
13  of the parties or the title company above and
14  beyond the memo I provided to you as to the
15  ownership of Lot 7?
16  A.  I don't recall.
17  Q.  Do you know if your title company
18  had relied exclusively on the memo I provided to
19  you and the research in that memo as to the title
20  of Lot 7 in your title company concluding to the
21  ownership of Lot 7?
22  A.  I believe they had other information
23  and in the e-mail, your e-mail, certainly was in
24  addition to the information they already had,
25  which helped them understand and be comfortable

Gans, Daniel - direct - Ash                              Page 237

1  with the ownership. It wasn't -- I wouldn't say
2  it was based solely upon one e-mail.
3  Q.  To the best of your recollection,
4  what was the additional information in the
5  possession of the title company as to the
6  ownership of Lot 7?
7  A.  I don't know, but I do recall they
8  had questions. It was open, so there was
9  conflicting issues that they had, so there was
10  other issues. There was other documents that
11  they were looking at.
12  Q.  However, my memo seemed to have
13  provided some closure on the issue, right?
14  A.  It seemed to give them final, the
15  final conclusion.
16  Q.  The transmittal of that memo from me
17  included a specific reservation that we were
18  sharing that information, but not to be relied
19  upon conclusively, correct?
20  A.  That is correct.
21  Q.  And that was your understanding?
22  A.  That was my understanding 100
23  percent.
24  Q.  On page Ackman 22 at the top there's
25  an e-mail from George Vallone to Bill Ackman,

Gans, Daniel - direct - Ash                              Page 238

1  Monday, July 1st, 2013 at 10:30 a.m., "Keeping
2  Bill in the loop." It says, "As we suspected it
3  was all a mistake and Walsh does in fact own the
4  3,300 square foot Lot 7. We have not heard
5  anything directly from CH about Walsh's demand
6  for more money." In this e-mail, "CH," refers to
7  Crescent Heights?
8  A.  Yes.
9  Q.  And "Walsh's demand for more money,"
10  does that refer to the release or relinquishment
11  of $1,792,394 of condemnation proceeds?
12  A.  That's correct.
13  Q.  And, again, the release of the
14  condemnation proceeds would include compensation
15  for a permanent easement on the 3,300 square foot
16  portion of Lot 7, correct?
17  A.  Correct.
18  Q.  So you would agree that if not
19  before, since Mr. Ackman had been in the loop, if
20  not before July 1st, 2013 at 10:30 a.m., he was
21  now aware that Ogden, also referred to as Walsh,
22  wanted to keep $1,792,394 of condemnation
23  proceeds to reinstate the deal, right?
24  A.  He definitely had the information
25  regarding that at that time. I don't know what

Gans, Daniel - direct - Ash                              Page 239

1  exactly his -- what he knew and what he was
2  reading and how much time he was putting into his
3  effort in looking into all this. I have some
4  reservations about how much he focuses on
5  different issues.
6      MR. ASH: DG-25, please.
7      (Exhibit DG-25 was received and
8  marked for identification by the court reporter.)
9  Q.  Okay. On July 1st, 2013, you had a
10  meeting in person with Greg Lyss, Larry Ackman
11  and George Vallone?
12  A.  That's correct.
13      MR. DALTON: Larry or Bill?
14      MR. ASH: Larry.
15      MR. DALTON: Okay.
16  Q.  Where was that meeting?
17  A.  I can't remember where the meeting
18  was that afternoon.
19  Q.  Do you remember attending a meeting?
20  A.  I remember having dinner with Larry
21  I believe that day and maybe we met right before
22  dinner. I don't recall.
23  Q.  It's possible "meeting" means
24  dinner?
25  A.  I don't remember Greg being there,

Gans, Daniel - direct - Ash                              Page 240

1  so it's -- in rereading this, he was at a
2  meeting. Maybe we met before dinner. I don't
3  recall.
4  Q.  Mr. Lyss indicates he attended the
5  first hour of a meeting, right?
6  A.  Yes.
7  Q.  So do you recall meeting at an
8  office somewhere and then going to dinner with
9  Larry Ackman?
10  A.  I don't remember.
11  Q.  Do you remember where you ate with
12  Larry Ackman?
13  A.  I don't remember.
14  Q.  Do you recall then going to Bill
15  Ackman's apartment?
16  A.  Yes.
17  Q.  Now, focusing on the meeting of the
18  afternoon in which Mr. Lyss attended, do you
19  recall who was present at that meeting?
20  A.  It would have been myself, Mr.
21  Vallone and Larry Ackman.
22  Q.  Does Larry Ackman maintain an
23  office?
24  A.  It's at Larry Square office.
25  Q.  Do you recall if that's where you

| Gans, Daniel - direct - Ash | Page 241 |
|---|---|

1    met on July 1st, 2013?
2    A.   I don't know.
3    Q.   Do you recall what was discussed on
4    July 1st, 2013 with Larry Ackman and Mr. Lyss?
5    A.   We would have discussed the
6    development project.
7    Q.   Was there any mention of Texas
8    Eastern easements or settlement during those
9    conversations?
10   A.   I don't recall.
11   Q.   Is it possible that was discussed?
12   A.   It's possible.
13   Q.   Did you discuss terms of a closing
14   on the Ogden properties?
15   A.   Yes.
16   Q.   What were the terms discussed?
17   A.   It was an all cash deal with no
18   contract.
19   Q.   And the consideration was $22
20   million?
21   A.   Yes.
22   Q.   And there would be no credit for
23   condemnation proceeds?
24   A.   That's correct, no contract.
25   Q.   Was that specifically discussed,

| Gans, Daniel - direct - Ash | Page 242 |
|---|---|

1    that there would be no credit for condemnation
2    proceeds?
3    A.   I don't recall what was discussed,
4    but it was not something that we would have
5    focused on because it was not part -- it was no
6    longer a part of the deal, so, we would not have
7    focused on that.
8    Q.   What documents do you recall
9    reviewing in that meeting in the afternoon of
10   July 1st, 2013?
11   A.   I think we would have had our memo
12   with us and very possibly that was all that we
13   would have brought.
14   Q.   You would have brought your entire
15   file for the project?
16   A.   No.
17   Q.   Just the memo?
18   A.   Just the memo.
19   Q.   That's the memo we've marked DG --
20        MR. DALTON: 23.
21   Q.   -- 23?
22   A.   That's correct.
23   Q.   You then recall having dinner with
24   Larry Ackman, but you don't recall where?
25   A.   That's correct.

| Gans, Daniel - direct - Ash | Page 243 |
|---|---|

1    Q.   Did Mr. Vallone join you?
2    A.   Yes, he did.
3    Q.   Anyone else?
4    A.   No.
5    Q.   After dinner you retired to Bill
6    Ackman's apartment?
7    A.   Yes.
8    Q.   And Bill Ackman joined you?
9    A.   Yes.
10   Q.   That was at about 8:30 in the
11   evening on July 1st, 2013?
12   A.   That's correct.
13   Q.   Who else attended the meeting in
14   Bill Ackman's apartment?
15   A.   Greg Lyss.
16   Q.   Larry Ackman?
17   A.   Yes, Larry Ackman, Greg Lyss, Mr.
18   Vallone and myself, Bill Ackman.
19   Q.   No one else?
20   A.   No one else.
21   Q.   How long did you meet at Bill
22   Ackman's apartment?
23   A.   Maybe for an hour.
24   Q.   What was the mood like of the
25   meeting?

| Gans, Daniel - direct - Ash | Page 244 |
|---|---|

1    A.   Relaxed, friendly.
2    Q.   Were there some cocktails served?
3    A.   No, no cocktails.
4    Q.   Larry Ackman was singing?
5    A.   You remind me of that. I don't know
6    how, but you remind me of that. That Larry
7    showed us what a good singer he was. We were
8    very impressed by that. He had just performed to
9    his family, so he was very proud of that.
10   Q.   What did he sing, do you recall?
11   A.   I don't -- Broadway show music,
12   very, very talented. His wife's a piano player,
13   I believe.
14   Q.   And what did you discuss at Bill
15   Ackman's apartment?
16   A.   We discussed the Coles Street
17   project.
18   Q.   What specifically did you discuss?
19   A.   That we thought it was a great
20   value, that he should do it. Bill had looked at
21   this property before only it had a near miss with
22   him, what we call a "near miss." We tried to
23   convince him again that this was a great value.
24   Q.   How did you try to convince him of
25   the value of this project?

Texas Eastern v.
0.77 a Acres

| Gans, Daniel - direct - Ash                    Page 245 |
|---|

1  A.   The price of the acquisition, the
2  value of the properties, the vicinity, what we
3  could get approved, our track record with Bill,
4  that's, I think generalizes the conversation.
5  Q.   Did you discuss the material terms
6  of a deal with Ogden Realty if he were to pursue
7  acquisition of the Ogden Realty properties?
8  A.   We discussed that there would be no
9  contract and that if he could close quick enough
10  they would sell us the property for $22 million.
11  Q.   Were the Texas Eastern easements
12  discussed at any point?
13  A.   I don't believe so.
14  Q.   How about the release of the
15  condemnation sale proceeds, was that discussed?
16  A.   I don't believe so.
17  Q.   Was Mr. Ackman aware that the
18  purchase of the Ogden Realty properties would be
19  subject to Texas Eastern easements for a natural
20  gas pipeline?
21     MR. DALTON: Objection to form.
22     MR. ASH: You can answer the
23  question.
24  A.   I'm not -- I don't know what he knew
25  at that point regarding the Texas Eastern

| Gans, Daniel - direct - Ash                    Page 246 |
|---|

1  properties.
2  Q.   To your knowledge, it was never
3  discussed with Mr. Ackman?
4  A.   Not specifically to my knowledge.
5  Q.   Did you ever review a survey of the
6  Ogden properties with Mr. Ackman?
7  A.   No.
8     (Exhibit DG-26 was received and
9  marked for identification by the court reporter.)
10  Q.   How long did you meet at Mr.
11  Ackman's apartment?
12  A.   Maybe for an hour.
13  Q.   What was the outcome of the meeting?
14  A.   Bill said he was unsure if he was
15  going to invest in this, in the property.  He
16  would think about it and give a call in the
17  morning.
18  Q.   Were there any follow-up items for
19  you or Mr. Vallone?
20  A.   I don't recall if he asked us for
21  anything else.
22  Q.   Did you and Mr. Vallone come
23  together?
24  A.   I don't understand the question.
25  Q.   Did you drive into the City

| Gans, Daniel - direct - Ash                    Page 247 |
|---|

1  together?
2  A.   Yes, we drove into the City
3  together.
4  Q.   And you left the City together?
5  A.   Yes, we did.
6  Q.   Where did you go after you left Bill
7  Ackman's apartment?
8  A.   Home.
9  Q.   What did you discuss with Mr.
10  Vallone after the meeting at Bill Ackman's
11  apartment?
12  A.   We debriefed on how the day went,
13  crossed our fingers and hoped that we'd get the
14  call, I'd get the call in the morning from Bill
15  and we'd be happy.
16  Q.   Did you get the call in the morning
17  from Bill?
18  A.   Yes, I did.
19  Q.   What did he say?
20  A.   Bill told me that his inclination
21  was not to do the deal.
22  Q.   Let me show you DG-26.  So this is
23  an e-mail from George Vallone to Anthony
24  Colletta, who is Mr. Ackman's attorney, and Bill
25  Ackman, and he copied you.  This was sent Monday,

| Gans, Daniel - direct - Ash                    Page 248 |
|---|

1  July 1st, 2013, 6 p.m.  So do you know if Mr.
2  Vallone went back to the office afterwards or he
3  went home?
4  A.   I believe he went home.
5  Q.   Do you see the subject is "Ogden
6  closing third info batch"?
7  A.   Yes.
8  Q.   Do you know if there were other
9  e-mails as part of a series of which this e-mail
10  was the third?
11  A.   I don't recall.  It appears that
12  way.
13  Q.   Do you still have e-mail in your
14  Inbox going back to 2013?
15  A.   I'd have to look for it.
16     MR. ASH: I would just ask to take a
17  look at Mr. Gans correspondence and see if there
18  are additional e-mails that are part of a series
19  that would include DG-26 as the third of a
20  series.
21     MR. DALTON: Sure.  We'll take a
22  look.
23  Q.   In this e-mail Mr. Vallone is
24  attaching a number of documents.  The first is a
25  revised budget, right?

| Gans, Daniel - direct - Ash | Page 249 |
|---|---|

1  A.   Correct.
2  Q.   Do you know what was revised in this
3  budget?
4  A.   No.
5  Q.   The second is a copy of a survey
6  2013?
7  A.   Yes.
8  Q.   Do you know if the attachments to
9  this e-mail, this is information specifically
10  requested by Bill Ackman, Larry Ackman or Greg
11  Lyss or Anthony Colletta for that matter?
12  A.   Yes, I believe it would have been
13  requested by one of them.
14  Q.   Do you know what other information
15  was requested at this time?
16  A.   I don't recall.
17  Q.   Do you know if there were any
18  questions from Mr. Ackman in regard to these
19  attachments?
20  A.   I don't recall any specific
21  questions.
22      (Exhibit DG-27 was received and
23  marked for identification by the court reporter.)
24  Q.   If you look at the middle of the
25  page, the first page marked DG-27, George Vallone

| Gans, Daniel - direct - Ash | Page 250 |
|---|---|

1  writes on July 1st, 2013 at 11:32 p.m., "Please
2  send $23 million.  We need approximately 2.6
3  million to close and rest to start the ball
4  rolling.  Thanks, Bill."
5      Was this discussed in the evening of
6  July 1st, 2013 that Bill Ackman would send you
7  $23 million?
8  A.   It was discussed that evening what
9  would be required.
10  Q.   Was there a commitment by Bill
11  Ackman to pursue the acquisition of the property
12  and to send $23 million for the acquisition of
13  the Ogden property?
14  A.   No.
15  Q.   Do you know if there was any
16  correspondence between 11:06 p.m. on July 1st,
17  2013 and 11:32 p.m. on July 1st, 2013 from
18  sending a budget to making a request for $23
19  million that would have indicated a commitment to
20  acquiring the Ogden Realty property?
21  A.   No, I don't believe there was
22  anything else.
23  Q.   The next morning you write at 7:42
24  a.m. that you are scheduled to go to a closing at
25  1 p.m., do you see that?

| Gans, Daniel - direct - Ash | Page 251 |
|---|---|

1  A.   You know, my dates right now, I'm
2  confused with what day the 1st was, Sunday,
3  Monday.
4  Q.   There was a lot of action?
5  A.   There's a lot of action.  We met
6  Bill on what night, it was on the 1st?
7  Q.   Monday?
8  A.   Monday the 1st.
9  Q.   Right.
10      THE WITNESS: Read the question
11  back, please.
12      (Record read back.)
13  A.   Yes, I see that, yes.
14  Q.   Is it your recollection that there
15  was a closing on the Ogden Realty property on
16  Tuesday, July 2nd at 1 p.m.?
17  A.   My recollection is that we did not
18  close at 1 p.m. on July 2nd.
19  Q.   Was there anticipated to be a
20  closing at 1 p.m. on July 2nd?
21  A.   It was our hope that there would be
22  a closing at 1 p.m. on July 2nd.
23  Q.   And who was your partner on July 2nd
24  at 1 p.m. at a scheduled closing, is it Crescent
25  Heights or is it Bill Ackman?

| Gans, Daniel - direct - Ash | Page 252 |
|---|---|

1  A.   Crescent Heights was out and our
2  only hope was that Bill Ackman would opt in.
3      (Exhibit DG-28 was received and
4  marked for identification by the court reporter.)
5  Q.   DG-28 we have an e-mail at the
6  bottom of the page from Bill Ackman to his
7  attorney, Colletta, Monday, July 1st, 2013 at
8  11:49 p.m., in which he writes: "After reviewing
9  the facts, I am unlikely to participate, so I
10  wanted to make sure your team did not spend any
11  more time."  Do you see that statement?
12  A.   Yes, I do.
13  Q.   And do you see a response from Greg
14  Lyss at the top of the page, "Bill, have you
15  communicated this to George and Danny?"  Do you
16  see that?
17  A.   Yes.
18  Q.   Had that information that Bill
19  Ackman would be unlikely to participate in the
20  deal, had that been communicated to you as of 10
21  a.m. on July 2nd, 2013?
22  A.   I spoke to Bill prior to 10:03 a.m.
23  on July 2nd, and he communicated to me at the end
24  of that call that he was still open to
25  investigating financing us or becoming our

Gans, Daniel - direct - Ash                                    Page 253

1   partner or purchasing the property.  So he had
2   not communicated to us that the deal was over at
3       10:03 a.m. on Tuesday.
4   Q.  He says the night before, "after
5   reviewing the facts," do you see that?
6   A.  Yes.
7   Q.  Did he discuss with you on the
8   morning of July 2nd what facts he was considering
9   that created his unlikely participation in the
10  deal?
11  A.  Yes.
12  Q.  What were the concerns Bill Ackman
13  had as of July 2nd, 2013 about acquiring the
14  Ogden Realty properties?
15  A.  He had concerns about getting
16  involved in a land deal and the time frames that
17  it takes.
18  Q.  Did he have any specific concerns
19  about this particular land deal from Ogden
20  Realty?
21  A.  I think the location was a concern.
22  Q.  Anything else?
23  A.  No, I don't recall anything else at
24  the moment.
25  Q.  Was Bill Ackman concerned about a

Gans, Daniel - direct - Ash                                    Page

1   like to put forward if he gave me the time.
2       When he got back on the phone with me
3   he told me he talked to his Dad, it was his Dad
4   on the other line, and that his father, Larry,
5   felt that he should do the deal and that the
6   acquisition price was good; and he told me that
7   he wasn't going to say that he was going to do
8   the deal at that point, he would make some phone
9   calls.
10      One of the phone calls he said he
11  would make was to our previous partners who we
12  sold a large portion of the Maxwell House
13  development to, which was Toll Brothers, and he
14  was going to make some other phone calls and that
15  he would get back to me.
16      George is, as it said here in some of
17  these e-mails, that morning flying down to
18  St. Thomas, and when he landed he called me and
19  said, What's going on?  I told him the whole
20  story.  I said, "Give a call, it couldn't hurt,
21  to Bill."
22      He called Bill, they chatted and Bill
23  had already talked to Doug at Toll Brothers, Doug
24  Yearly at Toll Brothers and said, Look, I'll do
25  the deal, and that was probably -- I don't know

Gans, Daniel - direct - Ash                                    Page 254

1   Texas Eastern natural gas pipeline running
2   through the Ogden Realty property?
3   A.  Not to my knowledge.
4   Q.  The deal closed on July 3rd,
5   correct?
6   A.  That's correct.
7   Q.  What was discussed between you, Mr.
8   Vallone, Mr. Ackman, Bill Ackman, Larry Ackman or
9   Greg Lyss that changed Bill Ackman's mind between
10  July 2nd and July 3rd?
11  A.  Bill called me maybe 20 minutes,
12  half an hour, 45 minutes after my e-mail that
13  morning to him.  As I mentioned, he told me that
14  he was inclined not to do the deal.  Bill was
15  very generous with his time, and let me try to
16  convince him that he was going to lose an
17  opportunity; and we talked about that for four,
18  five minutes and I wasn't changing his mind in
19  that time frame, and though he was listening and
20  I appreciated that; and then he told me, Hold on,
21  I have another call coming in I have to take.
22      And I waited on the line for four,
23  five minutes, a long time to be on hold,
24  especially in this circumstance, and I'm thinking
25  of all the many types of arguments I would still

Gans, Daniel - direct - Ash                                    Page 256

1   if he told George right on that phone call or
2   said, look, I'll call you back another hour or
3   something, but somewhere within that time frame
4   on Tuesday afternoon he decided he would move
5   forward, and I would say the primary force was
6   his father's recommendation.
7       MR. ASH: DG-29.
8       (Exhibit DG-29 was received and
9   marked for identification by the court reporter.)
10  Q.  We turn to page Ackman 175.  There's
11  an e-mail from you Wednesday, July 3rd, 2013,
12      12:12 p.m. to Larry Ackman with cc's:  "Hi, all.
13  Thank you for jumping through all the hoops to
14  make this deal happen.  We just heard that the
15  title company has not yet seen the wire transfer.
16  I have signed for the liability insurance as
17  closing manager."  Do you see that?
18  A.  Yes.
19  Q.  What does that mean?  What document
20  did you sign?
21  A.  Insurance certificate that would be
22  necessary to close, purchase the property.
23  Q.  What does it mean to be the "closing
24  manager"?
25  A.  I had been given the legal authority

    in agent of this entity.
    his included specific insurance
 3  coverage. Is this for errors or omissions, as
 4  you're A.S. in the role of a closing manager?
 5  A.  Liability insurance to me means on
 6  the property. I don't know what else. When I
 7  look at this right now liability insurance is
 8  property liability.
 9  Q.  When you refer to yourself as
10  closing manager, you had actual legal authority
11  to sign all documents on behalf of Coles Jersey
12  Development Company, LLC at the closing, correct?
13  A.  That's correct.
14  Q.  I'm going to show you what we
15  previously marked as DG-5 on February 12, 2015?
16  A.  Excuse me.
17      MR. DALTON: Do you want to take a
18  moment?
19      THE WITNESS: It happens.
20      MR. DALTON: It's Michael's
21  questioning.
22      MR. ASH: Need a minute, take a
23  drink.
24      THE WITNESS: Okay.  We'll try.  Go.
25  Q.  DG-5, this is a release that you

 1  signed at closing, correct?
 2  A.  Yes.
 3  Q.  It was a material term of the deal
 4  between Ogden Realty and Coles Jersey Development
 5  Company, LLC that there would be a release of all
 6  condemnation proceeds, correct?
 7  A.  Now I can only speak to the document
 8  that was what I signed.
 9  Q.  Was it your intention to sign a
10  release at closing as to any and all condemnation
11  proceeds for Ogden Realty from the $3.5 million
12  settlement paid by Texas Eastern?
13  A.  Yes, it was to waive any rights that
14  Hoboken Brownstone had on the contract.
15  Q.  Was it also to release any interest
16  from the buyer of the property from Ogden Realty
17  as the condemnation proceeds?
18  A.  I really can't speak on the
19  intention of others.
20  Q.  It was your understanding, however,
21  that was a material term of the deal for Ogden to
22  reinstate the sale of the properties, right?
23  A.  That's correct.
24  Q.  Do you believe you signed this
25  release in accordance with that material term of

 1  the deal?
 2  A.  Yes, I think it was material through
 3  Ogden that we signed this release.
 4  Q.  That you sign the release as an
 5  agent of the purchaser?
 6  A.  No, that I signed the release as the
 7  Hoboken Brownstone Company.
 8  Q.  That's not a legal entity, correct?
 9  A.  I understood it as the dba of West
10  Bank Realty would sign the original contract.
11  Q.  Do you recall after you closed, it
12  may have been September, October of 2013, I had
13  called you on the phone and asked for an easement
14  on the portion of Lot 7, the .077 acre portion of
15  Lot 7, Block 6005?
16  A.  Yes, I do.
17  Q.  Do you recall speaking on a number
18  of occasions?
19  A.  Yes, I do.
20  Q.  With whom did you discuss that
21  easement?
22  A.  Mr. Vallone, Kevin O'Brien, our
23  attorney, Greg Lyss, Larry Ackman.
24  Q.  Bill Ackman?
25  A.  I don't think I would have.  I don't

 1  know if I would have brought this directly to
 2  Bill.
 3  Q.  Did you understand that request for
 4  a permanent easement on the .077 acre portion of
 5  Lot 7, Block 6005 to relate back to the
 6  settlement between Texas Eastern and Ogden
 7  Realty?
 8  A.  I was dumbfounded at the time that
 9  this was an unresolved issue, as I thought it had
10  been resolved all before the closing.
11  Q.  You say you thought it had been
12  resolved.  It was your understanding that in
13  consideration for the $3.5 million, a permanent
14  easement on the .077 acre portion of Lot 7, Block
15  6005 was granted?
16  A.  Yes.
17      MR. ASH: Nothing further.
18      MR. DALTON: Nothing for me.
19      (Time noted at 12:51 p.m.)
20
21
22
23
24
25



Page 261

```
 1              C E R T I F I C A T E

 2

 3          I CERTIFY that the foregoing is a

 4  true and accurate transcript of the testimony as

 5  taken by and before me stenographically at the

 6  time and place aforementioned.

 7          I FURTHER CERTIFY that I am neither

 8  attorney for nor counsel to any of the parties;

 9  parties of any of the attorneys in this action;

10  and that I am not financially interested in the

11  outcome of this case.

12

13

14

15

16          RENEE RUSSO, CCR, CRCR, RPR, CRR

17          Certificate No. XI00143700

18

19

20

21

22

23

24

25
```

1                      C E R T I F I C A T E

2

3              I CERTIFY that the foregoing is a

4     true and accurate transcript of the testimony

5     as taken by and before me stenographically at

6     the time and place aforementioned.

7              I FURTHER CERTIFY that I am

8     neither attorney for nor counsel to any of

9     the parties; parties of any of the attorneys

10    in this action; and that I am not financially

11    interested in the outcome of this case.

12

13

14

15         _Renee Russo, CCR, CRCR, RPR, CRR_

16         RENEE RUSSO, CCR, CRCR, RPR, CRR

17         Certificate No. XI00143700

18

19

20

21

22

23

24

25