# Exhibit K

# In The Matter Of:
*Texas Eastern Transmission v.*
*0.077 Acres of Land*

*Raymond Loffredo*
*July 27, 2017*





**RIZMANRAPPAPORT**
CERTIFIED COURT REPORTERS

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
T (973)992-7650 F (973)992-0666
www.rizmanrappaport.com
reporters@rizmanrappaport.com

*Min-U-Script® with Word Index*

## Page 1

```
               UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF NEW JERSEY

---------------------------
TEXAS EASTERN TRANSMISSION,  :
LP, a limited partnership    :
of the State of Delaware,    :  Civil Action No:
                             :
       Plaintiff,            :  14-167-SRC-CLW
                             :
    v.                       :  DEPOSITION UPON
                             :  ORAL EXAMINATION
0.077 Acres Of Land, More    :        OF
or Less, In The City of      :  RAYMOND LOFFREDO
Jersey City, Hudson County,  :
New Jersey, COLES JERSEY     :
DEVELOPMENT CO., LLC, OGDEN  :
REALTY CO., JANE AND JOHN    :
DOES 1 through 50            :
(fictitious named            :
defendants) and ABC          :
BUSINESS ENTITIES 1          :
through 50 (fictitious       :
named defendants),           :
                             :
       Defendants.           :
---------------------------
```

T R A N S C R I P T of the stenographic notes of RENEE RUSSO, CCR, CRCR, RPR, CRR, a Certified Court Reporter and Notary Public of the State of New Jersey, Certificate No. XI00143700 held at the offices DeCotiis, Fitzpatrick & Cole, LLP, 500 Frank W. Burr Boulevard, Teaneck, New Jersey, on Thursday, July 27, 2017, commencing at 9:55 a.m.

## Page 2

A P P E A R A N C E S:

DECOTIIS, FITZPATRICK & COLE, LLP
Glenpointe Centre West
500 Frank W. Burr Boulevard, Suite 31
Teaneck, New Jersey 07666
BY: MICHAEL J. ASH, ESQ.
   (201) 347-2165
mash@decotiislaw.com
For the Plaintiff

BUCHANAN INGERSOLL & ROONEY, PC
1290 Avenue of the Americas
30th Floor
New York, New York 10104-3001
BY: CHRISTOPHER J. DALTON, ESQ.
   (212) 440-4400
christopher.dalton@dipc.com
For the Defendants

## Page 3

                INDEX
                                        PAGE
WITNESS: RAYMOND LOFFREDO

DIRECT EXAMINATION BY MR. ASH......... 4
CROSS-EXAMINATION BY MR. DALTON....... 46


              EXHIBITS

NO.      DESCRIPTION                   PAGE
RL-1     Notice of Deposition, 2 pgs    5
RL-2     Report of Mr. Loffredo        16
RL-3     Map                           21
RL-4     Deed, 19 pgs                  23
RL-5     Schedule C, 3 pgs             31
RL-6     Deed, 7 pgs                   35
RL-7     Grant of Easement,            41
         Consolidated Rail Corp.,
         Bates stamped TE408-TE424



         (Exhibits retained by the court reporter.)

## Page 4

Loffredo, Raymond - direct - Mr. Ash

R A Y M O N D  L O F F R E D O, 130 Pompton Avenue, Verona, New Jersey 07044, having been first duly sworn by the Notary Public, was examined and testified as follows:

DIRECT EXAMINATION BY MR. ASH:
Q. Okay. Let get started. Good morning, Mr. Loffredo. My name is Michael Ash. I'm an attorney here at DeCotiis, Fitzpatrick, Cole & Giblin. I represent the plaintiff in this matter, Texas Eastern Transmission, LP.
  You've been sworn in. Have you been deposed before?
A. Yes.
Q. About how many times?
A. I'd say three times.
Q. Three times. Okay. Well, quickly, a refresher on the ground rules. Your testimony today is being given under oath, so you recognize that your testimony has the same weight and impact as if you were testifying in a court of law.
A. Yes.
Q. All responses to my questions need to be audible so that we can have a record of the

**Loffredo, Raymond - direct - Mr. Ash**     Page 5

1  questions and answers. Is that understood?
2  A. It's understood.
3  Q. Okay. Are you taking any
4  medications or substances this morning that would
5  impair your ability to comprehend or respond to
6  my questions?
7  A. No.
8  Q. If there's a question you don't
9  understand, please say so. I'm happy to rephrase
10 the question. Is that understood?
11 A. It's understood.
12 Q. If there's an objection to a
13 question, Mr. Dalton will articulate the basis
14 for that objection. We'll discuss that objection
15 and you'll be directed to respond or not.
16 A. I understand.
17 Q. If you need a break, I'm happy to
18 accommodate you, but I don't expect we'll be that
19 long this morning.
20 A. I understand.
21 Q. All right.
22    MR. ASH: Let's mark this RL-1,
23 please?
24    (Exhibit RL-1 is received and marked
25 for identification by the court reporter.)

**Loffredo, Raymond - direct - Mr. Ash**     Page 6

1  Q. If you would please review the
2  document that we've marked RL-1. Have you seen
3  this document before?
4  A. Yes, I have.
5  Q. This is the notice for you to appear
6  today for your deposition; is that right?
7  A. That's correct.
8  Q. And the notice includes numbered
9  paragraphs 1 through 9 requesting certain
10 documents in your file. Did you review those
11 paragraphs?
12 A. Yes, I did.
13 Q. Did you bring documents with you
14 today responsive to the requests in Paragraphs 1
15 through 9?
16 A. Yes, some of them.
17 Q. Some of them.
18 A. Correct.
19 Q. Okay. Are there documents that are
20 responsive to Paragraphs 1 through 9 that you did
21 not bring with you today?
22 A. Well, I don't have any related to
23 Documents 3 and 4; 7, I don't believe I have a
24 retainer agreement; 6 and 8.
25 Q. So is it your testimony that you

**Loffredo, Raymond - direct - Mr. Ash**     Page 7

1  have no responsive documents --
2  A. To those.
3  Q. -- to Paragraphs 3, 4, 6, 7, 8?
4  A. Correct.
5  Q. Okay. And with regards to
6  Paragraphs 1, 2, 5 and 9, you brought all
7  responsive documents.
8  A. Everything that I have, correct.
9  Q. Okay. Are there documents that are
10 responsive to Paragraphs 1 through 9 that you did
11 not bring with you today under some claim of
12 privilege?
13 A. There were some e-mails that I
14 received from Chris Dalton's firm that I did not
15 bring.
16 Q. Okay. Did you speak with anyone to
17 prepare for your deposition today?
18 A. Chris Dalton yesterday.
19 Q. Anyone else?
20 A. No, not really.
21 Q. Do you understand that the present
22 litigation between Texas Eastern Transmission and
23 Coles Jersey Development Co., LLC, involves the
24 condemnation of a .077-acre permanent easement on
25 property designated in Jersey City as Block 6005,

**Loffredo, Raymond - direct - Mr. Ash**     Page 8

1  Lot 13 and a portion of Lot 7?
2  A. I did not. I've never seen the
3  complaint. I didn't know what the basis of the
4  litigation was.
5  Q. Okay. Do you have any knowledge of
6  Texas Eastern Transmission's pipeline project
7  through Jersey City that would include property
8  now owned by Coles Jersey Development Co., LLC?
9  A. I'm not clear. What -- other than
10 this? Other than this site? No.
11 Q. No. Okay.
12    What's your educational background?
13 A. Ah, you want schools I went to?
14 Q. Yes.
15 A. Undergraduate, Rutgers College. Law
16 School, Rutgers-Newark.
17 Q. What degree did you earn at Rutgers,
18 under grad?
19 A. BA.
20 Q. In what field?
21 A. History major.
22 Q. And you did not bring with you a
23 copy of your CV?
24 A. No, no.
25 Q. Do you maintain a CV?

Texas Eastern Transmission v.
0.077 Acres of Land

---

Loffredo, Raymond - direct - Mr. Ash                                    Page 9

1   A.  Is that a resume?
2   Q.  Yes?
3   A.  No, I do not.
4   Q.  You're a licensed attorney in New
5       Jersey?
6   A.  Yes.
7   Q.  Since 1978?
8   A.  Yes.
9   Q.  Are you still actively --
10  A.  Yes.
11  Q.  -- practicing?
12  A.  Yeah.
13  Q.  Okay.
14  A.  I don't practice, but I am still an
15      active attorney.
16  Q.  An active member?
17  A.  An active member of the bar.
18  Q.  Do you have any professional
19      licenses?
20  A.  Ah, no.
21  Q.  You don't have the license as a
22      title insurance producer?
23  A.  Well, a title insurance producer,
24      yes, I'm sorry, yes.
25  Q.  And when did you first receive a

---

Loffredo, Raymond - direct - Mr. Ash                                    Page 10

1       license as a title insurance producer?
2   A.  In the '80s, whenever they first
3       instituted it.
4   Q.  And that license is current?
5   A.  Yes.
6   Q.  Are you a licensed professional
7       engineer?
8   A.  No.
9   Q.  Are you a licensed surveyor?
10  A.  No.
11  Q.  Are you a licensed professional
12      planner?
13  A.  No.
14  Q.  Have you been recognized as an
15      expert in court?
16  A.  No, I don't think so.
17  Q.  Have you ever testified in court?
18  A.  Years ago.
19  Q.  And that was as a fact witness?
20  A.  Yeah. I was a fact witness. It was
21      a title issue.
22  Q.  Do you remember what county?
23  A.  I think it was -- that's a good
24      question. I don't remember, it was so long ago.
25      I think it was Bergen.

---

Loffredo, Raymond - direct - Mr. Ash                                    Page 11

1   Q.  Bergen. Do you recall if it was
2       Chancery?
3   A.  I don't recall. I don't recall.
4   Q.  To the best of your recollection,
5       the only time you've testified in court was the
6       one time in Bergen as a fact witness.
7   A.  Correct.
8   Q.  Of the three times that you've been
9       previously deposed, were they in connection with
10      an expert report or proffered expert testimony by
11      you?
12  A.  Ah, no. They were based on one of
13      our title files.
14  Q.  So that would have been in a -- in a
15      fact witness capacity?
16  A.  Yes, yes.
17  Q.  Aside from this matter, have you
18      prepared other expert reports in support of
19      litigation?
20  A.  No.
21  Q.  This is the first time --
22  A.  The first time.
23  Q.  -- you've ever been preparing an
24      expert report.
25  A.  Yes. I've been asked to, but I've

---

Loffredo, Raymond - direct - Mr. Ash                                    Page 12

1       never done it.
2   Q.  Have you ever lost a professional
3       license?
4   A.  No.
5   Q.  Have you ever received a complaint
6       against you made to any licensing board?
7   A.  No.
8   Q.  Have you ever been subject to
9       censure or discipline by a licensing board?
10  A.  No.
11  Q.  Have you ever been sued for
12      malpractice?
13  A.  No.
14  Q.  Have you ever been convicted of a
15      crime?
16  A.  No.
17  Q.  Your fee for testifying in this
18      matter is $350 an hour?
19  A.  I think so. I think that's what it
20      is.
21  Q.  Do you know or could you estimate to
22      the best of your recollection the number of hours
23      you've spent on this file?
24  A.  It's probably -- I think I spent
25      three hours. Well, three hours as far as this

---

Loffredo, Raymond - direct - Mr. Ash   Page 13

1   report that I did.
2   Q. This report took you three hours?
3   A. Well, reviewing the documents,
4   putting it together and then rereading it, yeah.
5   And then coming here.
6   Q. You did not underwrite the title
7   insurance policy for Coles Jersey Development
8   Company, LLC's purchase of Block 605, Lot 13.
9   A. No, we didn't.
10  Q. Have you previously done any other
11  work for Coles Jersey Development Company, LLC?
12  A. No.
13  Q. Have you previously done work for
14  Hoboken Brownstone Company or any affiliated
15  entities?
16  A. Not that I know of.
17  Q. Have you previously worked with Dan
18  Ganz on any matters?
19  A. I don't -- I don't think so, no. I
20  don't know who that is.
21  Q. Have you previously worked with
22  George Vallone on any matters?
23  A. I don't think so, no.
24  Q. Did anyone provide you with
25  assistance in preparing this report?

Loffredo, Raymond - direct - Mr. Ash   Page 14

1   A. No.
2   Q. Did you search the title records
3   personally?
4   A. No.
5   Q. Who did?
6   A. A searcher named Ranate Smith.
7   Q. Can you spell that, please?
8   A. R-a-n-a-t-e, and the last name is
9   Smith, S-m-i-t-h.
10  Q. Is that Miss Smith?
11  A. Yes. I guess.
12  Q. Is she an employee of yours?
13  A. No. She's an independent
14  contractor.
15  Q. And what was her fee for searching
16  the title records?
17  A. I don't -- it may have been $600. I
18  don't remember how much. The invoice is here.
19  It may have been $300 and then an additional
20  $300.
21  Q. Did she prepare an abstract or a
22  summary of the documents that she --
23  A. No, she did not.
24  Q. Did anyone else assist you in the
25  preparation of your report in this matter?

Loffredo, Raymond - direct - Mr. Ash   Page 15

1   A. No, no.
2   Q. Have you previously worked for the
3   law firm Buchanan Ingersoll & Rooney?
4   A. Yes.
5   Q. About how many times?
6   A. It's hard to say how many files
7   we've done with them over the years. Twenty,
8   maybe.
9   Q. And that would be related to
10  transactions?
11  A. Yes.
12  Q. Real estate conveyances?
13  A. Correct.
14  Q. Title insurance policies?
15  A. Correct.
16  Q. When were you first retained --
17  strike that.
18      Who retained you in this matter?
19  A. Ah, Chris Dalton.
20  Q. When were you first retained by
21  Chris Dalton?
22  A. Ah, me personally? I guess in
23  January.
24  Q. Of 2017?
25  A. Yes, 2017.

Loffredo, Raymond - direct - Mr. Ash   Page 16

1   Q. Have you ever inspected the subject
2   property, Block 605, Lot 13?
3   A. No.
4   Q. Did you have any discussions about
5   the subject property, Block 605, Lot 13, in
6   Jersey City, with any principal of Coles Jersey?
7   A. No.
8       MR. ASH: Let's mark RL-2, please.
9       (Exhibit RL-2 was received and
10  marked for identification by the court reporter.)
11      (Discussion off the record.)
12      MR. ASH: Okay. Let's go back on.
13      BY MR. ASH:
14  Q. I've marked a document RL-2.
15  A. Yes.
16  Q. Can you please review that and
17  confirm if that is the complete narrative portion
18  of the report you prepared in this matter?
19  A. Yes.
20  Q. The complete report also annexed 12
21  separate exhibits, correct?
22  A. Correct.
23  Q. Okay. But this is a complete copy
24  of just the narrative.
25  A. Correct.

| Loffredo, Raymond - direct - Mr. Ash | Page 17 |
|---|---|

1  Q. Okay. In addition to working with
2  Mr. Dalton, you also worked with a Mr. Goldsmith?
3  A. Yes.
4  Q. And what directions were you given
5  by either Mr. Dalton or Mr. Goldsmith?
6  A. Well, initially I did not work with
7  John Goldsmith. He had ordered searches directly
8  from somebody in my office. I think they were
9  just present owner deeds or deeds from
10 surrounding properties. And I think --
11    (Discussion off the Record.)
12 A. What was the question again? I'm
13 sorry.
14 Q. What directions were you given?
15 A. Well, initially, again, it went
16 through Maria in my office, and I think there's a
17 copy of everything, to order present owner deeds
18 on adjoining properties. It may have even been
19 on this property. I really wasn't involved in it
20 that much.
21 Q. When did you prepare the report
22 RL-2?
23 A. It was April, April of 2017.
24 Q. In preparing RL-2, did you have any
25 discussions with anyone from the Gilbane

| Loffredo, Raymond - direct - Mr. Ash | Page 18 |
|---|---|

1  organization?
2  A. No.
3  Q. In preparing RL-2, did you have any
4  discussions with anyone from Landauer Valuation?
5  A. No.
6  Q. In preparing RL-2, did you have any
7  discussions with anyone from Raphael Vignoly
8  Architects?
9  A. No.
10 Q. V-i-g-n-o-l-y.
11    MR. ASH: With a tilde over the "n."
12    (Discussion off the Record.)
13    BY MR. ASH:
14 Q. Did you have any discussions in
15 preparing RL-2 with Stanley Yorsz, Esquire?
16 A. No.
17 Q. In preparing RL-2, did you have any
18 discussions or conversations with any other
19 professionals aside from attorneys at Buchanan?
20 A. No.
21 Q. Would you agree that the scope of
22 work for your report, RL-2, was to conduct a
23 60-year chain of title search for Block 6005, Lot
24 13, in order to determine whether the legal
25 description of Block 6005, Lot 13, has been

| Loffredo, Raymond - direct - Mr. Ash | Page 19 |
|---|---|

1  consistent for a 60-year period?
2  A. That's correct.
3  Q. And that 60-year period was prior to
4  July 2013?
5  A. Yes, that's correct.
6  Q. Ultimately, your conclusions are on
7  Page 3 of RL-2.
8  A. Correct.
9  Q. Right? And there are three
10 conclusions you've come to.
11 A. Correct.
12 Q. One is that the legal description of
13 the property as vested in Coles Jersey
14 Development Co., LLC, has remained consistent for
15 at least 60 years.
16 A. Correct.
17 Q. That's your first conclusion.
18 A. Correct.
19 Q. Your second conclusion is that the
20 tax maps of the City of Jersey City do not
21 accurately reflect the full legal description of
22 the property as vested in Coles Jersey
23 Development Co., LLC.
24 A. Correct.
25 Q. Your third conclusion is that the

| Loffredo, Raymond - direct - Mr. Ash | Page 20 |
|---|---|

1  grant of easement from Consolidated Rail Corp. to
2  PSE&G, dated October 1, 1986, does not appear in
3  the chain of title to the property now vested in
4  Coles Jersey Development Co., LLC.
5  A. Correct.
6  Q. You reached no other conclusions in
7  your report, RL-2.
8  A. That's all I was looking at. That's
9  correct.
10 Q. Okay. So you did not conclude to
11 the location of the PSE&G electrical conduits
12 referenced in the 10/1/86 easement.
13 A. No.
14 Q. You did not conclude as to whether
15 or not Conrail owned the property over which it
16 granted a 10/1/86 electrical conduit easement to
17 PSE&G.
18 A. That's correct. I did not.
19 Q. You did not conclude whether or not
20 the PSE&G electrical lines can be physically
21 relocated.
22 A. That's correct. I did not.
23 Q. You did not conclude as to where the
24 PSE&G electrical lines could be relocated if it
25 was physically possible --

**Loffredo, Raymond - direct - Mr. Ash** — Page 21

1  A. That's --
2  Q. -- to relocate them.
3  A. That's correct.
4  Q. You did not conclude if the PSE&G
5  electrical lines constitute a trespass on the
6  Coles Jersey Development Co. property.
7  A. That's correct.
8  Q. You did not conclude or form an
9  opinion as to the quality of title of Block 6005,
10 Lot 13 and a portion of Lot 7 --
11 A. That's --
12 Q. -- owned by Coles Jersey Development
13 Co., LLC.
14 A. That's correct.
15 Q. You did not conclude as to the
16 validity of the easement to PSE&G for the
17 electrical lines in Block 6005, Lot 13 and a
18 portion of Lot 7.
19 A. That's correct.
20    MR. ASH: Here's RL-3.
21    (Exhibit RL-3 is received and marked
22 for identification by the court reporter.)
23    MR. ASH: Thank you.
24 Q. Mr. Loffredo, please take a look at
25 RL-3. Would you confirm if this is an accurate

**Loffredo, Raymond - direct - Mr. Ash** — Page 22

1  copy of Exhibit 1 to your report?
2  A. Yes.
3  Q. Okay. Now, you note in your report,
4  RL-2, that the description of the subject
5  property for 60 years is consistent with the
6  survey prepared by Caulfield Associates, LLP,
7  dated February 21, 2014, correct?
8  A. Correct.
9  Q. And the survey that we've marked
10 RL-3, which is Exhibit 1 to RL-2, is the February
11 21, 2014, survey by Caulfield and Associates,
12 right?
13 A. Yeah. That's -- yes, that's
14 correct.
15 Q. Okay. Who provided you with a copy
16 of this survey?
17 A. Chris Dalton or John Goldsmith.
18 Q. Okay. Did you review this survey,
19 RL-3, to conclude if the legal description in the
20 vesting deed to Coles Jersey Development Co.,
21 LLC, is consistent with the survey?
22 A. It's consistent, with a slight
23 variation. There may be a slight distance that's
24 different, but for the most part, yes.
25 Q. So your testimony is that this

**Loffredo, Raymond - direct - Mr. Ash** — Page 23

1  survey, RL-3, might have slight differences --
2  A. Slight variation, yeah.
3  Q. -- to the vesting deed.
4  A. Yeah. I'll --
5     MR. ASH: Hold on. Hold on.
6  There's no question pending.
7     Let's mark RL-4.
8     THE WITNESS: I recollect. Maybe
9  not the codes, the --
10    (Discussion off the record.)
11    MR. ASH: Hold on, because there's
12 no -- you've answered the question that I asked,
13 so there's no question pending.
14    THE WITNESS: Okay.
15    MR. ASH: We're going to mark a
16 document and then I'll ask you another question.
17    MR. DALTON: If you want to clarify
18 any testimony, you can certainly ask Mr. Ash for
19 the opportunity to do so.
20    THE WITNESS: Okay.
21    (Exhibit RL-4 was received and
22 marked for identification by the court reporter.)
23    MR. ASH: Thanks.
24    BY MR. ASH:
25 Q. Okay. RL-4 is Exhibit 2 to your

**Loffredo, Raymond - direct - Mr. Ash** — Page 24

1  report; is that right?
2  A. 8934. Yes, that's correct.
3  Q. And Exhibit 2, RL-4, is the vesting
4  deed to Coles Jersey Development Co., LLC, dated
5  July 2nd, 2013.
6  A. Correct.
7  Q. It's actually -- the deed was
8  recorded July 25, 2013, and rerecorded September
9  27, 2013, correct?
10 A. Correct.
11 Q. This deed includes a legal
12 description of the subject property.
13 A. Correct.
14 Q. Specifically Block 6005, Lot 13.
15 A. Correct.
16 Q. The Caulfield Associates survey,
17 RL-3 --
18 A. Right.
19 Q. -- Exhibit 1, is consistent with the
20 legal description for Tract 3 in the Cole's
21 Jersey vesting deal.
22 A. Correct.
23 Q. Entirely consistent.
24 A. Yes, correct.
25 Q. Well, why don't you take a minute --

Texas Eastern Transmission v.
0.077 Acres of Land

---

**Loffredo, Raymond - direct - Mr. Ash** — Page 25

1  A. Okay.
2  Q. -- and confirm that it's --
3  A. I can't read this that well.
4  (Discussion off the record.)
5  MR. ASH: Off the record.
6  (Discussion off the Record.)
7  MR. ASH: Okay. Let's go back on
8  the record.
9  BY MR. ASH:
10 Q. Mr. Loffredo, you, in responding to
11 my question, cannot confirm if the legal
12 description as plotted on Exhibit 1, RL-3, is
13 consistent with the legal description --
14 A. Well.
15 Q. -- of Tract 3 in the vesting deed to
16 Coles Jersey because the print is too small.
17 A. The print -- this print is too
18 small.
19 Q. Right.
20 A. I can't read this.
21 Q. However, I'll represent to you that
22 I can read those distances on RL-3 and that they
23 are identical to the courses described in the
24 metes and bounds description of Tract 3 in
25 Exhibit 2 RL-4.

---

**Loffredo, Raymond - direct - Mr. Ash** — Page 26

1  A. Okay.
2  Q. And is that consistent with your
3  recollection?
4  A. Correct.
5  Q. Okay. And that's consistent with
6  your analysis --
7  A. Correct.
8  Q. -- in RL-2.
9  A. Correct.
10 Q. Okay. You were provided with a copy
11 of the vesting deed to Coles Jersey Development
12 Co.?
13 A. I don't remember if we were provided
14 with it initially or we had the searcher pick it
15 up. I don't remember.
16 Q. Okay. Do you recall if you ever
17 reviewed the deed that was provided by the
18 seller, grantor, Ogden Realty Co., to Coles
19 Jersey Development Company, LLC, at the closing
20 on July 3rd, 2013?
21 A. Did I receive it in July? Did I
22 look? No. I wasn't at the closing.
23 Q. Understanding you weren't at the
24 closing, have you ever seen an unrecorded copy of
25 the vesting deed to Cole's Jersey Development

---

**Loffredo, Raymond - direct - Mr. Ash** — Page 27

1  Co.?
2  A. I don't believe so.
3  Q. If we're looking at RL-4, a deed,
4  Exhibit 2?
5  A. Um-hum.
6  Q. "The conveyance from Ogden Realty
7  Co. to Cole's Jersey Development Co., LLC, was
8  made subject to such state of facts as would be
9  disclosed by an accurate survey, and further
10 subject to easements, zoning requirements and
11 other restrictions of record, if any." Do you
12 see that?
13 A. Yes, I do.
14 Q. Is that pretty standard language in
15 a deed in New Jersey?
16 A. Sometimes. I mean, it's -- it
17 typically, no, it wouldn't be included. I mean,
18 an attorney wouldn't want that in. It's just
19 very open-ended.
20 But, yes, I've seen it in deeds.
21 Q. What does that mean when it's
22 included in a deed?
23 A. They're just not warranting that
24 they -- that -- to these facts, that, you know,
25 their description did not say they had a survey,

---

**Loffredo, Raymond - direct - Mr. Ash** — Page 28

1  that they're -- they're making it subject to
2  everything that I assume they had no knowledge
3  of.
4  Q. Would an accurate survey of Block
5  6005, Lot 13 and a portion of Lot 7, show the
6  location of PSE&G's electrical lines?
7  MR. DALTON: Objection to form.
8  You can answer.
9  A. I don't believe so.
10 Q. Okay. Why not?
11 A. I don't know if they're visible or
12 not, so if they could see. I don't know if they
13 would have a copy of the easement, if they
14 plotted the easement. There's no way of knowing.
15 Q. Do you know if Ogden Realty or
16 Cole's Jersey Development Co., LLC, had in their
17 possession as of July 3rd, 2013, a survey that
18 actually showed and disclosed the location of the
19 PSE&G electrical lines on Block 6005, Lot 13 and
20 a portion of Lot 7?
21 A. No, I don't.
22 Q. If Ogden Realty Co. had in their
23 possession prior to July 3rd, 2013, a survey that
24 showed the location of the PSE&G electrical lines
25 on Block 6005, Lot 13 and a portion of Lot 7,

---

### Page 29 — Loffredo, Raymond - direct - Mr. Ash

1. would you agree that Ogden Realty Company
2. conveyed title to Cole's Jersey Development Co.,
3. LLC, subject to the PSE&G electrical lines?
4.     MR. DALTON: Objection to form.
5.     But you can answer.
6. A. Well, if Cole's Jersey had -- Cole's
7. Jersey Development Co. had that survey and they
8. had actual knowledge based on the survey, yes.
9. Q. Yes, what?
10. A. Yes, they would have. They would
11. have knowledge of it.
12. Q. So title would have been conveyed
13. subject to those electrical lines.
14. A. Well, yes.
15. Q. If Cole's Jersey Development Co.,
16. LLC, had in their possession as of July 3rd,
17. 2013, a survey that disclosed the actual location
18. of the PSE&G electrical lines in Block 6005, Lot
19. 13 and a portion of Lot 7, would you agree that
20. Cole's Jersey acquired title to Block 6005, Lot
21. 13 and a portion of Lot 7, subject to the PSE&G
22. electrical lines?
23.     MR. DALTON: Objection to form.
24.     But you can answer.
25. A. Yes. Yes.

### Page 30 — Loffredo, Raymond - direct - Mr. Ash

1. Q. Would you agree that the PSE&G
2. electrical lines were an encumbrance on Block
3. 6005, Lot 13 and a portion of Lot 7, as of July
4. 2nd, 2013?
5.     MR. DALTON: Objection to form.
6.     But you can answer.
7. A. Based on the location I've seen on
8. the survey, yes.
9. Q. Yes, it was an encumbrance?
10. A. Yes, it was an encumbrance, correct.
11. Q. Is that a term of art for title
12. examiners, the term "encumbrance"?
13. A. Well, I'm not sure if we would call
14. it -- I mean, it's a -- it's an easement that
15. burdens the property that they're aware of. I
16. don't know if I would call it an encumbrance if
17. we had would set it up as an exception.
18. Q. Would you call it an "encroachment"?
19. A. It -- I would say that it's, I mean,
20. it's an encroachment extending over a property,
21. yeah.
22. Q. And that encroachment existed as of
23. July 2nd, 2013, to the best of your knowledge.
24. A. To the best of my knowledge.
25.     MR. ASH: RL-5, please.

### Page 31 — Loffredo, Raymond - direct - Mr. Ash

1.     (Exhibit RL-5 is received and marked
2. for identification by the court reporter.)
3. Q. Mr. Loffredo, we've marked this
4. document RL-5. And would you confirm if that is
5. an accurate copy of Exhibit 3 to your report,
6. RL-2?
7. A. I'm still looking for the page
8. numbers.
9.     MR. DALTON: At the top, up here.
10. A. Which exhibit now are we talking
11. about? Exhibit 5?
12. Q. Exhibit 3.
13. A. Exhibit 3.
14. Q. Mine's got tabs, if you want.
15. A. Wait. I'm looking for the book and
16. page. I can't find the book and page. 8934?
17. Q. Yes. Exhibit 3.
18. A. Yes. 8934.
19.     MR. DALTON: That's Exhibit 2.
20.     THE WITNESS: 970 -- well, 973.
21.     MR. DALTON: I think we said Exhibit
22. 3 to the report?
23.     THE WITNESS: Yeah.
24.     MR. ASH: Exhibit 3.
25.     MR. DALTON: We're looking at

### Page 32 — Loffredo, Raymond - direct - Mr. Ash

1. Exhibit 3. This is 3.
2.     THE WITNESS: Okay. This is 3.
3. This is part of -- okay.
4.     BY MR. ASH:
5. Q. Is Exhibit 3, what we've marked
6. RL-5, that's the legal description of the
7. property conveyed by Ogden Realty Co. to Cole's
8. Jersey Development Co., LLC?
9. A. Correct.
10. Q. And is that the same legal
11. description in the deeds you attached to your
12. report as Exhibit 2?
13. A. I'd have to take a look again. I --
14. Exhibit 2?
15. Q. Yes.
16. A. Yes, I believe it is.
17. Q. Is there a reason why you included
18. the legal description of the property acquired by
19. Cole's Jersey Development Co., LLC, as a separate
20. exhibit?
21. A. No, I don't think so.
22. Q. Okay. The portion of the property
23. acquired by Cole's Jersey Development Co., LLC,
24. that is encumbered by the Texas Eastern permanent
25. pipeline easement is described as "Tract 2" in

**Loffredo, Raymond - direct - Mr. Ash** — Page 33

1  RL-5? Is that right?
2  A. In this deed? In this deed, you're
3  talking about? Which deed are you talking about
4  here?
5  Q. I'm talking about RL-5.
6  A. Okay.
7  Q. Which is Exhibit 3.
8  A. Okay. And the Texas Eastern --
9  Q. Easement.
10 A. -- traversing across the property?
11 Q. Yes.
12 A. Yes.
13 Q. That is within the property
14 described as "Tract 2"?
15 A. Correct.
16 Q. And the PSE&G electrical lines also
17 encumber Tract 2, correct?
18 A. Correct, based on the document
19 that -- that I saw, correct.
20 Q. If you go to the bottom of the
21 description of Tract 2 in RL-5 in Exhibit 3,
22 there's a note that reads: The above description
23 was drawn in accordance with a survey made by
24 Dresdner Robin, D-r-e-s-d-n-e-r, Robin,
25 R-o-b-i-n, parenthesis, Donald F. Walby,

**Loffredo, Raymond - direct - Mr. Ash** — Page 34

1  W-a-l-b-y, initials PLS, end parenthesis, dated
2  October 4, 2005, and revised through November 3,
3  2006.
4     Do you see that notation?
5  A. Yes.
6  Q. Do you have a copy of the survey
7  prepared by Mr. Walby --
8  A. No.
9  Q. -- as of October 4, 2005 --
10 A. No.
11 Q. -- and revised November 3, 2006?
12 A. No.
13 Q. Did you ask for a copy of that
14 survey?
15 A. Ah, no, I did not.
16 Q. Do you know if the survey prepared
17 by Mr. Walby as of October 4, 2005, revised
18 November 3, 2006, is consistent with the
19 Caulfield Associates survey attached to your
20 report as Exhibit 1?
21 A. Yes. Yes.
22 Q. You do know that it's consistent?
23 A. Well, I'm looking at the -- I'm just
24 looking at the -- well, based on the description.
25 I've never seen the survey.

**Loffredo, Raymond - direct - Mr. Ash** — Page 35

1  Q. Okay.
2     MR. ASH: RL-6, please.
3     (Exhibit RL-6 is received and marked
4  for identification by the court reporter.)
5  Q. Let me show you what we've marked
6  RL-6.
7  A. It's dark in this office. I'm
8  having a hard time seeing everything.
9     MR. ASH: It looks like we got two
10 lights out there.
11    MR. DALTON: This one is RL-6.
12    MR. ASH: Yeah.
13    BY MR. ASH:
14 Q. RL-6, would you agree, is a copy of
15 a vesting deed of the subject property to Ogden
16 Realty Co., Exhibit 10 to your report.
17 A. Yes.
18 Q. Would you agree that Ogden Realty
19 Co. can only convey the real estate that it owned
20 by vesting deed to Cole's Jersey Development Co.,
21 LLC.
22 A. Correct.
23 Q. In the deed marked RL-6, the portion
24 of the subject property in the vesting deed to
25 Cole's Jersey Development Co., LLC, that is

**Loffredo, Raymond - direct - Mr. Ash** — Page 36

1  described as Tract 2 is described in RL-6 as
2  Parcel 3, Tract 1.
3  A. Correct.
4  Q. In Page 2 of your report, Paragraph
5  G --
6  A. Yes.
7  Q. -- you write that the legal
8  description of Parcel 3, Tract 1, is the same as
9  that contained in the deed from Ogden Realty Co.
10 to Cole's Jersey Development Co., LLC.
11 A. Correct, correct.
12 Q. So in preparing your report, you
13 compared the description in Exhibit 3 to Exhibit
14 10, right?
15 A. Well, I -- yeah. I compared it to
16 the survey, correct.
17 Q. Did you compare the descriptions?
18 A. Not to the descriptions by deed, no.
19 I just compared it to descriptions to the survey.
20 Q. Okay. Well, if you were to compare
21 the descriptions by deed, you would find that
22 they are not the same.
23 A. Right. Slight variation.
24 Q. Well, they're not identical, are
25 they?

Loffredo, Raymond - direct - Mr. Ash    Page 37

1  A.  No.
2  Q.  In fact, there are multiple courses
3  that are different, correct?
4  A.  Two courses, correct.
5  Q.  And the courses are different in
6  direction and distances.
7  A.  Well, distance, correct.
8  Q.  Did you have a survey that would
9  show the dimensions of the legal description in
10  RL-6?
11  A.  No.
12  Q.  Did you attempt to plot the legal
13  description in RL-6?
14  A.  We just compared it. We just
15  compared it to what's on the survey.
16  Q.  Well, do you know if what is
17  described in RL-6 is more real estate or less
18  real estate than what is described in --
19  A.  Slightly --
20  Q.  -- than what is described in
21  Exhibit 3?
22  A.  Slightly more.
23  Q.  It's slightly more.
24  A.  Right.
25  Q.  Do you know --

Loffredo, Raymond - direct - Mr. Ash    Page 38

1  A.  Well, I can't say -- I can't say
2  it's slightly more. There's a variation in two
3  courses. We have tie into -- the distances along
4  the street are correct, the distance going up.
5  It's just the distance, there's a slight
6  variation in the distance going back into the
7  lot.
8  Q.  There's a variation in the distance
9  on the western boundary of the property, correct?
10  A.  Correct.
11  Q.  And it's the western boundary of the
12  property where we find Texas Eastern's easement,
13  right?
14  A.  Correct.
15  Q.  It's the western boundary of the
16  property where we find the PSE&G electrical
17  lines, correct?
18  A.  Correct.
19  Q.  So it would be of critical value to
20  understand the exact dimensions of the subject
21  property on the western boundary, right?
22  A.  Right.
23  Q.  And you understand there's a
24  discrepancy in that description of the western
25  boundary of the subject property in the chain of

Loffredo, Raymond - direct - Mr. Ash    Page 39

1  title.
2  A.  Correct, correct.
3  Q.  And you have no opinion as to
4  whether or not the size of the property is
5  smaller or larger on the western boundary.
6  A.  Correct.
7  Q.  Do you know at what point between
8  1987, when Ogden Realty acquired the subject
9  property by Deed RL-6, and July 2013, when Ogden
10  Realty conveys property to Cole's Jersey
11  Development Co., LLC, when the size of the
12  property would have changed?
13  A.  If I'm not mistaken, it changed
14  based on the survey that was done in two thousand
15  -- what was the -- 2005.
16  Q.  That's the survey you haven't
17  reviewed.
18  A.  Correct.
19  Q.  And you've never seen that survey.
20  A.  I've never seen that survey.
21  Q.  So how do you know that it was that
22  survey that changed the size of the property?
23  A.  Because there's no reference to
24  that -- any other changes in that description
25  until that survey. Typically, you would not just

Loffredo, Raymond - direct - Mr. Ash    Page 40

1  use the survey description.
2  Q.  What else would you use?
3  A.  Both descriptions, the record
4  description and the survey description. A policy
5  would insure the area common to both, to both the
6  record description and the survey description.
7  Q.  But you're not providing an opinion
8  as to the state of --
9  A.  No.
10  Q.  -- or the quality of insurable
11  title.
12  A.  No.
13  Q.  Can you say with any degree of
14  certainty that you know when the legal
15  description of the subject property changed?
16  A.  I could take a look at the deeds
17  and -- and tell you when it changed.
18  Q.  Do you have an answer?
19  A.  I think -- I believe in 2006.
20  Q.  And what document are you reviewing?
21  A.  I'm looking at the deed, the present
22  owner deed. I'm not sure what exhibit that is.
23  Q.  That's the note in Exhibit 3 as to
24  the survey --
25  A.  The Ogden --

Texas Eastern Transmission v.
0.077 Acres of Land

---

Loffredo, Raymond - direct - Mr. Ash — Page 41

1  Q.  -- prepared by Dresdner Robin.
2  A.  Correct, correct.
3  Q.  And, again, that's a survey you've
4  never reviewed.
5  A.  Correct.
6  Q.  Now, going back to RL-6, Exhibit 10,
7  you'll note that the conveyance to Ogden Realty
8  Co. was made subject to easements, restrictions
9  and agreements of record, if any. Do you see
10 that?
11 A.  Correct.
12 Q.  So would you agree that Ogden Realty
13 Co. took title to the subject property subject to
14 the PSE&G electrical lines that relate back to a
15 1986 easement?
16 A.  That I can't say, no.
17 Q.  Okay.
18    MR. ASH: Let's mark RL-7, please.
19    (Exhibit RL-7 is received and marked
20 for identification by the court reporter.)
21 Q.  Okay. We've marked a document RL-7.
22 Would you please confirm is that is the PSE&G
23 easement from Conrail, which is attached to your
24 report as Exhibit 11?
25 A.  Yes.

---

Loffredo, Raymond - direct - Mr. Ash — Page 42

1  Q.  Okay. Do you see on the first page
2  of RL-7 there are, numbered 1 through 4,
3  different facilities identified?
4  A.  Yes.
5  Q.  Do you know which of the facilities
6  in this easement encumber the subject property?
7  A.  No.
8  Q.  Would you agree that the easement,
9  RL-7, does not have a description of the land
10 that this easement encumbers?
11 A.  That's correct.
12 Q.  Do you know when any of the
13 facilities described in this easement were
14 actually installed?
15 A.  No.
16 Q.  Did you undertake an independent
17 investigation as to when any of the facilities
18 described in the easement to PSE&G were
19 installed?
20 A.  No.
21 Q.  Do you know when Texas Eastern's
22 natural gas pipeline was installed on the subject
23 property?
24 A.  No.
25 Q.  Do you know if Texas Eastern's

---

Loffredo, Raymond - direct - Mr. Ash — Page 43

1  pipeline was installed on Block 6005, Lots 13 and
2  a portion of Lot 7, prior to Cole's Jersey
3  Development Co., LLC, acquiring title?
4  A.  Do I know? No, I don't know.
5    MR. ASH: I think I'm almost done.
6  I just want to take a look at the documents that
7  you brought today, see if I have any questions
8  about those documents, okay? So let's go off for
9  a couple.
10    (Recess is taken.)
11    MR. ASH: Okay. We can go back on.
12    BY MR. ASH:
13 Q.  Mr. Loffredo, who's Maria Varela?
14 A.  She's one of the administrative
15 assistants in my office. She orders title
16 searches.
17 Q.  And so her involvement in this
18 matter was purely administrative?
19 A.  Correct, correct.
20    MR. ASH: That's V-a-r-e-l-a.
21 Q.  In a December 9th, 2016, e-mail from
22 Mr. Goldsmith to you, Mr. Goldsmith describes a
23 portion of the subject property as a "gore"
24 property, g-o-r-e?
25 A.  Correct.

---

Loffredo, Raymond - direct - Mr. Ash — Page 44

1  Q.  Would you agree with the
2  characterization by Mr. Goldsmith that a portion
3  of the subject property is a gore?
4  A.  No, no.
5  Q.  Why not?
6  A.  Well, I think he was referring to,
7  and this is why we check the titles, there was a
8  discrepancy between the tax maps and the record
9  description for this lot, and I think that's what
10 he was -- I think that's where we started with in
11 looking for something that would indicate that
12 that -- who had title to that.
13 Q.  And did you review a memorandum from
14 W.H. Fricke to me as of March 7, 2013, describing
15 the subject property chain of title?
16 A.  Can I --
17 Q.  Let's mark this RL-8.
18    (Exhibit RL-8 was received and
19 marked for identification by the court reporter.)
20 Q.  What we've marked RL-8, this is a
21 document you brought that's part of your file,
22 correct?
23 A.  Yes, that's correct.
24 Q.  And Mr. Dalton or Mr. Goldsmith
25 provided this to you?

---

Loffredo, Raymond - direct - Mr. Ash  Page 45

1  A. Ah, correct.
2  Q. You reviewed this document, RL-8, in
3  preparing your report in this matter?
4  A. Ah, no, I didn't, as a matter of
5  fact.
6  Q. You didn't.
7  A. No, not for this report, no.
8  Q. Have you reviewed this memorandum?
9  A. I looked at this document when we --
10  when we initially -- I guess it was given to us
11  in December when he was -- and, again, and I
12  think everybody is confusing exactly what we're
13  looking for, and that's -- I think it may have
14  been sent to our searcher, and that's when we
15  pulled the deeds around that.
16      But no, I didn't use this for this
17  report.
18  Q. Do you have an opinion as to whether
19  or not the analysis in RL-8 is accurate or not?
20  A. No, I don't have an opinion on this
21  at all. I --
22  Q. Okay. I have nothing further.
23      MR. DALTON: I just wanted to
24  briefly clear up one thing. I'm not sure his
25  answer -- I'm not sure Mr. Loffredo answered the

Loffredo, Raymond - cross - Mr. Dalton  Page 46

1  question you had asked at one point.
2      MR. ASH: Okay.
3      MR. DALTON: So if I can just take
4  one moment.
5      CROSS-EXAMINATION BY MR. DALTON:
6  Q. Mr. Loffredo, can you take Exhibit
7  RL-3, which is the Caulfield survey, okay? And
8  then Exhibit RL-5, which is the property
9  description in the Cole's Jersey deed?
10     There it is.
11 A. Okay.
12 Q. And if you look at the description
13  on Tract 2 in RL-5, you were asked whether -- you
14  were directed to the fact that it contains a
15  statement that the description was drawn in
16  accordance with a survey by Dresdner Robin. Do
17  you see that in --
18 A. Yes, I do.
19 Q. Okay. And I believe you were just
20  asked whether the Cole's -- excuse me, whether
21  the Caulfield survey was consistent with the
22  Dresdner survey. Do you recall that question?
23 A. Yes, I do.
24 Q. And have you ever seen the Dresdner
25  survey?

Loffredo, Raymond - cross - Mr. Dalton  Page 47

1  A. No, I have not.
2  Q. So do you know whether the Caulfield
3  survey is consistent with the Dresdner survey?
4  A. No, I don't. I've never seen that
5  survey.
6      MR. DALTON: That's all I wanted to
7  check. Thank you. That's it.
8      MR. ASH: Okay. Nothing further.
9      (Discussion off the record.)
10     (Time noted at 11:08 a.m.)

Page 48

1           C E R T I F I C A T E
2
3      I CERTIFY that the foregoing is a
4  true and accurate transcript of the testimony as
5  taken by and before me stenographically at the
6  time and place aforementioned.
7      I FURTHER CERTIFY that I am neither
8  attorney for nor counsel to any of the parties;
9  parties of any of the attorneys in this action;
10 and that I am not financially interested in the
11 outcome of this case.
12
13
14
15
16           RENEE RUSSO, CCR, CRCR, RPR, CRR
17           Certificate No. XI00143700

```
                    C E R T I F I C A T E


           I CERTIFY that the foregoing is a
true and accurate transcript of the testimony
as taken by and before me stenographically at
the time and place aforementioned.
           I FURTHER CERTIFY that I am
neither attorney for nor counsel to any of
the parties; parties of any of the attorneys
in this action; and that I am not financially
interested in the outcome of this case.



           _Renee Russo, CCR, CRCR, RPR, CRR_
           RENEE RUSSO, CCR, CRCR, RPR, CRR
           Certificate No. XI00143700
```