UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

**BUCHANAN INGERSOLL & ROONEY PC**
Incorporated in Pennsylvania
550 Broad Street, Suite 810
Newark, NJ 07974
Telephone: (973) 273-9800
Facsimile:  (973) 273-9430
Christopher J. Dalton, Esq.

One Oxford Centre
301 Grant Street, 20th Floor
Pittsburgh, PA  15219-1410
Telephone: (412) 562-8841
Stanley Yorsz, Esq.
*Attorneys for Defendant*
*Coles Jersey Development Co., LLC.*

| | | |
|---|---|---|
| TEXAS EASTERN TRANSMISSION, LP, a limited partnership of the State of Delaware | : : : | Civil Action No. 14-167-SRC-CLW |
| Plaintiff, | : : | |
| v. | : : | **DECLARATION OF** |
| 0.077 Acres of Land, More or Less, In The City of Jersey City, Hudson County, New Jersey; COLES JERSEY DEVELOPMENT CO., LLC; OGDEN REALTY CO.; JANE AND JOHN DOES 1 through 50 (fictitious name defendants); and ABC BUSINESS ENTITIES 1 through 50 (fictitious name defendants), | : : : : : : : : : | **CHRSITOPHER J. DALTON IN SUPPORT OF COLES JERSEY DEVELOPMENT CO., LLC'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| Defendants. | : | |

1.      I am an attorney at law of the State of New Jersey, a member in good standing of the Bar of this Court, a shareholder in the firm of Buchanan Ingersoll & Rooney PC, and attorney of record for Coles Jersey Development Co., LLC ("Defendant").

2.      I make this Declaration in support of Defendant's opposition to Plaintiff's motion for summary judgment.

3.      Attached hereto as Exhibit 1 is a true and correct copy of the transcript of the deposition William Ackman.

4.      Attached hereto as Exhibit 2 is a true and correct copy of exhibit WA-6 from Mr. Ackman's deposition.

5.      Attached hereto as Exhibit 3 is a true and correct copy of a July 3, 2013 Release from Hoboken Brownstone Company to Ogden Realty Company and Texas Eastern Transmission.  This release is also in the record as Exhibit H to the January 9, 2014 Certification of Franklin S. Gessner (DE 1-6).

I declare under penalty of perjury that the foregoing is true and correct.


_s/Christopher J. Dalton_

Christopher J. Dalton

November 19, 2018

# **<u>EXHIBIT 1</u>**

# In The Matter Of:

*Texas Eastern v.*
*0.077 Acres of Land*

---

*William Ackman*
*October 16, 2015*

---

*Rizman Rappaport Dillon & Rose*
*66 W. Mt. Pleasant Ave.*
*Livingston, N.J. 07039*
*(973) 992-7650*
*reporters@rizmanrappaport.com*

Min-U-Script® with Word Index

## Page 1

```
 1          UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF NEW JERSEY
 2          CIVIL ACTION NO. 14-167-SRC-CLW

 3
   ------------------------)
 4 TEXAS EASTERN          )DEPOSITION UPON
   TRANSMISSION, LP,      )ORAL EXAMINATION
 5 a limited partnership)        OF
   of the State of       )WILLIAM ACKMAN
 6 Delaware,             )
                         )
 7        Plaintiff,     )
                         )
 8 v.                    )
                         )
 9 0.077 Acres Of Land,  )
   More or Less, In The  )
10 City of Jersey City,  )
   Hudson County, New    )
11 Jersey, COLES JERSEY  )
   DEVELOPMENT CO., LLC,)
12 OGDEN REALTY CO.,     )
   JANE AND JOHN DOES 1  )
13 through 50            )
   (fictitious name      )
14 defendants) and ABC   )
   BUSINESS ENTITIES 1   )
15 through 50            )
   (fictitious name      )
16 defendants),          )
                         )
17        Defendants.    )
   ------------------------)
18

19

20        T R A N S C R I P T  of the
   stenographic notes of JOMANNA DEROSA, a
21 Certified Court Reporter of the State of New
   Jersey, New York, California, and Arizona,
22 taken at the offices of PERSHING SQUARE
   CAPITAL MANAGEMENT, 888 7th Avenue, New
23 York, New York, on Friday, October 16, 2015,
   commencing at 2:04 p.m.
24

25
```

## Page 2

```
 1 A P P E A R A N C E S :

 2 DECOTIIS FITZPATRICK & COLE, LLP
   Glenpointe Centre West
 3 500 Frank W. Burr Boulevard, Suite 31
   Teaneck, New Jersey 07666
 4 (201) 928-0588
   jsmith@decotiislaw.com
 5 BY:  JEFFREY D. SMITH, ESQ.
           -and-
 6      MICHAEL J. ASH  ESQ.
        mash@decotiislaw.com
 7 For the Plaintiff

 8
   BUCHANAN INGERSOLL & ROONEY, PC
 9 550 Broad Street, Suite 810
   Newark, New Jersey 07102-4582
10 (973) 424-5614
   christopher.dalton@bipc.com
11 BY:  CHRISTOPHER J. DALTON, ESQ.
   For the Defendants

12

13 ALSO PRESENT:

14 DAVID KLAFTER, ESQ.
   Pershing Square Capital Management, L.P.

15

16

17

18

19

20

21

22

23

24

25
```

## Page 3

```
 1              I N D E X

 2 WITNESS                        PAGE

 3   WILLIAM ACKMAN

 4   DIRECT EXAMINATION BY MR. SMITH    4

 5
   EXHIBITS      DESCRIPTION      FOR IDENT.
 6
   WJ-1       Subpoena              6
 7 WJ-2       Memorandum           32
   WJ-3       Document             47
 8 WJ-4       Memorandum           49
   WJ-5       E-mail String        51
 9 WJ-6       E-mail String        56
   WJ-7       E-mail String        60
10 WJ-8       E-mail               63
   WJ-9       E-mails              66
11 WJ-10      String of E-mails    70
   WJ-11      Settlement Breakup   83
12 WJ-12      Closing Report       84
   WJ-13      Release              84
13

14

15

16

17

18

19

20

21

22

23

24

25
```

## Page 4

Ackman - Direct

```
 1 W I L L I A M   A C K M A N,
 2    having been first duly sworn,
 3    testified as follows:
 4    DIRECT EXAMINATION BY MR. SMITH:
 5 Q.  Good afternoon, Mr. Ackman.  We
 6 just met.  My name is Jeff Smith.  I represent
 7 the plaintiff in this case, the pipeline
 8 company, Texas Eastern Transmission, which is,
 9 as you know, owned by Spectra.
10 A.  Yes.
11 Q.  And Michael Ash is with me, and
12 we're to wrap up the fact part of the case over
13 the Jersey City property.  Okay?
14 A.  Yes.
15 Q.  You've had your deposition taken
16 before, I assume?
17 A.  I have.
18 Q.  How many times?
19 A.  In my life?
20 Q.  Yes.
21 A.  Ten, eight, something like that.
22 Q.  We'll dispense with the
23 instructions and try to move this along.  Just
24 also to move it along and keep everybody
25 focused, I'll refer to the property that's at
```

Texas Eastern v.
0.077 Acres of Land

| | |
|---|---|
| Ackman - Direct                    Page 5 | Ackman - Direct                    Page 7 |

**Page 5**

1  issue here.  It's bounded by Coles Street, 17th
2  and 18th Street in Jersey City as either the
3  property in Jersey City or the Coles Street
4  property.  Is that satisfactory?
5  A.  Yes.
6  Q.  Okay.  And if there's any doubt or
7  there's another property that comes into play,
8  please ask me to clarify or you clarify if
9  you're referring to something else.
10     Do you have any other real estate
11  interests in Jersey City at this point?
12  A.  I don't think so.
13  Q.  Okay.  Are you aware that some
14  documents were produced on your behalf in this
15  litigation?
16  A.  Yes.
17  Q.  Okay.  Did you play any role in
18  searching for those documents?
19  A.  I don't believe so.  I think my
20  general counsel handled it.
21  Q.  Okay.  All right.  That was my next
22  question.  So, just for the record, who, if
23  anyone, was involved?
24  A.  I don't know for sure, but it would
25  have been at least my general counsel or led by

**Page 7**

1  A.  Yes.
2  Q.  What did you review?
3  A.  They gave me a stack, I think, of
4  what we produced to you.
5  Q.  Okay.  Fair enough.  Do you recall
6  specifically what that was, the nature of the
7  documents?
8  A.  E-mails, an environmental report,
9  an LLC agreement, stuff like that.
10  Q.  Okay.  Have you spoken to Danny
11  Ganz (phonetic) about this litigation?
12  A.  Not in a very long time.
13  Q.  When did you last speak to Mr. Ganz
14  about this case?
15  A.  Six months ago.  I'm not sure of
16  that exact date.  It could have been 12 months
17  ago.
18  Q.  If it's an estimate, just tell us
19  it's an estimate or an approximation.
20  A.  Around the time that -- when this
21  started, I guess.  I don't even know.
22     MR. DALTON: January 2014 was it?
23     MR. SMITH: Yes.
24  Q.  About 18 months, 20 months?
25  A.  Okay.  So, it could have been a

| | |
|---|---|
| Ackman - Direct                    Page 6 | Ackman - Direct                    Page 8 |

**Page 6**

1  him.  I don't know if you'd call it my general
2  counsel or special counsel or senior counsel,
3  but he's a lawyer.
4     (WA-1 marked for identification.)
5  Q.  So you have a copy in front of you?
6  A.  Yes.
7  Q.  And the question to you certainly
8  is have you ever seen that before?
9  A.  I'm not sure.
10  Q.  Okay.  And I take it you didn't
11  review any lists of requests or anything.
12  A.  No.
13  Q.  You delegated production.  And as
14  far as you know, everything that was responsive
15  to the request has been produced?
16  A.  Yes.
17  Q.  All right.  Are you aware of any
18  documents that were withheld or otherwise not
19  produced?
20  A.  No.
21  Q.  Okay.  Who did you speak to in
22  preparation for the deposition?
23  A.  The two gentlemen to my left.
24  Q.  Very well.  Did you review
25  anything?

**Page 8**

1  year ago.
2  Q.  And I take it the same answer, you
3  haven't spoken to George Vallone (phonetic)
4  about this matter?
5  A.  That's correct.
6  Q.  How about Greg Liss (phonetic)?
7  A.  Greg certainly more recently than
8  that.
9  Q.  Okay.  And just so we're clear, I
10  want to separate any business discussions you
11  may have had about the property or development
12  from the litigation, the court case.
13  A.  I understand.
14  Q.  Okay.  How about your father?
15  A.  No.  I mean, again, my dad I see
16  every day.  Did we have a discussion about
17  this?
18  Q.  And I'm talking about a discussion
19  of substance, not I'm not going to spend a happy
20  Friday afternoon with lawyers comment.
21  A.  Not at all.
22  Q.  Okay.  Fair enough.  Have you
23  reviewed any of the court papers in this case,
24  the complaint, the answer, any of those
25  documents?

**Texas Eastern v.**
**0.077 Acres of Land**

| Ackman - Direct | Page 9 |
| --- | --- |

1 A.   Not that I can remember.
2 Q.   Just to belabor the obvious, I
3 started with it, but you understand that in
4 this case Texas Eastern has sued Coles Jersey
5 Development and a piece of property under, you
6 know, technical rules to confirm certain
7 property interests and address any
8 compensation, if appropriate, that may be at
9 issue.
10 A.   Yes.
11 Q.   You understand that?  Okay.
12      Do you understand that the focus in
13 this case is a particular slice of what we
14 referred to earlier as the Coles Jersey
15 property?
16 A.   Yes.
17 Q.   Block 605, 6005 Lot 7.  I don't
18 know if you know that.
19 A.   I'll take your word.
20 Q.   Okay.  It's shown on some of the
21 drawings as the corner piece or the corner
22 slice.  Is that familiar to you?
23 A.   No.
24 Q.   Okay.  Are you aware there was a
25 prior litigation relating to the same property,

| Ackman - Direct | Page 10 |
| --- | --- |

1 the property that Coles Jersey purchased from
2 Ogden through Hoboken Brownstone and Danny Ganz
3 and his partner?
4 A.   Litigation since we've owned the
5 property?
6 Q.   Prior to this.  No, prior to this.
7 A.   No, I'm not aware.
8 Q.   Okay.  Do you have any
9 understanding as to what Coles Jersey's claim
10 for compensation in this case amounts to?
11 A.   Coles Jersey is us.  Correct?
12 Q.   Yes.  Let me take a step back.  You
13 know what Coles Jersey is.  It's an LLC --
14 A.   That owns this asset.
15 Q.   That owns this asset.  Correct?
16 A.   Yes.
17 Q.   Fair to say that at one time you
18 were the sole member?
19 A.   Probably.
20 Q.   Okay.  Do you know who the members
21 are now?
22 A.   I don't.  Okay.  I assume
23 affiliates would have been my father and
24 affiliates of mine.
25 Q.   Okay.  Do you recall if Danny Ganz

| Ackman - Direct | Page 11 |
| --- | --- |

1 and/or George Vallone are members?
2 A.   They have a promote interest that
3 may be through a membership interest.  I'm not
4 sure exactly.
5 Q.   Okay.  Fair enough.  And what is a
6 promote interest?
7 A.   They get a piece of the profits
8 after we receive a return on the investment
9 we've made, assuming it's a successful
10 investment.
11 Q.   And do you recall approximately
12 when that interest was given?
13 A.   This deal came down in, like, 24
14 hours.  So, we basically bought it and had a
15 handshake on eventually coming up with a
16 compensation arrangement that made sense, and
17 maybe within a few weeks of the deal closing.
18 Q.   It was reduced to writing?
19 A.   It was reduced to writing.
20 Q.   Okay.  So, go back to my earlier
21 question about Coles Jersey's claim for
22 compensation in this case.  Do you have an
23 understanding as to what -- not specifically,
24 but generally that claim relates to?
25 A.   Yeah.  Basic understanding is that

| Ackman - Direct | Page 12 |
| --- | --- |

1 you condemn part of our property, and that
2 impairs, obviously, the value of the asset, and
3 reduces the number of units we can build, and
4 we're entitled to be compensated for that.
5 Q.   And are you aware of a valuation of
6 that impairment or reduction in the value of
7 that asset?
8 A.   I have a pretty good sense of what
9 I think it's worth.
10 Q.   What is that?
11 A.   We just contracted to buy the only
12 other outparcel in the property for a purchase
13 price of six and a half million dollars, and we
14 can build 55 units.  So, if I just were to take
15 that number -- and, by the way, I bought it
16 because I thought it was worth more.  Right?
17 So, just using that benchmark, you know,
18 probably 120,000 a unit.
19      So, depending upon how many units,
20 I think my understanding is something -- we
21 lost the right to build something like 60
22 units.  And if I use that purchase price, I
23 would get about a $7.2 million estimate of
24 impairment, depending upon where the -- you
25 know, what part of the property was condemned,

---

**Ackman - Direct**        Page 13

1  that can also affect the value. If it's a
2  corner, it could be more valuable, for example.
3  Q. What is the related parcel? What's
4  the address, if you know, or the approximate
5  address?
6  A. I don't know the address, but if
7  you were to look at the property, I believe
8  there's one outparcel.
9  Q. Okay. Just for the record, what's
10  an outparcel?
11  A. So, if it's a square, and then
12  there's a piece that we don't own, we just made
13  a deal to buy that piece in the last week.
14  Q. It essentially completes the block
15  if you're looking at a site plan or a sketch?
16  A. That's correct. And, again, that
17  was the price we paid. Obviously I think it's
18  worth more than that. Otherwise I wouldn't
19  have bought it.
20  Q. Now, you said this is under
21  contract. You haven't closed yet?
22  A. That's correct.
23  Q. When did it go to contract?
24  A. Monday or Tuesday.
25  Q. Is there a closing date?

---

**Ackman - Direct**        Page 14

1  A. I think 30 days from the contract
2  signing. I think we have a 15-day due
3  diligence period.
4  Q. Are you aware of any documents,
5  appraisals, valuations that reference that per
6  unit value or anything that relates to the
7  Coles Jersey property itself?
8  A. I think we have engaged an
9  appraiser. I have not seen an appraisal.
10  Q. Okay. So, either he or she has
11  begun their work, or there's a draft, but you
12  haven't seen anything?
13  A. That's correct.
14  Q. All right. Have you heard any
15  reports?
16  A. I have not.
17  Q. Okay. So, this is based on your
18  experience, the numbers you're giving us for
19  the per unit price?
20  A. No, it's based on my writing a
21  check.
22  Q. Well, that's what I'm getting at.
23  A. That's a pretty good indicator, I
24  would say.
25  Q. Okay. And we started earlier with

---

**Ackman - Direct**        Page 15

1  you have no other real estate interests in
2  Jersey City. So, once you close you'll have
3  this outparcel in Coles Jersey?
4  A. That's correct.
5  Q. And I don't want to belabor this,
6  but I need to ask a few questions. Obviously
7  Pershing Capital is your primary business?
8  A. Correct.
9  Q. Generally, why don't you give us a
10  summary of your real estate experience, as an
11  investor?
12  A. Extensive. I've been a real estate
13  investor beginning in the early '90s, and at
14  that time my real estate investments were
15  principally through an entity called Gotham
16  Partners, which was my former investment fund.
17     In the Jersey area we bought the
18  Maxwell House coffee factory, actually in
19  partnership with George Vallone and Danny Ganz.
20  So, that's how I got to know a little bit about
21  the Hudson waterfront.
22     And then I invested in a lot of
23  pubically-traded real estate companies. I've
24  been Chairman of the Board of a couple of real
25  estate companies, and I've been -- maybe three.

---

**Ackman - Direct**        Page 16

1     So, there's one called First Union
2  Real Estate Investments that I was chairman of
3  for a number of years. And then there's the
4  Howard Hughes Corporation that I'm currently
5  chairman of that's an active real estate
6  developer around the country.
7     But just so you understand my life,
8  I spent 99 percent of my business time on
9  Pershing Square, and I spend 1 percent of my
10  time on sort of personal investments. And my
11  biggest personal investments are real estate
12  related. And in that category we own, you
13  know, a lot of -- a large number of apartments
14  and some hotel assets, some land, some retail,
15  a mix of things. But I'm a very experienced
16  real estate investor.
17  Q. Do you develop? Do you build?
18  A. I don't do anything myself.
19  Q. Okay.
20  A. But we are in partnership with --
21  our real estate team consists of my father,
22  Greg Liss, and myself. And I'm a very
23  part-time asset. It's really dad and Greg who
24  spend the bulk of time. But obviously in light
25  of the size of the internal team, everything we

---

| Ackman - Direct | Page 17 |
| --- | --- |

1  do pretty much is in partnership with somebody
2  who is doing the work. But we have done a lot
3  of development.
4  Q. Okay. So, somebody, as in this
5  case, is kind of the leather on the ground, and
6  your father and Greg Liss kind of manage it
7  from an asset perspective with you?
8  A. That's correct. Yes. They'll
9  check in with me every once in a while.
10 Q. Right. Okay. What is Table
11 Management?
12 A. Table Management is a family office
13 responsible for managing my personal
14 investments. Greg is an employee of Table
15 Management.
16 Q. When approximately was it formed?
17 I mean, is it a more recent entity?
18 A. Yeah. In the last several years.
19 I don't remember exactly.
20 Q. And when you say personal assets,
21 that would be real estate and other investments
22 in assets?
23 A. Yes. Private investments and real
24 estate.
25 Q. Who are the members?

| Ackman - Direct | Page 18 |
| --- | --- |

1  A. I think myself, my wife. My father
2  has some interest in various things, as well as
3  Greg Liss and Andrea Markison (phonetic), who
4  sort of oversees the administrative aspects.
5  Q. You mentioned Greg Liss' role. Is
6  he actually an employee? Is he paid by Table
7  Management?
8  A. I don't remember the exact entity
9  structure, but he's paid by one of an
10 affiliated entity.
11 Q. Would you call that his primary
12 assignment, is overseeing and managing the
13 Table?
14 A. That's correct.
15 Q. And we can call it Table for short?
16 A. Yes.
17 Q. Any other employees or officers?
18 A. There are administrative and
19 accounting related support.
20 Q. So, we talked a little bit about
21 Maxwell House. What I'd like to just focus on
22 is prior to the purchase of this Jersey City
23 property, the Coles Jersey property.
24    Why don't you tell us what other
25 real estate experience you had, whether looking

| Ackman - Direct | Page 19 |
| --- | --- |

1  at deals or getting into deals in Hudson
2  County, Jersey?
3  A. I think it's principally Maxwell
4  House. So, in the '90s George and Danny -- oh,
5  actually, I met them in the late '80s. I
6  worked for my father at the time. He ran a
7  company called Ackman Brothers and Singer, and
8  they arranged equity and mortgage financing for
9  real estate developers.
10    And in that capacity the firm was
11 approached by George and Danny about arranging
12 financing for property in Hoboken, not Maxwell
13 House, another asset, and then the market
14 really took a downturn, but I got to know them
15 in that capacity.
16    And then a number of years later I
17 went into -- I started an investment firm, and
18 then George and Danny approached me about
19 investing in what is called the Maxwell House
20 Coffee Factory property. And we ended up
21 forming a joint venture and buying that
22 property. And we worked on that with them
23 for -- over time.
24 Q. And in the course of your work with
25 Ganz and Vallone you came to be aware of

| Ackman - Direct | Page 20 |
| --- | --- |

1  Hoboken Brownstone?
2  A. Yes. That's one of their entities.
3  Q. They essentially do business as --
4  most commonly Hoboken Brownstone?
5  A. I believe so, yes.
6  Q. Do you understand them to be the
7  principals in Hoboken Brownstone?
8  A. Yes.
9  Q. Are you aware of any other
10 principals?
11 A. No.
12 Q. So, other than Coles Jersey and
13 Maxwell House, no other deals or potential
14 deals with Mr. Ganz and Mr. Vallone?
15 A. We did one small deal, I believe,
16 in Hoboken. I don't remember the name or the
17 address. It may have been one or two, but
18 nothing material.
19 Q. Okay. How do you define "small"?
20 A. Equity investment in the several
21 million dollar category.
22 Q. Residential?
23 A. Residential.
24 Q. Let's focus back on Coles Jersey.
25 When did you first become aware of this

| Ackman - Direct | Page 21 |
| --- | --- |

1  property, for whatever reason, but presumably
2  as an investment?
3  A.  So, I think a couple years, 18
4  months, 24 months before we ended up buying
5  this property, George and Danny pitched me on
6  investing in Jersey City, and this property in
7  particular.
8  Q.  And obviously it's not a memory
9  test.  I don't expect you to remember specific
10 dates.  But if I represent to you that this
11 deal closed in early July of '13 --
12 A.  It could have been 2011, 2010,
13 something like that.
14 Q.  -- kind of work back from that.
15 Okay.
16 A.  A couple years before.  I would say
17 18 months to three years would likely cover the
18 period, but if I had to guess, two years.
19 Q.  So, they came to you?
20 A.  Yes.
21 Q.  And you already had a relationship,
22 as you've said?
23 A.  Yes.
24 Q.  What happened at that point, your
25 initial work?

| Ackman - Direct | Page 23 |
| --- | --- |

1  Q.  Okay.  Are you aware there's a
2  building across the street called the Cast Iron
3  Lofts?
4  A.  Yes.
5  Q.  Was that up when you made your
6  drive-through or drive-by or tour?
7  A.  It might have been under
8  construction, but, again, I'm not 100 percent
9  sure.
10 Q.  Why didn't you get involved at that
11 time?
12 A.  I just wasn't that interested in
13 investing in vacant land.  I just didn't think
14 the timing was right.
15 Q.  Is this based more on your
16 experience and kind of a conceptual look,
17 rather than looking at financials or
18 projections?
19 A.  Just judgment.
20 Q.  Okay.  Did you have other
21 discussions about that property between that,
22 whether it's 2010-2011 period and the summer of
23 2013, when this deal closed rapidly?
24 A.  Not until the summer of 2013.
25 Q.  So, how did that come about?  When

| Ackman - Direct | Page 22 |
| --- | --- |

1  A.  I told them I wasn't interested.
2  Q.  Did you have an understanding, at
3  that time, that they had an interest in the
4  property, whether an option or other contract
5  right?
6  A.  I don't know if they had one or
7  were close to getting one or -- I'm not sure.
8  Q.  How much due diligence did you do
9  before deciding you weren't interested?
10 A.  Very little.  I did see the
11 property.
12 Q.  You physically went out there?
13 A.  I think I turned them down
14 initially, and these are fairly persistent
15 guys, and at some point they convinced me to
16 just go with them, and they drove the property
17 with me.
18    That was later.  I don't remember
19 exactly when that was.  But it was probably at
20 least a year before we ended up -- but I'm not
21 100 percent sure.
22 Q.  Right.  Let me ask you, this may
23 help you a little bit.  Have you been out there
24 since?
25 A.  No.

| Ackman - Direct | Page 24 |
| --- | --- |

1  did you first get contacted again in connection
2  with this property?
3  A.  So, George and Danny called me to
4  let me know that they had found a partner to do
5  this deal with, and that they were talking to
6  him -- actually, I might have gotten a call
7  from Bruce Menin.
8     So, I had known Bruce Menin.  I'm
9  friends with him.  Our kids go to the same
10 school.  I know his wife.  So, either he called
11 me first or George and Danny called me to tell
12 me I was going to get a call from Bruce Menin,
13 but he was looking at this deal and wanted a
14 reference on George and Danny, and I think
15 George and Danny asked if I wouldn't mind
16 taking a call from him, being a reference for
17 them.  And, in fact, that's what I did.
18 Q.  At that time, the initial call from
19 Bruce Menin, you said he was looking at the
20 deal.  Did you have any understanding as to
21 whether there was a contract contingent or
22 otherwise, or was this earlier?  Was he just
23 sort of putting his toe in the water?
24 A.  I have no idea.  It was more, you
25 know, I understand you worked with George and

Ackman - Direct                                        Page 25

1  Danny, you know, a number of years ago, what do
2  you think of them, are they trustworthy, are
3  they good at what they do, that kind of thing.
4  Q.  And you endorsed George and Danny?
5  A.  Yes.  I accurately described their
6  capabilities.
7  Q.  What happened next?
8  A.  About a week or so prior to when
9  they were supposed to close, I got a call from
10  George and Danny, telling me that they were
11  having some issues with Bruce, and they wanted
12  my advice on -- you know, since I knew them
13  pretty well -- how to deal with the issues they
14  were having.
15  Q.  Did you understand what the issues
16  were at that point or was it more kind of a
17  character issue that --
18  A.  I think that there were some
19  misunderstandings about, you know, what --
20  about the deal or whatever -- I didn't know the
21  particular facts.  And that had caused
22  apparently Bruce to have some concern about the
23  partnership.
24  Q.  And, by the way, are you familiar
25  with Crescent Hill Partners?  Do you know that

Ackman - Direct                                        Page 26

1  to be one of Bruce's companies?
2  A.  I thought it was Crescent Heights.
3  Maybe I'm wrong.
4  Q.  Oh, I'm sorry.  It is.
5  A.  I know Bruce.  I don't really
6  know -- I know he's done a lot of development.
7  Q.  Right.  You haven't done any deals
8  with him?
9  A.  I have not.
10  Q.  So, again, just to go back to your
11  call to Mr. Menin after Dan and George asked
12  you to make the call --
13  A.  No, no.  Bruce called me.
14  Q.  Oh, he called you.  I'm sorry.
15  A.  Yes.  And I'm not sure if George
16  and Danny told me to expect a call from him or
17  not, but I did get a call from Bruce one day.
18  I remember where I was at the time.
19  Q.  Where were you?
20  A.  I was in our bathroom here.  I just
21  finished my workout, and he called me on my
22  cell phone.  So, that was a memorable spot to
23  take a call from him.
24  Q.  Not the first or last, but it was
25  memorable.

Ackman - Direct                                        Page 27

1  A.  I don't remember precisely my state
2  of undress, but it's possible that I was just
3  out of the shower.  Are these details valuable
4  to a lawyer?
5  Q.  Not particularly, no.  So, as best
6  you recall, what did Mr. Menin say to you, what
7  did you say to him?
8  A.  He said to my understanding you
9  know George and Danny, and I'm looking at doing
10  a deal with them.  I just wanted to know what
11  you think of them, you know, what your --
12  how you think of them as partners.  I asked
13  what kind of deal.  He said he's buying a piece
14  of land, so on and so forth.
15     And I told him that, you know, I've
16  known these a guys long time, that I liked
17  them, and I thought they were good guys, and I
18  thought they were very good at understanding
19  the politics and working on the approval
20  process, and environmental and all the various
21  issues involved in acquiring land in Hudson
22  County.
23     I said I was less confident in
24  their ability to do, you know, a major
25  high-rise development.  I thought what he was

Ackman - Direct                                        Page 28

1  looking for was a partner to buy a piece of
2  land with who could navigate the politics, take
3  the property for approval, maximize the zoning.
4  I thought that would be very good.
5  Q.  Did you understand, at that point,
6  Mr. Ackman, that that was the Coles Jersey
7  property that you looked at some years before?
8  A.  I don't think so.  I'm not sure.
9  Q.  It didn't get to that level of
10  particularity?
11  A.  He didn't even mention the
12  property.
13  Q.  Other than knowing it was in Jersey
14  City?
15  A.  Right.
16  Q.  He didn't get into the particulars
17  of the project?
18  A.  Pretty much everything George and
19  Danny have done has been either in Hoboken or
20  Jersey City or somewhere on the shore there.
21  And it was about a property in -- I think he
22  said it was a Jersey City deal.  I thought
23  their skill set was well-suited to it.
24  Q.  What happened next?
25  A.  Like Thursday or Friday before, I

Texas Eastern v.
0.077 Acres of Land

| Ackman - Direct | Page 29 |
|---|---|

1　believe, the Monday deal was supposed to close
2　or some kind of time frame like that, I got a
3　call from George and Danny saying -- oh, I'm
4　sorry.  George then called me, as I mentioned,
5　and told me they were having issues.  This is
6　probably a month or two after I had originally
7　spoken to Bruce.  And he asked for my advice on
8　how to deal with Bruce because he was concerned
9　that they were supposed to close in a
10　relatively short period of time, and that Bruce
11　was having cold feet about going forward.
12　Q.  Did George say anything more
13　particular about the cause of the cold feet or
14　any issues in the project?
15　A.  So, I asked him what the issues
16　were, and he said, look, you know what, there
17　have been some issues that have come up since
18　closing that they feel that we haven't
19　adequately disclosed to them, and it's causing,
20　like, a loss of trust.  He asked me how I
21　thought he should handle it.
22　Q.  What happened next?
23　A.  I gave him advice.  Would you like
24　to know the advice?
25　Q.  Yes.

| Ackman - Direct | Page 30 |
|---|---|

1　A.  I said you should make a list of
2　all the various issues, write him a detailed
3　letter explaining what the facts are.  I told
4　him that he's a very fact-based guy.  And
5　explain where the misunderstanding had come
6　from.  And then follow it up with a call or an
7　e-mail.
8　Q.  Okay.  One thing maybe we can do to
9　move this along is, you know, you recall having
10　some discussions over the weekend at the
11　barbecue with Mr. Menin.  I'm just trying to
12　fix days to get a sense of the timeline.  If
13　not, we'll take it brick-by-brick.
14　A.  I had a barbecue with Bruce Menin.
15　I didn't realize it was in the midst of this
16　deal.
17　Q.  Okay.  Let me take a step back.
18　We'll try to refresh your memory as best we
19　can.
20　So, after you give the advice to
21　George -- for George and Danny, what happens
22　next, as far as you know?
23　A.  He wrote a letter to Bruce and took
24　my advice.
25　Q.  Now, prior to that call or the

| Ackman - Direct | Page 31 |
|---|---|

1　completion of that call with Mr. Vallone, did
2　you have any sense of particular issues,
3　whether they're title, environmental, economic,
4　or otherwise?
5　A.  No.
6　Q.  Okay.  Did there come a point where
7　you learned what at least some of the issues
8　were?
9　A.  Yes.
10　Q.  How?
11　A.  Yesterday.  I read a document --
12　Q.  When you read the documents
13　produced in this litigation to us?
14　A.  That's correct.  Which is what
15　refreshed my recollection I had given advice to
16　write a letter.
17　Q.  Having refreshed your memory, you
18　don't recall that you were already going to see
19　Bruce socially, whether at a barbecue or
20　otherwise?
21　A.  I think it was July 4th weekend or
22　around that time, and I might have, you know,
23　said to George and Danny that I'm going to see
24　him this weekend and I'll put in a good word
25　for you, whatever.  And, in fact, I did do

| Ackman - Direct | Page 32 |
|---|---|

1　that.
2　Q.  And, again, if it helps, I'll
3　represent this.  If it doesn't, ignore it.
4　A.  I'm not sure that was the weekend,
5　you know --
6　Q.  Right.  That's what I'm about to
7　say.  The weekend in which you -- we understand
8　from other sources, but it's your memory that's
9　at issue today, your best recollection, the
10　weekend on which you saw Mr. Menin was the
11　weekend before the 4th, which was the following
12　weekend.
13　A.  Okay.  You know, I don't know for
14　sure.
15　(WA-2 marked for identification.)
16　Q.  The court reporter has marked a
17　memorandum dated June 29, 2013, four pages,
18　which you have in front of you.  Take a
19　moment to look at it, but the question will be
20　do you recognize it?
21　A.  Yes.
22　Q.  What do you recognize it to be?
23　A.  This is a letter that I looked at
24　yesterday that was, in effect, the letter that
25　I had recommended that George write to Bruce,

Texas Eastern v.
0.077 Acres of Land

| Ackman - Direct | Page 33 |
|---|---|

1 summarizing, you know, whatever the issues were
2 that created the relationship problem.
3 Q.   And do you have any recollection of
4 seeing this letter memo before yesterday?
5 A.   No.
6 Q.   Just for the record, there's some
7 handwriting that was put on in our office.
8 Ignore that at the bottom.  That just ties into
9 another deposition.
10     And the stamp at the bottom,
11 Ackman 00006, references that it was produced
12 in this case under your -- from your lawyers on
13 your behalf.
14 A.   Yes.
15 Q.   Let me ask you to take a look at
16 the second line of that memo.
17 A.   Okay.  When you say "second line,"
18 you mean where?
19 Q.   Under the subject, first full
20 paragraph.
21 A.   Yes.
22 Q.   "When you told us that there was a
23 perceived issue with our integrity and
24 honesty."
25     Do you recall those discussions?

| Ackman - Direct | Page 34 |
|---|---|

1 Is that what you were referring to earlier when
2 you said Mr. Menin wanted to check in on Danny
3 and George in some fashion?
4 A.   Yes.  Basically that some issues
5 arose that were unanticipated by Bruce, as I
6 understand it, but -- and that had made him,
7 you know, have some concern about George and
8 Danny as potential partners.
9 Q.   And as you said earlier, this deal
10 ended up closing essentially in 24 hours, your
11 part of the deal?
12 A.   Almost.  A day or two.  It was
13 pretty quick.
14 Q.   Right.  And quite soon after this
15 memo was prepared?
16 A.   Certainly, yes.
17 Q.   Do you recall at the time were
18 either Mr. Ganz or Mr. Vallone or both copying
19 you on documents with Mr. Menin, were they
20 blind copying you?  Do you have any
21 recollection of that process?
22 A.   I believe my lawyer told me.  I
23 don't know if I'm allowed to say that or not.
24 Q.   I'll leave that to your lawyer.
25     MR. DALTON: We represented in a

| Ackman - Direct | Page 35 |
|---|---|

1 prior deposition that apparently these were
2 blind copied, but when we produced them,
3 Microsoft decided to wipe the bcc.
4     THE WITNESS: Well, the bcc never
5 shows up on an e-mail.  That's why it's blind.
6 Q.   So, you recall that in realtime you
7 were being blind copied on anything?
8 A.   No.
9 Q.   In the 1 percent of your time you
10 devote to other assets, you get such things?
11 A.   I mean, first of all, I get so many
12 e-mails, that if you ever want to reach me, you
13 should not send me an e-mail.  You should call.
14 So, that's one piece of advice.
15     And if it relates to -- again, I
16 outsource this stuff to my father and to Greg,
17 and this wasn't even a deal that I was involved
18 with.
19     Look, I think of George and Danny
20 as friends, and I was trying to help them.
21 This was an important deal to them.  And Bruce
22 is a friend of mine.  So, I was the original
23 reference between the two parties, and so I was
24 just trying to help them get their deal done.
25 Q.   There comes a time where you do

| Ackman - Direct | Page 36 |
|---|---|

1 invest in this and it becomes your asset.
2     Correct?
3 A.   Yes.
4 Q.   Did you outsource the review of
5 this project, the due diligence, to your father
6 and to Greg?
7 A.   We didn't really have time to do
8 due diligence.  I mean, what due diligence we
9 could do, they did.  In fact, actually, Greg
10 felt that -- and Greg invests in pretty much
11 every deal that we've done.
12     And interestingly on this one there
13 wasn't enough time to do due diligence that he
14 wasn't willing to invest, and actually he
15 recommended strongly I not make the investment.
16 Q.   We'll go over the particulars, but
17 what, if anything, did you review in connection
18 with making the final decision to invest in
19 this asset?
20 A.   I just spoke to George and Danny,
21 and my dad.
22 Q.   And Greg?
23 A.   And Greg.  And I met with George
24 and Danny.  They came over and kind of made the
25 pitch.  I was up and down as to whether to do

| Ackman - Direct | Page 37 |
| --- | --- |

1  it or not.
2  Q.  Right.  When they came over, where
3  did you meet?
4  A.  In the conference room next door.
5  Q.  Did you ever meet anywhere else,
6  your apartment, a restaurant, anywhere else
7  that you recall?
8  A.  No, I don't think so.
9  Q.  Did Mr. Menin ever ask you to
10  review any of these memos or documents or give
11  your thoughts to him on any of these issues?
12  A.  No.
13  Q.  If you look at the first page, 1,
14  broker commission.
15  A.  Yes.
16  Q.  Okay.  In the second line it refers
17  to a $22 million land cost.  Do you see that?
18  A.  Yes.
19  Q.  There came a time where you came to
20  learn that this asset was going to cost you
21  approximately $22 million?
22  A.  I think more like 23 with the other
23  costs.
24  Q.  Right.  With the closing costs and
25  cushion and that sort of thing?

| Ackman - Direct | Page 39 |
| --- | --- |

1  "Spectra Energy Condemnation Settlement."
2  A.  Yes.
3  Q.  Okay.  Did you come to learn that
4  there was a Spectra Energy condemnation
5  settlement?
6  A.  I read this literally a couple of
7  hours ago, but that's how I -- I have some
8  vague recollection of it, but I remember it
9  from reading this.
10  Q.  Okay.  So, just so we're clear, you
11  refreshed whatever memory you had a couple of
12  hours ago.  You read this.
13  A.  Yes.
14  Q.  What vague memory of a Spectra
15  Energy condemnation settlement did you have
16  prior to reading this document earlier today?
17  A.  I don't have a recollection of a
18  Spectra Energy condemnation settlement.  I have
19  a recollection there was some kind of title or
20  issue that related to a pipeline that came up
21  shortly before the closing, and one of the
22  things that had to be resolved prior to the
23  funds being wired.
24  Q.  At the time you closed you
25  understood there was an easement for a pipeline

| Ackman - Direct | Page 38 |
| --- | --- |

1  A.  Yes.
2  Q.  When did you learn that?
3  A.  Shortly before the closing.
4  Q.  Okay.  And we'll get to that.  You
5  were asked to wire money.  You got it on short
6  notice.  Right?
7  A.  Very.  This is sort of a first for
8  me.  I haven't bought a piece of real estate on
9  24-hour notice before.
10  Q.  It's one of my questions.  Have you
11  bought one without a written agreement, a land
12  purchase agreement?
13  A.  I don't think so.  It's fun.
14  Q.  How did you become aware of the
15  cost, other than a "please send me a lot of
16  money" request?
17  A.  No, no.  George told me what the
18  approximate cost was.  I didn't know the exact
19  cost until I got wiring instructions.
20  Q.  And that was in one of the meetings
21  you had either in this conference room or --
22  A.  Yes.  I mean, basically we're
23  taking over Bruce's deal.
24  Q.  Let me ask you to look at the
25  second page.  There's a caption in bold

| Ackman - Direct | Page 40 |
| --- | --- |

1  either adjacent to or under the property.
2  Correct?
3  A.  I believe so, yes.
4  Q.  That somehow impaired the asset?
5  A.  That's right.
6  Q.  Okay.  Did you come to learn that
7  there had been any litigation over that
8  impairment, that easement, whether a valuation
9  or construction of the technical easement or
10  anything else?
11  A.  Other than this litigation?
12  Q.  Yes.  Prior to this.
13  A.  No, I was not aware of that.
14  Q.  I'm talking in the time in which
15  the deal closed and it became your asset?
16  A.  No.
17  Q.  Okay.  Did you ever see the
18  purchase and sale agreement for the prior
19  contingent buyer with either Ogden or anything
20  that Bruce Menin -- Bruce Menin's team put
21  together?
22  A.  You know, I literally did no due
23  diligence on this property.  We just didn't
24  have the time.  And I'm just not the person who
25  does due diligence.

**Texas Eastern v.**
**0.077 Acres of Land**

---

Ackman - Direct                                      Page 41

1 Q.  Understood.
2 A.  The person who would have done the
3 due diligence didn't do the due diligence
4 either.
5 Q.  And that's Greg Liss, and perhaps
6 with your father's input?
7 A.  That's right.
8 Q.  Okay.  It would be no one else?
9 A.  That's correct.
10 Q.  And to your knowledge they didn't
11 have a packet of materials, however thin or
12 thick, that --
13 A.  I'm sure they got whatever they
14 could get, but this was -- I mean, Greg thought
15 I was crazy is really what it came down to.
16 You know, I never even contemplated making the
17 investment, and I was really helping George and
18 Danny get Bruce to make the investment, and
19 that at the absolute eleventh hour I got a call
20 from George and Danny saying that Bruce had
21 dropped out, and that they were very excited
22 about the deal, and would I consider it.
23 Q.  You mentioned that at closing you
24 became aware there was some kind of issue,
25 title or otherwise, with respect to a pipeline?

---

Ackman - Direct                                      Page 42

1 A.  I know that one of the issues that
2 had to be resolved before this thing closed,
3 there were some open title issue as to whether
4 the title company would insure around it or
5 not, and I was reminded of that by reading the
6 papers this morning.  But my understanding is
7 it was resolved and once it was resolved, we
8 sent the money.
9 Q.  Did you come to learn that it was
10 material to the pipeline company that the issue
11 be resolved?
12 A.  I have no idea.
13 Q.  Either with you or with Ogden or
14 with anyone else?
15 A.  No idea.
16 Q.  Did you ever have any discussions,
17 prior to closing, regarding how any settlement
18 proceeds between the pipeline company and the
19 potential buyer that preceded you would
20 allocate those settlement proceeds?
21 A.  No idea.
22 Q.  Did you come to learn there was a
23 settlement of some sort?
24 A.  Not until I read this stuff.
25 Q.  All right.  Not a vague memory,

---

Ackman - Direct                                      Page 43

1 like you said, about a potential --
2 A.  I mean, accept the following:  I
3 had turned this deal down a couple of years
4 prior.  The next time I heard about it was when
5 Bruce called me to find out about George and
6 Danny, and then George and Danny confirmed that
7 this was this asset.  I learned that at some
8 point in time.
9     And then I was sort of coaching
10 them, in some sense, on how to deal with Bruce,
11 who is a good guy, who I like, and I like
12 George and Danny, and I thought they'd be a
13 good partnership.  I really had no personal
14 interest in the deal.
15     When it ultimately dropped out,
16 George and Danny asked if they could come see
17 me to pitch me on investing the night before
18 this thing was supposed to close.  And I took
19 the meeting.  And they're good salespeople.
20     And I like them, and I trust them.
21 And, you know, on a back of the envelope basis
22 I thought it was very cheap, and the timing was
23 good.  And so, I said I would make the
24 investment, and I handed it off to Greg, my
25 dad, and our outside lawyer.

---

Ackman - Direct                                      Page 44

1     And then once the issues were
2 resolved, as far as, you know, whatever closing
3 issues had to be resolved, I agreed to wire the
4 money.  And there wasn't even a contract.
5 Q.  And the meeting you took, is that
6 the meeting you said in an adjacent conference
7 room?
8 A.  That's correct.
9 Q.  All right.  Did you ever meet at
10 your apartment?
11 A.  You know, it could have been at my
12 apartment.
13 Q.  Do you recall one meeting, two
14 meetings?
15 A.  Now that you mention it, it might
16 have been pretty late, and it might have been
17 at home.  I think they might have come to my
18 house or maybe we started the meeting here and
19 went to my house.  I don't even remember
20 exactly.  But we had a meeting in the evening
21 to go over this.
22 Q.  All right.  How many face-to-face
23 meetings do you recall with George or Danny or
24 both prior to wiring the money?
25 A.  One.

---

**Texas Eastern v.**
**0.077 Acres of Land**

| Ackman - Direct | Page 45 |
| --- | --- |

1  Q.  If you could turn, please, to page
2  3, No. 3 in bold, "Title Insurance Problem."
3  And I'd like to just focus you on the short
4  second paragraph in that section.
5    "Notwithstanding any of that, we
6  tried to convince you yesterday that even if we
7  lost that 3,300 foot piece, it would cost just
8  255,000 of the 1.79 million credit off the
9  purchase price we had gotten from the Spectra
10  settlement, and just 15 units of density on a
11  1,000 unit project."
12    Do you ever recall reading that?
13  A.  I mean, I read it this morning.
14  Q.  Other than this morning.
15  A.  That's correct.
16  Q.  Okay.  Do you know what that 3,300
17  foot piece is?
18  A.  I assume it's about -- what this
19  litigation is about, but I'm not sure.
20  Q.  The corner piece, Lot 7?
21  A.  Yes.
22  Q.  But you're not sure?
23  A.  That's right.
24  Q.  Did anyone ever tell you that the
25  title issue or the additional easement rights

| Ackman - Direct | Page 46 |
| --- | --- |

1  that were still in question would cost 15 units
2  on the overall project, or something in that
3  ballpark?
4  A.  No.
5  Q.  You gave us a number earlier as to
6  your estimate based on your having written a
7  recent check.  Has anyone ever, other than
8  that, come up with any estimate as to the loss
9  of units that might be caused by this easement?
10  A.  Yeah.  My understanding is loss of
11  units is something in the order of 60-odd
12  units.  I don't know that for sure.
13  Q.  And what's the basis for that, the
14  60 number; if you recall?  Where did you hear
15  it?  Where did you see it?
16  A.  Either Greg -- I think Greg or my
17  father told me.
18  Q.  Do you recall any discussions with
19  anyone prior to closing that --
20  A.  To save you a lot of time, I didn't
21  speak to anyone prior to closing except for
22  Danny, George, Greg or my father.  So, that's
23  the universe.
24  Q.  And you recall one meeting with
25  Danny and/or George?

| Ackman - Direct | Page 47 |
| --- | --- |

1  A.  That's correct.
2  Q.  Okay.  No more?
3  A.  They called me to tell me the deal
4  had fallen through, and they said they wanted
5  to come see me right away to see if I would
6  step into the deal.
7  Q.  Okay.  And the best you know or
8  recall, did they themselves actually meet with
9  Greg and/or your father?
10  A.  I don't think Greg -- I don't
11  remember who else was in the meeting.  They may
12  have just come to see me at my house, my
13  apartment.
14    (WA-3 marked for identification.)
15  Q.  Okay.  Mr. Ackman, the court
16  reporter has handed you what's been marked
17  WA-3, which is a memo dated June 30, the day
18  after the document we were just looking at,
19  again, from Mr. Vallone and Mr. Ganz to
20  Mr. Menin.
21    This was produced on your behalf.
22  Other than seeing it today, do you recall
23  seeing this document?
24  A.  Actually, I didn't see it today.
25  Q.  You did not?

| Ackman - Direct | Page 48 |
| --- | --- |

1  A.  So, I may have missed this in
2  production.
3  Q.  All right.  Just so we're clear,
4  you didn't see it today.  Have you seen it at
5  any point?
6  A.  I have not.
7  Q.  Have you discussed it with anyone,
8  as far as you know?
9  A.  I didn't know it existed.  It would
10  be hard to discuss it.
11  Q.  I'd like to direct your attention
12  to the very first paragraph, the second
13  sentence.
14    "You indicated that if we can get
15  the title company to agree to insure over Lot
16  No. 7 (which is the strip of land on the
17  western edge of the property that has been
18  causing the title problem) that you will escrow
19  the balance of the closing proceeds."
20    Is that consistent with what you
21  recall, that there was some kind of title
22  issue, insurance --
23  A.  I did not know anything like this
24  kind of detail.  My understanding, there was
25  some kind of title thing that was holding the

Texas Eastern v.
0.077 Acres of Land

| Ackman - Direct | Page 49 |
|---|---|

1 deal up, and that had to be resolved before it
2 closed. Once it was resolved, we sent the
3 money.
4 Q. That's as far as it got, as far as
5 you know?
6 A. That's all I know.
7    (WA-4 marked for identification.)
8 Q. You've been handed WA-4,
9 Mr. Ackman, and it's a memo, June 30, same day,
10 from Mr. Ganz to Mr. Menin and Mr. Vallone. It
11 includes the earlier memo, and I just want to
12 focus you quickly on the line at the top.
13    "We just heard back from Ray. "
14    Did you ever become aware there was
15 a Ray involved in the deal?
16 A. No.
17 Q. All right. Do you know a Ray who
18 works with Bruce Menin or with Walsh Trucking
19 or Ogden?
20 A. I don't know.
21 Q. Okay. It goes on to say that:
22    "They would allow us to close
23 tomorrow if we'd walk away from our share of
24 the condemnation proceeds."
25    Did you ever become aware that as

| Ackman - Direct | Page 50 |
|---|---|

1 the deal evolved that the seller was requiring
2 the buyer to give up any claim to condemnation
3 proceeds with the pipeline company?
4 A. No.
5 Q. No one ever told you that?
6 A. I don't remember, certainly.
7 Q. Did you ever participate in any
8 calls with Mr. Ganz or Vallone and Mr. Menin?
9 A. No.
10 Q. Okay. So, if there's any reference
11 to conference calls or calls between one of the
12 Vallone-Ganz team and Mr. Menin, it's safe to
13 say you did not participate?
14 A. Definitely not. I was -- again,
15 just to be clear, I was not involved in the
16 deal. I was just trying to help a couple
17 friends get through some partnership issues.
18 Q. They were all friends. Right?
19 Essentially Mr. Menin was a friend?
20 A. A friend of mine. And George and
21 Danny. I think Bruce was not a friend of
22 George and Danny.
23 Q. Understood. They were friends of
24 yours. You were trying to help both sides,
25 give them your best advice?

| Ackman - Direct | Page 51 |
|---|---|

1 A. That's right.
2    (WA-5 marked for identification.)
3 Q. Mr. Ackman, you've been handed
4 what's been marked WA-5. It's a four-page
5 document. It's essentially an e-mail string.
6 The top e-mail is from Monday, July 1, from
7 Mr. Ganz to Mr. Menin and others.
8    What I'd like to do first is if you
9 look at the second page, at the top there's an
10 e-mail that same day from Mr. Vallone to Bill
11 Ackman.
12 A. Okay.
13 Q. Okay. This came out of your
14 production. Do you recall receiving that
15 e-mail from Mr. Vallone?
16 A. I didn't recall it until I read it
17 this morning, but yes.
18 Q. Okay. You now recall it?
19 A. I mean, if you had asked me prior
20 to my reading it did you receive an e-mail, I
21 probably would have a tough time remembering,
22 but having seen it, I do now.
23 Q. Okay. Having now seen it, you
24 recall reviewing it at the time?
25 A. Yes.

| Ackman - Direct | Page 52 |
|---|---|

1 Q. All right. He specifically, in the
2 second paragraph, says:
3    "We have not heard anything
4 directly from C.H. about Walsh's demand for
5 more money."
6    Do you recall discussing that
7 concept, Walsh's demand for more money, with
8 Mr. Ganz or Mr. Vallone?
9 A. No.
10 Q. Do you understand that C.H. is
11 Crescent Heights?
12 A. I assume it is.
13 Q. Okay. And did there come a time
14 where you understood that the demand for more
15 money related to the proceeds of a condemnation
16 settlement?
17 A. A vague recollection. Again, what
18 I was focused on was what we were buying, as
19 opposed to someone else's problem. And once
20 they told us we owned the property or the title
21 issue was resolved, then I was comfortable.
22 Q. But you did understand the demand
23 for more money was in connection with the
24 closing on that asset. Not your closing, but
25 somebody's closing. Correct?

| Ackman - Direct | Page 53 |
|---|---|

1  A.  I'm not sure that's correct.
2  Again, what I told George and Danny was once I
3  decided to the deal, that, you know, assuming
4  the lawyers sign off on everything and we get
5  good title to the property, again, we're buying
6  without a contract, we're buying without
7  anything.  You know, no reps, nothing.  I'm
8  okay to go forward.
9      And once they told me that we were
10  okay to go forward, I went forward.  I didn't
11  get into the details of the backstory.  That
12  wasn't interesting to me.  What was important
13  to us was we're buying property with good
14  title.
15  Q.  Now, having reviewed these
16  documents today and refreshed your memory
17  recalling at least one meeting or the meeting
18  with Mr. Ganz and Mr. Vallone, just to save a
19  little time, do you recall that they met
20  earlier with your father?
21  A.  It's possible.
22  Q.  Okay.  You don't dispute it, but
23  you don't have a specific recollection of
24  knowing that at the time?
25  A.  It's vaguely familiar.

| Ackman - Direct | Page 54 |
|---|---|

1  Q.  Put another way:  Did you discuss
2  with your father his meeting or the
3  information, if any, that he gained from
4  Mr. Ganz and Mr. Vallone?
5  A.  I think what happened was I was not
6  available to meet when they came over, and
7  so -- and I was -- my dad met with them, and,
8  you know, if I'm going to invest $22 million in
9  something, I should probably hear the story
10  myself.
11      I have a lot of respect for my
12  father, but I still wanted to take a look.  And
13  so, I think they came over later that evening,
14  if that makes sense.
15  Q.  Whether from your father or the
16  meeting that evening with Mr. Ganz and
17  Mr. Vallone, as you evaluated whether to take
18  this deal, you came to understand what the
19  price and the terms would be.  Correct?
20  A.  Yes.  It wasn't much in the way of
21  terms.  It was basically you wire the money
22  tomorrow and you own the property.  That was
23  kind of the deal.
24  Q.  All-cash deal?
25  A.  All-cash deal.

| Ackman - Direct | Page 55 |
|---|---|

1  Q.  No purchase and sale agreement?
2  A.  Nothing.
3  Q.  No other terms?
4  A.  Correct.
5  Q.  When you met at the apartment, what
6  did you discuss?  The apartment or the
7  conference room, wherever that meeting took
8  place.
9  A.  They just, you know, told me why
10  this was a good deal, and, you know, really
11  encouraged me to -- you know, we had a big
12  success the last time we were partners, and it
13  was kind of a -- it was a classic sales pitch,
14  I would say.
15  Q.  Just so we're clear, who was there?
16  A.  I'm sure it was George, and
17  probably Danny.
18  Q.  All right.  Was your father there?
19  A.  No.
20  Q.  How about Greg Liss?
21  A.  No.  I think it was in my
22  apartment.  I think they just came to see me.
23  They might have met with Greg and my dad
24  earlier in the day, or just my dad.  I'm not
25  sure.

| Ackman - Direct | Page 56 |
|---|---|

1  Q.  Did you review anything in paper,
2  whether documents, plans, agreements, sketches,
3  Google Maps, anything?
4      MR. SMITH: At the meeting with
5  Mr. Ganz and Mr. Vallone.
6  A.  I don't really remember, but I
7  think it was more of --
8  Q.  A pitch?
9  A.  -- a pitch.  It was more like, you
10  know what, you bet with us before, it worked
11  out well, you know, we really need you, and I
12  fell for it, as they say.
13  Q.  Do you feel as if you fell for it
14  today, as you sit here today?
15  A.  I feel great about it.  I feel like
16  I thought it was a good investment.  I wouldn't
17  have made it if I didn't think it was a good
18  investment.
19      (WA-6 marked for identification.)
20  Q.  Mr. Ackman, you've been handed
21  WA-6.  It's a two-page e-mail chain.  The top
22  e-mail is from you.  Ackman@persq is your
23  e-mail address, your business e-mail address?
24  A.  That's correct.
25  Q.  And it's to Mr. Liss?

| Ackman - Direct | Page 57 |
|---|---|

1  A.   Yes.
2  Q.   All right.  And just briefly I'll
3  see if this refreshes your memory.  Look at the
4  second page first.
5      At the very bottom there's a
6  message from Lawrence Ackman, that's your
7  father, to Greg and William A. Ackman.
8      "Bill is meeting with George and
9  Danny and me tonight."
10  A.  I'm sorry.  Where are you?
11  Q.   At the very bottom, 6:19 p.m.  Do
12  you see that?
13  A.   Okay.
14  Q.   Just take a moment and look.  I
15  just want to know if that refreshes your memory
16  that your father and Greg had an earlier or
17  pre-meeting with Mr. Ganz and Mr. Vallone?
18  A.   I believe they did.  I'm not 100
19  percent sure.  So, what's confusing is the
20  subject matter is "Bill is meeting with George
21  and Danny and me tonight."  So, that implies
22  that my dad was there, but I don't remember my
23  father at the meeting.
24      And then the rest of it says:
25      "They are going to present the

| Ackman - Direct | Page 58 |
|---|---|

1  Jersey City deal to Bill," which implies he's
2  not there, as a "get the site plan
3  environmental cleanup approvals and sell all or
4  part of the property thereafter to other
5  developers" type deal.
6  Q.   Let me ask you if this helps.  Move
7  up to the next e-mail, which is about 40
8  minutes later.  That's from Greg to your father
9  and you.
10  A.  Yes.
11  Q.  "Bill, first, would you like me to
12  come tonight?  I sat through the first hour of
13  their meeting with Larry today."
14  A.   Yes.
15  Q.   So, I'm just simply asking if that
16  helps refresh your memory as to what was
17  reported to you.
18  A.   Well, I trust, based on this, that
19  they met earlier, that Greg and my dad met with
20  George and Danny.
21  Q.   Okay.  Does that help refresh your
22  memory at all as to what report, if any, you
23  received from your father and/or Greg?
24  A.   No.  I remember what advice I got.
25  Greg was opposed to the deal.  My father was in

| Ackman - Direct | Page 59 |
|---|---|

1  favor of it.
2  Q.   What, as best you recall, was the
3  basis of Greg Liss' objection?
4  A.   Inadequate due diligence, and his
5  assessment that the returns were not good
6  enough.  He made a reference here.  I mean, you
7  can just read his -- I'm happy to read it into
8  the record if you want me to.
9  Q.   No need.  And this is in the
10  record.  And for the record, just to summarize,
11  he references what he sees as a less than
12  extraordinary per unit return.  Is that
13  correct, just to simplify?
14  A.   I don't know about per unit, but he
15  says he believed it would be a lesson at 20
16  percent return, and that he'd rather invest
17  more in Post Brothers deals, which are some
18  apartment deals we've been doing, than do these
19  deals.
20      Greg, so you should know, is a very
21  conservative guy.  He's the "no" guy.  It's
22  valuable to have one of those around.
23  Q.   Okay.  And do you recall anything
24  other than that less than or approximate 20
25  percent return objection that he raised, any

| Ackman - Direct | Page 60 |
|---|---|

1  other issues that Greg raised?
2  A.   His principle issue, I don't think,
3  was the returns.  He just felt like, you know,
4  he's in a -- I don't think you could call it a
5  fiduciary role, but he's a employee, and the
6  risk reward to him for recommending something
7  that he hasn't had adequate time to do his
8  homework on is not attractive.
9      (Recess taken.)
10      (WA-7 marked for identification.)
11  Q.   Mr. Ackman, you've been handed a
12  three-page document stamped Ackman 00036
13  through 38.  The first page is a July 1 e-mail
14  from Mr. Vallone to Mr. Colletta and you.  Do
15  you recall receiving that e-mail?
16  A.   No.
17  Q.   Okay.  The first line says: "This
18  one I'm copying Bill" --
19  A.   I did see it this morning, though.
20  Q.   Okay.  Right.  And thank you for
21  clarifying that.  I want to know if you recall
22  seeing it in real time.
23  A.   I don't.
24  Q.   "This one I'm copying Bill because
25  he wanted the revised budget."

Texas Eastern v.
0.077 Acres of Land

| Ackman - Direct | Page 61 |
|---|---|

1  Do you recall reviewing a revised
2  or a budget?
3  A.  I'm sure I did.
4  Q.  Okay.  And then that's something
5  you would have asked for in connection with the
6  pitch from Mr. Ganz and Mr. Vallone?
7  A.  For sure.
8  Q.  It says: "Also attached is a site
9  survey."
10  Did you ever review a site survey
11  prior to closing?
12  A.  No.  I don't know if I could read
13  this.  For the record, it's miniscule.
14  Q.  Because it's small?
15  A.  That's right.
16  Q.  Not because of the form.
17  A.  That's right.
18  Q.  Okay.
19  A.  I'm not a surveyor.  Where is the
20  property that's the subject of the litigation?
21  Q.  I'm sorry?
22  A.  Actually, I'm curious as to where
23  this property is on the survey.
24  Q.  Okay.  I was going to ask you if
25  you knew.

| Ackman - Direct | Page 62 |
|---|---|

1  A.  So I know what we're fighting
2  about.
3  Q.  Right.  Okay.  So, let me ask you
4  first.  I'll flip it back at you, but I think I
5  know what the answer is going to be.
6  Do you know where the property at
7  issue here is?
8  A.  I do not.
9  Q.  All right.  I will represent to
10  you, and I don't think your counsel will
11  disagree, if you look at the shaded area about
12  two-thirds of the way up in the left corner.
13  And I'm using glasses, but it is identified as
14  Block 6005, Lot 7.
15  A.  Okay.  That looks very, very
16  valuable to me.  That could be the most
17  valuable part of the property, by far.
18  Q.  So, you're stopping at two verys or
19  do you want to add a couple of verys, just for
20  the record?  I don't want to cut you off.
21  A.  It's waterfront practically.
22  Q.  Let me ask you, just orienting you,
23  and I'm taking a shot, can you identify where
24  the outpiece is that you're under contract to
25  purchase?

| Ackman - Direct | Page 63 |
|---|---|

1  A.  I have no idea.
2  (WA-8 marked for identification.)
3  Q.  So, Mr. Ackman, I've handed you a
4  one-page document Bates-stamped Ackman 00049.
5  At the top there's an e-mail from you to Greg
6  Liss, July 2, 2013, responding to Mr. Liss'
7  e-mail.  And I'd like to read your succinct
8  response and ask you about each of those
9  points.
10  "Let's do the work we can do and
11  then we can decide."
12  I take it that references whatever
13  due diligence is possible in the short time
14  before potential closing?
15  A.  I think we closed on the 3rd.
16  Correct?  The morning of the 3rd.
17  Q.  Yes, the next day.
18  A.  So, the e-mail was July 2nd, 1:41
19  p.m.  There wasn't really much time to do any
20  work.
21  Q.  Right.  Let's confirm the "as of
22  right zoning."  What does that refer to?
23  A.  What we believed the -- you know,
24  George and Danny believed we could build 1,000
25  units or some number like that.  Let's make

| Ackman - Direct | Page 64 |
|---|---|

1  sure that's true.  You know, without getting
2  some kind of variance to build more.
3  Q.  Okay.  So, you wanted someone to
4  give you --
5  A.  Worst case.
6  Q.  -- a legal assessment is what's a
7  give me in terms of the zoning, how many units?
8  A.  Basically, yes.
9  Q.  Okay.  And the final sentence says
10  "I was aware of the" -- or the second to
11  last sentence, I'm sorry:
12  "I was aware of the environmental."
13  What does that refer to?
14  A.  If you look at the previous e-mail,
15  Greg is saying -- you know, as I've said:
16  "This likely is a fine deal, but
17  there is a non-zero likelihood that there is
18  something wrong here.  This is the first we've
19  heard about the $300,000 tideland claim on the
20  title, and it's the first I'd heard there was a
21  potential million-dollar environmental cleanup
22  bill."
23  So, then above it says:
24  "I was aware of the environmental."
25  I think the environmental number

**Texas Eastern v.**
**0.077 Acres of Land**

---

Ackman - Direct                                    Page 65

1  cost was in the number that George and Danny
2  had given us.
3  Q.  Was that environmental issue
4  resolved satisfactorily, to your knowledge?
5  A.  I believe so.  We got whatever the
6  work plan approved, and I think we're in the
7  process of cleaning the property now.
8  Q.  All right.  So, my next question
9  relates to now.  Are you aware of what the
10  current state of play is with respect to any
11  environmental issues on the asset?
12  A.  I know we approved an incremental
13  budget to clean up the property, and I think
14  they estimated it would get done by the end of
15  this year.
16  Q.  And what's the estimated cost?
17  A.  I don't remember.
18  Q.  Can you ballpark a number?  Six
19  figures, seven figures?
20  A.  A million-ish all in, something
21  like that.
22  Q.  And the final sentence:
23     "I was aware of the environmental"
24  is followed by:  "That's in the cost
25  projection."

---

Ackman - Direct                                    Page 66

1  A.  Yes.
2  Q.  Fair to say that refers to the
3  budget we looked at earlier?
4  A.  Yes.
5  Q.  Which you had reviewed?
6  A.  That's correct.
7  Q.  To refresh your recollection, if I
8  say to you that Mr. Ganz and Mr. Vallone were
9  impressed with your father's singing when you
10  all met?
11  A.  Then maybe he was in my apartment
12  and he let it out.  You know, my dad likes to
13  sing.  It definitely would have been in my
14  apartment, though.  I don't think we would have
15  had any singing going on here.  There's a piano
16  in my apartment.
17  Q.  Okay.  What does he sing?
18  A.  Showtunes, Gershwin.
19     (WA-9 marked for identification.)
20  Q.  So, Mr. Ackman, you've been handed
21  WA-9, which is a one-page document with two
22  e-mails, one from you to Mr. Colletta.  And, by
23  the way, for the record that's your lawyer or
24  one of your lawyers at Sullivan & Cromwell?
25  A.  That's correct.

---

Ackman - Direct                                    Page 67

1  Q.  And then the top e-mail, Tuesday
2  morning, July 2, from Greg Liss to you, copying
3  your father, I'd like to focus on your e-mail
4  to Tony Colletta?
5  A.  Yes.
6  Q.  It says:
7     "Tony, I know my dad reached out to
8  you on a potential deal."
9     And that's from the night before,
10  just for the record.  Right?  11:49 on July 1?
11  A.  Yes.
12  Q.  "After reviewing the facts, I am
13  unlikely to participate, so I want to make sure
14  your team did not spend any more time."
15     What facts, as best you recall,
16  were you talking about?
17  A.  Remember, this was probably the
18  night I met with George and Danny.  Correct?
19  Q.  It was, yes.
20  A.  And I was, frankly, waffling about
21  whether or not to do this deal.  And, I don't
22  know, at 11:49 at night I decided to
23  $20 million without doing any homework, you
24  know, that might be dumb.  So, I changed my
25  mind, or I decided not to go ahead.

---

Ackman - Direct                                    Page 68

1  Q.  Okay.  And as we obviously have
2  discussed on the 3rd, a day, day and a half
3  later, you did, in fact, close?
4  A.  Yes.
5  Q.  What changed?
6  A.  I called George and Danny to tell
7  them my decision.  Or I called George, and then
8  George talked me back off the cliff and
9  convinced me to go forward.  He's a good
10  salesman.
11  Q.  I'm getting that.  Did you acquire
12  any additional information after 11:49 on the
13  1st?
14  A.  No.  I mean, he just sort of said,
15  look, trust me.  That was basically it.  And I
16  happen to like the guy.
17  Q.  At the time you were waffling or
18  reconsidering --
19  A.  Well, I hadn't decided.  I met with
20  George and Danny, I heard them out, you know.
21  I said I would think about it and get back to
22  them.  And then I was thinking about a lawyer
23  burning up hours at Sullivan & Cromwell type
24  rates overnight, and I wanted to shut that
25  down.  That's why I sent the e-mail.

---

Texas Eastern v.
0.077 Acres of Land

| | |
|---|---|
| Ackman - Direct                               Page 69 | Ackman - Direct                               Page 71 |

**Page 69**

1  Q.  That the lawyers got right away,
2  when we all reviewed it.
3  A.  And, also, I don't like people
4  staying up all night, you know, assuming that
5  they were, working on something I'm not going
6  to do.  Just the human element.  Forget the
7  legal fees.
8  Q.  Right.  Was it a factor at all in
9  your hesitation, we'll call it, that there was
10  this title issue out there?
11  A.  No.
12  Q.  How about the environmental issue?
13  A.  No.
14  Q.  How about the settlement or
15  potential settlement?
16  A.  Well, to be clear, I wasn't going
17  to buy the property unless we got good title.
18  So, that's clearly an issue.
19  Q.  But assuming that could be
20  resolved, that was otherwise not going to
21  affect your decision on the economic
22  investment?
23  A.  That's correct.
24  Q.  Was it at all a factor that there
25  was still an environmental issue?

**Page 71**

1  "To summarize what I just told you,
2  one, I just sent the assignment document to
3  Tony of our company over to you."
4  Do you know what the assignment
5  document is?
6  A.  No.
7  Q.  Do you know what "our company" is?
8  A.  Hoboken Brownstone, I assume, but I
9  don't know.
10  Q.  "Two, earlier we signed the release
11  docs C.H. wanted, so I'm pretty sure we're good
12  with them."
13  Do you know what he's referring to
14  there?
15  A.  Okay.  So, I think what this is, is
16  we -- I think they wanted some of their costs
17  reimbursed in exchange for our taking over the
18  deal.
19  Q.  And "they" being Crescent Heights?
20  C.H. refers to Crescent Heights?
21  A.  That's right.
22  Q.  Okay.  Do you think the release
23  docs relate to reimbursement for certain costs?
24  A.  It's possible.
25  Q.  Are you speculating?

| | |
|---|---|
| Ackman - Direct                               Page 70 | Ackman - Direct                               Page 72 |

**Page 70**

1  A.  No.
2  Q.  How about that there was this
3  potential or actual settlement with the
4  pipeline company?
5  A.  I wasn't aware of it.
6     (WA-10 marked for identification.)
7  Q.  Mr. Ackman, you've been handed
8  WA-10, which is a five-page document, pages
9  numbered 173 through 177.  It's a string of
10  e-mails, starting pre-closing and ending at the
11  top on that first page with an e-mail from
12  Mr. Ganz, thanking everyone for their effort to
13  close.
14  A.  Yes.
15  Q.  Okay.  I'd like to ask you to look
16  at page 4.  Just above the middle there's an
17  e-mail from Mr. Vallone to you, Mr. Colletta,
18  your father, cc'g Ganz, O'Brien.  Let me just
19  help refresh your memory.  It says:
20  "Hi, Bill.  It's so funny, you just
21  called me as I was typing this."
22  Do you recall speaking to
23  Mr. Vallone the day of the closing?
24  A.  No.
25  Q.  He says:

**Page 72**

1  A.  I'm speculating.
2  Q.  Okay.  We don't want you to
3  speculate.  So, you don't know specifically or
4  generally what the release docs --
5  A.  I would ask George, for one.
6  Q.  Okay.  And on the next page, about
7  the middle, there's an e-mail from Mr. Ganz as
8  the closing process proceeds.  The second
9  reference he references they're looking for the
10  wire transfer.  The third sentence he says:
11  "I have signed for the liability
12  insurance as closing manager."
13  Did you understand liability
14  insurance was for the Coles Jersey as the owner
15  of the asset?
16  A.  I assume, but I don't know for
17  sure.
18  Q.  Okay.  Do you recall any
19  discussions about that?
20  A.  No.
21  Q.  It is true that at the closing on
22  the 3rd it was Coles Jersey that was acquiring
23  the property?
24  A.  That sounds like a legal thing you
25  should ask my lawyer about.

Ackman - Direct                                     Page 73

1  Q.  Okay.  So you're not sure?
2  A.  I just do what my lawyer tells me
3  when it comes down to closings.
4  Q.  Who was advising you at that
5  closing?
6  A.  Sullivan & Cromwell.
7  Q.  At that time?
8  A.  Tony Colletta.
9  Q.  You didn't attend the closing.
10  Right?
11  A.  That's correct.
12  Q.  Okay.
13  A.  Remember, this is not my day job.
14  Q.  Putting aside which legal entity
15  was the acquiring entity, which I think the
16  lawyers can find a way to agree on, if nothing
17  else, as of the closing I think we've
18  established earlier, you were the sole member
19  of Coles Jersey Development?
20  A.  Yes.  If that's what it's called,
21  yes.
22  Q.  Right.  Okay.  And we went over who
23  else became members at later dates.  Right?
24  A.  And, again, I'm not 100 percent
25  sure, but those are likely to be the other

Ackman - Direct                                     Page 74

1  members.
2  Q.  Right.  And there would be records
3  to confirm that?
4  A.  Yes, there would be.
5  Q.  You didn't attend the closing.  Who
6  attended the closing; if you know?
7  A.  I believe Danny Ganz.
8  Q.  All right.  Anyone else?
9  A.  Lawyers?  I don't know.
10    MR. DALTON: Do you mean on behalf
11  of Coles Jersey?
12    MR. SMITH: Yeah, let me make it
13  clear.
14  Q.  Obviously there was a seller and
15  there was a purchaser.  We'll leave open the
16  precise name of the purchaser, but do you know
17  who attended for the seller?  Did anybody ever
18  report to you?  Do you have any understanding?
19  A.  No.
20  Q.  Okay.  Who attended for the
21  purchaser?
22  A.  Danny Ganz was our representative.
23  I assume the Sullivan lawyers, someone would
24  have been there.
25  Q.  You don't know?

Ackman - Direct                                     Page 75

1  A.  I don't know.  I guess it could all
2  have been done over the phone, basically, by
3  e-mail.
4  Q.  Now, at the time of the closing did
5  you understand that this property was subject
6  to an easement from the pipeline company,
7  whatever it was called, whether it was Texas
8  Eastern or Spectra?
9  A.  I have a recollection there was an
10  easement for a pipeline, yes.
11  Q.  Did you understand that the seller,
12  at that point, Ogden -- did you know the seller
13  was Ogden?
14  A.  No.  The name is familiar.
15  Q.  Did you have an understanding as to
16  who the seller was?
17  A.  No.  I mean, there's Walsh
18  Trucking, there's Ogden.  I'm not sure who did
19  what to whom.
20  Q.  Okay.  It's not a gotcha.  You
21  associate Ogden, though, with this deal?
22  A.  Yes.
23  Q.  Did you have an understanding that
24  Ogden had been in litigation with the pipeline
25  company prior to the closing?

Ackman - Direct                                     Page 76

1  A.  No.  You've been suggesting that
2  over the course of this conversation, but I
3  wasn't aware of it then.  In my mind that's all
4  business.  Right?  I was just focused on are we
5  getting clean title, what are we paying.  That
6  would have absorbed my focus.
7  Q.  So, same focus July 3rd of '13,
8  which you've heard, looking at papers or
9  talking to your lawyer --
10  A.  All I wanted to know was are we
11  getting clean title to the property.  I mean,
12  there was nothing else we were getting.  There
13  are no reps, there are no warranties, there's
14  no contract.  So, it was just, you know, I'll
15  give you the money if you give me the property.
16  That was it.
17  Q.  Did you have any understanding, at
18  that time, again, July 3rd, that Ogden had
19  engaged in any kind of settlement with the
20  pipeline company?
21  A.  I did not.
22  Q.  Did you have any understanding that
23  Mr. Ganz and/or Mr. Vallone, either
24  individually or as Hoboken, had engaged in any
25  settlement with the pipeline company?

| Ackman - Direct | Page 77 |
| --- | --- |

1 A.  Not that I'm aware of.
2 Q.  Did you have any understanding that
3 the seller, Ogden, or otherwise, had made it a
4 condition of the sale that the buyer give up
5 any claim to the settlement proceeds?
6 A.  No.
7 Q.  Did you understand at
8 closing that --
9 A.  I did read something to that effect
10 in the documents I read this morning.
11 Q.  This morning?
12 A.  That's correct.
13 Q.  When we were talking about July of
14 '13?
15 A.  That's correct.
16 Q.  Okay.
17 A.  You know, I actually didn't even
18 realize you could sort of do a deal without a
19 contract.  And my lawyer told me, make sure you
20 get good title.  If you got good title I'll
21 tell you, you can wire the money.  That's what
22 I knew.  So, I can save you a lot of questions.
23 Q.  Did you understand that without
24 being able to find it on a site plan or a
25 drawing, that the purchase included that

| Ackman - Direct | Page 78 |
| --- | --- |

1 additional bit of property where there had been
2 some question about title?
3 A.  My understanding was there was a
4 question about title.  You know, I told George
5 and Danny I was not going to go forward unless
6 it was resolved.  They resolved it.  It was
7 resolved.
8   Once it was confirmed it was
9 resolved, you know, the title company was
10 prepared to give us an insurance policy.  I
11 went forward.
12 Q.  All right.  Stated differently, did
13 you understand that that issue related
14 specifically to this Lot 7 that we've been
15 talking about?
16 A.  I did not.
17 Q.  After the closing, in approximately
18 the early fall of '13, do you recall any
19 discussions with Mr. Ganz or Mr. Vallone or
20 anyone else about needing to reach some kind of
21 agreement with the pipeline company?
22 A.  I don't know about needing to reach
23 an agreement with the pipeline company, but my
24 father made me aware there was a dispute over a
25 portion of the property that the pipeline

| Ackman - Direct | Page 79 |
| --- | --- |

1 company needed to put their pipe through the
2 property.  I did become aware of that, yes.
3 Q.  And did you come to learn that that
4 dispute was resolved?
5 A.  No.  If it was resolved, why are we
6 here?
7 Q.  Good question.  Well, there's two
8 components.  Did you come to understand that
9 the pipeline company's right to the easement
10 was confirmed by a representative of yours or
11 Coles Jersey's?
12 A.  No.
13 Q.  There's two components, the
14 easement and the valuation.
15 A.  Okay.  Now you're above my head.
16 Q.  Okay.  So you never understood
17 those as two pieces of a small puzzle --
18 A.  That's right.
19 Q.  -- or any other formula?  Okay.
20 A.  I'm the high level guy in this
21 deal.  There are other people who knew more
22 than I.
23 Q.  And to the extent there were
24 day-to-day issues that might relate to things
25 like what's the way to perfect an easement,

| Ackman - Direct | Page 80 |
| --- | --- |

1 would that be your father, Greg?  Who would
2 have been involved?
3 A.  Probably our lawyers.
4 Q.  Okay.  And other than lawyers, who
5 on the Table team, to call it that --
6 A.  It could have been my dad or it
7 could be Greg.
8 Q.  Okay.  I'll try to go quickly
9 through this because I think we've touched on
10 this, but just in terms of the current status
11 of the project, you have said you had a
12 contract to purchase the outpiece?
13 A.  That's correct.
14 Q.  Any other pending or potential
15 transactions in Jersey City at this time?
16 A.  We're seeking an upzoning of the
17 property.
18 Q.  Of the Coles property?
19 A.  Yes.
20 Q.  Okay.
21 A.  So, we got the as-of-right
22 approval.  It's to sort of protect our
23 downside.  And we believe there is community
24 support and political support for an upzoning
25 of the property that would approximately double

Ackman - Direct                                   Page 81

1  the buildable unit volume.  That's why we're --
2  I was prepared to pay six and a half million
3  dollars for that piece of property, because if
4  we can double the approval, we can more than
5  double the value of that piece of property.
6  Q.  And is this upzoning -- as you
7  understand it, does it cover both the outpiece
8  and the Coles Jersey piece?
9  A.  Yes.
10  Q.  Okay.  As a unified piece?
11  A.  Yes.  I think very soon there's a
12  community board meeting about this.  And I
13  think initially it only covers the part we own,
14  because we have not yet closed on the new
15  piece.  But I think once we close on the new
16  piece we'd probably submit it, obviously, for
17  the whole block.
18  Q.  Right.  But it's your understanding
19  you can amend and bring that into some kind of
20  singular package?
21  A.  It's not my understanding, but I
22  assume that that's the case.
23  Q.  Okay.  All right.  So, with the
24  hearing upcoming there is something filed at
25  this point, as far as you know?

Ackman - Direct                                   Page 82

1  A.  I don't know the answer to that.
2  Q.  Any other approvals that are
3  contemplated?
4  A.  No.  My understanding is we have an
5  as-of-right fully approved shovel-ready project
6  for approaching 900 units, which we could start
7  building the beginning of the year, but in
8  light of the fact there's interest in an
9  upzoning, we're going to pursue that before we
10  decide to build the project.
11  Q.  Do you have any agreements or
12  options or discussions concerning selling the
13  property at this point?
14  A.  No.
15  Q.  Is it your plan to sell it or to
16  build?
17  A.  The answer is we're open-minded.
18  We're certainly not going to build it
19  ourselves.  So, we would either joint venture
20  it with a builder, sell the whole thing, or
21  somewhere in between.  You know, maybe keep
22  some, sell some, sell a block, sell the whole
23  thing.
24      But I think we want to figure
25  out -- you know, obviously we want to get this

Ackman - Direct                                   Page 83

1  upzoning before we consider any of those
2  alternatives.
3  Q.  I assume.  But you're telling me
4  consistent with what we discussed before, to
5  the extent this asset is being managed, it's
6  being managed by your father and/or Greg Liss?
7  A.  I mean, George and Danny, of
8  course.
9  Q.  And George and Danny.
10  A.  Here it's being overseen by my
11  father and Greg Liss.
12      (WA-11 marked for identification.)
13  Q.  Mr. Ackman, you've been handed
14  what's marked WA-11.  It's stamped DG 00388 and
15  389.  Have you ever seen this before?
16  A.  I don't think so.
17  Q.  It purports to be a breakup of a
18  settlement.  And I'll represent to you that
19  we've been told relating to the property at
20  issue here.
21      Under final settlement there's a
22  reference to "corner."  Does that mean anything
23  to you?
24  A.  No.
25  Q.  And just to be clear, you said a

Ackman - Direct                                   Page 84

1  moment ago you don't recall seeing this
2  particular document.  Do you recall seeing data
3  in some form breaking out or allocating a
4  settlement in connection with this property?
5  A.  No.
6  Q.  Do you recall any discussions along
7  the same subject matter, breaking out a
8  settlement and allocating proceeds?
9  A.  No.
10      (WA-12 marked for identification.)
11      (WA-13 marked for identification.)
12  Q.  Mr. Ackman, you've been handed two
13  documents.  WA-12 is a four page document.  The
14  front page is a closing report that references
15  Coles Jersey Development/Ogden Realty real
16  estate transaction.  And WA-13 is a single page
17  document captioned "Release."
18      I'm just going to ask you first,
19  look at each and please tell me, one by one, if
20  you've seen these before.
21  A.  I have not seen WA-12.  And I have
22  not seen WA-13.
23  Q.  Are you aware that there is an
24  index of closing documents in connection with
25  the Coles Jersey deal?

---

Ackman - Direct                                    Page 85

1  A.  No.  I hope there is.  I have not
2  seen it.
3  Q.  Okay.  You obviously haven't
4  reviewed it?
5  A.  I have not.
6  Q.  Has anyone mentioned anything about
7  it to you --
8  A.  No.
9  Q.  -- about any of the agreements or
10  other documents that are in there?
11  A.  No.
12  Q.  All right.  As anyone ever
13  discussed with you that in connection with the
14  closing there was an assignment of licenses,
15  permits, contracts, and other intangible
16  property?
17  A.  No.
18  Q.  Has anyone ever discussed with you,
19  or are you aware that someone on behalf of
20  Coles Jersey Development entered into such an
21  assignment with the seller, Ogden?
22  A.  No.
23  Q.  Are you familiar with Dan Ganz's
24  signature?
25  A.  No.

---

Ackman - Direct                                    Page 86

1  Q.  Has anyone ever discussed with you
2  that there was any release given in connection
3  with the closing of any proceeds relating to a
4  settlement with the pipeline company?
5  A.  No.
6  Q.  Have you ever become aware, other
7  than this moment, from what you might glean
8  from seeing this document?
9     You've never seen these before?
10  You didn't see these even this morning.
11     Correct?
12  A.  That's correct.
13     MR. SMITH: Okay.  I have nothing
14  further.  Thank you.
15     (Time Ended:  3:39 p.m.)
16     (Exhibits retained by Reporter.)
17
18
19
20
21
22
23
24
25

---

Page 87

1          C E R T I F I C A T E
2
3          I CERTIFY that the foregoing
4  is a true and accurate transcript of the
5  testimony as taken by and before me
6  stenographically at the time and place
7  aforementioned.
8          I FURTHER CERTIFY that I am
9  neither attorney for nor counsel to any of
10  the parties; parties of any of the attorneys
11  in this action; and that I am not
12  financially interested in the outcome of
13  this case.
14
15
16
17
18     _____
19     JOMANNA DEROSA, C.C.R.
20
21
22
23
24
25

# EXHIBIT 2

**From:** William A. Ackman <ackman@persq.com>
**Sent:** Monday, July 01, 2013 7:52 PM
**To:** Greg Lyss
**Subject:** Re: Bill is meeting with George and Danny and me tonight

No rush

----- Original Message -----
From: Greg Lyss
Sent: Monday, July 01, 2013 07:45 PM
To: William A. Ackman
Subject: Re: Bill is meeting with George and Danny and me tonight

I'll try to be prompt.

_____
Greg Lyss
O - (212) 652-3186
M - (917) 756-0568

----- Original Message -----
From: William A. Ackman
Sent: Monday, July 01, 2013 07:42 PM
To: Greg Lyss
Subject: Re: Bill is meeting with George and Danny and me tonight

830

----- Original Message -----
From: Greg Lyss
Sent: Monday, July 01, 2013 07:39 PM
To: William A. Ackman
Subject: Re: Bill is meeting with George and Danny and me tonight

When?

_____
Greg Lyss
O - (212) 652-3186
M - (917) 756-0568

----- Original Message -----
From: William A. Ackman
Sent: Monday, July 01, 2013 07:06 PM
To: Greg Lyss; Lawrence D. Ackman
Subject: Re: Bill is meeting with George and Danny and me tonight

Sure. We don't need to decide by tomorrow. Every other buyer will take time.

1

Exhibit No. WA-6
Date 10 16 15
Jomanna DeRo

DG-25

Ackman00034

----- Original Message -----
From: Greg Lyss
Sent: Monday, July 01, 2013 07:04 PM
To: Lawrence D. Ackman; William A. Ackman
Subject: RE: Bill is meeting with George and Danny and me tonight

Bill --

First, would you like me to come tonight?  I sat through the first hour of their meeting with Larry today.

As of now, my opinion is that I would pass on this opportunity.  We've been here before with this very piece of property with George and Danny on the verge of losing it.  There is no time to do any due diligence, negotiate an LPA, etc...  If we had some reasonable time, I might view this differently.

On the merits, I am not certain this is such an incredible opportunity that would merit jumping through the hoops of closing this in one day.  As I heard George say it, the $22mm purchase price is roughly $22/FAR.  To get to the first entitled building would be $27mm.  It is not clear how much more the costs to entitle the other two parcels would be.  Let's say another $5mm (I am using gross estimates because I have no numbers from which to work).  That gives you an all in cost of $32mm, or roughly $32/FAR.  Your father thinks this could sell for $50/FAR.  Danny said it would be worth 50%-100% more than we paid for it.  At 50% higher over 3 years, it's a wash given the expenses.  At 100%, it's a sub 20% return.  I'd rather invest more in Post Brothers deals than do this deal under these circumstances.

Let me know about tonight.

Thank

Greg


-----Original Message-----
From: Lawrence D. Ackman
Sent: Monday, July 01, 2013 6:19 PM
To: Greg Lyss; William A. Ackman
Subject: Bill is meeting with George and Danny and me tonight

They are going to present the Jersey City deal to Bill as a "get the site plan and environmental cleanup approvals and sell all or part of the property thereafter to other developers" type deal.  I think that Bill will be interested in this land speculation and therefore you should call or e-mail to him right away what your opinion is of the deal.  It has to close tomorrow or George and Danny will lose the "opportunity".

2

Ackman00035

## **<u>EXHIBIT 3</u>**

<u>RELEASE</u>

For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, The Hoboken Brownstone Company, its heirs, successors, predecessors, and assigns (collectively the "Company") hereby irrevocably and forever unconditionally release, remit, acquit, waive and discharge Ogden Realty Company, a New Jersey General Partnership, and Texas Eastern Transmission, LP, a Limited Partnership of the State of Delaware (both entities hereinafter collectively referred to herein as the "Released Companies"), for all causes of action, claims, counterclaims, suits, rights, demands, damages, injunctive or declaratory relief, costs, expenses, accounts, judgments, executions, debts, losses, obligations, rights of contribution or indemnification, attorneys' fees, and any and all other liabilities of any kind or nature or description whatsoever, whether arising at law or in equity, under Federal law, State law, common law or any other law, whether known or unknown, asserted or unasserted, express or implied, foreseen or unforeseen, suspected or unsuspected, which the Company ever had, presently has, may have, or claim or assert to have, against the Released Companies from the beginning of time until the date of this Agreement in respect of the condemnation award, or settlement in lieu of condemnation award, arising out of the permanent and temporary condemnation by Texas Eastern Transmission, LP., of certain real property located in the City of Jersey City, New Jersey, as specifically referenced in the matter of <u>Texas Eastern Transmission L.P. v. 1.73 Acres of Land, More or Less, et.al.</u> Docket No. 12-3412-SRC, including, but not limited to, Block 6005, Lots 7 and 13 on the Tax Map of the City of Jersey City.

This Release is intended to be construed to release any and all such claims and rights in respect of such condemnation award, or settlement in lieu of condemnation award, arising on or before the date of execution of this document to the fullest extent permitted by law.

The Hoboken Brownstone Company

By: _Daniel Gans_          _7/3/13_
    Daniel Gans,               Date
    Chief Executive Officer